# EXHIBIT A

AGREEMENT

BETWEEN

# YALE UNIVERSITY

&

# LOCAL 35, FUE, UNITE HERE

2002 • NEW HAVEN, CONNECTICUT

# TABLE OF CONTENTS

**ARTICLE**                                                                 **PAGE**

|       |                                              |     |
| ----- | -------------------------------------------- | --- |
| I     | Recognition                                  | 1   |
| II    | Rates of Pay                                 | 2   |
| III   | Hours of Work                                | 12  |
| IV    | Overtime                                     | 15  |
| V     | Holidays                                     | 17  |
| VI    | Vacation                                     | 20  |
| VII   | Sick Leave                                   | 22  |
| VIII  | Leaves                                       | 25  |
| IX    | Layoff                                       | 29  |
| X     | Job Vacancies                                | 32  |
| XI    | Union Security                               | 35  |
| XII   | Relations Between University and Union       | 36  |
| XIII  | Bulletin Boards and Insignia                 | 38  |
| XIV   | No Strike−No Lockout                         | 38  |
| XV    | Grievance Procedure                          | 39  |
| XVI   | Arbitration                                  | 43  |
| XVII  | Discipline and Discharge                     | 44  |
| XVIII | Seniority                                    | 45  |
| XIX   | Safety                                       | 50  |
| XX    | Employee Benefits                            | 55  |
| XXI   | Management                                   | 63  |
| XXII  | Subcontracting/Staffing                      | 64  |
| XXIII | Alternative Work                             | 73  |
| XXIV  | Training and Education                       | 75  |
| XXV   | Testing                                      | 77  |

XXVI   Miscellaneous Provisions ............................................... 78

XXVII   Nondescrimination ............................................... 81

XXVIII   Yale Student Employees................................................ 81

XXIX   Best Practices, Labor Management Cooperation................83

XXX   Casual Employees ............................................... 89

XXXI   Dining Services ............................................... 94

XXXII   Entire Agreement................................................ 94

XXXIII   Duration of Agreement................................................ 95

Letters, Side Letters, Letters of Agreement................................96

Exhibit A – Job Rates ...............................................100

Appendix -- Dental Benefits...............................................102

INDEX..................................................................104

AGREEMENT, entered into as of January 20, 2002 by and between YALE UNIVERSITY, hereinafter referred to as the "University" and LOCAL NO. 35, FEDERATION OF UNIVERSITY EMPLOYEES, AFL-CIO, hereinafter referred to as the "Union."

WITNESSETH:

WHEREAS, the University and the Union recognize and approve of the principle of collective bargaining between the University and its employees as beneficial to harmonious relations and conduct of the University; NOW, THEREFORE, in consideration of these premises, the Parties do agree as follows:

## ARTICLE I
RECOGNITION

### Section 1.1

For the purpose of collective bargaining with respect to wages, rates of pay, hours of employment and other conditions of employment, the University recognizes the Union as the collective bargaining representative of all its employees in the departments of Physical Plant, Custodial Services, Utilities, Grounds Maintenance, Dining Services, Campus Mail, Traffic, Receiving and Stores, and Fire Marshal paid on an hourly basis exclusive of executive, supervisory, professional, and clerical personnel. The word "employee" as used in this Agreement refers only to employees within the bargaining unit, and includes Yale students employed in bargaining unit jobs.

### Section 1.2

The terms and conditions of this Agreement shall have no application whatsoever to employees outside of the bargaining unit.

A. For the purposes of determining eligibility for the benefits provided under Sections 2.4, 2.5, 2.6, 2.7, 5.6 and Articles V, VI, VII, VIII, IX and XX of this Agreement, the word "employee" or the term "members of the bargaining unit" as used in said articles refers only to employees within the bargaining unit as defined in Section 1.1 above, who are regularly scheduled for twenty (20) or more hours per week in permanent jobs.

B. For the purposes of determining eligibility for benefits under Sections 20.1 and 23.5 and Articles V, VI, VII and VIII, the term "employee" shall also refer to employees within the bargaining unit as defined in Section 1.1 above, who are regularly scheduled for less than twenty (20), and with respect to Article VI, ten (10) or more, hours per week in permanent jobs.

**Section 1.3**

Except in emergencies, bargaining unit work shall not be performed by supervisory personnel.

**Section 1.4**

The terms and conditions of Sections 3.4, 4.3, 4.4, 5.1, 6.1, Articles VII and VIII, 20.1, Article XXIII, 26.4 and 26.5 shall have no application whatsoever to Yale students employed in bargaining unit jobs.

**Section 1.5**

The University shall not normally assign bargaining unit work to non-bargaining unit personnel except with reference to bargaining unit work performed by employees of subcontractors as otherwise provided in Article XXII. No managerial or professional employee of Yale University may perform bargaining unit work in the employ or on behalf of a subcontractor. Any University official involved in making a subcontracting decision for bargaining unit work shall disclose any ownership interest, other than ownership of stock in a publicly held corporation, prior to making the subcontracting decision. The University will disclose such a relationship to the Union in the event that it makes such a subcontracting decision.

## ARTICLE II
RATES OF PAY

**Section 2.1**

A. The Job Rate of pay for each job title shall be the rate of pay listed for that job title on the relevant dates in Exhibit A attached hereto and made a part hereof.

B. Effective January 27, 2002, January 26, 2003, January 25, 2004, January 23, 2005, January 22, 2006, July 23, 2006, January 21, 2007, July 22, 2007, January 20, 2008, July 20, 2008, January 18, 2009, and July 19, 2009 shall be the higher of the following:

    1. The Job Rate listed in Exhibit A for each of those dates for the employee's job title.

C. All employees who complete five (5) years of service in their labor grade shall receive as of the date of such service completion an additional forty cents (40¢) per hour wage increase. For purposes of completing the required five (5) years of service in the labor grade, time worked in classifications upgraded effective January 20, 2002, *i.e.*, Pantry Worker to Grill Worker shall count for those employees now classified in Labor Grade 5; service as Light Custodians shall count toward service as Custodians; service in a labor grade 1 Dining Services position shall count toward service in a labor grade 3 Dining Services position; all time worked in any particular labor grade shall count, whether continuous or not; and all time worked shall count for an employee who works in a particular labor grade, then works in a higher labor grade and then works in a labor grade lower than the second grade worked. This forty cents (40¢) per hour wage increase shall be a one-time increase. Once an employee has achieved this additional forty cents (40¢) per hour one(1)-time increase, the employee shall continue to receive it so long as he or she is employed in the bargaining unit, whether or not the employee stays in the same or a higher or lower labor grade, including temporary employment in a higher or lower labor grade. A Senior Groundskeeper 'A' who leaves that job title shall no longer receive the additional amount above Senior Groundskeeper, but shall receive an additional forty cents (40¢) per hour because of the completion of five (5) years of service in grade. Service for all purposes in this section shall not be considered interrupted when the labor grade for a job title changed because of an upgrade or combination into another job title or because of a change in the labor grade system.

**Section 2.2**

PROBATIONARY PERIOD

A.  A new employee hired in Labor Grade 3 or below shall be engaged
    on a probationary basis for a period of not more than thirty (30)
    calendar days. This probationary period will not include time
    when the probationary period employee's unit is closed during
    the academic calendar year. During this probationary period, the
    University is free to terminate the employment of any such person
    who is judged not to be competent or otherwise qualified to become
    a regular employee and to do so without notice or warning, or
    reference or recourse to the grievance procedure or discipline and
    discharge provisions of this Agreement. By agreement of the Parties,
    the probationary period for a new employee in Labor Grade 3 or
    below may be extended for an additional thirty (30) calendar days.
    If the supervisor feels that an employee may fail the probationary
    period, the supervisor, the employee, and a union representative
    shall consult about the matter before the probationary period has
    ended and before a final decision has been made.

B.  A new employee hired in Labor Grade 4 and above shall be engaged
    on a probationary basis for a period of not more than forty-five
    (45) calendar days. This probationary period will not include time
    when the probationary period employee's unit is closed during
    the academic calendar year. During this probationary period, the
    University is free to terminate the employment of any such person
    who is judged not to be competent or otherwise qualified to become
    a regular employee and to do so without notice or warning, or
    reference or recourse to the grievance procedure or discipline
    and discharge provisions of this Agreement. By agreement of the
    Parties, the probationary period for a new employee in Labor Grade
    4 and above may be extended for an additional forty-five (45)
    calendar days. If the supervisor feels that an employee may fail the
    probationary period, the supervisor, the employee, and a Union
    representative shall consult about the matter before the probationary
    period has ended and before a final decision has been made.

### Section 2.3
TRIAL PERIOD

A. An employee awarded a posted job vacancy in Labor Grade 3 or below in accordance with Section 10.1 of this Agreement shall undergo a trial period of thirty (30) calendar days. By agreement of the Parties, the trial period for an employee in Labor Grade 3 or below may be extended for an additional thirty (30) calendar days.

B. An employee awarded a posted job vacancy in Labor Grade 4 and above in accordance with Section 10.1 of this Agreement shall undergo a trial period of thirty (30) calendar days. By agreement of the Parties, the trial period for an employee in Labor Grade 4 and above may be extended two (2) times for an additional thirty (30) calendar days each time, or a maximum of ninety (90) calendar days.

C. If the supervisor feels that an employee may fail the trial period, the supervisor, the employee and a union representative shall consult about the matter before the trial period has ended and before a final decision has been made. In the event that an employee fails the trial period, the employee shall, upon notice of such failure, be restored to the Base Hourly Rate for his or her former labor grade and be assigned to the first vacancy that may occur in that job title subsequent to the date of his or her return from the unsuccessful trial period.

D. In the event that a Dining Services employee successfully completes the trial period for a temporary summer position, the employee will not be required to undergo an additional trial period as long as the employee does not miss more than one (1) summer working in the same job title.

### Section 2.4
SATURDAY PREMIUM

A premium will be added to the Base Hourly Rate of employees as defined in Section 1.2A. of this Agreement to compensate for regularly scheduled work performed on Saturday, for all hours worked including overtime hours, in the amount per hour per Exhibit A.

**Section 2.5**

SUNDAY PREMIUM

A premium will be added to the Base Hourly Rate of employees as defined in Section 1.2 A. of this Agreement to compensate for regularly scheduled work performed on Sunday, for all hours worked including overtime hours, in the amount per hour per Exhibit A.

**Section 2.6**

ROTATING SHIFT PREMIUM

A premium will be added to the Base Hourly Rate for employees as defined in Section 1.2 A. of this Agreement to compensate for rotating shifts, in the amount per hour per Exhibit A.

**Section 2.7**

NON-ROTATING SHIFT PREMIUM

A premium will be added to the Base Hourly Rate of employees as defined in Section 1.2 A. of this Agreement to compensate for regular non-rotating shifts, commencing 4:00 PM or later and prior to 4:00 AM, in the amount per hour per Exhibit A.

**Section 2.8**

COST OF LIVING ADJUSTMENTS

A.  For the periods shown below only, all Base Hourly Rates of pay set forth in Exhibit A of this Agreement shall be adjusted upward by one and one-half cents (1 1/2¢) per hour for each one (1) point increase in the Bureau of Labor Statistics' Consumer Price Index US City Average for Urban Wage Earners and Clerical Workers (Revised CPI-W) over the November 1998 base period reading (index base year 1982-1984 = 100).

B.  Adjustments, if any, shall be made effective and added to the Base Hourly Rates of pay as follows:

　　1.  First adjustment: Sunday, April 1, 2007 based on the difference in the CPI readings for November 2006 and February 2007.

2. Second adjustment: Sunday, July 1,2007 based on the difference in the CPI readings for February 2007 and May 2007
3. Third adjustment: Sunday, October 7, 2007 based on the difference in the CPI readings for May 2007 and August 2007
4. Fourth Adjustment: Sunday, January 6, 2008 based on the difference in the CPI readings for August 2007 and November 2007
5. Fifth adjustment: Sunday, April 6,2008 based on the difference in the CPI readings for November 2007 and February 2008
6. Sixth adjustment: Sunday, July 6,2008 based on the difference in the CPI readings for February 2008 and May 2008
7. Seventh adjustment: Sunday, October 5, 2008 based on the difference in the CPI readings for May 2008 and August 2008
8. Eighth adjustment: Sunday, January 4, 2009 based on the difference in the CPI readings for August 2008 and November 2008
9. Ninth adjustment: Sunday, April 5, 2009 based on the difference in the CPI readings for November 2008 and February 2009
10. Tenth adjustment: Sunday, July 5, 2009 based on the difference in the CPI readings for February 2009 and May 2009
11. Eleventh adjustment: Sunday, October 4, 2009 based on the difference in the CPI readings for May 2009 and August 2009
12. Twelfth adjustment: Sunday, January 3,2010 based on the difference in the CPI readings for August 2009 and November 2009

C. A decline in the aforementioned Consumer Price Index shall not result in a reduction of the Base Hourly Rates of pay set forth in Exhibit A of this Agreement.

D. As long as the index specified in this Agreement is available, it will be used as the basis for determining Cost of Living Adjustments. If the current index is modified during the term of this Agreement, it is presumed that this modified index will be the basis for determining the Cost of Living Adjustments so long as the increases provided by this Agreement are not thereby reduced. If necessary, either Party may submit the question of the modified index to an

impartial arbitrator for final and binding arbitration. The Parties shall attempt to agree upon any arbitrator with expertise in cost of living provisions. Failing agreement on any such arbitrator, the selection of the arbitrator for this purpose shall be as provided in Article XVI of this Agreement.

**Section 2.9**

JOB DESCRIPTIONS AND JOB TITLES

A.  The job descriptions set forth in Exhibit C attached hereto and made a part hereof shall be used as guides in hiring, training, promoting, assigning, and evaluating performance. An employee may be assigned to any or all of the "typical duties and responsibilities" set forth in the job description for his or her job title. No employee, however, shall be expected to perform all the typical duties and responsibilities listed at all times, and it is understood that the enumeration is representative rather than inclusive. An employee may be required to perform duties and responsibilities of lower labor grade employees in his or her craft, trade, or department when necessary to meet operating conditions or when the employee would otherwise be laid off for lack of work in his or her own job title.

B.  1.  The University shall notify the Union of any changes in the job descriptions set forth in Exhibit C at least twenty-one (21) working days prior to its desired effective date of any such change. Within those twenty-one (21) days the parties will meet to discuss the job description and attempt to arrive at mutual agreement. After consideration of the Union's suggestions, the University shall determine the new duties and make a preliminary determination of job requirements and the labor grade. If mutual agreement is reached, the new job description with associated duties, requirements and labor grade will be implemented. If no agreement is reached, the new or revised job description with associated duties, and preliminary requirements and labor grade shall be held in abeyance pending the results of job description mediation/arbitration. Such mediation/arbitration shall be held within sixty (60) days of the Unions' filing for same, which filing shall be made within ten (10) days of the meeting described above. Where either party anticipates a multiple day hearing, the

referee shall be informed and offer multiple dates within the sixty (60) day period. In the event of a continuance, the parties and referee shall agree before the close of the first hearing on a prompt continuation date. When necessary, briefs shall be filed within twenty-one (21) days of the hearing and the referee shall issue an arbitration decision within twenty-one (21) days of receipt of the briefs. The Union must accept a hearing date within sixty (60) days of filing offered by the referee unless another Local 35 arbitration hearing date has previously been scheduled within fourteen (14) days of the date offered by the referee. In the event that the Union fails to accept the offered hearing date, the job description shall be implemented on an interim basis, pending the result of the mediation/arbitration. In the event the selected referee cannot offer a date within sixty (60) days of filing, the parties will request that the next referee on the panel offer a date. The referee will hold discussions and if necessary attempt to mediate the matter, and if such mediation is unsuccessful, then the referee shall decide the appropriate job requirements and/or labor grade. The job description referee shall be selected from a panel of three (3) referees selected by the parties. In accepting appointment to the panel, the referee will indicate his or her willingness to abide by the time limits. Any referee who does not issue an award within the twenty-one (21) day period will be dropped from the panel after receipt of the decision.

2. Any downgrades will be prospective in that incumbents' grade levels will be red circled for as long as they remain in that classification including a return from an unsuccessful trial period. The University cannot downgrade any Labor Grade 11 classification in the Physical Plant, any Labor Grade 3 or 4 positions existing as of the signing of this agreement, the Custodial Service Furniture Mover classification, or any classification negotiated and agreed to by the parties subsequent to January 1, 1996.

C. If the Union believes that the University has significantly altered the duties and/or responsibilities of any job classification since the date of this Agreement, and also for the term of this Agreement (unless the parties mutually agree at contract negotiations to except any

specific job classification(s) that pre-date the Agreement) in a way that warrants a change of that job classification to a higher labor grade, or separation of one (1) classification into two (2) or more classifications, at least one (1) of which warrants a change to a higher labor grade, then the parties will negotiate and, if no agreement is reached, the question of whether a higher labor grade is warranted shall be submitted to binding arbitration before a member of the job description referee panel. This provision covers a classification whose duties and/or responsibilities have changed incrementally as well as a change that occurs at a particular time.

### Section 2.10
LICENSING

The parties agree that all bargaining unit employees in the licensable trades in Physical Plant, Utilities per that departmental agreement, Fire Control Mechanics, Grounds Maintenance Master/Mechanics, Dining Services Refrigeration Mechanic and the various LG10 Truck Driver titles with CDLs should possess the requisite license for their jobs/trade(s).

A. The University agrees to pay fifty cents (50¢) per hour to all Labor Grade 11 mechanics in Physical Plant as well as those referenced in Utilities, Fire Control Mechanics, Grounds Maintenance Master/Mechanics, Dining Services Refrigeration Mechanic and the various LG10 Truck Drivers who possess the CDL. This differential is not base building, but if earned in the five (5) -year period defined in the pension plan will be applied toward an employee's final salary for pension calculation purposes.

B. All newly hired individuals and all internally promoted employees, hired or promoted after January 19, 1992 into the licensed trades/jobs must have at the time of hire or promotion, the requisite license for the trade/job in which they will work and shall maintain a current, valid license as a condition of continued employment.

C. There will be no grievances concerning in-trade jurisdictional disputes as a result of this provision.

D. The University will reimburse an employee (except a newly-hired employee) 100% of the cost of the state occupational license required by his/her job description. The University will also reimburse 100% of the cost of an approved training course or program taken in preparation for passing a required occupational licensing exam. In addition, 100% reimbursement will be given to an employee for the acquisition of any additional occupational license(s), provided that the University determines the additional license is relevant to the employee's job title. In order to be eligible for the training reimbursement and/or the reimbursement of additional licenses, the employee must secure the approval of his or her supervisor and the Director of Facilities Management or his designee prior to commencing said training or obtaining an additional license.

E. Effective March 1, 1998, labor grade 11 employees working in a trade where a license is required by law who do not possess a license will be placed in a labor grade 11 sub-classification performing only work in their trade that does not require a license. They will be ineligible for emergency callbacks and for any overtime where they might be called to perform licensed work. They are eligible for carryover or scheduled overtime that does not require a license. When a supervisor knows that overtime work not requiring a license is available, the supervisor may offer it to employees in the unlicensed sub-classification. Any overtime offered to employees in the unlicensed sub-classification need not be equalized. The Union may not file a grievance in a case where a supervisor assigns unlicensed work to a licensed, bargaining unit employee.

**Section 2.11**

TRADES PREMIUM

A premium will be added to the base hourly rate of regular LG11 Physical Plant employees, Utilities Mechanics and Fire Control Mechanics for all hours worked including overtime hours per Exhibit A.

# ARTICLE III
HOURS OF WORK

### Section 3.1
FULL-TIME EMPLOYEES

The regular work week for full-time employees shall consist of five (5) consecutive days in a week of seven (7) days, and the regular work day shall consist of eight (8) consecutive hours in a twenty-four (24) hour period, excluding meal periods, which shall not be paid for, provided, however, that nothing contained herein shall limit the University from scheduling shorter work weeks or work days in the event of an emergency; or in a week in which a holiday falls; or during short work weeks in which operations do not require regular schedules in Dining Services. (see Section 23.6). Employees shall be available and report for the days and hours of work as scheduled or required in their jobs except for illness, injury on or off the job, or for any other bona fide reason.

### Section 3.2
PART-TIME EMPLOYEES

A.  The University shall not schedule part-time employees except as may be required to meet operating conditions. No part-time employee regularly scheduled for less than twenty (20) hours per week shall be employed in a job above Labor Grade 4, except in Dining Services: Cook's Helper I & II, Bake Shop Helper, Catering Service Attendant/ Rounds, Grill Worker, Head GSA, Head Pantry Worker; in Physical Plant: Light Truck Driver; in Custodial Services: Senior Custodian; in Grounds Maintenance: Groundskeeper. Except for student positions, no new positions shall be established after the effective date of this Agreement that are regularly scheduled for less than ten (10) hours per week.

B.  The University shall not schedule casual or temporary employees in a job listed in Exhibit A while any employee is on layoff without first offering such job to qualified, laid-off employees.

C. The University shall not schedule casual or temporary employees for more than thirty (30) days without posting such temporary job vacancy in accordance with Section 10.1A.. No temporary position shall exist for more than nine (9) months, except where the temporary position is to replace an employee on a leave of absence. No position that recurs after a maximum of nine (9) months shall be deemed temporary. The duties to be performed by an employee in a temporary position shall be specified at the time the position is created.

D. The University shall not schedule casual or temporary employees, except as may be required for special events, when the work required can be performed on a straight-time basis by regular employees within a work unit. Casual employees shall be used only in situations that the Union and the University agree are beyond the control of the University, and shall be limited to the use of casuals as special-event workers, to replace absent employees, and in the Department of Dining Services when recruiting Yale student employees for fall vacancies.

E. The University shall employ Rounds persons scheduled for at least twenty (20) hours per week in Dining Services, Grounds Maintenance and Custodial Services who shall be available to fill in for any absent employee or assist with peak workloads. The Parties shall confer regarding the appropriate number of Rounds people. In Dining Services, weekend worker positions may be expanded to include weekday shifts as All-Classification Rounds (encompassing the duties of the Pantry Worker, GSA and Desk Attendant job descriptions) along with two (2) weekend shifts in the Pantry Worker, GSA, Pantry-Desk or Desk Attendant classifications.

F. When a regularly scheduled position of twenty (20) to forty (40) hours is vacated and the University determines to fill such position, it will do so with a benefit level position.

G. Upon request, the Union shall have access to information showing work units and hours worked per week for all casual and temporary employees. In addition to the casual employee data the University

has provided to the Union, the University will indicate one (1) of the following reasons for casual usage: absent employee, special event, posted vacancy, other.

H. When extra straight-time hours are available, they shall be offered evenly to qualified employees in the same work unit.

I. If, over twenty-six (26) or more consecutive weeks, a permanent employee averages at least twenty (20) hours per week in his or her work unit, the employee will receive benefits and will be offered a schedule of at least twenty (20) hours per week.

**Section 3.3**
REDUCTIONS OF REGULARLY SCHEDULED HOURS OF WORK

A. Regularly scheduled employees shall not be subject to having their regularly scheduled hours of work reduced during the life of this Agreement without the consent of the employee. The University may transfer an employee in the same job title to fulfill the requirements of this section. The provisions of this section shall not be applicable in the event of a layoff as defined in Article IX.

B. All full-time employees and Light Custodians regularly scheduled for thirty (30) hours or more per week, who as of April 30, 1971, held jobs regularly scheduled for a Monday to Friday work week, shall continue to be so scheduled, so long as they continue to hold said jobs.

**Section 3.4**
SPLIT SHIFTS

There shall be no split shifts.

**Section 3.5**
The University shall post on the appropriate bulletin board the regular schedule of hours to be worked by each employee, and a copy thereof shall be given to the Union upon request.

**Section 3.6**

Except in emergencies, employees shall be notified during working hours when overtime is to be required and shall be notified forty-eight (48) hours in advance when premium time work outside the regular schedule is to be required on holidays, Saturdays, and Sundays.

**Section 3.7**

Employees shall receive at least one (1) calendar week's notice of the establishment of a new schedule of regular hours of work. In the event of an emergency, a temporary change in scheduled hours of work may be made without such notice. If the present schedules in the departments of Physical Plant, or Utilities, or Grounds Maintenance, or Campus Mail, or Traffic, Receiving and Stores or Fire Marshal are changed, such changed schedule shall not vary by more than one (1) hour from the present schedules.

**Section 3.8**

The Parties agree, upon request by the employees in a particular work unit, to explore the feasibility and desirability of scheduling that work unit for four (4) days per week of ten (10) hours per day. No such schedule shall be instituted without the mutual consent of the employees in the unit involved, the Union, and the University.

## ARTICLE IV
OVERTIME

**Section 4.1**

Overtime will be paid as follows:

A. One and one-half (1 1/2) times the regular hourly rate shall be paid for all hours worked in excess of eight (8) hours in any day or forty (40) hours in any week.

B. One and one-half (1 1/2) times the regular hourly rate shall be paid for all hours worked on any of the holidays enumerated under the holiday provisions (Article V) of this Agreement.

C.  Two (2) times the regular hourly rate shall be paid for all hours worked on the seventh (7th) consecutive day worked. An employee who performs work (except as provided below in this paragraph) during each of seven (7) consecutive workdays, as the workday is normally defined in that employee's work unit, shall be eligible for overtime pay pursuant to this paragraph whether or not such work was performed continuously following completion of the employee's regular shift on the preceding workday. At least two (2) hours of work shall be required to meet the conditions of this paragraph if the only work performed during that workday by the employee is as a replacement for an employee who had been scheduled to work or if the additional work is not specifically directed by the supervisor.

D.  When an employee performs work on the seventh (7th) consecutive day due to a callback, callback pay will be governed by the time of day the callback assignment begins. When actual work for the callback begins at any hour on the sixth (6th) consecutive day of work, the employee will be paid at one and one-half (1 1/2) times the regular hourly rate for the entire callback period. When such work for the callback begins at any hour on the seventh (7th) consecutive day of work, the employee will be paid at two (2) times the regular hourly rate for the entire callback period.

E.  There shall be no pyramiding of any overtime pay rate under this Article for any hours worked in the same workweek. In cases in which more than one (1) overtime pay rate is payable, the single highest rate shall be paid.

**Section 4.2**
The University will establish a list of work units and review said list with the Union. Subsequent changes in work unit definitions will be reviewed with the Union prior to implementation. Any disputes between the parties concerning such work unit definitions shall be processed through the Grievance Procedure, Article XV, and the Arbitration Procedure, Article XVI. Overtime shall be distributed evenly among available, qualified employees who normally do the work and who have signed the Overtime Work Opportunity Request Form in the work units established herein. Pursuant to Section 4.1A., a list of

employee names and overtime hours worked within the work unit for the previous week shall be posted in that work unit.

**Section 4.3**
An employee called back to work after completing his or her regularly scheduled day of work, and after the employee has left the premises, shall be entitled to a minimum of four (4) hours pay at one and one-half (1 1/2) times his or her regular hourly rate of pay, provided the employee is called back to report for work four (4) or more hours prior to the starting time for his or her next regularly scheduled day of work.

**Section 4.4**
Employees required to work two (2) or more hours of overtime at the beginning or end of the workday shall be allowed one-half (1/2) hour for meal time and shall be paid for this half hour at the overtime rate in addition to the two (2) hours, unless the University provides the meal, in which event said one half (1/2) hour period shall not be paid.

**Section 4.5**
Except on jobs for which the lunch hour is included and paid for as part of the regular working day, work done during the employee's lunch hour shall be paid for at overtime rates.

## ARTICLE V
HOLIDAYS

**Section 5.1**
An employee shall be entitled to holidays and holiday pay in each calendar year as provided herein.

A. Designated Holidays:

1. New Year's Day
2. Good Friday
3. Memorial Day
4. Independence Day
5. Labor Day
6. Thanksgiving Day

7. Christmas Day
8. Dr. Martin Luther King Jr. Day

*(Note: Employees assigned to work in units that are operating on Dr. Martin Luther King Jr. Day and who wish to take that holiday off to celebrate the birthday of Martin Luther King, Jr., must make their request in writing, no later than December 15. Such request shall be granted except in unusual circumstances. Conflicting requests from employees who request to take this holiday shall be resolved on the basis of their respective classification seniority.)*

When these holidays occur on a Saturday or Sunday, the parties shall negotiate sufficiently in advance of each of these holidays regarding the day on which such holiday will be observed in each department.

B. Floating Holidays: In addition to the above-designated holidays, there shall be five (5) floating holidays in each calendar year. The dates of four (4) floating holidays shall be determined by the University after consultation with the Union if the holiday is to be granted on a departmental basis, or after consultation with the employee if the holiday is to be granted on an individual basis. With respect to a holiday to be granted on an individual basis, the request of an employee for a specific date shall not be denied unreasonably. Employees shall receive no less than thirty (30) days notice of the date on which any other floating holidays may be taken.

C. The provisions of this Article and any other Article of this Agreement with respect to Independence Day and Labor Day shall not apply to any employee who is on seasonal layoff on either of such days, except as provided in Section 5.5 hereof.

**Section 5.2**

A. Holiday pay shall be an employee's regular hourly rate multiplied by the employee's regularly scheduled hours, except that those employees whose regular schedule is one (1) or two (2) eight-hour (8-) days per week will receive holiday pay equal to the employee's regular hourly rate multiplied by the employee's average weekly paid hours divided by five (5) for the previous six (6) month period

ending on September 15 or March 15 (or the end of the pay period ending just before or just after September 15 or March 15). Holiday pay shall be paid to an employee for each of the above holidays, whether such holiday is worked or not and regardless of whether such holiday is on a scheduled day of work.

B. A holiday shall be counted as a day worked for purposes of computing overtime pay, unless the holiday falls on the employee's scheduled day off.

**Section 5.3**
To qualify for holiday pay, an employee is required to be present on the working days immediately before and after a holiday unless obliged to be absent because of bona fide illness or unless excused for a justifiable reason with the approval of the employee's supervisor. Employees on layoff as outlined in Article IX of this Agreement shall not be entitled to holiday pay during the period of time that they are laid off for lack of work. In any case where an employee feels he or she has a justifiable reason for absence other than layoff on a day immediately before or after a holiday, the employee must submit the reason for such absence in advance thereof to his or her supervisor unless extreme circumstances make it impossible. Promptly after each holiday the University will send the Union a list of employees who do not receive holiday pay.

**Section 5.4**
If a holiday falls on a day for which an employee is qualified for sick leave pay, the employee shall be paid holiday pay for that day instead, and such day shall not be counted as a sick leave day.

**Section 5.5**
When a holiday falls during an employee's vacation, the employee shall be granted an extra day of vacation at a time consistent with the operational requirements of the University, or a day's pay in lieu thereof, in the discretion of the University; provided, however, that if the holiday falls during the vacation or layoff period of an employee who has been laid off because of lack of work in connection with the end of the school term, the employee shall not be entitled to pay for such holiday unless he or she shall have worked more than nine (9) weeks between June 15 and September 15 of the year in question. For the purpose of this

Section, vacation time shall be counted as time worked. If a holiday falls during an employee's layoff during the Christmas or spring recesses, the employee shall be entitled to pay for such holiday.

**Section 5.6**
In addition to the floating holidays outlined in Section 5.1B., for employees as defined in Section 1.2 A. of this Agreement in Dining Services there shall be one (1) additional floating holiday in each calendar year. Such holiday will be granted on an individual basis after consultation with the employee. With respect to this additional holiday, the request for a specific date shall not be denied unreasonably.

## ARTICLE VI
VACATION

**Section 6.1**
An employee regularly scheduled for ten (10) or more hours per week shall be entitled to vacation and vacation pay in each calendar year as defined herein.

A. Vacation Service Allotment: An employee's vacation service allotment shall be determined on the basis of his or her years of service as of December 31 of any year, for that calendar year as follows:

| *Continuous Years of Service as of December 31* | *Vacation Service Allotment* |
| --- | --- |
| Less than 1 | Pro rata share of two (2) weeks as per section 6.1 B. |
| 1 to 4 | 2 weeks |
| 5 to 9 | 3 weeks |
| 10 to 19 | 4 weeks |
| 20 or more | 5 weeks |

B. Vacation Share: An employee who has not completed one full calendar year of service as of December 31 of any year shall earn a one-twelfth (1/12) share of his or her vacation service allotment

for each month in which he or she has worked at least 50% of the available work days. The vacation shares so earned may be used in the calendar year in which they are earned.

**Section 6.2**

A. Vacation pay shall be an employee's regular hourly rate multiplied by his or her regularly scheduled hours.

B. A paid vacation day shall be counted as a day worked for purposes of computing overtime pay.

**Section 6.3**

An employee with one (1) or more years of service who dies, retires, is permanently laid off, is inducted into military service, or whose employment is terminated for any reason shall be entitled to vacation pay on a pro rata basis.

**Section 6.4**

So far as work requirements permit, and unless any emergency arises, employees in each work unit shall be given a choice of available vacation periods on the basis of their department seniority standing. During the last two (2) weeks of November of each year, the University shall give each employee an opportunity to make known his or her vacation preference for the following calendar year. An employee who does not make known his or her vacation preference during this period may be assigned a vacation by the employee's supervisor. Controversies between employees who choose the same vacation periods shall be resolved on the basis of their respective department seniority. No later than December 15 in each year, the vacation schedule for the following calendar year shall be posted in each work unit.

**Section 6.5**

An employee may elect to omit some or all of his or her vacation in any year and add the portion so omitted to his or her vacation for the ensuing year. This privilege shall not extend beyond a total accumulation of two (2) years' vacation privileges.

21

**Section 6.6**
Employees not on vacation shall give reasonable assistance in covering the duties ordinarily performed by employees on vacation. In no case, however, shall an employee be expected to perform more than a normal day's work.


# ARTICLE VII
SICK LEAVE

**Section 7.1**
An employee shall be entitled to sick leave pay in each calendar year as provided herein.

A.  Basic sick leave: An employee shall receive sick leave pay up to an annual basic allowance in hours equal to 2.4 times the employee's regular weekly scheduled hours. However, employees in their first year of employment shall earn a one-twelfth (1/12) share of their sick leave allotment for each month in which they have worked at least 50% of the available workdays. Sick leave shares so earned shall be credited on a monthly basis. Commencing January 1 of the next calendar year, each employee will receive an annual basic allowance in hours equal to 2.4 times the employee's regular weekly scheduled hours. An employee shall be eligible for sick leave pay after six (6) months of service, except that an employee who is obliged to be absent from work because of injuries sustained on the job shall be eligible for sick leave pay regardless of service.

B.  Accumulated Sick Leave: In any calendar year an employee shall be entitled to accumulate sick leave provided the employee uses less than his or her basic allowance during the calendar year. The employee shall then be credited with the difference between his or her basic allowance and the number of hours used until the employee has reached a maximum of two thousand seven hundred fifty two (2752) accumulated sick leave hours. These accumulated hours shall be used after the basic allowance is exhausted.

C.  Worker's Compensation Supplement: In cases in which an absent employee is entitled to payments under the Connecticut

Worker's Compensation Act, supplementary payments will be made from the employee's sick leave allowance to the extent of the difference between the employee's Worker's Compensation payments and his or her regular hourly rate multiplied by his or her regularly scheduled hours, unless the employee requests that such supplementary payments not be made.

D. Death Benefits: Should an active employee who has completed one (1) or more years of service die while on the active payroll of the University, the estate shall be paid any unused accumulated sick leave pay that would have been payable to the employee had the death not occurred.

E. Retirement: An employee retiring on or after November 1, 2003 will be paid out 25% of the employees accumulated sick time at retirement and the 75% balance will be applied toward the employee's years of service as specified below. Any employee retiring on or after January 20, 2008 will be paid out 50% of the employee's accumulated sick time at retirement and the 50% balance will be applied toward the employee's years of service as specified below. Such retiring employee shall receive additional pension service credit for the amount of calendar time covered by working days equal to the balance of accumulated unused sick leave days that the employee may have. There shall not be any actual pay for the balance of such accumulated unused sick leave. An employee who terminates while vested but does not yet collect a pension benefit from Yale shall have such time added to his or her pension service credit for all purposes. An employee who terminates while vested and begins immediately to collect a pension benefit from Yale may either retire earlier than otherwise by an amount of time equal to the sick leave credit provided in this paragraph, and begin immediately to collect a pension in the same amount that the employee would otherwise have received if retiring at the scheduled time, or may retire at the scheduled time and receive additional service credit based upon the additional credit provided by this paragraph. Although no pay will be received for the amount of additional credit provided by this paragraph, the employee's pension amount will not be reduced because this period of additional credit is unpaid.

F. Except as provided in D. and E. above, the sick leave provisions of this Agreement shall not be used in any manner as terminal leave pay at the time of an employee's retirement or severance of his or her relations with the University.

**Section 7.2**

A. Sick leave pay shall be an employee's regular hourly rate multiplied by his or her regularly scheduled hours.

B. A paid sick leave day shall be counted as a day worked for purposes of computing overtime pay.

**Section 7.3**
To qualify for sick leave pay, an employee is required to be in fact unable to work due to illness or injury, or if able to work, that medical attention was required that day to continue working. The University may in its discretion require an employee to submit proof from a health care provider (i.e. doctor, nurse, physicians assistant, pharmacist) that his or her absence was necessary and due to illness or injury. Prior to requesting medical proof, if either party detects a pattern or evidence of excessive absenteeism, a meeting with a supervisor and union representative will immediately take place to review the circumstances and share the results with the employee. The employee will be advised that further abuses may lead to disciplinary action and the requirement to submit proof from a health care provider for further absences. The University may also require proof before an employee returns to work that he or she is physically fit to return. Any employee who is found to have obtained sick leave pay under false pretenses is subject to discharge.

**Section 7.4**
An employee, upon his or her request, may receive a written statement of his or her record of accumulated sick leave days.

**Section 7.5**
Any employee who is ill and receiving sick leave at the end of any calendar year shall be entitled to the unused portion of his or her sick leave allowance for that year plus his or her basic allowance for the next

calendar year, to be used, if necessary, before the employee's return to work in the next calendar year. In the year in which such employee returns to work, the employee will be entitled to his or her sick leave allowance for such year minus the used portion of his or her basic allowance.

**Section 7.6**

In view of these provisions for sick leave pay, an employee shall give reasonable assistance in covering duties ordinarily performed by employees who are absent. In no case, however, shall an employee be expected to perform more than a normal day's work. An employee shall notify his or her supervisor or department head promptly in case it is necessary for the employee to be absent.

## ARTICLE VIII

LEAVES

**Section 8.1**

DEATH IN FAMILY

An employee, as defined in Section 1.2 A. and Section 1.2 B. of this Agreement, is entitled to be absent without loss of pay in the event of death in his or her immediate family from the day of death until no more than two (2) days after the day of the funeral inclusive, providing that such absence does not exceed three (3) days. Pay for such absence shall be the employee's regular hourly rate multiplied by his or her regularly scheduled hours. Paid time under this section shall be counted as time worked for purposes of computing overtime pay. This provision will apply only in the case of the death of the employee's wife or husband, domestic partner, child, mother or father, brother or sister, mother-in-law, father-in-law, grandparent, grandchild or a person in an equivalent relationship. Should the death of any relative covered by this section occur while an employee is on paid vacation, the employee will be credited with additional vacation days to the same extent that paid funeral leave would have been granted pursuant to this section.

## Section 8.2
JURY DUTY

An employee, as defined in Section 1.2 A. of this Agreement, who is required to be absent from work because of jury duty is entitled to supplemental pay equal to the difference between the juror's compensation for such duty and the employee's regular hourly rate multiplied by his or her regularly scheduled hours.

## Section 8.3
MILITARY DUTY

An employee, as defined in Section 1.2 A. of this Agreement, who is in the reserves of the Armed Forces of the United States or the State of Connecticut, who is required to be absent for military reserve duty is entitled to supplemental pay equal to the difference between the military compensation for such duty and the employee's regular hourly rate multiplied by his or her regularly scheduled hours. In no case shall the employee's privilege extend beyond four (4) weeks' pay in any two (2) consecutive calendar years.

## Section 8.4
UNION BUSINESS

A.  A leave of absence of up to eight (8) years may be granted to any four (4) bargaining unit employees elected or hired by the Union to full-time positions. Any such leave may be renewed for a period of eight (8) years from January 1, 2002. An employee on leave of absence for this purpose shall continue to accumulate seniority, and upon returning to work the employee shall be restored to the then appropriate Base Hourly Rate for the former job title, and shall be assigned to the first vacancy that may occur in that job title, subsequent to the date of return from the leave of absence. The provisions of Section 8.5 D. will not apply to leaves of absence under this paragraph. However, the employees may continue coverage under the retirement plan, or any portion of the insurance plans provided by this Agreement upon payment by the employees or the Union to the University the actual costs incurred by such coverage.

B. A leave of absence commencing six (6) months prior to the expiration of this agreement and terminating one (1) month after a successor agreement is reached may be granted to any three (3) bargaining unit employees elected or hired by the Union to full-time positions. An employee on leave of absence for this purpose shall continue to accumulate seniority, and upon returning to work the employee shall be restored to the employee's bargaining unit position. The provisions of Section 8.5 D. will not apply to leaves of absence under this paragraph. However, the employees may continue coverage under the retirement plan, or any portion of the insurance plans provided by this Agreement upon payment by the employees or the Union to the University the actual costs incurred by such coverage.

## Section 8.5
LEAVE OF ABSENCE

A. Period: An employee who expects to be absent from work for more than thirty (30) consecutive calendar days for good cause may be granted, upon proper application in writing on a form to be provided by the University for that purpose, a leave of absence of not more than one year in total duration.

B. Extensions: In the event that an employee on leave of absence is unable to return to work on or before the "Expected Return Date" set forth in his or her initial application, the employee may apply for an extension in the same manner as provided for in the initial application, but in no case shall the total duration of the initial leave and any subsequently granted extensions exceed one year, except in unusual circumstances and except for absences on account of illness or injury covered by Worker's Compensation..

C. Pay: Except for an employee entitled to holiday pay, vacation pay, or sick leave pay under the terms of this Agreement, an employee on leave of absence shall not be paid by the University for any day during the period covered by the leave.

D. Employee Benefits: (Health, Life Insurance, and Pensions). Except for an employee entitled to pay under the terms of this Agreement, an employee on leave of absence shall not be covered by the contributory employee benefits during the period covered by the leave unless the employee elects to make direct premium payments to the University to continue his or her coverage during the period of leave of absence. Upon such direct payments, the University shall continue to pay its share of the premium. Arrangements for such direct premium payments must be made with the Benefits Section of the Human Resources Department by the employee. The University shall continue to pay the premiums for non-contributory benefits for an employee on leave of absence.

E. Payroll Deductions: Except for an employee entitled to pay under the terms of this Agreement, an employee on leave of absence shall not be subject to any payroll deductions since such an employee shall not be receiving any pay from which such deductions can be made.

F. Other Rights and Privileges: An employee on leave of absence shall be entitled to the rights and privileges conferred upon an employee by the provisions of this Agreement. An employee on leave of absence shall be treated as if he or she were actively at work and not on leave of absence for the purpose of earning floating holidays, vacation, and sick leave in accord with Sections 5.1, 6.1, and 7.1, respectively.

G. Work from Another Employer: An employee on leave of absence may not accept work from another employer during the period covered by the leave, without the express approval of the University.

H. Unemployment Compensation Benefits: An employee on leave of absence may not apply for Unemployment Compensation Benefits in Connecticut, or in any other state during the period covered by the leave.

I. Return to Work: An employee on leave of absence shall be expected to return to work on or before the "Expected Return Date" set forth in his or her initial application, or any subsequently granted extension. If the employee has been on a disability, Worker's

Compensation, or pregnancy leave of absence, such employee shall be required to produce proof, before he or she returns to work, that he or she is physically fit to return to regular duty. In the event of a disagreement between an employee's doctor and a doctor designated by the University regarding an employee's fitness to return to the employee's former position and/or the employee's return to any work for the University, the opinion of a mutually agreeable third doctor shall be obtained, and the return to work decision shall then be made by the University doctor. That decision shall be based upon the preponderance of evidence from the three (3) opinions. Upon returning to work the employee shall be restored to the then appropriate Base Hourly Rate for the former job title, and shall be assigned to the first vacancy that may occur in that job title subsequent to the date of return from the leave of absence.

J.  Termination: An employee on leave of absence who (1) except in unusual circumstances fails to return to work on the "Expected Return Date" set forth in his or her initial application or any subsequently granted extension, or (2) except in unusual circumstances or on account of an illness or injury compensable under Worker's Compensation, fails to return to work after one (1) year from the date his or her initial leave commenced, or (3) accepts work from another employer without the express approval of the University, or (4) applies for Unemployment Compensation Benefits shall be terminated and shall be deemed to have resigned.

## ARTICLE IX
LAYOFF

**Section 9.1**

A.  No employee, as defined in Section 1.2 A. and Section 1.2 B. of this Agreement, shall be involuntarily terminated, laid off, have their classification, hours of work, or rate of pay reduced due to subcontracting, now or at any time during the term of this Agreement.

B. No employee, as defined in Section 1.2 A. and Section 1.2 B. of this Agreement who is on the regular payroll as of the signing of this Agreement shall be involuntarily terminated, laid off, have their classification, hours of work or rate of pay reduced during the term of this Agreement, except for annual temporary seasonal layoffs, provided that nothing herein shall impair the University's right to suspend, discipline or discharge employees for just cause. For the purpose of this section, an employee on temporary seasonal layoff, as of the signing of this Agreement, shall be deemed to be on the regular payroll. The provisions of this section shall not be applicable in the event of war, national emergency, or any cause, which drastically curtails the number of students attending the University or the services rendered by the University.

C. No employee as defined in Section 1.2 A. and 1.2 B. of this Agreement who is not yet on the regular payroll as of the signing of this Agreement shall be laid off or have their hours of work reduced during the term of this Agreement except for annual temporary seasonal layoffs, shut-down of an operation or work unit, the service performed by bargaining unit employees is to be discontinued or there is a significant technological change, provided that nothing herein shall impair the University's right to suspend, discipline or discharge employees for just cause.

D. In no case shall any employee, as defined in Section 1.2 A. and 1.2 B., of this Agreement, be involuntarily terminated from University employment due to staff reductions.

E. When any unit is under consideration to be closed or service is under consideration to be discontinued or substantially diminished, the University will consult with the Union as soon as possible, but in no case less than three (3) months in advance of giving notice of layoff, to permit employee input on ways to improve the unit's financial and operational situation. The University will give good faith consideration to employees' suggestions.

F. When a service is being discontinued or reduced, after the provisions of Article XVIII have been exhausted, the University may require the affected employee to bump into another job classification in the same labor grade or a lower labor grade for which he/she is qualified. The bumping employee may displace a person with less University seniority in any other job title for which he/she is qualified provided he/she may not displace an employee with ten (10) or more years of service. The bumping employee will carry his or her salary and labor grade to the new position. Employees who have been forced to bump to another classification will be restored to the original classification by seniority as vacancies arise in the original classification.

**Section 9.2**

It shall be the responsibility of any employee who is laid off for lack of work to keep the University informed as to his or her current address. In the event that the University is to recall the employee to work, it shall give him or her written notice at his or her last known address, a copy of which shall be mailed to the Union. The employee's rights to recall shall be forfeited in the event that he or she does not appear for work within ten (10) working days after the sending of such written notice. The seniority rights with respect to recall of any employee who is laid off for lack of work shall terminate twelve (12) months after the date of such layoff.

**Section 9.3**

Except in cases of legitimate emergency and other unforeseen eventualities, the University shall notify the Union sixty (60) days in advance of a permanent general layoff of employees and will consult with the Union regarding the impact of such layoff before it is implemented. For the purpose of such notice a general layoff shall be considered to be any layoff involving more than two (2) employees in any department of the University during any calendar quarter. Nothing contained herein shall curtail the right of the University to transfer personnel to any other job within the University, subject to the other terms and provisions of this Agreement.

# ARTICLE X
JOB VACANCIES

## Section 10.1
POSTED JOB VACANCIES

Qualified employees shall be given preference for jobs listed in Exhibit A when job vacancies are available.

A. Notices of jobs available and the dates they are to take effect will be posted on the employee bulletin boards on a University-wide basis for a period of not less than ten (10) days, and copies of such notices will be mailed to the Union at the time they are posted. These notices shall be posted immediately, both in the case of permanent jobs and in the case of temporary jobs expected to last thirty (30) days or more. Action with respect to filling available jobs will be taken within two (2) weeks after the deadline for filing applications for such job except that in cases in which an effective date for the job is posted, action shall be taken on or before such effective date.

B. An employee interested in being considered as a candidate for a job vacancy posted in accordance with the provisions of this Section may bid for that job in writing on a form to be provided by the University for that purpose. If an employee desires to withdraw a bid once made, the withdrawal shall be made in writing.

C. Except in emergencies and after consultation with the Business Manager or Business Agent or President or Chief Steward of the Union, no person will be hired for such job until notice of availability of such job has been posted for ten (10) days.

D. The University will notify the Union of the names of the employees who have applied and the names of the applicants who have been employed for any such jobs promptly after the job has been awarded. The proper representative of the University will also promptly inform employees who have applied but who have not been accepted concerning the reason why they were not chosen.

E.  Once posted, a job shall be filled within a reasonable time, and shall not be rescinded except for cause.

F.  Employees are restricted from bidding on temporary job vacancies in the employee's labor grade or a lower labor grade to no more than one (1) time every nine (9) months, except where the employee is applying for the job because of bona fide health problems, for an increase in hours of at least twenty-five percent (25%), or for training purposes. An employee who wishes to bid on vacancies in the employee's labor grade or a lower labor grade for training purposes will request in advance the permission of the department head where the employee desires to work. Such request shall not be unreasonably denied.

G.  An employee who has bid on and accepted more than four (4) permanent job vacancies or temporary job vacancies of more than six (6) months in the immediate previous two (2) years may not bid on permanent job vacancies in the employee's labor grade or a lower labor grade, except where the employee is applying for the job because of bona fide health problems, or for an increase in hours.

## Section 10.2
OTHER JOB VACANCIES

A.  When it is necessary for the University to temporarily promote an employee for two (2) or more hours, the employee shall be paid the appropriate rate under Sections 2.1B.1. or 2.1B.3. of the job to which he or she is temporarily promoted for the entire day on which such temporary promotion is made. The selection of the employee temporarily promoted shall be made in accordance with Section 18.3E.

B.  When it is necessary for the University to temporarily transfer an employee for ten (10) or more but less than thirty (30) days, the selection of the employee temporarily transferred shall be made in accordance with Section 18.3F. If the temporary transfer is expected to last thirty (30) days or more, it shall be posted in accordance with Section 10.1A.

C.    When it is necessary for the University to permanently transfer an employee, the selection of the employee permanently transferred shall be made in accordance with Section 18.3G.

**Section 10.3**

LEADPERSONS

A. Leadpersons may be appointed by the University on a temporary or permanent basis and such appointment shall be made in accordance with Section 10.1 and Section 18.3 of this Agreement. Prior to the selection of any bidder, the University shall notify the Union of those who have bid for the job. After consultation with the Union, the University shall select the best-qualified candidate from those who have applied. The University may revoke its selection of any Leadperson in the event that the employee fails to properly discharge the duties of the position. Leadpersons, in addition to their regular job duties, shall, at the direction of their supervisors, direct the work of and assign tasks to employees; determine the manpower and material requirements and the means and methods to be used in accomplishing work assignments; secure materials, supplies, and equipment; and train and instruct employees. Leadpersons shall not have the responsibility and authority to handle grievances, hire, discipline or discharge, or advance or promote, or effectively recommend such actions for the employees they lead. In the case of a temporary appointment, the notice required by Section 10.1D. of this Agreement shall state the prospective duration of the appointment. Appointment to a position of Leadperson shall in no way affect an employee's seniority in the bargaining unit or his or her membership in the Union.

B. An employee appointed to the position of Leadperson shall receive his or her Base Hourly Rate plus a premium per hour per Exhibit A for each hour worked as a Leadperson, and Watch Engineers, in accordance with that departmental agreement shall receive his or her Base Hourly Rate plus the Watch Engineer Lead Person premium per hour per Exhibit A

C. For the purpose of determining vacation pay under Section 6.2 of this Agreement, any employee who has worked as a Leadperson for at least six (6) months during the twelve- (12) month period immediately preceding the commencement of his or her vacation period shall receive vacation pay based on his or her Leadperson rate.

D. For the purpose of determining sick leave pay under Section 7.2 of this Agreement, any employee temporarily assigned as a Leadperson shall receive sick leave pay based on his or her Leadperson rate only for that portion of his or her illness that occurs while the employee is serving as a Leadperson and in no case beyond the expiration date of the temporary assignment as a Leadperson.

### Section 10.4
SUPERVISORY OR MANAGEMENT POSITIONS

The University shall notify the Union in writing whenever an employee is promoted to a supervisory or managerial position.

## ARTICLE XI
UNION SECURITY

### Section 11.1
UNION MEMBERSHIP

All regularly scheduled employees, including student employees, as a condition of continued employment within the bargaining unit, shall acquire membership in the Union thirty (30) days after their date of hire or thirty (30) days after the effective date of this Agreement, whichever is the later, and shall retain such membership for the term of this Agreement; provided, that such membership is available to any employee on the same terms and conditions generally applicable to other members, and that such membership is not denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining such membership.

### Section 11.2

UNION DUES, FEES, AND ASSESSMENTS

A.  The University shall, to the extent duly authorized by instruments
    of assignment, deduct the dues, fees, and assessments payable
    to the Union from the wages of each employee who shall in
    writing authorize the University to make such deductions. Such
    authorization may be revoked by the employee only during the
    last fifteen (15) days of August of any year during the life of this
    Agreement. For any employee who has authorized such deductions
    and whose dues are not deducted in any month but who remains
    in the University's employment, the University shall make a double
    deduction the following month in two (2) separate weeks. The
    University shall remit monthly to the Secretary-Treasurer of the
    Union a check for the amount so deducted, accompanied by a list
    including the names of employees for whom deductions have been
    made. In addition, the University shall mail to the Union each
    month an alphabetical list of all regularly scheduled employees in
    bargaining unit jobs.

B.  The Union shall indemnify the University and hold it harmless for
    any amounts that it is compelled to repay to any employee as a result
    of a claim that an amount was improperly paid to the Union.

C.  The University shall mail to the Union each month a list of Yale
    student employees scheduled to work in that month.

## ARTICLE XII

RELATIONS BETWEEN THE UNIVERSITY AND THE UNION

### Section 12.1

The University will make reasonable arrangements to enable the
Business Manager, Business Agent, President, or Chief Steward of
the Union to confer with its members during working hours. Such
conferences shall not unduly interfere with the employee's work
schedule. Arrangements for such conferences shall be made by the
Business Manager, Business Agent, President, or Chief Steward of

the Union with the Director of Labor Relations or the appropriate
department head or the employee's immediate supervisor.

**Section 12.2**

A. Representatives of the Union who are employees shall have the
   right to confer with employees during working hours provided that
   there shall be no undue interference with the work of the employees
   and provided that arrangements with the employees' immediate
   supervisors are made.

B. The University shall grant one (1) Officer designated by the Union
   a leave of absence as provided in Article VIII of this Agreement for
   the duration of his or her election to that position. The University
   will pay fifty per cent (50%) of his or her regular weekly earnings
   (without overtime) and the Union will pay the other fifty per cent
   (50%).

In addition, one (1) Department Steward in each Department shall be
allowed up to four (4) hours per week, with pay from the University,
at a mutually convenient time, for investigation of grievances and
communicating with members in his or her department. In the
Departments of Dining Services there shall be two (2) Department
Stewards, one (1) of which shall be allowed up to eight (8) hours per
week, and the other shall be allowed up to four (4) hours per week with
pay from the University, for these purposes. The additional four hours
may be rotated between the two (2) stewards with prior coordination
with management; and in Custodial Services, there shall be three (3)
Department Stewards (one for Residential Colleges and the Central
Campus, one for the Science Area, and one for the School of Medicine)
who shall be allowed up to four (4) hours per week, with pay from
the University, for these purposes. The aforementioned Department
Stewards shall be privileged to conduct Union business with employees
within the bargaining unit providing that there shall be no undue
interference with the work of the employees.

C. The Parties shall jointly select a bilingual employee who is not
   a Department Steward and who is capable of speaking, reading,
   and writing both English and Spanish. The employee so selected

shall be known as the "interpreter" and shall have the privilege to be absent from work for up to four (4) hours per week at a mutually convenient time to act as an interpreter for Spanish-speaking employees who speak little or no English: (1) at grievance meetings with grievants or with representatives of the University, involving a grievant who speaks little or no English, or (2) at other meetings with representatives of the University where the University requires an employee who speaks little or no English to be present. The interpreter shall be paid by the University at his or her Base Hourly Rate for up to four (4) hours per week while performing in accordance with this section.

## ARTICLE XIII
BULLETIN BOARDS AND INSIGNIA

**Section 13.1**
The University will permit the reasonable use by the Union of the regular employee bulletin boards of the University for the purpose of notifying members of the Union of:
1. Meetings of the Union
2. Union elections
3. Social, educational, or recreational affairs of the Union.

**Section 13.2**
The University shall provide an adequate number of bulletin boards in conspicuous locations for use by the Union.

**Section 13.3**
All employees shall have the right to wear Union buttons evidencing union membership while on duty.

## ARTICLE XIV
NO STRIKE—NO LOCKOUT

**Section 14.1**
The Union shall not collectively, concertedly, or individually engage in or participate directly or indirectly in any strike, slowdown, stoppage, or

any other interference with or interruption of the work or operations of the University during the term of this Agreement; and the University shall not lock out any of the employees in the bargaining unit during the term of this Agreement.

**Section 14.2**
Employees who violate these provisions shall be subject to disciplinary action including discharge; and any claim by either Party against the other of a violation of this Article shall be subject to the Grievance and Arbitration provisions of this Agreement.

## ARTICLE XV
GRIEVANCE PROCEDURE

**Section 15.1**
The purpose of this Article is to provide an orderly method for the expeditious settlement of a dispute between the Parties over the interpretation, application, or claimed violation of any of the provisions of this Agreement. Such a dispute shall be defined as a grievance under this Agreement and must be presented promptly within fifteen (15) working days after it arises and be processed in accordance with the following steps, time limits, and conditions herein set forth.

*STEP 1:*
A.  The employee with his or her Shop Steward shall first orally take up his or her grievance with his or her immediate supervisor, or with the supervisor responsible for the grievance, at a mutually convenient time. The Supervisor shall give his or her oral answer to the grievance within three (3) working days after the close of the discussion.

B.  If the grievance is not settled in the oral stage, the aggrieved employee may reduce it to writing, on a form to be provided by the University for that purpose. If the aggrieved employee is unwilling to file a grievance and such failure will prejudice the rights of other employees, the Business Manager, the Business Agent, the Chief Steward, or the President of the Union may file a grievance in writing on said form and in accordance with this procedure, on behalf

of such aggrieved employee. The written grievance shall contain the name and job title of the grievant; the date of the incident complained of; the Section of the Agreement allegedly violated, improperly applied, or misinterpreted; the facts that constitute the wrong complained of; and the relief sought by the grievant.

The foregoing shall in no way prevent the Union from amending or modifying the written grievance up to and including Step 3 of the Grievance Procedure. The form shall be signed by the aggrieved employee, dated and given within three (3) working days after the receipt of the oral answer of the Supervisor, to the Supervisor who shall within three (3) working days after the receipt of the written grievance give his or her written answer to the grievance.

*STEP 2:*

If the grievance is not settled in Step 1, the Union may appeal it, by giving a written notice of such appeal within 5 (five) working days after the receipt of the written answer of the Supervisor, to the Department Head who shall discuss it with the Union's Chief Steward, the Department Steward, the Steward, and the Grievant within 10 (ten) working days of the Department Head's receipt of the Step 2 grievance. The Department Head or his or her designated representative shall give his or her written answer to the grievance within 5 (five) working days after the close of the discussion.

*STEP 3:*

If the grievance is not settled in Step 2, the Union may appeal it, by giving a written notice of such appeal within seven (7) working days after the receipt of the written answer of the Department Head or his or her designated representative, to the Director of Labor Relations who shall discuss it with the Union's Grievance Committee at a mutually convenient time within fifteen (15) working days. The Union's Grievance Committee shall be composed of the Chief Steward, The President, The Department Steward and the Steward from the grievant's department.

The Director of Labor Relations or his or her designated representative shall give his or her written answer to the grievance within ten (10) working days after the close of the discussion. If the grievance is denied, the written answer shall give the reasons for the denial including a brief

40

explanation of the basis for the conclusion that this Agreement has not been violated.

*STEP 4:*
If the grievance is not settled in Step 3, either Party may, upon written notice given to the other Party, within 20 (twenty) working days after the receipt of the written answer in Step 3, submit said grievance to arbitration in accordance with the procedure and conditions set forth in the Arbitration provisions of this Agreement.

**Section 15.2**
The time limits herein set forth may be extended by mutual consent in writing. Absent such extension, if either Party fails to meet any time limit, the grievance shall be considered settled in favor of the other party.

**Section 15.3**
If the University claims that the Union has violated any provision of this Agreement, it may present a grievance to the Union, in writing, and if the Parties fail or are unable to settle it, the University may appeal it to arbitration, in accordance with the Arbitration provisions of this Agreement.

**Section 15.4**
A grievance which affects a substantial number or class of employees, and which the University's representative designated in Step 1 lacks authority to settle, may initially be presented at Step 2 within thirty (30) working days after it occurs or, by agreement between the parties, the Union may submit such grievance directly to Step 3.

**Section 15.5**
Any grievance concerning subcontracting shall proceed directly to Step 2 and be processed quickly and expeditiously and given first priority by both Parties.

**Section 15.6**
The Union's Business Agent may participate at any step of the grievance procedure.

**Section 15.7**

Periodically, if there is an accumulation of unresolved grievances pending arbitration, the Parties shall use the following procedure:

A.  On a departmental basis, the grievant, Department Steward, Union Business Manager, Business Agent, Chief Steward, and/or the President shall meet with the department manager and/or supervisor with representatives of the Labor Relations Department.

B.  Both sides will be encouraged to settle, compromise, and/or negotiate a mutually satisfactory settlement.

C.  Should a grievance remain unresolved, the Parties shall have the option to mutually submit unresolved grievances to informal mediation.

D.  The parties shall agree on a mediator who shall work with the parties to settle the grievance in a mutually satisfactory fashion. If no settlement is possible, the mediator would give the parties an immediate oral advisory opinion, based on the collective bargaining agreement, as to how the grievance would be decided if it went to arbitration.

E.  The fees and expenses of the mediator shall be borne equally by both the Union and the University.

F.  The Parties shall reserve the right to arbitrate any grievances. Such grievances may be arbitrated by the mediator if mutually agreed to by the parties. Otherwise, the services of an arbitrator as outlined in Article XVI will be utilized. Nothing said by the mediator in any advisory award or mediation procedure shall be used by either Party in the event the case proceeds to arbitration.

G.  Nothing herein shall be construed to modify or amend the time limits set forth in Articles XV and XVI of this Agreement.

# ARTICLE XVI
ARBITRATION

## Section 16.1

Arbitration proceedings shall be conducted under the rules and regulations, as amended, of the Federal Mediation and Conciliation Service (FMCS), which Rules are hereby incorporated by reference.

## Section 16.2

A. The Party demanding arbitration, after giving the written notice required by Section 15.1, Step 4 of this Agreement shall promptly arrange to meet with the other party for the purpose of randomly selecting an arbitrator from the designated panel.

  If a named arbitrator cannot ordinarily provide hearing dates within sixty (60) days, then the parties shall negotiate to substitute or add to the list of named arbitrators on the designated panel. Such subtraction or addition shall be by mutual agreement or by a striking procedure from an FMCS panel as described herein.

  The parties may dismiss an arbitrator from the designated panel by mutual agreement. The parties will select a replacement within sixty (60) days.

B. Hearings shall normally be held on campus at a mutually agreeable time.

C. The Panel of Arbitrators shall consist of the following:

| | |
|---|---|
| Tim Bornstein | Parker Denaco |
| Tia Denenberg | Joan Dolan J. |
| Larry Foy | Sharon Ellis |
| Linda Franklin | Roberta Golick |
| Richard Higgins | Mark Irvings |
| Craig Overton | Jeffrey Selchick |
| Michael Stutz | |

**Section 16.3**

A.  Each Party shall bear the expenses of its representatives and witnesses.

B.  The fees and expenses of the arbitrator shall be paid by the losing party if the grievance is denied in total, or if the grievance is not either denied or granted in total, by the parties as specifically allocated by the Arbitrator. The Parties jointly shall advise the Arbitrator of this provision of the Agreement at the start of the hearing regarding any grievance. If the parties commence an arbitration hearing but then settle the grievance, such fees and expenses shall be borne equally by the Parties.

C.  Any briefs to be filed shall be filed within fourteen (14) days after the end of the hearing, except by mutual agreement to extend such deadline.

D.  The Arbitrator shall issue the award in the case within thirty (30) days after receipt of the briefs, unless the Arbitrator has requested and received the permission of both Parties for an extension of such deadline.

**Section 16.4**

A.  The Arbitrator shall not have authority to add to, subtract from, modify, change, or alter any of the provisions of this Agreement.

B.  The award of the Arbitrator shall be final and binding on the Parties.

**Section 16.5**
Upon request of either party, both the Step 3 hearing and the arbitration hearing on any grievance regarded by either party as urgent shall be expedited.


## ARTICLE XVII
DISCIPLINE AND DISCHARGE

**Section 17.1**
The University retains the right to discipline and discharge employees for

just cause. Disciplinary action shall be administered by the University in the presence of the employees' steward and/or department steward, unless the employee requests otherwise. After fifteen (15) months of no further infractions, the University will remove the latest infraction from an employee's personnel file and all prior infractions issued for the same category will remain in the employee's file but shall not be used as a basis for increasing any progressive discipline for violations of a similar degree. The parties further agree that the fifteen (15) months may be reduced to twelve (12) if the parties agree to do so. No disciplinary action shall be issued for any offense known or that should have been known to the University, which occurred more than thirty (30) scheduled working days prior to the date of the disciplinary action.

**Section 17.2**
An employee who is absent from work for five (5) or more consecutive working days without notifying his or her supervisor shall be deemed to have voluntarily resigned his or her employment with the University, except in unusual circumstances.

**Section 17.3**
If the Union wishes to protest the propriety of the University's action in any case involving suspension or discharge, it must within ten (10) working days after the University's action submit a grievance in writing in accordance with the Grievance Procedure (Article XV) of this Agreement. In such case the grievance need not be presented to the immediate supervisor but may be submitted directly to the Department Head in Step 2.

## ARTICLE XVIII
SENIORITY

**Section 18.1**
Employees shall accumulate the following categories of seniority:

A. University Seniority–Length of continuous service with the University within the bargaining unit.

B.  Department Seniority—Length of continuous service in a particular department of the University as set forth in Section 1.1 of this Agreement.

C.  Classification Seniority—Length of continuous service in a particular job classification as listed in Exhibit A.

**Section 18.2**

A.  An employee shall continue to accumulate seniority during:

1.  Time spent in the Armed Services of the United States or of the State of Connecticut, or under Leave of Absence granted for active training service.
2.  Periods of Absence because of illness or injury provided the employee has notified his or her supervisor.
3.  Leave of Absence granted, provided the Union agrees thereto, for a period not to exceed one (1) year except in unusual circumstances and except for absences on account of illness or injury covered by Worker's Compensation.
4.  Long-term disability subject to the following: if an employee who is on a Leave of Absence or any renewal thereof pursuant to Section 8.5 of this Agreement begins to collect under the Long-Term Disability policy, the employee shall continue to be covered by such Leave of Absence or renewal until its expiration, except that the employee shall no longer earn floating holidays, vacation, or sick leave or collect holiday pay. After expiration of such Leave of Absence or extension, the employee shall cease to accrue seniority, but shall retain accrued seniority, which may be exercised in the event the employee becomes able and qualified to return to active employment prior to expiration of a five- (5) year period following the end of the Leave of Absence or renewal thereof. Such an employee may return to a vacancy for which the employee is qualified in the same or lower labor grade that the employee previously occupied.

B.  An employee shall retain his or her seniority rights during any period in which the employee is laid off for lack of work or his or

her employment has been terminated for reasons in no way the employee's fault, provided:

1. The employee is reinstated within a period of one (1) year or,

2. The employee is reinstated after such one-year period but works for a continuous period of one (1) year following reinstatement;

3. The employee shall not accumulate seniority during the period in which he or she is so laid off.

C. An employee shall lose his or her seniority for the following reasons:

1. If the employee quits, or if the employee is discharged for just cause.
2. If the employee fails to return to work within the period designated in his or her recall notice or is laid off for a period in excess of one year, except as modified by subparagraph 2. of paragraph B. above.
3. If the employee is promoted or transferred to a University job outside of the bargaining unit and holds such job for a period of twelve (12) or more consecutive months. An employee promoted or transferred to a University job outside of the bargaining unit for a period of less than twelve (12) consecutive months shall be subject to the provisions of Section 2.3D. of this Agreement; however, no such employee, while holding a job outside the bargaining unit, may bid against a bargaining unit employee for a bargaining unit job.

D. 1. If an employee leaves a particular department but remains a bargaining unit employee, and later returns to that department, the employee's department seniority shall include the length of earlier service in that department.

2. If an employee leaves a particular classification but remains a bargaining unit employee, and later returns to that classification, the employee's classification seniority shall include the length of earlier service in that classification.

**Section 18.3**

The above types of seniority shall be applied as indicated below:

A.  When an employee is unable to perform in his or her regular job title
    due to a permanent partial disability or a temporary partial disability
    expected to last more than thirty (30) consecutive calendar days, he
    or she may replace the employee with the least University Seniority
    in any other job title in which he or she is able and qualified to
    perform the work. The employee so replaced shall be subject to the
    provisions of Section 18.3B. below.

B.  When it is necessary, because of lack of work, to permanently lay
    off an employee in any job title, the order shall be from those with
    the least Classification Seniority within that job title to those with
    the most. An employee so laid off may replace the employee with
    less University Seniority in any other job title in the same or a lower
    labor grade provided he or she is qualified to perform the work.

C.  When there is a recall after layoff, an employee qualified to perform
    the work available shall be reinstated to University employment in
    the order of his or her University Seniority.

D.  When two or more employees apply for a posted job vacancy under
    Section 10.1, preference shall be given to the employee having the
    most University Seniority provided he or she is qualified to perform
    the work.

E.  When there is a temporary promotion under Section 10.2A. in a
    work unit, preference shall be given to the employee in that work
    unit having the most Classification Seniority provided operational
    requirements so permit and provided he or she is qualified to
    perform the work. It shall then be offered in descending order of
    Classification Seniority to qualified employees, with the least senior
    qualified employee required to accept. However, for temporary
    promotions for Grill Workers and Display Cooks the following will
    apply: When management decides to fill a temporary vacancy they
    will do so in the following manner and order: 1) The first offering
    will be to the most senior trained individual who is physically in the

unit and on the unit list for the classification; and then in descending seniority order to those trained and physically in the unit. 2) To a trained individual on the unit list for the classification who is not scheduled to work at that time. If there is more than one trained individual not scheduled to work, then work will be offered in seniority order. 3) To any other DA/PW, PW, or LG3 Rounds worker in the unit as assigned by management. All PW, PW/DA and Rounds individuals in each unit may be required to perform display cooking and or grillwork on a limited basis.

F. When there is a temporary transfer under Section 10.2B. in a work unit, preference shall be given to the employee in that work unit having the most Classification Seniority, provided operational requirements so permit and provided he or she is qualified to perform the work. It shall then be offered in descending order of Classification Seniority to qualified employees, with the least senior qualified employee required to accept.

G. When there is a permanent transfer under Section 10.2C. in a work unit, preference shall be given to the employee in that work unit having the most Classification Seniority, provided operational requirements so permit and provided he or she is qualified to perform the work. It shall then be offered in descending order of Classification Seniority to qualified employees with the least senior qualified employee required to accept.

## Section 18.4

A. All duly elected and duly authorized Officers, Trustees, Stewards, and members of the Executive and Negotiating Committees of the Union shall have preferential seniority standing with respect to permanent layoffs. In deciding questions of seniority among these groups, preference shall be given in the following order: first, President, Vice-President, Treasurer, Recording Secretary, Chief Steward, Sergeant-at-Arms; and second, Stewards; and third, members of the Executive Board; and fourth, members of the Negotiating Committee.

The seniority standing of the individuals within each of the above groups in relation to each other shall be determined according to

University Seniority except that the first group shall be in the order
stated.

B.  The six (6) Union officers shall have preference with respect to
seniority in the selection of summer job vacancies for which they
may be qualified if their regular jobs are not scheduled that summer.

**Section 18.5**
The University will check the list of employees in the bargaining unit
with the Secretary of the Union to make sure any inaccuracies are
corrected. The University will also send to the Union each quarter a list
of the names of all current employees in the bargaining unit.

## ARTICLE XIX
SAFETY

**Section 19.1**
The University agrees to provide a place of employment that shall be
safe and healthy for the employees. The University shall furnish and
use safety devices and safeguards, and shall adopt and use methods and
processes adequate to render such place of employment safe, and shall
do every other thing necessary to protect the life, health, and safety of
the employees. The University shall repair and maintain every place of
employment so as to make it safe. The term "safe" or "safety" as applied
to any employment or place of employment shall include personal
security and shall include conditions and methods of sanitation and
hygiene necessary for the protection of the life, health, and safety of
employees.

**Section 19.2**
The University shall comply with legal regulations regarding safety of
working conditions. Employees shall observe reasonable safety rules and
shall report immediately to their supervisors any accident or injury.

**Section 19.3**
Each employee shall have access to results of all medical examinations
of that employee, including but not limited to those done by the Yale

Health Plan. With the employee's permission, the Union shall have similar access.

**Section 19.4**

A Joint Safety and Health Committee shall be established composed of no more than eight (8) University-selected members and eight (8) Union-selected employees. The Committee shall be chaired by the Director of the Office of University Safety (or his/her designee). One of the Union-selected members shall be designated by the Union as Chief Union Safety Steward for Local 34 and one Union-selected member shall be designated by the Union as Chief Union Safety Steward for Local 35, for the purpose of serving as a focal point for communications and coordination of activities addressed by this Article. This committee will meet monthly, or at a schedule determined by the Committee, to review, discuss, and make recommendations related to safety and health issues at the University. By mutual agreement, the Local 34 and Local 35 portions of the Committee may meet separately with University-selected members of the Committee in lieu of the regular monthly meeting. The two Chief Union Safety Stewards shall meet with the Director in advance of the meetings to discuss the agenda. Committee meetings shall normally be held during working hours, including a one (1) hour preparation period prior to the meeting and employees serving on this Committee will be paid by the University for any of their work time spent at meetings of such Committee, or carrying out functions authorized by the Committee during their normally scheduled work hours.

Among other things, the Committee shall:

1. Make recommendations for the correction of unsafe or harmful conditions and the elimination of unsafe or harmful work practices. Make recommendations regarding safety and security in parking areas and the areas employees use to and from such parking areas.

2. Review and analyze all reports of occupational injury and illness to employees.

3. Recommend rules and procedures for the prevention of accidents and illness and for the promotion of the health and safety of employees.

4. Recommend topics for safety and health training of Supervisors, Union Stewards, and employees.

5. Distribute information to employees designed to educate and inform employees with regard to their health and safety while at work for the University.

The University shall within a reasonable time after the Committee makes a recommendation advise the Committee that it intends to accept the recommendation in full or in part, and on what timetable; or that it does not intend to accept the recommendation in full or in part, and the reason(s) for that decision not to accept; or that it needs more time to consider the recommendation.

**Section 19.5**
Upon request, the University shall provide to employees or the Union available, relevant information regarding substances in the work place or equipment design.

**Section 19.6**
Upon request, and except to the extent limited by applicable laws or regulations with the force of law, the University shall provide the Union available, relevant University records on accidents, test results, and safety records maintained by the Office of University Safety, except that no personal medical records or information regarding any University employee will be provided without the employee's written consent, unless required by law.

**Section 19.7**
No employee will be subject to discipline for refusing to perform work that a reasonable employee in a similar situation would consider unsafe.

**Section 19.8**
An employee shall first bring matters concerning safety and health to the attention of his or her Supervisor. If the safety or health matter is

not resolved satisfactorily, the employee may request the presence of the appropriate Chief Union Safety Steward. That Chief Union Safety Steward or his or her designee, who shall be a member of the Union's Safety Committee, may discuss the matter and possible solutions with area supervisors and/or the Director, at a mutually agreeable time, and the matter may be referred for discussion at meetings of the Committee.

The appropriate Chief Union Safety Steward, or a Union member of the Committee if the Chief Union Safety Steward is not available, will be advised promptly of any incident that could reasonably lead to endangering the health and safety of employees. The appropriate Chief Union Safety Steward, or Union member of the Committee, may accompany the Director or his or her designee in a review of the accident/incident.

If the employee has reasonable grounds to conclude that the performance of a work assignment, such as, but not limited to, the performance of a task without the proper safety equipment, may pose a serious and substantial threat to the employee's health and safety, the employee shall have the right to consult promptly with the appropriate Chief Union Safety Steward or his or her designee. If the presence of the Chief Union Safety Steward is necessary, he or she may be excused from work without loss of pay for purposes contemplated by this Section in accordance with the following:

A. The Union shall notify the University of the names of the Chief Union Safety Stewards and their designees.
B. Requests for time-off shall be made to the immediate Supervisor.
C. Time-off without loss of pay shall be contingent on legitimate operational needs. Authorization for such time will not be unreasonably denied.
D. The time-off requested and/or authorized shall be reasonable in duration, consistent with the needs of the situation.
E. Time-off without loss of pay will be requested and authorized only in situations that:

    1. are of significant magnitude and/or
    2. affect significant numbers of bargaining unit employees and/or
    3. pose the potential for serious health risk and/or

4. pose the potential for major misunderstandings and misinformation.

## Section 19.9
The University shall make reasonable efforts to advise each employee, through safety and health training and/or through advice on specific occasions as needed, of health and safety risks that the employee is likely to encounter in the course of the employee's assigned work.

## Section 19.10
Nothing in this Agreement shall be construed to dilute the University's authority and responsibility described in Section 1 of this Article, nor shall anything in the Agreement be construed to limit the right of employees or the Union to file grievances concerning safety and health. Whenever possible, health and safety related grievances will be filed by Union Stewards of the Joint Health & Safety Committee. In no case shall a grievance citing this article proceed to a second (2nd) step meeting without notification to the Health and Safety Union stewards.

## Section 19.11
The rights and privileges granted to the Union committee members under this Section shall be exercised with due consideration given to the operating needs of their work units and they shall request authorization to leave the work place from their Supervisors. This authorization shall not be unreasonably denied.

## Section 19.12
Drug-free first-aid kits shall be accessible at all times when employees are at work.

## Section 19.13
The Unit Safety Committee Pilot Program will be implemented by the Office of Environmental Health and Safety, giving good faith consideration to the suggestions and guidance of the Joint Health and Safety Committee, in conjunction with the departments or units involved. After a successful pilot, the program will be expanded campus-wide at a reasonable pace of expansion, consistent with available resources giving highest priority to those departments or units with the highest accident or injury rates.

# ARTICLE XX
EMPLOYEE BENEFITS

## Section 20.1
LIFE INSURANCE

An employee, as defined in Section 1.2A. of this Agreement, shall be included in the Yale University Group Life Insurance Plan, which shall provide, at the employee's option, for either contributory life insurance or noncontributory life insurance, of $5,000 as set forth in published statements and subject to the eligibility and other requirements of the plan and subject to the general limitations thereon. An employee, as defined in Section 1.2B. of this Agreement, shall be included for $5,000 of noncontributory life insurance as defined above.

## Section 20.2
YALE HEALTH PLAN

A.  An employee, as defined by Section 1.2A. of this Agreement, shall be entitled to participate in the Yale Health Plan (YHP), which now includes the types of coverage's previously provided by the Yale Health Plan Major Medical Plan. The University shall contribute one hundred percent (100%) of the premium for such plan for an employee and the employee's dependents (as presently defined in the plan).

B.  The lifetime maximum benefit under the YHP for inpatient psychiatric treatment will be $75,000 per person and for employees enrolled in the University's group health insurance plans other than the YHP who have reached the lifetime maximum for inpatient psychiatric benefits under those plans, the University will reimburse additional qualifying expenses for inpatient psychiatric treatment up to $25,000 per person. `The YHP benefit for outpatient psychiatric treatment will be $40 per visit to a maximum of $1,200 per plan (fiscal) year, with an annual deductible of $100. The lifetime maximum for such treatment will be increased to $6,000. The per-visit reimbursement shall be increased to $50 effective July 1, 2004 and to $60 per-visit effective July 1, 2006. The YHP pharmacy

deductible will be increased to 150/450 effective July 1, 2004 and 200/600 effective July 1, 2006.

**Section 20.3**

FEDERALLY QUALIFIED HEALTH MAINTENANCE ORGANIZATIONS

In lieu of the benefits provided by Section 20.2, above, an employee may subscribe to a qualified Health Maintenance Organization (HMO) offered by the University, for hospital, medical, surgical, and related services. The employee will pay each month in advance, the balance of the full premium, in accordance with the following schedules and provisions:

A.  Effective July 1, 1997, the University will offer an HMO package equivalent to the M. D. Health Plan "Standard Plan" updated January 1, 1996 with a $100/$200 Unlimited Maximum Prescription Rider.  If an employee elects such option, the employee will contribute each month in advance for the following month's coverage in accordance with the following schedules and provisions:

| | |
|---|---|
| Single | $55.07 |
| 2 Person | $82.75 |
| Family | $98.82 |

Employee contributions for the period beginning July 1, 2004, and continuing through the end of this agreement, will increase or decrease in the same percentage as any increase or decrease in the full premium of the plan.

B.  Effective July 1, 1997, the University will offer an HMO package equivalent to the M. D. Health Plan "Standard 250 Point of Service Plan" with 80/20 Coinsurance, $250 / $750 annual deductible, and $1,000 / $3,000 maximum out-of-pocket expense and a $100/$200 Unlimited Maximum Prescription Rider. If an employee elects such option, the employee will contribute each month in advance for the following month's coverage in accordance with the following schedules and provisions:

| | |
|---|---|
| Single | $76.92 |
| 2 Person | $132.06 |
| Family | $153.33 |

Employee contributions for the period beginning July 1, 2004, and continuing through the end of this agreement, will increase or decrease in the same percentage as any increase or decrease in the full premium of the plan.

C. If an employee elects any other Health Maintenance Organization (HMO) offered by the University in lieu of the above plans, and the subscription charge required for the employee's participation in the HMO is greater than the amount required under Section 20.2, the University will pay each month in advance an amount equal to what it would have contributed under Section 20.2 above, and the employee will contribute an amount equal to the balance of the required premium.

## Section 20.4
PAYMENT

A. In all cases where payment by an employee is required for participation, the University will deduct such payment from the employee's wages upon receipt of a written authorization for such purpose from the employee.

B. Monthly payments for the plans described in Sections 20.2 and 20.3 above, will be scheduled on a four times per month basis.

## Section 20.5
CHANGES IN MEDICAL BENEFITS

A. All benefits provided by this Article are subject to the provisions of the applicable insurance policy or plan.

B. The University may change or renew the carriers used to provide any group insurance plan benefits or may self-insure any of such benefits; provided, however, the University will not diminish the

57

benefits or unduly complicate the claims handling procedures except pursuant to agreement with the Union.

C.  The University will not diminish the benefits provided employees by the Yale Health Plan except pursuant to agreement with the Union.

**Section 20.6**

DENTAL PLAN

The University shall make available to employees, as defined in Section 1.2A. of this Agreement, a Dental Care Plan providing dental benefits at least comparable to those described by the Blue Cross "Co-Pay Plan" in effect as of January 23, 1985, modified to provide for 100% reimbursement for "Dental Listed Benefits A through D" provided to the employee and 80% reimbursement for "Dental Listed Benefits E through I" provided to the employee. A summary of those listed benefits is attached to this Agreement as an appendix. Any plan provided by the University (i) shall be one that utilizes dentists with guaranteed and published rates for specified services, and (ii) shall include a number of dentists mutually agreeable to the University and the Union, the determination of such number of dentists not being subject to grievance or arbitration. Employees who wish to have eligible dependents covered by the plan may elect to do so by contributing the cost of such additional coverage's, but employees who have completed eighteen (18) months or more of continuous service at the time of election are required to pay one-half (1/2) of the additional cost for such dependent coverage. If the premium required for the employee's participation in the Dental Care Plan is greater than the amount the University is obligated to contribute under this section, the University will deduct from the employee's pay, upon receipt of a written authorization for such purpose from the employee, the additional amount required for full payment of the premium.

The dental coverage includes the equivalent of the Blue Cross Rider A, Additional Basic Benefits. A summary of these benefits is attached to this Agreement as an appendix.

**Section 20.7**

FUTURE IMPROVEMENTS

Any health insurance benefit programs or improved University contributions thereto made available to University employees outside the bargaining unit shall be made available to an employee as defined in Section 1.2A. of this Agreement to the same extent.

**Section 20.8**

RETIREMENT BENEFITS

A.  An employee, as defined in Section 1.2A. of this Agreement, shall be included in the Yale University Staff Employees Retirement Plan, as set forth in the published statements and subject to the eligibility and other requirements of the plan and subject to the general limitations thereon. The University shall maintain said retirement plan in full force and effect for the life of this Agreement.

1.  An employee who retires on or after January 20, 2002 shall have his or her retirement income under the Yale Staff Employees Retirement Plan calculated using the following schedule of multipliers:

| Portion of Employee's Pre-Retirement Wage Base | Multiplier |
| --- | --- |
| Up to 30,000 | 1.5%, |
| above $30,000 to $55,000 | 1.4%, |
| above $55,000 | 1.3%. |

Beginning in January 2004, the tier definition amounts will be adjusted on the dates of across-the-board wage increases by the average (mean) of the across-the-board increases for Local 35 and Local 34.

2.  The Yale Staff Employees Retirement Plan will provide that for employees who retire at age 55 or older with thirty (30) years or more of credited service, the actuarial reduction of benefits for retirement prior to age 65 shall be two percent (2%) times the

number of years below age 65. For employees who retire with twenty-five (25) years or more of credited service, there shall be no reduction of benefits for years after the 60th birthday

3. If an employee who is vested in the Yale Staff Employees Retirement Plan dies before age 55 and is survived by spouse and/or minor children, there shall be no discount factor in the benefit, and the survivor's benefit will be paid beginning immediately to spouse and/or minor children that would have been provided under the surviving spouse option had the deceased participant reached age 55. Health benefits of the surviving spouse and/or minor children shall be continued for two (2) years or until the spouse becomes eligible for equivalent coverage, whichever comes first.

4. The Yale Staff Employees Retirement Plan shall be amended to provide a cash-out option for terminated vested employees.

5. An employee, as defined in Section 1.2A. of this Agreement, shall, upon retirement, be provided with $5,000 of non-contributory life insurance, pursuant to the Yale University Group Life Insurance Plan.

6. The supplemental retirement program will be modified so that the University will provide, for employees age 45 and over with at least five (5) years of service, a dollar-for-dollar match of employee contributions up to four percent (4%) of the annual salary of the employee and for any other employee with at least two (2) years of service, a dollar-for-dollar match of employee contributions up to two percent (2%) of the annual salary of an employee. This program will commence and employees may begin making contributions on January 1, 1998 or earlier as provided in C.3., below.

B. The University will provide the following benefits for an employee with ten (10) years of credited service who both retires from the University and commences receiving benefits from the Yale Staff

60

Retirement Plan: 1) a life insurance policy in the face amount of $5,000; and 2) if the retired employee was a participant in the University's group health insurance plans, or in a sponsored HMO, or in the Yale Health Plan at the time of retirement and is by virtue of his or her age ineligible for Medicare, the University shall contribute all or a portion of the premium for an individual contract covering the employee as scheduled below:

1. For retirees with twenty (20) or more years of credited service on the date of retirement, and for retirees employed prior to January 19, 1992 with ten (10) or more years of credited service on the date of retirement, the University will contribute 100% of the same amount that it would contribute if the employee continued to be employed by the University.
2. For retirees who were employed on or after January 19, 1992 and with ten (10) but less than twenty (20) years of credited service on the date of retirement, the University will contribute 80% of the same amount that it would contribute if the employee continued to be employed by the University.

C. If (or when) the retired employee is eligible for Medicare, the employee's University group health insurance plan participation, or sponsored HMO or his or her Yale Health Plan participation or other coverage, if any, shall be discontinued, and the University shall contribute toward the cost of a retiree health insurance package that will include Medicare Part B, Blue Cross 65 High Option, Blue Shield 65- Plan 81 and the Yale University Major Medical Plan, or other plans with equivalent coverage's. Such contributions shall not exceed 100% of the coverage cost for retirees identified in B.1. above, and shall not exceed 80% of the coverage cost for retirees identified in B.2. above.

However, commencing no later than January 1, 1998, a mutually acceptable Medicare Risk HMO will be substituted in place of Blue Cross 65 High Option and Blue Shield 65-Plan 81 and the Yale Major Medical Plan as the standard, no contribution retirement medical care option for retirees age 65 and over and their eligible dependents. The University will continue to pay the Medicare Part B contribution for retirees age 65 and over and their eligible dependents.

1. The mutually acceptable Medicare Risk HMO will have co-pays and primary features at least equivalent to the US Healthcare Medicare 5 plan plus an unlimited prescription rider after a $10 per prescription co-pay and an out of network option after co-pays and deductibles are met. Among plans meeting these criteria, the primary selection criteria will be objective evidence of quality of care and strong panels in primary care and important specialties in Connecticut and especially in the New Haven area. If these are also relatively equal, secondary selection criteria may include premium cost and easily available shorter term out of state coverage.

2. The existing Blue Cross 65 High Option and Blue Shield 65-Plan 81 and Yale Major Medical plan will continue to be offered as an optional coverage for a monthly premium of $40.99 for the retiree and $40.99 for the spouse. Premiums will increase annually by the same percentage as the underlying Blue Cross 65 High Option and Blue Shield 65-Plan 81 and the Yale Major Medical plans.

3. For an employee who both retires from the University on or after January 18, 1992 and commences receiving benefits under the Yale Staff Retirement Plan, the University shall contribute toward the health insurance of that employee's eligible dependent in the same manner and at the same level as afforded the retiree. When (or if) the eligible dependent is eligible for Medicare (age 65 or over), participation in the group insurance, HMO or Yale Health Plan will be discontinued and contribution to health insurance will be made in the same manner and at the same level as afforded to a retiree who is eligible for Medicare.

**Section 20.9**

LONG TERM DISABILITY

All employees, as defined in Section 1.2A. of this Agreement, shall be included in the University's existing long-term disability program. The University may change the carrier used to provide this benefit or may self-insure the benefit, provided, however, the University will not diminish the benefits or unduly complicate the claims-handling procedures except pursuant to agreement with the Union.

### Section 20.10
MORTGAGE LOAN PROGRAM

The University will continue its mortgage loan program for members of this bargaining unit, as defined in Section 1.2A. of this Agreement, to the same extent and on the same terms as it continues in effect for other University employees.

### Section 20.11
EMPLOYEE ASSISTANCE PROGRAM

The University shall continue to provide an Employee Assistance Program, which will not be operated at the Yale Health Plan. It will be available to all employees without charge.

### Section 20.12
SCHOLARSHIP FOR SONS AND DAUGHTERS

The University shall continue in effect the Scholarship Program for Sons and Daughters for members of this bargaining unit to the same extent and at the same levels as it continues in effect for other University employees. The program will include full-time attendance at a community college. Employees with a permanent schedule of thirty-five (35) or more hours per week will be considered full time for this benefit only and must meet the other qualification criteria of the plan.

## ARTICLE XXI
MANAGEMENT

### Section 21.1
Except as otherwise provided in this Agreement, nothing in this Agreement shall be deemed to limit the University in any way in the exercise of the regular and customary functions of management, including, among other things, the direction of the working forces; the establishment of methods of operation; the promotion and demotion of employees; the establishment of plans for increased efficiency; the adoption and maintenance of engineering standards and standards of performance and quality; the right to hire, suspend, or discharge

for proper cause; the right to select or employ supervisory employees, including foremen and their assistants; the right to transfer or relieve from duty because of lack of work; the right to determine from time to time the number of hours worked per day and per week; and the right to establish and enforce reasonable rules and regulations pertaining to personal conduct and deportment of employees and the determination of employee competency.

**Section 21.2**
The provisions of this Agreement shall not be used by either party arbitrarily, capriciously, or in a discriminatory manner with respect to the University, the Union, or its members.


## ARTICE XXII
SUBCONTRACTING/STAFFING

The provisions of this Article (hereafter called the "Subcontracting/ Staffing article") shall apply for the duration of this collective bargaining agreement (effective January 20, 2002 through January 20, 2010) and for the duration of a successor to this agreement, which the parties agree shall be effective from January 21, 2010 through January 20, 2014.

**Section 22.1**
The University may subcontract any work. The Union may not grieve the University's decision to subcontract work but it may grieve violations of the restrictions and guarantees hereinafter.

A. Effective upon the ratification date of this collective bargaining agreement and continuing for the duration of this subcontracting/ staffing article, the University will not reduce the number of full-time equivalent positions (ftes) in the bargaining unit below 733.46. Effective January 21, 2006, the University will not reduce the number of full-time equivalent positions (ftes) in the bargaining unit below 858.

B. Effective upon the ratification date of this collective bargaining agreement and continuing for the duration of this subcontracting/

staffing article, the existing labor grades will have three brackets: labor grades 1 through 4; 5 through 9; and labor grades 10 and 11. Trades Helper Program positions are part of the labor grade 10 and 11 bracket.  The University agrees to maintain minimum staffing in the upper two labor grade brackets at the following levels:  146.04 ftes in the second bracket (labor grades 5-9) and 268.39 ftes in the third bracket (labor grades 10 and 11).  Effective upon the ratification date of this collective bargaining agreement all LG 11 trade positions vacated in the Physical Plant (Medical and Central/Science) through December 31, 2004 will be replaced by LG 11 trades positions.

C. Effective upon the ratification date of this collective bargaining agreement and continuing for the duration of this subcontracting/ staffing article, the University agrees to maintain minimum staffing in the departments at the following levels:

| | |
|---|---|
| Dining Services | 189.02 |
| TR+S | 6.75 |
| Custodial Services | 235.13 |
| Campus Mail | 9.38 |
| Grounds Maintenance | 39.00 |
| Utilities | 37.50 |
| Fire Marshall | 6.75 |
| Physical Plant | 190.80 |

D. The base staffing levels for the Custodial and Physical Plant Departments will be reviewed on an annual basis beginning July 1, 2004.  The staffing levels would move downward proportionately if the University closes buildings or major space therein (a subcontract is not an elimination of or reduction in services.)  The staffing levels would move upward proportionately if the University opens

new University-owned and -occupied buildings used for academic, administrative or research purposes.

For each 10, 000 square feet added or deleted, .24 fte Custodial positions and .18 fte Physical Plant LG 11 trades positions shall be added to or deleted from the base staffing levels.

Footage added as part of Payne Whitney Gym renovations will not count toward any increase in staffing levels.  Should the University construct a facility dedicated to temporary (while the new location remains under construction) relocation, it would not count toward any increase in staffing levels, unless the occupancy ceases to be temporary.

Any project which substantially renovates greater than 20,000 square feet of space, excluding residential facilities, and substantially changes or intensifies or de-intensifies the use of that space, will trigger an adjustment, up or down, in the base staffing levels, as defined in the table below.  The factors are applied per 20,000 square feet, or fraction thereof.

| Type of change | Physical Plant | Custodial |
|---|---|---|
| vacant to office | .2 | .4 |
| office to lab | .2 | none |
| vacant to lab | .3 | .3 |

E.  Carryover overtime on jobs in progress will be offered to the group (i.e. bargaining unit or subcontractor) that began the work.

F.  Emergency callbacks and standby duty will be offered first to bargaining unit employees in areas where bargaining unit employees normally perform the work, except for: 1) emergencies which by their size or nature can not be handled by normally available bargaining unit employees; 2) work on items under warranty; 3) work on items which the subcontractor has installed or made repairs in the preceding year.

The University may introduce a new system for expediting call back calls, including the following provisions: 1) In the control mechanics, equipment mechanics, plumbing and electrical trades the University will furnish any employee interested in accepting callbacks a beeper. The University will beep all employees when a callback is available. Employees will have ten (10) minutes to call the control center and express interest in the work. The work will be offered to the employee (or employees where multiple employees are required) with the highest priority position on the callback list who responds during the ten- (10) minute period. 2) In other Physical Plant trades, the University will call at least the top five (5) employees on the call back list for the trade when call back work is available. Before changing over to a new system, the University and Union Physical Plant subcommittee representatives for the affected area will meet to work out the detailed implementation of the system and to discuss measures to make the callback systems work better including purging lists. The remedy for equipment or dispatcher error is to ensure that the employee is offered opportunity for the proper equalized share of work during the equalization period.

Where scheduled Physical Plant work will be performed on an overtime basis by a subcontractor in areas where bargaining unit employees perform the work, it will be offered to bargaining unit employees first.

In the following exceptional circumstances, the University may subcontract the work described above which would normally be performed by bargaining unit employees:

    a)  The skills or equipment are unavailable within the bargaining unit; or,

    b)  The date for completion is made known on short notice with a deadline that cannot reasonably be postponed, and such deadline cannot be met with available skills or equipment; or,

    c)  The cost of performing the work is unreasonably high as compared to the bid of a subcontractor paying the prevailing rates in the community. "Prevailing rates" shall refer to the prevailing wage determination for this area made by

the U.S. Department of Labor or the Connecticut State Department of Labor, if one is available.  The following are typical examples of conditions that would meet the test of this Subsection above if they made the cost of performing the work unreasonably high, and thereby permit the University to subcontract work without violating the Agreement:

1. Where a public or private grant or contract requires the University to secure competitive bids before performing the work.

2. Where the work to be performed is at a Yale property remote from New Haven.

3. Where the special expertise of the subcontractor allows for performing the work in substantially less time than that of Yale employees.

4. Where a special parts inventory would be too costly to maintain.

5. Where the labor involved is covered by a warranty or guarantee.

6. Where the subcontractor provides replacement equipment while Yale's defective equipment is being repaired.

7. Where the work to be performed is highly seasonal in nature and the employment or year-round employees is not justified.

G. The current practice regarding catering in University auditoriums will continue, and the University agrees not to subcontract bargaining unit food service work in Yale University Dining Services facilities.

H. In work areas staffed by bargaining unit custodians, the University will continue to offer all types of extra straight time work required

by management to permanent Custodial Department employees per Section 3.2H. Such extra-time work will not be diverted to subcontractors. The previous sentence is not intended to limit the University's ability to make legitimate schedule or operational changes which may result in lower availability of extra straight time, for example, by increasing permanent schedules, or reducing or eliminating work.

I. The minimum wage for employees of subcontractors performing work for the University will be $10.00 per hour effective with the ratification of this agreement. On each annual raise date thereafter, this rate shall increase by three percent (3%).

J. When Local 35 bargaining unit work is contracted out, the University shall give preference to employers that are located in New Haven County and who give preference for employment to residents of New Haven County. Preference shall go to employers meeting these criteria if other factors are substantially equal.

K. In the event that the University decides to subcontract work which will require the transfer of any permanent employee the University will give the Union sixty (60) calendar day notice of such transfer and the following provision shall apply. For the first fifty (50) days of the sixty (60) day notice period, any permanent employee facing involuntary transfer due to a decision by the University to subcontract shall have preference for any requisitioned vacancy, posted or un-posted, for which the employee is qualified in the employee's department, in the employee's labor grade or any lower grade, scheduled for the same or fewer hours than the employee is scheduled for (for this purpose only, any schedule of thirty-five [35] hours or more shall be considered a schedule of forty [40] hours). Should more than one permanent employee facing involuntary transfer due to a decision by the University to subcontract desire a position, the employee with the most University seniority shall be awarded the position.

In the event that an employee has not found a new position within the first fifty (50) days of the sixty (60) day notice period, the University may require the employee to bump into a position in the

department in the same labor grade or a lower labor grade for which he/she is qualified.  The bumping employee may displace a person with less University seniority and the same or fewer scheduled hours, provided he/she may not displace an employee with ten (10) or more years of service.  The bumping employee will carry his or her salary and labor grade to the new position.  Employees who have been forced to bump to another classification will be restored to the original classification by seniority as vacancies arise in the original classification.

**Section 22.2**
This article and Article IX—Layoff, shall remain in full force and effect for the period set forth in the introductory paragraph hereof.  They shall not be a subject of mandatory negotiation, strikes or lockouts with respect to their inclusion as the exclusive subcontracting/staffing and layoff articles of the successor to the January 20, 2002 through January 20, 2010 agreement, except that only the issue of whether new and renovated buildings which come on line subsequent to ESC, CAB, TD, Vanderbilt and Pierson will be staffed by Local 35 can be bargained (mandatory subject of bargaining) in 2010 contract negotiations (Does not apply to balance of Articles IX and XXII). Prior to January 21, 2014, either article may be modified or amended only by mutual written agreement between the parties resulting from voluntary, non-mandatory bargaining except as noted in this section. Both articles shall be a subject of mandatory negotiation for a successor to the agreement effective January 21, 2010—January 20, 2014 and shall remain in full force and effect until and unless mutually changed by the Parties.

**Section 22.3**
The Parties agree that all pending grievances relating to subcontracting are hereby withdrawn with prejudice and no grievances relating to subcontracting shall be filed for the period prior to ratification.

**Section 22.4**
The Joint Labor-Management Best Practices Committee established pursuant to Article XXIX, or a mutually agreeable structure there-under shall research, design, and implement "best practices" for work associated with the new and existing buildings referred to in this Section.

"Best practices" shall mean practices that substantially increase productivity, efficiency and satisfaction of employees or managers or improve the quality of services performed within given financial resources.

The Committee members will first receive training funded pursuant to Section 29.13 in interest-based problem solving, performance measurement and high performance organizations.  The Committee shall then develop "best practices" for the buildings referred to in this Section and where appropriate research, identify, and review existing industry standards and practices; solicit employee, management and stakeholder input; solicit outside technical assistance; assess future trends in technology, and their likely impact on staffing; review safety considerations for trade related work; review subcontractors practices and results and determine their effectiveness against industry standards; develop and implement metrics and measures, including financial performance, efficiency and quality; review current work rules and the utilization of people, training, investment in technology and equipment, job descriptions, staffing etc., for necessary modifications in order to implement "best practices;" review and monitor results and compliance with best practices that are implemented.  Base line data will be collected so trends can be detected and progress measured over time. Progress will be reviewed and best practices refined as learning occurs. The Committee will also develop a process to communicate results to stakeholders and recommend remedial action if necessary.

Mutually agreed best practices that change and/or modify work rules, job descriptions, or other matters contained in the labor agreement shall supersede the terms of the labor agreement, except that the Committee shall not change wage rates assigned to pay grades. Different departments doing different types of work may need to tailor best practices so as to address their particular concerns.  However, like work should be uniform.  All best practices shall be reduced to written agreements and signed by both parties. Failure of the subcommittee or mutually agreed structure to mutually agree on best practices to be implemented in ESC, CAB, TD, Vanderbilt and Pierson or the failure of a demonstration project in one of these buildings prior to January 20,

2010 shall be referred to the Best Practices Policy Board for review and an intensive effort to reach agreement in the thirty (30) days subsequent to referral. Absent such agreement during the thirty (30) day referral period, the University reserves its rights to subcontract per Section 22.1.

Upon agreement regarding best practices to be implemented in ESC, CAB, TD, Vanderbilt or Pierson and after training of joint committee members from a particular building, such best practices shall be jointly implemented in the initial demonstration buildings referred to in this Section at the first reasonable opportunity to allow access of Local 35 staff, subject to the terms of current subcontractor obligations. Nothing herein prevents the University continuing the use of subcontracts in any capacity it chooses in or at any location, consistent with the terms of this Article. The initial demonstration buildings to be staffed by Local 35 after mutual agreement and approval on best practices and training shall be ESC, CAB and TD. There shall be joint input regarding criteria for any new hire for these buildings. All jobs in these sites shall be posted except that previous TD Dining Hall employees shall automatically return to TD and Custodial employees shall return after discussion per past practice.

Vanderbilt and Pierson shall thereafter become demonstration buildings staffed by Local 35 provided mutual agreement and approval on best practices has been attained on initial sites, training has been completed, initial problem-solving engagement in initial sites is underway and the initial sites are demonstrating reasonable progress.

Boyer, Calhoun and Peabody are potential initial secondary demonstration buildings and the University shall have the sole discretion of determining when these projects shall begin.

**Section 22.5**
SNOW REMOVAL

Subcontractors will complement the work of Grounds Maintenance workers in accordance with the snow removal agreement that is incorporated herein by reference.

## ARTICLE XXIII
ALTERNATIVE WORK

**Section 23.1**
The University will offer Alternative Work for fifty-two (52) weeks
per year to employees, as defined in Section 1.2A. of this Agreement,
if they desire work and if their positions are for fewer than twelve (12)
months per year. Employees will be scheduled such that their regular
straight-time weekly income is not decreased while they are performing
Alternative Work.

**Section 23.2**
Employees in Labor Grades 1 through 6 who work as painters during
Alternative Work periods will be paid at the Labor Grade 6 rate. The
trial period for these employees will be thirty (30) working days during
any Alternative Work period.

**Section 23.3**
Dining Services employees who are eligible for alternative work
during the January recess will be assigned to alternative work projects,
including cleaning, in Dining Services departments. In addition to
meeting the requirements of Section 6.4 with respect to submitting
vacation requests and posting of the vacation schedule, March 1st of
each year will be utilized as a final cut-off date for employees to submit
changes to summer vacation requests. After March 1, all requests will be
finalized, and except in an emergency, there will be no changes to the
submitted requests.

**Section 23.4**
When work is available during alternative work periods in the
employee's home department in normally seasonal work units, such
work shall be offered in the following order: 1) By seniority in the
affected job classifications to employees in the work unit in which the
work exists. 2) To those employees from other units who are medically
or otherwise unqualified to perform alternative work. 3) By seniority
in the affected job classifications to employees from other work units
department–wide who have indicated a preference to remain in

their home departments and who are not scheduled in twelve- (12) month positions. 4) To those employees from the home unit based on regularly scheduled hours and classification seniority (from least to most) from those employees having 15 years or less University seniority. 5) If insufficient staffing for such home department work results, the University shall have the right to assign or temporarily transfer the least senior employees, based on regularly scheduled hours and classification seniority (from least to most) if they desire work and their positions are for fewer than twelve (12) months per year, to vacancies in their home departments. However, employees shall be assigned to their home unit in the event that a conference or other similar event is scheduled to last two (2) weeks or less or in the case where the scope of the conference or event changes within 30 days of the event. When work is available during Alternative Work periods in the employee's home unit, assigned employees will be scheduled for work during alternative work periods so that their weekly earnings are at least equal to their regular straight-time earnings.

**Section 23.5**

After all employees as defined in 1.2A. of this Agreement have been offered work, employees as defined in 1.2B. of this Agreement shall be assigned work up to their regular number of hours of work for the summer recess period only. These employees shall be assigned to work in their home department, or to Alternative Work if it is available and the employees are available and qualified to perform the work. If Alternative Work is offered pursuant to this Section, it shall be offered to employees on the basis of their regularly scheduled hours and University Seniority within job title, in descending order. Nothing in this Section shall preclude the University from assigning additional hours of work, if such work is desired.

**Section 23.6**

The University shall ensure that no employee loses more than seven (7) days work per year as the result of days during "short work weeks" on an employee's regular job when alternative work is not offered by the University. Employees must notify their immediate supervisor in writing as soon as they have lost five (5) days of work due to "short work weeks." Management will not incur any liability under this section if the required notice is not given. The University agrees to confer with the

Union regarding ways to find productive work for employees who lose work on such "short work week" days.

**Section 23.7**
Any employee who does not wish to accept Alternative Work shall be entitled to a leave of absence with the privilege of taking alternative employment during such leave if the employee desires. Once an employee is assigned to alternative work they will be prohibited from leaving and then returning to alternative work except for those employees with pre-approved vacations and leaves.

**Section 23.8**
Prior to the commencement of the January, Spring,  Pre-Commencement and summer recess periods, Dining Services and Union representatives will meet to discuss alternative work and Dining Services assignments.


ARTICLE XXIV
TRAINING AND EDUCATION

**Section 24.1**
The University and the Union recognize the importance to employee morale and to efficient operation for sufficient opportunities for personal and professional growth by employees within their own jobs or trades, as well as advancement to better jobs or different trades. Among other needs in this area, the Parties agree that it is mutually advantageous for employees in more skilled or specialized jobs to have the opportunity to keep abreast of developments and improvements in the technologies, methods, and materials related to their trades.

**Section 24.2**
Upon successfully completing courses or authorized training programs related to his or her job, or to job opportunities within the University, any qualified employee shall be reimbursed by the University 50% of the cost of tuition of such course or program. In order to be eligible for this 50% reimbursement, the employee must secure the approval of his or her supervisor and department head, which approval shall not

be denied unreasonably. This Section applies to training taken by the employee on the employee's own time.

**Section 24.3**
In an effort to ensure that employees keep current with "the state of the art" in their respective trades, training seminars or short courses will be conducted in certain areas where required. The determination of the requirement under this skills training program will be based on recommendations submitted by employees and supervisors to a Skills Training Committee. This committee will include an equal number of representatives from the bargaining unit and from management and will meet periodically to review requirements and to recommend courses to the appropriate department managers. For Dining Services employees such training may be scheduled on days when the employees would otherwise not be scheduled to work.

**Section 24.4**
The Parties shall establish a Joint Committee, consisting of four (4) members selected by the University, four (4) selected by the Union, and a Chairperson mutually agreeable to both parties. This Joint Committee will explore appropriate training and educational programs and opportunities, and make recommendations to both Parties.

**Section 24.5**
The parties have agreed to establish certain training programs in the Departments of Physical Plant and Dining Services. These training programs are described in separate letters that are hereby incorporated into this Agreement. Admission to these programs is reserved for members of this bargaining unit. The Trades Helper Committee, which shall consist of an equal number of University and Union representatives, shall be responsible for the direction of these programs. Among other things, this Committee shall determine methods of increasing the bidding rate and the acceptance rate of minorities, females, employees from lower labor grades, and employees from Custodial Services, and shall also determine what tests shall be used in connection with these programs and how to evaluate the tests. The University agrees to continue the Trades Helper Program. Such positions are designed to progress to Labor Grade 11 in the

Physical Plant Department. Whether or not new positions are added to the program will be determined on an annual basis according to operational need.

**Section 24.6**
The Parties shall agree on a method of offering to employees who are actively interested in advancement—with first priority to an employee who is denied a bid on the basis of qualifications and experience or who fails a trial period—the opportunity for a survey of the employee's qualifications and experience, including pre-testing or other methods, to assist the employee in preparing for advancement to other jobs at Yale. Following such a survey for each interested employee, the Parties shall endeavor to establish a program tailored to that employee to help that employee qualify for advancement.

## ARTICLE XXV
TESTING

**Section 25.1**
The Parties agree that the University has a right to use tests as an aid in evaluating qualifications for hiring and promotion, so long as such tests are not the sole basis for evaluating an individual's qualifications and adequate consideration is also given to work history, experience, prior evaluations, and other relevant factors.

**Section 25.2**
Tests used for these purposes shall be nondiscriminatory, reasonably related to the actual requirements of the job, fairly administered, and consistently and fairly scored.

**Section 25.3**
At the employee's request, the Union shall have the right to observe the administration of practical tests.

# ARTICLE XXVI
MISCELLANEOUS PROVISIONS

### Section 26.1
BREAKAGE

The University shall make no charge against any employee for breakage unless such breakage is willful or deliberate.

### Section 26.2
UNIFORMS

The University shall supply and launder uniforms for all employees who are required to wear them. The University shall also supply appropriate outside jackets when employees are required to work outside on a regular basis. The University shall consult with employees regarding the kinds and styles of uniforms, and shall give good faith consideration to the views of the employees.

### Section 26.3
RELIEF

There shall be one paid ten- (10) minute coffee break for employees who work four (4) or more hours on each work shift. There shall be two paid ten- (10) minute coffee breaks for employees who work six (6) or more hours on each work shift.

### Section 26.4
WASH-UP

The University shall grant reasonable periods at the beginning and end of each shift for wash-up and putting on uniforms.

### Section 26.5
MEALS

When a Dining Services employee works during a normal meal period and his or her dining hall is open, the University shall provide the

employee with a meal from the regular menu of the day, except that a substitute meal may be provided for a special charge meal.

**Section 26.6**
LOCKERS

Sufficient locker space and suitable dressing facilities shall be provided for all employees.

**Section 26.7**
TOOLS

The University shall replace broken, worn out, or stolen hand tools of the trade belonging to an employee, when such tools are required to do his or her assigned work and are not supplied by the University. No replacement, however, will be made unless the loss is connected with University work, is not caused by the willfulness or negligence of the employee, and is promptly reported in writing by the employee to his or her supervisor on a form to be supplied by the University for that purpose. All such claims shall be subject to investigation, at the discretion of the University, and a disposition shall be made within thirty (30) days of the submission of the claim by the employee.

**Section 26.8**

A. Safety Shoes.

When the University requires an employee to wear safety shoes, the University shall supply a standard model without cost to the employee. Replacement shoes shall be supplied as needed provided the old pair is turned in. The University and the Union shall jointly review the question of whether safety shoes should be required in any job classification in which the employees request such a review. After giving good faith consideration to both the employee's and the Union's views, the University will determine which employees are required to wear safety shoes. The University shall confer with the Union regarding the appropriate reimbursement rate for safety shoes.

B. Eye Protection.

The University will provide and require the use of safety glasses, goggles, or shields for employees on an as-needed basis.

For those employees who require eye protection in the performance of most of their day-to-day duties and who wear prescription eyeglasses, the University will provide prescription safety glasses at the employee's request. The employee will be required to provide the prescription for the glasses at their own expense if it is not covered by their medical insurance plan. The University will select the vendor/s and pay for one (1) pair of basis prescription safety eyeglasses to include single or straight-line bi-focal vision with permanently installed side shields. The employee may upgrade the frames (permanently installed side shields are required) or lenses at their own expense. The employee may request replacement glasses once every year or whenever their prescription changes. Employees will bear the cost of replacement due to breakage.

**Section 26.9**
DEFINITIONS AND USAGE

A. Emergency: An "emergency" shall be defined as a crisis, a sudden or unexpected happening or situation.

B. Base Hourly Rate: "Base Hourly Rate" means the rate shown for each job title in Exhibit A, including any COLA adjustment pursuant to Section 2.8.

C. Regular Hourly Rate: "Regular hourly rate" means Base Hourly Rate plus applicable premiums pursuant to Sections 2.4, 2.5, 2.6, 2.7, 2.10, 2.11 and 10.3.

D. Promotion: "Promotion" means a change to a job title in a higher labor grade.

E. Transfer: "Transfer" means a change to another work unit without any change in classification.

F.   Plurals: Words used in the singular shall be deemed to be plural
     and words used in the plural shall be deemed to be singular, as
     appropriate.

## ARTICLE XXVII
NONDISCRIMINATION

### Section 27.1

The University and its management and the Union and its members
shall not unfairly discriminate against any employee with regard to
employment, transfer, promotions, work assignments, or any other
terms or conditions of employment because of such employee's race,
color, creed, religious belief or non-belief, national origin, political
affiliation, age, sex, handicap, sexual orientation, status as a veteran or
disabled veteran, or activity in or on behalf of the Union.

### Section 27.2

If a job vacancy is filled from outside the bargaining unit, preference
shall be given to a minority and/or female candidate, provided that
he or she is qualified to perform the work, in a job title in which the
University does not employ at least 6.9% females and 25% minorities.

The University shall take reasonable affirmative steps to attract qualified
minority and female candidates in order to meet the requirements of
this Section and shall report to the Union every six (6) months on the
hiring statistics.

## ARTICLE XXVIII
YALE STUDENT EMPLOYEES

### Section 28.1

Regular schedules and regular work assignments shall, when possible,
be given to Yale student employees within each work unit on the basis of
seniority at the beginning of each semester.

**Section 28.2**
The University shall make a reasonable effort to maintain the same number of hours of work per week for student employees each semester.

**Section 28.3**
Student employees who expect to be on an approved leave of absence from the University, or on Withdrawal from the University for academic reasons, for not more than two (2) consecutive semesters shall be eligible for a leave of absence from their positions as student employees and maintain their rate of pay and seniority after returning from such leave of absence. Student employees shall apply in writing for such leave of absence, indicating expected return date. The provisions of this Section shall be in accordance with Sections 8.5B., I. and J.

**Section 28.4**
The University shall continue to provide, to the extent normally provided in the past, work opportunities for Yale students involving custodial work, furniture moving, and the like. When such work opportunities are available for Yale students, they shall be offered first to Yale students employed in the bargaining unit covered by this Agreement, and among them by seniority. Such work shall be paid for at that student's rate of pay under this Agreement.

**Section 28.5**
Student employees shall be permitted reasonable wash-up time at the beginning of the shift.

**Section 28.6**
The University shall not employ Yale students for the purpose of laying off any other employee. Yale students will not be employed to replace any qualified employee in a job listed in Exhibit A while such employee is on layoff without first offering such job or jobs to any qualified, laid-off employee.

**Section 28.7**
When the University contemplates a reduction in services provided to students where bargaining unit employees presently perform such services and the performance thereof is to be done by unpaid students,

it shall inform the Union in such fashion as to provide for a meeting at least thirty (30) days prior to the actual introduction of such a reduction in services. Since characterization of such a reduction as permanent or temporary may well be ambiguous or arbitrary, and since such reductions of services have historically occurred only rarely, the University shall inform the Union with reference to any and all such reductions. At the required meeting the University shall delineate and demonstrate the valid operational reasons for the change. If the Union resists these reasons, it has the right to seek arbitration as to their validity. It shall not be required of the Union to demonstrate that there has been a substantial adverse impact on the number of jobs in the bargaining unit to justify its proceeding to arbitration.

**Section 28.8**
A Student Dining Services Worker who has purchased a less-than-21-meal dining plan may elect to decline a meal during the employee's work shift and avoid the charge to his or her account.

## ARTICLE XXIX
BEST PRACTICES, LABOR-MANAGEMENT COOPERATION

**Section 29.1**
The University and the Union agree to create committee structures to improve the University's overall quality, efficiency and workplace culture. The commitment is a mutually cooperative effort to improve customer service, increase productivity through the design and implementation of best practices and their associated targets and metrics, prevent and resolve conflicts, improve employee satisfaction, discuss ongoing issues and changes, improve staff relations, and promote positive labor-management relations. "Best Practices" shall mean practices that substantially increase productivity, efficiency and satisfaction of employees or managers or improve the quality of services performed within given financial resources. Funding pursuant to Section 29.13 hereof shall be provided by the office of the Vice President for Finance and Administration for the activities of the committee structures created hereunder.

**Section 29.2**

A Policy Board will be created which will set the direction for best practices efforts and labor management cooperation throughout the campus and provide general oversight to the Departmental Committees and Innovative Work Systems Initiative projects described below.  The Board will be comprised of the Presidents of Local 34 and 35, the Vice-President for Finance and Administration, and the Chief Operating Officer of the School of Medicine or a similar level representative from the School of Medicine.  The Policy Board will reach decisions by unanimous agreement.  The board shall meet monthly, unless mutually agreed otherwise.

**Section 29.3**

The University and the Union encourage the formation and continuing efforts of Joint Departmental Committees (JDC) in both bargaining units. JDCs will work out resolutions of local work system problems, attempt to prevent group grievances, discuss significant operational or organizational changes prior to implementation, and encourage change in work practices and management practices that substantially increase worker productivity as well as positive labor-management relationships.

**Section 29.4**

Over a reasonable timeframe, JDC's shall be formed in Local 35 departments and in Local 34 departments.  In either bargaining unit, committees may be formed from groupings of smaller departments, especially where there is a functional or geographic logic to combining departments, subject to mutual agreement.

**Section 29.5**

Department Committee meetings will be informal with joint agendas and will normally take place during work time in departments.  In addition, meetings between line managers and stewards for both Local 34 and Local 35 shall be conducted.  The University agrees to release staff for reasonable amounts of time for the purposes of these activities.

**Section 29.6**

The University and the Union shall create an Innovative Work Systems Initiative ("Initiative") to promote major initiatives for substantive change in the workplace at Yale. The Initiative seeks to enhance employee involvement and performance by promoting local projects that make significant changes in how work is organized and managed. Productivity initiatives, and their accompanying targets and metrics, job flexibility, improved management or union practices, team-based work organization, a higher degree of employee participation in work process design and decision-making, increased skills training, and opportunities for gain sharing are examples of projects to be explored. As projects advance and the University and the Union gain experience in successfully implementing better work systems, the parties intend that improvements will be implemented in many work units around the University consistent with the operation of such work units.

**Section 29.7**

There will be an Initiative Steering Committee with ten (10) members, including five (5) University representatives, three (3) Local 34 representatives and two (2) Local 35 representatives. The University representatives will be appointed by the Vice President for Finance and Administration; the Union representatives will be appointed by the Presidents of the respective union locals. The Steering Committee will undergo extensive training in high performance organizations within six (6) months of the Agreement and will receive ongoing training coordination and facilitation from external and/or internal consultants during that period and from time to time thereafter as mutually agreed.

**Section 29.8**

The Initiative Steering Committee will review proposals for local demonstration/pilot projects and may make proposals or actively solicit them. Projects will be chosen by consensus in the Steering Committee and will be subject to final approval by the Policy Board. Financial resources must be committed or made available as a condition for Board approval in order for the project to be implemented.

**Section 29.9**

Projects will be undertaken in both the Local 34 and Local 35 bargaining units. A high degree of interest among both employees and managers in an area will be a strong positive factor in the selection process. Ideally, projects will be spread across the campus and representative of the kinds of work performed by employees represented by the Unions. Local project meetings will be informal with joint agendas and will normally take place on work-time in departments.

**Section 29.10**

A Joint University/Union Labor Relations Training and Education Program will be established. In order to insure the success of this program, it is critically important and expected that both management and union representatives will participate. This Program will develop and implement a curriculum, including but not limited to, Human Resources Management issues, the Collective Bargaining Agreements, Interest-Based Negotiation Process, Problem Solving, Diversity Training and Standards of Conduct.

**Section 29.11**

A Joint Problem Solving Committee will be established. Whenever possible problems should be solved at the lowest department level. However, because we recognize that some problems cannot be solved locally we want to create processes to allow timely, non-confrontational resolution of problems. When either party perceives that a systemic obstacle exists to solving a problem at the local level, that party is encouraged to seek assistance within the committee.

Options for action by the committee on problems referred to it include, but are not limited to:

1. Sending the problem back to the department for solution;
2. Sending the problem back to the department for solution, and designating union or management employees to assist the department with problem solving;

3. Sending the problem back to the department for solution with recommendations as to the problem-solving process or the content of a solution;

4. Create a joint ad hoc committee to recommend a solution or assist the department with problem solving;

5. Develop a solution itself or assist the department with problem solving.

The multiplicity of options, most of which do not include direct intervention by the committee is meant to underscore the committee's paramount function of promoting the growth of a culture of communication and problem solving. It is also meant to limit the members' responsibilities to the committee and their time commitment to a reasonable level, given their other responsibilities in the University or Union.

While it is our mutual expectation that the problem solving process will significantly reduce the number of grievances that will need to be processed, the grievance language in the respective contracts will remain in force except that time limits in the grievance process will be tolled during the problem-solving process unless the Union gives the University written notice that it wants grievance time limits to be observed.

**Section 29.12**
Joint, periodic and effective communication to the University community shall be undertaken to publicize topics including Best Practices Successes, Health and Safety, Labor/Management Training, and various other communications from University/Union leadership.

**Section 29.13**
Recognizing that labor and management seek to create an atmosphere of mutual respect and trust, and that both seek to identify opportunities for improved productivity and workplace satisfaction, the parties agree that the University shall:

A. Create a $50,000 budget line under the auspices of the VP for Finance and Administration each year for the first three years of the

program to fund the operating expenses of the various committees and structures created under this Article including, by way of example and not by way of limitation, facilitating joint trips to meetings, demonstration projects and other labor-management programs and supporting training opportunities and related expenses that can contribute to the spirit and intent of this article. The Policy Board shall determine the allocation of these funds each year.

B.  Create an additional $50,000 budget line under the auspices of the VP for Finance and Administration for the first year of the Initiative Steering Committee to facilitate its initial work. The Initiative Steering Committee shall determine the allocation of these funds, which may be utilized, by way of example and not by way of limitation, for the committee's training and facilitation, for outreach to the Yale community, and for demonstration projects. This budget line is independent of any financial resources that may be made available pursuant to Section 8 hereof.

C.  Provide reasonable release time without loss of pay for a reasonable number of union representatives and/or committee members, subject to the approval of their supervisors and operation needs, for the sole purpose of furthering the purposes of this Article.

**Section 29.14**
The provisions herein shall apply for three (3) years subsequent to ratification of the agreement, at which time both labor and management shall assess the results of the projects and may choose, by mutual agreement, to continue and/or expand the program.

**Section 29.15**
All of the structures described above can be changed at any time by mutual agreement. The University and the Unions recognize that there is high likelihood that changes will need to be made over time and that not all projects or departmental committees will be totally successful immediately.

**Section 29.16**

Since the purpose and intent of this Article is to foster voluntary labor-management cooperation, this Article shall not be subject to the grievance and arbitration provisions of either the Local 34 or Local 35 Agreement, nor shall any of the provisions of this Article be construed to interfere with or modify in any way the terms of Article XXII in the Local 35 Agreement.

## ARTICLE XXX

CASUAL EMPLOYEES

A casual employee is an individual employed by Yale performing Local 35 bargaining unit work on an irregular basis. The Union shall represent all such casual employees for purposes of collective bargaining, and they shall have only the rights specifically set forth in this Article.

**Section 30.1**

Casuals are classified in two categories, as follows:

A. Probationary casuals: casuals who have worked fewer than 390 hours in a particular department. This probationary period may be extended by mutual agreement of the parties for up to an additional 390 hours.

B. Post-probationary casuals: casuals who have worked more than 390 hours in a particular department, but fewer than 780 hours in that same department in a 52 consecutive week period.

**Section 30.2**

THE RIGHTS OF PROBATIONARY CASUALS

Probationary casuals shall be offered and assigned work at the employer's discretion, and shall be paid at the rate of $1.00 less than the base rate for the job to which they are assigned. It is understood that in the Department of Dining Halls, the base rate for casuals shall be Labor Grade 1. The University is free not to employ, or to terminate the employment of any such probationary employee without notice or warning, and no such action may be challenged under the grievance procedure or discipline and discharge provisions of this Agreement. The

Union cannot grieve the discharge of a probationary casual employee. The Union may file a grievance if the University engages in an arbitrary pattern or practice of terminating employees near the probationary threshold for the sole purpose of preventing casual employees from attaining non-probationary status.

A grieveable pattern or practice shall be described as an event in which the percentage of probationary casual employees who are terminated between 346 and 390 hours is 10% greater than the percentage of probationary casual employees terminated between 300 and 345 hours during a calendar year. If the arbitrator finds a violation of this section, the remedy shall be to cease and desist from such pattern and practice, and shall be prospective only.

**Section 30.3**
THE RIGHTS OF POST-PROBATIONARY CASUALS

A.  Post-probationary casuals shall be subject to discipline and discharge for just cause. A casual who is offered and refuses four (4) consecutive work opportunities shall be deemed to have voluntarily resigned his/her position.

B.  Post-probationary casuals may bid on temporary and permanent job vacancies in accordance with the provisions of section 10.1b.

C.  Once an individual completes 390 hours in a particular department and assumes the status of a post-probationary casual, the individual's rate of pay shall be increased by $0.50, and it shall thereafter increase to the base rate of the assigned job at 780 hours.

D.  Post-probationary casual employees who expect to be absent from work for more than thirty (30) consecutive calendar days for good cause may be granted, upon proper application in writing on a form to be provided by the University for that purpose, a leave of absence of not more than one (1) year in total duration. An employee who returns from such a leave will be offered available work in the Department in which the employee achieved post-probationary status, after other post-probationary employees in that department have been offered work. A post-probationary casual

employee who returns from such a leave shall not suffer a reduction in his/her hourly rate. Post-probationary casual employees who leave University employment for one (1) year or more and are re-employed will return to probationary casual status at the rate of pay applicable to probationary casual employees.

**Section 30.4**

ASSIGNMENT OF WORK

After exhausting extra straight time opportunities offered to permanent Section 1.2A. and 1.2B. employees where appropriate and in consideration of the University's rights to subcontract as elsewhere provided in the contract, the University retains the sole right to determine the amount of work that will be offered to casuals. The following are the conditions under which the University will assign work to casuals once management has decided to use them. The goal of these offering systems is to allow that, given the number of hours of work that Yale makes available, senior casual employees progress toward meeting the thresholds for achieving Section 1.2B. permanent employee status.

A.   Except as otherwise agreed, casuals will be offered the first opportunity for work in their unit once extra straight time opportunities for regular employees have been exhausted, and before casuals in other units are offered available work. Work assignments shall be offered in seniority order to qualified casuals in the unit absent unusual circumstances.

B.   In Dining Services, absent unusual circumstances, opportunities for work, once extra straight time opportunities for regular employees have been exhausted, shall be offered to a Dining Services casual employee(s) through an assignment system in which work may be offered to any of the three (3) most senior available qualified casuals in each work unit, except in Commons where the work shall be offered to the eight (8) most senior available, qualified casuals, provided that opportunities will be at least eighty-five percent (85%) equalized each quarter among the three (3) (or eight (8), as applicable) most senior casuals in each unit. In work units where use of casuals is minimal, the University need not maintain an offering

list of three (3) casuals. All casual work by an employee in any dining hall unit counts toward the 390 and 780-hour thresholds.

At the University's discretion, a separate list of banquet servers may be maintained. The Seniority ranking for the banquet servers unit will be based on date of hire, not on hours worked. Banquet servers who work less than 100 hours per calendar year will drop back to zero (0) hours at the beginning of the next year.

C.   In the Central/Science Custodial Department, opportunities for work once extra straight time opportunities for regular employees have been exhausted shall be offered to Central/Science Custodial casual employees in each of three zones through an assignment system in which work may be offered to any of the ten (10) most senior available, qualified casuals in each zone, provided that opportunities will be at least 85% equalized among them each quarter.

D.   The parties shall meet every three months beginning May 1, 1997 to review the progress of the casual offering systems. In the event that the eight (8) person equalization system in Commons or the ten (10) person equalization system in the Custodial zones dilutes the opportunities for the employees in a zone to achieve sufficient hours to become permanent employees, the University in its discretion shall either lower the number of employees on the list for Commons or for that zone or adopt a tiered equalization system to ensure that casual employees progress. However, in no case will the University be obliged to reduce the number of employees on the list or the number of employees in the top tier of a tiered system to less than three.

E.   Notwithstanding A., B. and C. above, casual employees who are bargaining unit retirees of a department may be assigned schedules that yield a salary below the threshold for Social Security benefit reduction before work is offered to other casual employees.

## Section 30.5

GRIEVANCE AND ARBITRATION RIGHTS

Casual employees who have achieved post-probationary status shall be entitled to grieve alleged violations of their rights as set forth in Section 3 and Section 4 of this Article by utilizing the provisions of Articles XV (Grievance Procedure) and XVI (Arbitration), provided, however, the sole remedy in the event of a violation of Section 4 hereof shall be prospective, namely the extension of an employee's 52 consecutive week period needed to reach 780 hours. The Union may also file a grievance regarding alleged violations of section 4 on behalf of any probationary or post-probationary employee.

## Section 30.6

RIGHTS OF CASUALS WITH 780 HOURS IN A PARTICULAR DEPARTMENT

Once a casual has worked a minimum of 780 hours in a particular department within a 52 consecutive week period, the individual shall become a permanent Section 1.2B. employee and shall be entitled to the rights of such employees. Should such a casual be offered a permanent assignment and refuse such an assignment, the employee shall revert to a zero balance as a probationary casual.

## Section 30.7

NONDISCRIMINATION

The provisions of Article XXVII of this Agreement are specifically incorporated by reference into this Article XXX.

## Section 30.8

PRESERVATION OF SALARY RATES FOR CURRENT CASUALS

Notwithstanding any contrary provisions of this Article XXX, casual employees who were employed as of September 8, 1996 shall not suffer a reduction in hourly rate as a result of this article.

**Section 30.9**

REPRESENTATION OF CASUALS

In consideration of the inclusion of this Article XXX in this Agreement, the Parties agree with reference to Case No. 34-RC-1376 pending before the National Labor Relations Board, that the Union shall withdraw its petition in that matter, the University shall withdraw its objections to said election, all with prejudice.

## ARTICLE XXXI

DINING SERVICES

Retail Worker positions will not be introduced in any residential college dining-hall, in the HGS dining hall, or in the board plan portion of Commons. Such Retail Workers will also be used to staff new cash operations or expanded hours of operation as well as sandwich, pastry or coffee carts in any locations. All replacement positions for vacated LG3 positions in units other than described in the prior sentence will be Retail Worker positions.

## ARTICLE XXXII

ENTIRE AGREEMENT

The Parties agree and intend that this written Agreement sets forth the wages, rates of pay, hours of work, and other working conditions of employment of the employees covered which are to govern during the term of this Agreement, and that obligations not expressly provided for in this Agreement need not be assumed by either Party and no other terms or conditions shall be added to or subtracted from this Agreement during its term, by arbitration or otherwise.

## ARTICLE XXXIII
DURATION OF AGREEMENT

**Section 33.1**
This agreement shall remain in effect until 12:01 am, January 20, 2010 and from year to year thereafter unless modified or terminated in accordance with the provisions of Section 33.2 of this Article.

**Section 33.2**
Either party is privileged to request the modification or termination of this Agreement as of January 20, 2010, or on any January 20 thereafter. Should either Party desire to exercise this privilege, it shall give the other Party written notice not less than forty-five (45) days prior to the January 20 in question. The Parties agree to meet within fifteen (15) days after the date of receipt of such notice to consider proposed modification of this Agreement or the making of a new Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused these presents to be duly executed this twenty-second day of September 2003.

| YALE UNIVERSITY | Local 35, Federation of University Employees |
|---|---|
| Brian Tunney | Robert Proto |
| John Bollier | Ron Altieri |
| Claire Brennan | Frank Anderson |
| Jonathan Clune | Michael Boyd |
| Santo Galatioto | Michael Boyle |
| James Juhas | Clarence Cummings |
| Jed Shivers | Cheryl Hall-Dinello |
| Diane Turner | Craig Green |
| Eric Uscinski | Virginia Henry |
| Mary Varga | Cielo Lizasuain |
| | Pat Marchitto |
| | John Martin |
| | Margret Riccio |
| | Michael Santarcangelo |
| | Michael Schoen |
| | Philip Voight |
| | David White |
| | Mark Wilson |

95

YALE UNIVERSITY          LABOR RELATIONS DEPARTMENT

Mr. Michael Boyle          November 15, 1974
Chief Negotiator           December 20, 1977
Local 35, F.U.E., AFL-CIO  May 1, 1980
                           January 17, 1982
                           January 19, 1985
                           January 18, 1988
                           January 19, 1992
                           January 21, 1996
                           January 20, 2002 [Revised and renewed]

*Re: Employment of Yale Students in Bargaining Unit Jobs*

Dear Mr. Boyle:

This letter sets forth the agreement of the Parties concerning the above referenced subject matter.

The University reserves the right to employ Yale students in bargaining unit jobs, subject only to the provisions of the Agreement, and to the limitations enumerated and set forth below:

1 . A Yale student may not be regularly scheduled for more than 20 hours per week in a bargaining unit job.
2 . A Yale student may be employed only in a vacant bargaining unit job (after it has been posted, except for entry level jobs) in Labor Grades 1 through 3.
3 . A Yale student may be employed in the job of Function Bartender.
4 . Yale students employed in bargaining unit jobs will not continue to work in such jobs during a strike by the Union.
5 . Regular employees (other than Yale students) shall have the right to displace Yale students in lieu of layoff in accordance with Section 18.3B. to the extent required to provide them with as close as possible to the same number of hours of work as they were scheduled to perform prior to the layoff as provided by Arbitrator Rubin's Award of 1/27/76.

Very truly yours,

Brian J. Tunney
Director of Labor Relations

YALE UNIVERSITY                    LABOR RELATIONS DEPARTMENT

Mr. Michael Boyle                  June 15, 1974
Chief Negotiator                   December 20, 1977
Local 35, F.U.E., AFL-CIO          May 1, 1980
                                   January 17, 1982
                                   January 19, 1985
                                   January 18, 1988
                                   January 19, 1992
                                   January 21, 1996
                                   January 20, 2002 [Renewed]

*Re: University Retirement Plan*

Dear Mr. Boyle:

This letter will explain how the University shall continue to administer the Yale Staff Retirement Plan during the term of this Agreement.

With respect to disability retirement, an employee with ten (10) years of continuous service who has been certified as totally disabled under the federal Social Security Act shall be entitled to pension benefits calculated as if he or she had retired normally as of the date of his or her total disability, less any payments under the Workers' Compensation laws. Thus the monthly disability benefit shall be 1/12th of the employee's highest base annual earning rate multiplied by the schedule of multipliers shown in Article XX, Section 20.9A.1., multiplied by the number of years of continuous service as of the date of disability, reduced by periodic payments under Worker's Compensation laws. In all types of retirement, years of continuous service shall include periods of leave of absence ranging from thirty (30) days to not more than one (1) year, periods of absence of less than thirty (30) days duration whether paid for or not, and short-term periods paid for but not worked under the provision of the Agreement covering Holidays, Vacation, Sick Leave, Death in Family, Jury Duty, and Military Duty. "Highest Base Annual Earnings Rate" shall be the employee's highest normal regular hourly rate during his or her last five (5) years of employment multiplied by his or her maximum regularly scheduled hours of work per year, including hours paid for but not worked, during his or her last five (5) years of employment.

Very truly yours,

Brian J. Tunney
Director of Labor Relations

**Letter of Agreement (not a side letter)**

The parties agree on the following "grandfather" rights for employees working in Alternative Work prior to January 17, 1988:

a. All trial periods described in Article XXIII shall be deemed met if the employee has previously worked at least the required number of working days in that type of work in the Alternative Work program.

b. If and to the extent that the University continues to include trades assistant work in the Alternative Work program, employees who previously worked in those positions shall have the opportunity to continue in their previous work (in order of seniority if fewer positions exist than previously), if they performed the work satisfactorily.

c. If, pursuant to paragraph b. above, an employee whose regular job is below Labor Grade 9 who has previously worked as a trades assistant chooses to continue in such available work, such employee shall be paid for all Alternative Work periods at Labor Grade 9.

**Side Letter**

In regard to the proportion of Light Custodian and Custodian positions, the University will maintain 1080 weekly hours of regularly scheduled Light Custodian hours in the Central/Science areas and 360 regularly scheduled weekly hours in the School of Medicine Area. The University retains the right to staff building crews on the basis of operational need.

**Side Letter**

After the newly created rounds positions are added to the total employee count in Dining Services the University will use approximately the same ratio of PWs, DA/PWs and DAs collectively in the Residential College Dining Services units with respect to the total Residential College Dining Services staffing in LG 3 positions in these units. However, while no significant or dramatic change will occur in the ratio, the University retains the right to staff individual units on the basis of operational need.

**Side Letter**

The University will amend and modify any flex dollar board plan that results in more than 20% of the undergraduate board charge being spent outside of the food service system in order not to exceed the 20% limit.

**Side Letter**

Applicants for the Trades Helper—Externship Apprentice and the Dining Services—Culinary Apprentice programs are strongly encouraged to read the program details as outlined in the Memorandum of Agreement between the Union and the University dated September 22, 2003. Copies of this memorandum and the program details can be obtained from the Union office, the Human Resource office at 155 Whitney Ave., and on their respective web sites. In addition to reading the program details, no one will be accepted to either program until both the Union and the University have briefed them. This briefing in the form of an informational session will go over the program specifics and the impact participation may have on certain benefits including pension.

## Exhibit A Job Rates

1.35 BASE HOURLY RATE CHART

| Year | | Sep-03 | Jan-04 | Jan-05 | Jan-06 | Jul-06 | | Jul-07 | Jan-08 | Jul-08 | | Jan-09 | Jul-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Grade | 1 | 2 | 3 | 4 | 5 | 5 | 6 | 6 | 7 | 7 | 8 | 8 | 8 |
| 1 | 11.60 | 12.01 | 12.37 | 12.74 | 13.00 | 13.25 | 13.52 | 13.78 | 14.06 | 14.33 | 14.62 | 14.90 |
| 2 | 12.88 | 13.33 | 13.73 | 14.14 | 14.43 | 14.71 | 15.01 | 15.30 | 15.61 | 15.91 | 16.23 | 16.55 |
| 3 | 13.21 | 13.67 | 14.08 | 14.50 | 14.79 | 15.08 | 15.38 | 15.68 | 16.00 | 16.31 | 16.64 | 16.96 |
| 4 | 13.57 | 14.04 | 14.46 | 14.89 | 15.19 | 15.49 | 15.80 | 16.11 | 16.43 | 16.75 | 17.09 | 17.42 |
| 5 | 14.31 | 14.81 | 15.25 | 15.71 | 16.03 | 16.34 | 16.67 | 16.99 | 17.33 | 17.67 | 18.03 | 18.38 |
| 6 | 15.31 | 15.85 | 16.33 | 16.82 | 17.16 | 17.49 | 17.84 | 18.19 | 18.56 | 18.92 | 19.30 | 19.68 |
| 7 | 15.86 | 16.42 | 16.91 | 17.42 | 17.77 | 18.12 | 18.48 | 18.84 | 19.22 | 19.59 | 19.98 | 20.37 |
| 8 | 16.97 | 17.56 | 18.09 | 18.63 | 19.01 | 19.38 | 19.77 | 20.16 | 20.57 | 20.97 | 21.39 | 21.81 |
| 9 | 17.61 | 18.23 | 18.78 | 19.34 | 19.73 | 20.11 | 20.51 | 20.91 | 21.33 | 21.75 | 22.19 | 22.62 |
| 10 | 19.49 | 20.17 | 20.78 | 21.40 | 21.83 | 22.26 | 22.71 | 23.15 | 23.62 | 24.08 | 24.56 | 25.04 |
| 11 | 22.30 | 23.08 | 23.77 | 24.48 | 24.97 | 25.46 | 25.97 | 26.48 | 27.01 | 27.54 | 28.09 | 28.64 |

PREMIUMS

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| License | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 |
| Lead | 0.45 | 0.80 | 0.82 | 0.85 | 0.87 | 0.88 | 0.90 | 0.92 | 0.94 | 0.95 | 0.97 | 0.99 |
| Saturday | 0.50 | 0.80 | 0.82 | 0.85 | 0.87 | 0.88 | 0.90 | 0.92 | 0.94 | 0.95 | 0.97 | 0.99 |
| Sunday | 0.55 | 0.80 | 0.82 | 0.85 | 0.87 | 0.88 | 0.90 | 0.92 | 0.94 | 0.95 | 0.97 | 0.99 |
| Night | 0.50 | 0.80 | 0.82 | 0.85 | 0.87 | 0.88 | 0.90 | 0.92 | 0.94 | 0.95 | 0.97 | 0.99 |
| Rotating | 1.20 | 1.60 | 1.65 | 1.70 | 1.73 | 1.77 | 1.80 | 1.84 | 1.87 | 1.91 | 1.95 | 1.99 |
| Watch En | na | 1.20 | 1.24 | 1.27 | 1.30 | 1.32 | 1.35 | 1.38 | 1.40 | 1.43 | 1.46 | 1.49 |
| Trades | na | 0.50 | 0.52 | 1.05 | 1.07 | 1.09 | 1.11 | 1.14 | 1.16 | 1.18 | 1.20 | 1.23 |
| 5 years | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 | 0.40 |

Sanitation Drivers, Delivery Driver, Truck Drivers and Furniture & Equipment Movers (Med), = LG 10 plus $0.16.

Building Attendants hired Jan.24, 1988 or earlier - LG9 plus $1.13.

**CAMPUS MAIL**
LG8   Mail Clerk/Carrier

**CUSTODIAL SERVICES**
LG2   Light Custodian
LG6   Senior Custodian
LG7   Furniture Mover
LG10  Furniture and Equipment Mover

**DINING SERVICES**
LG1   General Worker
LG1   Special Function Worker
LG2   Function Bartender
LG2   Specialty Retail Worker
LG3   Catering Services Assistant Rounds
LG3   Desk Attendant
LG3   Dining Hall Rounds
LG3   General Services Assistant
LG3   Pantry Worker
LG3   Pantry Worker/Desk Attendant
LG3   Waiter/Waitress
LG4   Display Cook
LG5   Bake Shop Helper
LG5   Cook's Helper 1
LG5   Catering Service Attendant Rounds
LG5   Grill Worker
LG6   Cook's Helper 2
LG6   Head General Services Assistant
LG6   Head Pantry Worker
LG9   Garde Mangr
LG9   Third Cook
LG10  Baker
LG10  Delivery Truck Driver
LG10  Second Cook
LG11  Chef
LG11  First Cook
LG11  Head Baker
LG11  Head Meat Cutter

**FIRE MARSHALL**
LG6   Alternate Work
        Deputy Fire Inspector
LG6   Deputy Fire Inspector
LG11  Fire Control Mechanic
LG11  Fire Inspector

**GROUNDS MAINTENANCE**
LG1   Grounds Student
LG3   Groundskeeper

LG4   Groundskeeper
LG5   Groundskeeper
LG8   Grounds Maintenance
        Mechanics Helper
LG8   Sr. Groundskeeper A
LG8   Sanitation Worker
LG8   Gardener
LG10  Gardener
LG10  Sanitation Truck Driver
LG11  Grounds Maintenance Mechanic
LG11  Master Gardener
LG11  Master Grounds Maintenance
        Mechanic

**PHYSICAL PLANT**
LG5   Alternate Work/Maintenance.
LG6   Light Truck Driver
LG6   Mechanic's Helper
LG8   Electrical Assistant
LG9   Building Attendant
LG11  Carpenter
LG11  Controls Mechanic
LG11  Electrician
LG11  Electrician/High Voltage Mechanic
LG11  Equipment Mechanic
LG11  Glazier
LG11  Locksmith
LG11  Mason
LG11  Oil Burner Mechanic
LG11  Painter
LG11  Plumber
LG11  Refrigeration Mechanic
LG11  Roofer
LG11  Sheetmetal Mechanic

**TRAFFIC, RECEIVING & STORES**
LG8   Truck Drivers Assistant
LG10  Truck Driver

**UTILITIES**
LG5   Utility Worker B
LG11  Power Plant Controls Mechanic
LG11  Power Plant Controls Mechanic/
        Mechanic
LG11  Power Plant Mechanic
LG11  Oiler
LG11  Utility/Oiler
LG11  Watch Engineer

# APPENDIX

SCHEDULE OF DENTAL BENEFITS

For dental care provided by a Participating Dentist, the Plan will pay 100% of the dentist's usual, customary, and reasonable charge for listed benefits A. through D. and 80% for E. through I. shown below. You, the subscriber, pay the difference.

A.  Oral examination, including treatment plan, if necessary (See note below.)

B.  Periapical and bitewing X-rays as required (See note below.)

C.  Topical fluoride application for members under age 19.

D.  Prophylaxis, including cleaning, scaling, and polishing.

E.  Repair of Dentures.

F.  Palliative emergency treatment as needed.

G.  Fillings consisting of silver amalgam and tooth color synthetic restorations, including stainless steel crown. (Primary teeth: Payment for inlays and crowns are limited to the amount payable for fillings.)

H.  Simple extractions. (Payment for surgical extraction of teeth is limited to the amount payable for simple extractions.)

I.  Endodontics, including pulpotomy, direct pulp capping, and extirpation of pulp and filling of root canals (excluding restoration).

*Note: Oral examinations, diagnosis, and full mouth series of X-rays: Benefits will be payable not more than once in any three (3) consecutive calendar years.*

Routine oral examination and prophylaxis: Benefits will be payable for not more than two (2) visits per calendar year.

A series (2) of bitewing X-rays will be payable not more than once per calendar year and none in the year that a full mouth series is taken.

Rider—Additional Basic Benefits—this Rider provides 50% coverage for additional basic benefits, including inlays, on-lays and crowns when not part of a bridge, space maintainers, oral surgery consisting of fracture and dislocation treatment, diagnosis and treatment of cysts and abscesses, surgical extractions and impaction and apicoectomies.

Services not scheduled above are excluded.

# INDEX

*Where a passage carries over onto a subsequent page, only the number of the first page is given.*

Alternative work . . . . . . . . . . . 73
   Assignment . . . . . . . . . . . . 73
   Grandfather rights . . . . . . . . 98
   LOA in lieu of . . . . . . . . . . . 75
   Short work weeks . . . . . . . . . 74
Arbitration . . . . . . . . . . . . . . 43
   Arbitrator's fee . . . . . . . . . . 44
   Award . . . . . . . . . . . . . . . 44
   Expedited . . . . . . . . . . . . . 44
   Selection of arbitrator . . . . . . 43
Bargaining unit work, reserved to
   bargaining unit . . . . . . . . . . . 2
Benefits
   Death before age 55 . . . . . . . 60
   Dental insurance . . . . . . . . . 58
     Appendix . . . . . . . . . . . 102
   Eligibility . . . . . . . . . . . . . . 1
   Healthcare plans . . . . . . . .55, 56
   Life insurance . . . . . . . . . . . .55
   Life Insurance Retiree . . . . . . 61
   Other HMOs . . . . . . . . . . . 56
   Plan A . . . . . . . . . . . . . . . 56
     Premiums . . . . . . . . . . . 56
   Plan B . . . . . . . . . . . . . . . 56
     Premiums . . . . . . . . . . . 57
   Premium deductions . . . . . . . 57
   Psychiatric care . . . . . . . . . .55
   Retirement
     Disability . . . . . . . . . . . 97
     Medical . . . . . . . . . . . . 61
     Retirement after
       January 1, 1998 . . . . . . . 61
     Spouse/eligible dependent . 60
     Pension . . . . . . . . . . . . 59
      Cash-out option . . . . . . . 60
     Early retirement . . . . . . . 59

Supplemental matching
   program . . . . . . . . . . 60
Sick leave credit . . . . . . . . . . 23
Yale Health Plan . . . . . . . . . . .55
   Benefit cannot be diminished . 57
   Psychiatric care . . . . . . . . .55
Benefit level position . . . . . . . . .14
Best Practices . . . . . . . . . . 70, 83
Breakage . . . . . . . . . . . . . . 78
Breaks . . . . . . . . . . . . . . . 78
Bumping . . . . . . . . . . . 31, 48, 73
   Disability bump . . . . . . . . . 48
Callbacks . . . . . . . . . . . . 16, 66
Casual employees . . . . . . . . . . 89
   Assignment of work . . . . . . .91
   Retiree exception . . . . . . . . 92
   Defined . . . . . . . . . . . . . . 89
   Fair treatment . . . . . . . . . . . 93
   Grievance procedure . . . . . . . 93
   Post-probationary . . . . . . 89, 90
   Post-probationary, rate of pay . . 90
   Post-probationary, transition to
     permanent (Section 1.2B.)
     status . . . . . . . . . . . . . 93
   Probationary . . . . . . . . . . . 89
   Probationary, rate of pay . . . . . 90
   Review of offering of assignments . 91
Casual or temporary employees
   Information . . . . . . . . . . . . .12
   Limitations . . . . . . . . . . . . .13
Death Benefits . . . . . . . . . . . 60
Death in family . . . . . . . . . . . 25
Dining Halls . . . . . . . . . . . . 94
   Ratio of LG3 positions . . . . . . 98
   Retail Worker, where permitted . 94
Disability retirement . . . . . . . . 97

Discipline and Discharge . . . . . . 44
Downgradings . . . . . . . . . . . . 9
Duration General . . . . . . . . . . 95
  Layoff and subcontracting . . . . 70
Emergency, defined . . . . . . . . 80
Employee Assistance Program . . . 63
Entire agreement. . . . . . . . . . 94
Extra straight-time hours . . . . . .14
Eye Protection . . . . . . . . . . . 80
Fair treatment . . . . . . . . . .81, 93
Flex dollar board plan . . . . . . . 99
Grievance procedure. . . . . . . . 39
  Arbitration, appeal to. . . . . . .41
  Casual employees . . . . . . . . 93
  Mediation . . . . . . . . . . . 42
  Policy grievance. . . . . . . . .41
  Step 1. . . . . . . . . . . . . . 39
  Step 2 . . . . . . . . . . . . . 40
  Step 3. . . . . . . . . . . . . . 40
  Subcontracting . . . . . . . .41, 64
    Extensions . . . . . . . . . .41
  Written grievance
    Amendment . . . . . . . . . 40
    Form . . . . . . . . . . . . 39
Holidays . . . . . . . . . . . . . .17
  Effect on computing overtime . . .19
  Floating holidays . . . . . . . . .18
  Hours of work. . . . . . . . . .12
  Pay . . . . . . . . . . . . . . .18
Initiative Steering Committee. . . . 85
Job description . . . . . . . . . . . 8
Job security . . . . . . . . . . . .14, 29
  Employee input . . . . . . . . . 30
  Layoff notice . . . . . . . . . . 30
  Notice of transfer of work to Yale
    students . . . . . . . . . . . . 82
  Responsibilities of laid-off
    employee . . . . . . . . . . . .31
  Seniority retention while on
    layoff . . . . . . . . . . . . . 46
  Student employment
    limitation . . . . . . . . . 82, 96

Job vacancies . . . . . . . . . . . . 32
  Awards. . . . . . . . . . . . .32, 48
  Bids . . . . . . . . . . . . . . 32
  Bids, limitations. . . . . . . . .33
  Postings . . . . . . . . . . . . 32
  Temporary transfer . . . . . . . 49
Joint department committee . . . . 84
Joint problem solving committee. . 86
Jury duty . . . . . . . . . . . . . 26
Labor Management Cooperation .70, 83
Layoff See also Job security . . . 29, 70
  Notice . . . . . . . . . . . . . 30
  Recall rights . . . . . . . . . . . 48
Layoff, Seniority order. . . . . . . 48
Leadpersons . . . . . . . . . . . . 34
Leaves
  Benefits . . . . . . . . . . . . 28
  Death in family . . . . . . . . . 25
  Extension . . . . . . . . . . . 27
  Jury duty. . . . . . . . . . . . 26
  Military . . . . . . . . . . . . 26
  Outside employment . . . . . . . 28
  Pay . . . . . . . . . . . . . . 27
  Payroll deductions . . . . . . . 28
  Personal . . . . . . . . . . . . 27
  Return to work . . . . . . . . . 28
  Seniority accumulates . . . . . . 46
  Termination. . . . . . . . . . . 29
  Unemployment . . . . . . . . . 28
  Union business . . . . . . . . . 26
License . . . . . . . . . . . . . . 10
Light Custodian positions, ratio of . 98
Light Custodians . . . . . . . . . .14
Lockers . . . . . . . . . . . . . . 79
Long term disability . . . . . . . . 62
Management rights . . . . . . . . . 63
Martin Luther King Day
  Observance . . . . . . . . . . . .18
Meals . . . . . . . . . . . . . . 78
Mortgage loan program . . . . . . . 63
No strike—no lockout . . . . . . . 38
Nondiscrimination. . . . . . . . . .81

Overtime . . . . . . . . . . . . . . .15
Part-time employees . . . . . . . . .12
Pension *See subheading under* Benefits
Policy Board . . . . . . . . . . . . 84
Probationary period . . . . . . . . . . 4
Promotion defined . . . . . . . . . . 80
Rate of pay
    40¢ . . . . . . . . . . . . . . . 3
    Base hourly rate, defined . . . . . 80
    Casual employees . . . . . . . . . 90
    COLA . . . . . . . . . . . . . . . . 6
    Exhibit A. . . . . . . . . . . . . .100
      Increase . . . . . . . . . . . . . 3
    Increases . . . . . . . . . . . . . . 3
    Job rate . . . . . . . . . . . . . . 2
    Premiums . . . . . . . . . . . .5, 11
    Regular hourly rate, defined . . 80
Recognition. . . . . . . . . . . . . . 1
    Casual employees
      represented . . . . . . . . . . . 1
Retirement *See subheading under* Benefits
Roundspersons . . . . . . . . . . . .13
Safety . . . . . . . . . . . . . . . 50
    Consultation with Chief Union
      Safety Representative. . . . . . 52
    Information to be made available . 52
    Joint Committee . . . . . . . . . .51
    Unit Safety Committees . . . . . 54
    Unsafe conditions. . . . . . . . . 52
Safety Shoes . . . . . . . . . . . . . 79
Schedule
    Notice of changes . . . . . . . . . .15
Scholarship Program for
    Sons and Daughters . . . . . . . 63
Seniority . . . . . . . . . . . . . . 45
    Accumulation on leave,
      disability, etc. . . . . . . . . . . 46
    Application in job bid . . . . . . 48
    Application in layoff . . . . . . . 48
    Application in permanent
      transfer . . . . . . . . . . . . . 48
    Application in recall . . . . . . . 48

Application in temporary
    promotion . . . . . . . . . . 48
Application in temporary
    transfer . . . . . . . . . . . . 49
Classification seniority . . . . . . 46
Department seniority. . . . . . . 46
Loss of . . . . . . . . . . . . . . . 47
Union stewards . . . . . . . . . . 49
University seniority. . . . . . . . 45
Sick leave . . . . . . . . . . . . . . 22
    Accumulated leave . . . . . . . . 22
    Basic leave . . . . . . . . . . . . . 22
    Death benefits. . . . . . . . . . . 23
    Eligibility, proof. . . . . . . . . . 24
    Retirement. . . . . . . . . . . . . 23
    Workers comp supplement . . . 23
Snow removal . . . . . . . . . . . . 72
Split shift . . . . . . . . . . . . . . .14
Subcontracting . . . . . . . . . . . 2, 64
    Callbacks . . . . . . . . . . . . . 66
    Carryover work . . . . . . . . . . 66
    Custodial extra straight time. . . 68
    Dining Halls exempt . . . . . . . 68
    Exceptional circumstances . . . . 67
    Minimum wage for
      subcontractor employees . . . 69
    Notice . . . . . . . . . . . . . . . 69
    Physical Plant overtime,
      scheduled . . . . . . . . . . . . 66
    Staffing guarantees . . . . . . . . 64
Supervisory personnel . . . . . . . . 2
Temporary promotion. . . . . . . .33
Temporary transfer . . . . . . . . .33
Testing . . . . . . . . . . . . . . . 77
Tools . . . . . . . . . . . . . . 79
Training . . . . . . . . . . . . . . . 75
    Joint Committee . . . . . . . . . 76
    Reimbursement . . . . . . . . . . 75
    Trades Helper program. . . . . . 76
    Dining Services Culinary
      Apprentice . . . . . . . . . . . 99
      Side letter . . . . . . . . . . . . 99

Transfer, defined . . . . . . . . . . . 80
Trial period . . . . . . . . . . . . . . 5
Uniforms . . . . . . . . . . . . . . . 78
Union business
    Access, communication . . . . . 37
    Bulletin boards . . . . . . . . . . 38
    Department Stewards . . . . . . 37
    Leaves . . . . . . . . . . . . . .26, 37
    Translator . . . . . . . . . . . . 37
Union buttons . . . . . . . . . . . . 38
Union dues . . . . . . . . . . . . . . 36
    Deduction . . . . . . . . . . . . 36
Union membership . . . . . . . . .35
Upgradings . . . . . . . . . . . . . 8
Vacation. . . . . . . . . . . . . . . 20
    Effect on computing overtime . . .21
    Selection, assignment. . . . . . .21
Washup . . . . . . . . . . . . . . . 78
Work units
    Definition . . . . . . . . . . . . 16
Work week
    4 day week. . . . . . . . . . . . .15
    Minimum . . . . . . . . . . . .12
    Regular. . . . . . . . . . . . . .12
    Shorter. . . . . . . . . . . . . .12
Worker's compensation . . . . . . . 28
Yale student employees . . . . . . .81
    Meal charge . . . . . . . . . . . 83
    Side letter . . . . . . . . . . . . 96