UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


- - - - - - - - - - - - - - - - - - X

CURTIS REDDICK,                              :

                    PLAINTIFF,              :
            VS.                              :CIVIL ACTION NO.:
YALE UNIVERSITY, ET AL,                       3:13 CV 01140 RNC

                    DEFENDANTS.            :

- - - - - - - - - - - - - - - - - - X




        DEPOSITION OF CURTIS REDDICK, taken at the law

offices of Williams, Walsh & O'Connor, 37 Broadway,

North Haven, Connecticut, before Jennifer Tramontano, a

Licensed Shorthand Reporter and Notary Public, in and

for the State of Connecticut, on Friday, June 13, 2014,

at 9:09 a.m.


            DEL VECCHIO REPORTING SERVICES, L.L.C.
             PROFESSIONAL SHORTHAND REPORTERS
                    117 RANDI DRIVE
               MADISON, CONNECTICUT 06443
             (203) 245-9583    (800) 839-6867
                  FAX (203) 245-2760


        HARTFORD          NEW HAVEN          STAMFORD

1   A P P E A R A N C E S:

2

3

4

5   On Behalf of the Plaintiff:

6   Employee Rights, LLC
    57 State Street
7   North Haven, Connecticut 06473

8   By:  Michelle Gramlich, Esquire

9

10

11   On Behalf of the Defendant, Yale University:

12   Donahue, Durham & Noonan
     741 Boston Post Road
13   Guilford, Connecticut 06437

14   By:  Brock T. Dubin, Esquire

15

16   On Behalf of the Defendant, Union Local 35 and Riccio:

17   Livingston, Adler, Pulda, Meiklejohn & Kelly
     557 Prospect Avenue
18   Hartford, Connecticut 06105-2922

19   By:  Gregg D. Adler, Esquire

20

21   Also Present:  Mica Notz, Paralegal

22                  Mrs. Riccio

23

24

25

1    A    No.

2    Q    And finally, Mr. Reddick, the medical

3  conditions we have been discussing today, do they

4  interfere with your ability to work?

5    A    Only when I have severe spasms.

6    Q    What is your present position at Yale

7  University, Mr. Reddick?

8    A    Senior custodian.

9    Q    Senior custodian?

10   A    Yeah.

11   Q    When you were hired by Yale University in

12 1999, what was your position?  I'm sorry.  Is it 1999?

13           MR. ADLER:  '90.

14           MR. DUBIN:  1990.

15 BY MR. DUBIN:

16   Q    When you were hired by Yale University in

17 1990, what was your position?

18   A    Custodial.

19   Q    Custodial.

20   A    Yes.

21   Q    Is it fair to say that you had been promoted?

22   A    I was promoted when I bidded on a senior.  I

23 was a regular custodian, then I bidded on a senior

24 custodian, and I was promoted.

25   Q    When was that promotion?

1    A    It was sometime during that time period, but I

2    don't know exactly what year it was.

3    Q    Okay.  I don't know what time period you're

4    talking about.  Are you saying at some point between

5    1990 and the present?

6    A    Yes.

7    Q    You cannot be more specific than telling me

8    that you were promoted at some point in the past 24

9    years?

10    A    I have been at Yale for just about 25 years,

11    so it had to be, being a senior custodian for about

12    maybe 13, or no, more than 13 years, but I can't -- I

13    can't remember.  I'm just -- I can't remember.

14    Q    Okay.  How many promotions did you receive

15    since you started employment at Yale in 1990?

16    A    That's the only promotion I had, as far as

17    senior custodian.

18    Q    I do understand that you were actually --

19    you're also a union steward?

20    A    Yes.

21    Q    All right.  When did you become a union

22    steward?

23    A    In 199 -- let's see, I think '98 or '99.

24    Q    I want to ask you what your job duties and

25    responsibilities are as a senior custodian.

1    A    Well, my responsibilities as senior custodian
2    is to make sure that the tasks is done.  I work at the
3    law school, rearranging the classrooms, cleaning
4    bathrooms, answering calls, different calls that we
5    have, different tasks.  Each and every day it's
6    different setups, set classrooms up, and set up for
7    different things that they have functions at the job.
8    Q    You said, when I asked you, you said to make
9    sure the tasks get done at the law school; are you
10   responsible for performing those tasks as a senior
11   custodian?
12   A    I'm responsible for those tasks, along with
13   responsibility to the other ones under me to make sure
14   that those tasks are complete.
15   Q    Okay.  How many people do you have under you?
16   A    One person, her name is Lavene (phonetic.)
17   She works in the daytime.
18   Q    I'm sorry?
19   A    Lavene.
20   Q    Lavene.
21   A    Walker, yeah.
22   Q    Have you ever had any other people under you
23   since you've been a senior custodian?
24   A    There were people who were there but then they
25   had transferred out.  They were from the dining hall.

1    supervisor first to try to come to a remedy of -- to the

2    problem.

3         Q    Okay.  Can you file grievances on your own

4    behalf as a union steward?

5         A    Yes.

6         Q    And how many grievances have you filed on your

7    own behalf as union steward?

8         A    Many.  I just don't know how many.  It was a

9    whole lot.

10        Q    When filing -- so, let me understand this.  If

11   someone who is not a union steward would like to file a

12   grievance, they would require a union steward to file it

13   on their behalf?

14        A    Yes.

15        Q    Okay.  So, an employee that is not a union

16   steward, they cannot file a grievance unless they get

17   approval from the union; is that --

18        A    No.  They can file a grievance.  They can if

19   they want to, they can.  The employee can file a

20   grievance.

21        Q    Without the union?

22        A    Without a steward present, they can.  They can

23   go to the union office.

24        Q    Do they need a union steward's signature?

25        A    I really don't know that because, normally,

1        Q       So, if you believe that, at the time, you were

2    on intermittent FMLA, why would you need that form, as

3    well?

4        A       Which form?

5        Q       This form.  I mean, in other words, why would

6    you be granted what seems to me this other type of FMLA?

7        A       This right here, somebody checked that, but

8    they didn't check the -- see, this come from the

9    supervisor, this part.  This don't come from my doctor.

10   This come from the supervisor.

11            The supervisor, once you sign your name here,

12   the supervisor sign his name there.  Then this got to be

13   approved by the supervisor.  The supervisor have to sign

14   it, or his boss, like Roger -- I mean, Bob Young, which

15   that's his signature.

16            So, anything that's checked off here,

17   basically they checked that.  So, somebody checked that

18   box there, disability, but they didn't check the

19   intermittent.

20       Q       They didn't check intermittent there?

21       A       Right, but if you were to go and get that

22   document from my counsel here or my doctor, he always

23   had the intermittent.

24       Q       Can we agree that it's your employer that

25   needs to grant the FMLA, not your doctor?

1       A    The employer.

2       Q    Okay.  All right, and this particular request

3   for FMLA expired on February 1, 2009; correct?

4       A    Yeah, I believe that's -- yeah, that's

5   correct.

6       Q    Okay, and the next in the sequence of

7   documents I have, as far as the FMLA, does not resume

8   until January 21, 2010, and you're free to look at all

9   of the documents I have here.

10      A    So, like I said, after this one, and then this

11  one, let's see, Roger Watson, because like I said, I

12  wasn't out.  I wasn't out that much with Roger Watson

13  with my flareup, so that's why I told you I don't know

14  if it was several weeks after.

15           So, each time, each time these -- this part

16  right here has to go to the supervisor, and the

17  supervisor would have to, you know, sign his name, and

18  then he have to have his boss sign it.

19      Q    Can we agree that the incident where

20  Mr. McGuire -- withdrawn.

21           The incident with regard to Mr. McGuire --

22  withdrawn.

23           Was there an incident when Mr. McGuire accused

24  you of failing to clean bathrooms located in your

25  assigned area?

1      A     Yes.

2      Q     Okay.  Do you know when that incident

3 occurred?

4      A     That incident occurred after I reported to the

5 dean, but I don't know exactly what month it was.

6      Q     Okay, and how soon after you made the report

7 to the dean?

8      A     That was -- that was after I touched bases

9 with Bob Young, and he didn't do anything, and then

10 right after that, I went to the dean and reported it.

11 Also, I reported it to my union, too.

12      Q     Okay.  So, would that have been in the month

13 of September 2009?

14      A     Like I said, I don't know the month.

15      Q     All right.  In your Complaint, you allege that

16 this false accusation occurred in October of 2009; are

17 you aware of that?

18      A     As far as the dates, I'm aware of what I said,

19 but I'm not aware of the dates because I can't remember,

20 I can't.  I can't.  I can't pinpoint myself on which

21 date, what date, or what month it occurred.  I only can

22 tell you exactly what happened.

23      Q     Okay.  In your Complaint, you say in or around

24 October 2009, your supervisor, Mr. McGuire, falsely

25 accused you of failing to clean bathrooms located within

1    your assigned area; is that truthful?

2         A    That's truthful.

3         Q    Okay.  What I want to know is how soon after

4    you made the report to Mr. Young or the dean did this

5    false accusation occur?

6         A    Well, the false accusation occurred during

7    October '09.

8         Q    Okay.  So, my question is:  Do you know how

9    much time elapsed between the time you made the report

10   to the dean --

11        A    Immediately after that.

12        Q    Okay.  That's what I want to know.  So, we can

13   agree sometime in September or October of 2009, you made

14   the report to the dean?

15        A    Yes.

16        Q    And is it fair to say that sometime in

17   September or October 2009, Mr. McGuire was harassing you

18   because of your attendance issues?

19        A    Yes.

20        Q    And is it fair to say that in September or

21   October of 2009, you believed to have been protected by

22   the FMLA?

23        A    That's correct.

24        Q    Okay, and in fact, that is why you believe you

25   were being harassed, because you were being reprimanded

1  about your attendance, when you believed to be covered

2  by the FMLA?

3      A    I was covered by the FMLA.

4      Q    That's the harassment you're talking about;

5  correct?

6      A    Yes.

7      Q    And would you agree that if you were missing

8  work, and you were not covered by the FMLA, your

9  supervisor reprimanding you from missing work would not

10 be harassment?

11     A    That's a different -- that's a question I

12 can't answer.

13     Q    Okay.  That's fine.

14     A    Because I don't know his motives.  I only can

15 tell you exactly why he did what he did.

16     Q    Would you agree that if the bathroom was not

17 cleaned by the night shift the prior evening, it would

18 be, in fact, your responsibility to clean it?

19     A    Not necessarily.

20     Q    Okay.  Whose responsibility would it be to

21 clean the bathroom if the night shift was not able to

22 clean the bathroom?

23     A    Well, what they do is, they have an overtime

24 sheet where they call people in for the overtime to take

25 care of the tasks that's at night, so that's a different

1    thing.

2            They call these people rounds people, and

3    people who has less hours, they give those hours, all

4    that overtime to them so that those tasks could be taken

5    care of at night.  It never was flooded over to us in

6    the daytime.

7        Q    So, is it your testimony that from 1990 to

8    October of 2009, that is the first time that you have

9    ever had to clean a bathroom that was not cleaned by the

10   night shift?

11       A    No.  I clean bathrooms every day.

12       Q    Okay.  The harassment that you claim to have

13   suffered at the hands of Mr. McGuire, did you report it?

14       A    Yes.

15       Q    And to whom did you report it?

16       A    I reported it to the dean, Dean Mark

17   Timberline.  He was the dean at the time.

18       Q    Timberline?

19       A    Timberline.

20       Q    And was that a written report or a verbal

21   report?

22       A    It was a verbal report.

23       Q    Who is Mr. McGuire's supervisor, or was Mr. --

24       A    Bob Young.

25       Q    Why is it that you didn't report this to Mr.

1   Young?

2       A    I did.  That's who I said.  Remember I said to

3   you, that I said that I talked to the boss about him

4   harassing me, and he didn't do anything.

5       Q    Okay.  I'm sorry.  I was not clear.  So, there

6   are two separate reports we're talking about.  There was

7   one report where you were talking about where

8   Mr. McGuire was harassing you about your attendance

9   issues; correct?

10      A    That's correct.

11      Q    And then there was the bathroom incident;

12  correct?

13      A    Yes.

14      Q    Okay.  Did you report the bathroom incident?

15      A    The bathroom incident, yes, I did.

16      Q    Who did you report the bathroom incident to?

17      A    To the dean.

18      Q    So, with regard to the bathroom incident, you

19  did not tell Mr. Young?  You went right to the dean?

20      A    I went to the dean about the bathrooms and

21  about Marquese harassing me.

22      Q    Was this your second report to the dean or the

23  first?

24      A    This was the first report.

25      Q    Okay.  So, let's back up.  Before the bathroom

1    incident, you did not make a report to the dean?

2        A    I did not make a report to the dean because I

3    went to talk to his boss first --

4        Q    Bob Young?

5        A    -- to try to resolve it, yes, but I mean, I

6    just want to make this clear that the incident with him

7    harassing me based on my use of FMLA, that was the very

8    first, that was the very first incident.

9        Q    Okay, and that occurred shortly before the

10   bathroom incident?

11       A    Yes.

12       Q    Okay, and that report was to Mr. Young?

13       A    Yes.

14       Q    Was that report also to the dean?

15       A    No.  The report about Marquese harassing me

16   and with the bathrooms was with the dean.

17       Q    Okay, but before the bathroom, it was just Mr.

18   Young that you reported?

19       A    Mr. Young, yeah.

20       Q    Did you make that report -- now we're talking

21   about in October of 2009, did you make reports to anyone

22   other than the dean and Mr. Young?

23       A    Yes, HR.

24       Q    Okay.  Who at HR?

25       A    I don't know.  I think Valerie Stanley, the

1      A      Yes.

2      Q      Things did not get better; correct?

3      A      No, it didn't.

4      Q      You filed a grievance; correct?

5      A      I filed a grievance.

6      Q      Okay, and was that sometime in November of

7  2009?

8      A      Yes, it was, because right after, that's when

9  Andy came over, and we were -- and we had a discussion

10  with the supervisor McGuire in his office, and then he

11  disclosed it.

12      Q      Okay.  So, in that meeting, was there a

13  discussion about Andy -- withdrawn.

14            In that meeting, was there a discussion that

15  you were upset that Mr. McGuire was counseling you on

16  your absenteeism?

17      A      Yes.

18      Q      Okay, and it was your position that you were

19  protected by the FMLA?

20      A      That's correct.

21      Q      Mr. Reddick, I don't understand how you can

22  have some type of discussion, okay, about these problems

23  without some discussion of your medical condition.

24      A      No.  I didn't disclose that to him.

25      Q      But you were saying that you had a medical

1   condition; correct?

2       A    Yes, but I didn't tell him what it was at the

3   time.

4       Q    So, it's your position --

5       A    But he - I'm sorry.

6       Q    So, it's your position that Mr. McGuire did

7   not know what your medical condition was?

8       A    No.  I did speak to him about my medical

9   condition, but he disclosed that in front of -- in front

10  of them.

11      Q    Okay.  In the context of a discussion about

12  your medical leave; correct?

13      A    No, no.  If I can explain it that it was based

14  upon my attendance.  That's what was the discussion

15  about when we was in his office.  It didn't have

16  anything to do with my condition, like what he was

17  saying, telling them about my condition.

18      Q    Okay.  We'll agree that there was a discussion

19  about your attendance in his office?

20      A    Right, right.

21      Q    We will also agree that your response was you

22  were on FMLA leave because of a medical condition;

23  correct?

24      A    Yes.

25      Q    Okay.  So, we can agree that the discussion of

1    your medical condition was in the context of discussing

2    your FMLA leave?

3        A     It was in reference to the fact of my

4    attendance, yes.

5        Q     Can you please tell me the names of every

6    employee Mr. McGuire shared your medical information

7    with?

8        A     Andy, he's the shop steward; and Robert,

9    what's his last name?  He's the supervisor, Robert.

10       Q     Daly?

11       A     No, no.  Mike Roberts, Mike Roberts, he was

12   there.

13       Q     Okay.  What exactly did Mr. McGuire say about

14   your medical issues?

15       A     He disclosed that I had a condition of -- I

16   don't know if he used the words of spasm, but he told

17   them about what I had.

18       Q     What did he say?

19       A     You know, I don't -- I can't remember

20   everything, but I -- but there was two witnesses that

21   were there, Andy, and because I -- like I said, it had

22   been awhile, but I had those two witnesses that were

23   there that he was discussing it, so I can't -- if I say

24   something, I don't want to say something and say a word

25   that I'm not really sure, but the two witnesses that

1    were there, that's why I gave you their names.  Andy was

2    there, and Mike Roberts was there when he disclosed my

3    medical condition.

4         Q    Okay.  Well, the two witnesses haven't filed

5    lawsuits, you have; you understand that?

6         A    I understand that, but I'm saying but I'm

7    giving you two witnesses who were there, and they heard

8    him was telling about my medical.

9         Q    I understand.  I'm deposing you today, not

10   those two witnesses; you understand that?

11        A    I understand that, but I only can give you

12   what actually happened.

13        Q    I'm only asking you actually what happened.

14   You filed a lawsuit claiming that you were harassed;

15   correct?

16        A    Right.

17        Q    And you are claiming that one of those

18   elements of harassment was that Mr. McGuire disclosed

19   your medical information in front of someone else;

20   correct?

21        A    Yes, that's correct.

22        Q    And that upset you; correct?

23        A    Yes, it did.

24        Q    And caused you emotional distress; correct?

25        A    Yes.

1    Q    Okay.  So, with that, I would like to know

2    what exactly you remember Mr. McGuire disclosing.

3    A    Like I said, I can't remember all of the

4    things that were -- that were said.

5    Q    To the best of your recollection, if you can,

6    as you sit here today, what I want to know, just so you

7    know, today we're taking your deposition, you understand

8    that; correct?

9    A    Yes.

10   Q    There's going to be a trial in this case, you

11   understand that?

12   A    Yes.  I understand that.

13   Q    You're going to be sitting on a witness stand;

14   correct?

15   A    Yes.

16   Q    You're going to be addressing a jury; correct?

17   A    Yes.

18   Q    Your lawyer is going to be asking you a series

19   of questions; do you know that?

20   A    Yes.

21   Q    Okay, and one of the allegations that you have

22   made in your Complaint is that this Mr. McGuire harassed

23   you and retaliated against you when he disclosed your

24   medical information; correct?

25   A    Yes.

1      Q      Today I would like to know exactly what you're

2      going to tell that jury, okay; do you understand that?

3      A      Yes.

4      Q      So, if you can, to the best of your knowledge

5      and recollection, tell me what Mr. McGuire said about

6      your medical condition.

7      A      Well, he mentioned to them and stuff that I

8      do -- that I do have a condition of spasms, but I don't

9      know the rest of all the things he said.  Those two

10     witnesses who were there, they know.  I can only just

11     tell you just that part because he said a lot -- a few

12     other things, too, and that's when -- that's when even

13     Andy said that you can't talk to him about -- I mean,

14     you can't talk about his medical condition, discuss his

15     medical condition.

16     Q      Okay.  Just so you and I are clear --

17     A      Because he was the shop steward that was

18     representing me at the time.

19     Q      So you and I are clear, when we have the trial

20     in this case, what you're going to tell the jury is he

21     mentioned spasms, but you don't know the rest of what he

22     said?

23     A      That's correct.

24     Q      Okay.  Thank you.

25            One of the claims you made in your Complaint

1    BY MR. DUBIN:

2        Q    Mr. Reddick, before we took a break here, you

3    told me that you came back in April of 2011; correct?

4        A    Yes.

5        Q    Did you -- how is that you came back?  Did you

6    get a doctor to lift any restrictions?

7        A    No.  After I had -- after I had been out, my

8    doctor did lift the restrictions and stuff, but he said

9    I still could have it to work.

10       Q    Okay.  So, we can agree that at sometime in

11   March 2011, you attempted to go to work with

12   restrictions; correct?

13       A    Yes.

14       Q    Okay.  Do you know what those restrictions

15   were?

16       A    Yes, that I couldn't lift more than ten

17   pounds.

18       Q    Is that the first time those restrictions were

19   ever imposed on you?

20       A    No.

21       Q    And were those the only restrictions that you

22   were given in March of 2011?

23       A    Yes.

24       Q    And which doctor gave you those restrictions;

25   that Dr. M?

1        A      "M," yes.

2        Q      At some point, Mr. Young and Mr. Good learned

3   about this, and they told --

4        A      Well, I just feel -- I just feel that it was

5   wrong for them -- I felt discriminated against because I

6   felt for me to have to go to leave the workplace, it

7   caused financial -- it caused financial problems for me

8   because I didn't have any -- I didn't have anything

9   coming in at the time, and I felt that they were

10  discriminating against me.

11       Q      We have taken a break, and you have changed

12  your answer, sir?

13       A      Hum?

14       Q      We have taken a break, and you have changed

15  your answer.  Your answer before was you just did not

16  like the way you were spoken to.  After the break --

17       A      I'm just telling you I felt the way he was --

18  that the way he was talking to me and stuff in a

19  negative way, you know, and I feel because of that very

20  reason I was discriminated against because I was forced

21  off the job.

22              Like I said, you know, when you say -- when

23  you was talking to me, you was talking rather fast, and

24  I can't -- I have to -- I need time to be able to think

25  about the things that actually took place and how I

1    restrictions were lifted?

2        A    Immediately, yes.

3        Q    Okay.   Until the restrictions were lifted;

4    correct?

5        A    Yes.

6        Q    Okay, and you went to your doctor?

7        A    I went to my doctor.

8        Q    Okay, and the restrictions were lifted?

9        A    The restrictions were lifted, yes.

10       Q    And then you went back to work?

11       A    Yeah.   I went back to work after that, yes.

12       Q    Okay.   Now, you said that that constitutes

13   discrimination?

14       A    Yes, because I had a medical condition.   That

15   wouldn't happen, and I feel that it was -- that I lost

16   wages because of that very reason, and I also -- I also

17   felt that when I had restrictions before, I was

18   accommodated, and I never was -- it wasn't a problem

19   then, and why is it a problem now?

20       Q    Let me ask you this:   Did you, during this

21   April 7, 2011 meeting with Gray Mitchell, say "I need an

22   accommodation"?

23       A    Yes, I asked for accommodation.

24       Q    What accommodation did you ask for?

25       A    I asked for accommodation for me doing the job

1    because of me not being able to use my arm, because it

2    was in my arm that I had fluid in my arm.

3         Q    So, this is the fluid in the arm episode

4    you're claiming that occurred on April 11 -- in April of

5    2011?

6         A    Yeah, yes.

7         Q    Was the fluid in your arm, does that in any

8    way relate to the spasms that you have, or is that a

9    different medical condition?

10        A    No, it's to the same thing that I have, the

11   spasms.  I get -- like I said, it affects my system.

12        Q    What is the accommodation that you asked for?

13   I didn't understand the accommodation that you asked

14   for.

15        A    Well, the accommodation I asked for was to be

16   able to do things that -- which I had in the past, like

17   light stuff, like, you know, doing, like I said, setting

18   up different functions.  Those are light things I could

19   do, also assist -- getting the assistance which I asked,

20   which Lavene is on the job and stuff, so I asked for a

21   helper, a buddy, which is a buddy system where you can

22   get assistance for if you have any type of problem,

23   medical problem or something, or if you need some

24   assistance and helping, helping in the area.

25              So, it's not that I couldn't do the essential

1   part of my job.  It's just that I needed some help

2   because I can only use that arm, the one arm.  The other

3   arm had fluid in it, so I asked for accommodation.

4       Q    So, you could not use the arm with fluid in

5   it; is that correct?

6       A    The arm that I had with fluid in it, I

7   couldn't lift more than ten pounds in that arm, but as

8   far as using it, I could use it, but as far as using it

9   to the fullest, no.

10      Q    When did this fluid develop?

11      A    When I had the -- when I had the episode.

12      Q    When was that?

13      A    That was -- let's see --

14      Q    The Complaint shows the third week of

15  February 2011; is that about right?  I'm looking at

16  Paragraph 44.

17      A    Yeah, February 11, yeah, okay.

18      Q    It doesn't say February 11.  It says the third

19  week of February 2011; is that correct?

20      A    The third week of February you said?

21              MS. GRAMLICH:  That's what it says here.

22          This is what he's reading.

23              THE WITNESS:  Let me see this.  Okay,

24          around the third week of February '11, yes.

25  BY MR. DUBIN

1      Q    Okay.  So, it was around the third week of

2  February 2011?

3      A    Yes.

4      Q    And you had an episode; correct?

5      A    Yes.

6      Q    And you used your intermittent FMLA; correct?

7      A    Yes.

8      Q    And then you returned to work on March 2;

9  correct?

10      A    Yes.

11      Q    And you had fluid in your arm; is that

12  correct?

13      A    That's true.

14      Q    And you were -- and you then had a minor

15  lifting restriction documented by your treating

16  physician; correct?

17      A    Yes.

18      Q    And you believe that lifting restriction to

19  have been ten pounds; correct?

20      A    Yes.

21      Q    Okay.  The accommodation that you wanted and

22  asked for was to use the buddy system?

23      A    Yes.

24      Q    Okay, and I think what you told me what you

25  wanted to do was, you wanted to do setup; is that what

1   you wanted to do, light duty and setting up functions?

2       A    Yeah.  Those setups basically were light where

3   I can, you know, be able to do those things, but also,

4   there are other tasks, too, that they want you to do all

5   combined together.

6            So, if you were -- if you were to have a

7   buddy, or if you had to do it, you can either -- they

8   can either assign you to do that or not assign you to do

9   that, or they can assign you to a buddy that can help

10  and assist you to take -- to take care of the tasks,

11  and, also, with the buddy system, also, there is also to

12  do things such as wash windows and stuff.

13      Q    What do the setups entail, Mr. Reddick?

14      A    The setups entail setting up the classrooms,

15  like rearranging them.  Like if you ever go to court,

16  you know, you have the different types of setups.  They

17  may want you to set up, set the chairs a certain way

18  diagonal corners and stuff like that.

19           There are other things you got to bring in the

20  room to set up, like some podiums and stuff, things like

21  that.

22      Q    So, did the setups involve moving chairs?

23      A    Yeah, light stuff, like chairs.

24      Q    How about tables?

25      A    Tables, yes, some tables, but you also have

1    someone to assist you.

2        Q    And who did you have to assist you?

3        A    Lavene, Lavene Walker.

4        Q    Is that a male or female?

5        A    Female.

6        Q    And how old is Lavene Walker?

7        A    I don't know how old she is.  I don't know how

8    old she is.

9        Q    Okay.  How tall is she?

10       A    She's about 5'6".

11       Q    Okay.  How much does she weigh, approximately,

12   do you know?

13       A    I don't know her weight.  I don't know, but

14   she been doing that for -- we've been doing that for

15   years, so she's familiar.  She can do the job.

16       Q    The accommodation that you had requested is

17   that Lavene and you, with your one arm, move the tables

18   and chairs?

19       A    Yes.

20       Q    And that accommodation was --

21       A    Yes, but also, washing windows and things like

22   that was also in the buddy system, too.

23       Q    Okay.  You returned to work after that period

24   of time, when?  I'm looking at your Complaint, again,

25   sir.  The Complaint says that it looks like it was a

1   period of five weeks.

2       A    Yes.

3       Q    In your Complaint you said that Yale forced

4   you out of the workplace for five weeks without pay.

5       A    Yes.

6       Q    And this was in 2011 --

7       A    Yes.

8       Q    -- correct?  And denied you the usual benefits

9   of employment you had normally accrued during that time.

10  So, what I want to know is:  What loss of pay do you

11  claim for that period of time?

12      A    I had no money coming in.

13      Q    That wasn't the question.  The question is:

14  What is the amount you're claiming?

15      A    I don't know exactly what amount I'm claiming.

16      Q    You don't know what the salary that you lost

17  for that five-week period was?

18      A    I don't know, but without me having a check

19  every week, that's what I lost.  I lost my regular

20  salary, but I don't like -- I don't know.

21      Q    What is your -- what was your salary at the

22  time or your hourly rate?

23      A    I think it may have been $15 or $16 an hour.

24      Q    Okay.  For 40 hours a week?

25      A    Yes.

1    in April, April 7, 2011?

2         A    I was still senior custodian.

3         Q    So, we can agree that from April 7, 2011,

4    until the present, your job title hasn't changed;

5    correct?

6         A    My job title haven't changed.

7         Q    Can we agree with that?

8         A    Yes.

9         Q    Can we agree your salary has not changed?

10        A    No, my salary hasn't changed.

11        Q    Can we agree that your salary actually

12   increased from April 2011 until the present?

13        A    Yes.  They didn't deny me any salary -- I

14   mean, any increase.

15        Q    Okay.  So, how -- I'm just going to try and

16   not complicate this question.  There's three areas I'm

17   concerned with now:  Your job responsibilities before

18   April 7, 2011, when you were asked to leave; okay?

19        A    That's correct.

20        Q    Then there is a period of time when you came

21   back when you were relieved of your typical duties and

22   did whatever Gray wanted you to do for two months; okay?

23   And then there's a third area when that stopped; okay?

24             What I want to know is:  How did your job

25   responsibilities for kind of phase one, before you left

1    there, that they are TLs, team leaders.

2        Q    That's 18 people?

3        A    Eighteen people.  In the second phase, there

4    was another 19 people.  So, it was two phases.  I was in

5    the first phase, and then the second phase was in 2010.

6        Q    Okay.  So, based on your testimony, in 2009

7    and 2010, the only person that did not receive this new

8    position and this pay increase was you?

9        A    Was me.

10       Q    You're the only one?

11       A    I say I was the only one.  Anyone who did not

12   receive it was -- I think there's one or two people who

13   had got out of the program, but then there was some who

14   were -- I think somebody was -- well, it was replaced.

15   Two people were replaced, I believe.

16       Q    Did you complete the program?

17       A    I completed all of the program except one day

18   when I was sick.

19       Q    So, you did not complete the program?

20       A    I completed only up until the last day.  I was

21   there the last day, but I had to leave.  I was sick, and

22   so, I told Andy -- I mean, Lou Annanoni (phonetic.)

23   He's the guy -- he's the one who had the program,

24   started the program, along with the union that was

25   present there, too.  His name is Lou Annanoni.

149

```
1       Q     So, you did not complete the program?

2       A     No.

3       Q     No, you did?  Let's try it again.  Am I

4    correct or incorrect that you did not complete the

5    program?

6       A     I didn't complete that last day.

7       Q     All right.  Do you know the names of all of

8    the other participants in the program in the year you

9    participated?

10      A     Vondeen.  James Carr; Gary Henderson; Melinda

11   Franklin.  I said James Carr.  I said Melinda Franklin,

12   Gary Henderson.  Jacqueline, I don't know her last name,

13   Jacqueline.  There are so many people.  I'm just trying

14   to remember their names.

15      Q     If you can't remember them all, that's fine.

16      A     Okay.

17      Q     Okay.  Can we agree that the people that did

18   get this promotion --

19      A     Yes.

20      Q     -- and these positions completed the program?

21      A     Yes.

22      Q     We can agree that you did not?

23      A     That's correct.

24      Q     Did you ask to be allowed to complete the

25   program?
```

1      A      I asked for accommodation, yes.

2      Q      And who did you ask?

3      A      I asked Brian Wyngate, and I asked Bob Young,

4   and they said, "Curtis, not to worry.  We understand

5   that you were sick," and they said, "Don't worry.  We'll

6   set you up for an interview and not to worry."

7      Q      Was that in writing or oral?

8      A      No, it was oral.

9      Q      When was that?

10     A      That was sometime in September of 2010.

11     Q      The day that you had the episode which

12  prohibited you from completing the program, when was

13  that?

14     A      I don't know, offhand.  I don't know, offhand.

15  I really don't know because Lou, the one who sponsored

16  the program, Lou Annanoni, he would know because I had

17  went to him when I was having the episode.

18     Q      But you don't recall when that was?

19     A      No.

20     Q      What was the accommodation you requested?

21     A      The accommodation was requested after, after I

22  had the episode.  I seen Brian.  I talked to Brian

23  directly and also Bob Young, and they said, "Don't

24  worry.  We're going to set up for the interview, and you

25  come to the interview, and you let everybody else know

1    about what took place."

2         And then when I was there, I asked for

3    accommodation.  I said, "Can I complete the last class?"

4         And they says, "Well," they said, "You have

5    to -- you've got to do the whole class all over."  I

6    mean, the whole program all over.

7         I said, "Why is it you're penalizing me

8    because I was sick and I had an episode?"  I said, "Can

9    I have -- can you accommodate me?  Can I do that one

10   class?"

11        And they said no, and then they said, "Okay.

12   Thanks for coming, Mr. Reddick, and we'll let you know

13   if you be selected in the next phase."

14        Then I got an e-mail, I think, a week later.

15   They signed it, and said, "Unfortunately you was not

16   chosen to be selected in the program."

17   Q    Okay.  So, the team leader program, you did

18   not complete, you missed the last day; correct?

19   A    That's correct.

20   Q    You had to leave; correct?

21   A    Yes, because of my condition.

22   Q    You had an episode?

23   A    Yes.

24   Q    And how long were you out of work for?

25   A    I was out of work probably for about three

1   days or so.

2        Q    Then you reported back to work?

3        A    I reported back to work.

4        Q    And then at some point, you spoke to Brian

5   Wyngate and Bob Young?

6        A    Yes.

7        Q    And you asked them for an accommodation?

8        A    Yes.  I asked them can I complete -- I'm sorry

9   because you --

10        Q    Go ahead.

11        A    I asked them, "Can I complete the last class?"

12        Q    And they said?

13        A    And they said, "Well, not to worry."  They

14   said, "We'll set you up for an interview and then you

15   come to the interview.  You know, you tell them

16   everything, you know," and then from there, I was hoping

17   that I can do the class, and then they told me no, no.

18   They denied me.

19             They said, "No.  You can't do that one class."

20             I said, "Why?  I was sick.  Why?  I feel

21   unfair that why you penalizing me because you know I

22   have a medical condition," which they were aware that I

23   had a medical condition.

24        Q    So, Brian Wyngate and Bob Young accommodated

25   your request by setting you up with an interview?

1       A     Yes.

2       Q     Do you claim that Bob Young ever discriminated

3  against you?

4       A     Yes.

5       Q     We've discussed that?

6       A     Yes.

7       Q     So, yet, in this case, Bob Young actually --

8  you conveyed a request for an accommodation, and it was

9  granted; correct?

10      A     The accommodation was to be able to do that

11 class over.  That wasn't accommodated.  I was not

12 accommodated because I didn't get a chance to do that

13 last class over.

14      Q     That wasn't Bob Young's call, was it?  Bob

15 Young gave you an interview?

16      A     No.  Bob Young was part of the interview.

17      Q     So, Bob Young is one of the interviewers?

18      A     Bob Young was one of the interviewers.

19      Q     So, he said, "We'll set you up with an

20 interview," and he gave you that interview; correct?

21      A     Yeah, I got the interview, yes.

22      Q     And they told you that you couldn't complete

23 the one class you missed, but they would invite you to

24 do the whole program over?

25      A     They said you would have to do the whole

1    program over, but I never had the opportunity because

2    they never selected me.

3        Q    Was the program offered again?

4        A    I was denied.  It was not -- it was not

5    offered to me.

6        Q    Was it offered again in 2009?

7        A    It was offered in 2010.

8        Q    I'm sorry, 2010.  Did you apply for it the

9    next time it was offered?

10        A    Yes, I did.

11        Q    And were you accepted?

12        A    No, no, I wasn't accepted.

13        Q    So, it's your opinion that everyone who

14    attended the program -- withdrawn.

15            Was there any guarantee that everyone who

16    participated in the program would have been successful

17    in the program?

18        A    I really don't know because I can't speak for

19    every person, but they did say that if you completed the

20    program, that you would be placed in that position.

21        Q    Was there also -- you agree that there was

22    also an interview in the training process?

23        A    Yes.

24        Q    And were you assessed a grade as a result of

25    the interview?

1      A      Well, my interview that I first had, I was.  I

2   was qualified.  So, they said, "Congratulations.  You're

3   qualified," and that's when I was scheduled with 18

4   other individuals to be into the training program.

5      Q      Okay.  Did this occur, this first phase, was

6   this in June of 2009; does that make sense?

7      A      Yeah, the first interview, yes.

8      Q      Okay, and individuals successful in the

9   interview phase of the program were required to attend

10  this two-week training session; correct?

11     A      That's correct, yes.

12     Q      And you were successful in the interview

13  process, and you completed -- I'm sorry.  You were

14  successful in the interview process; correct?

15     A      Yes.

16     Q      Now, are you aware that -- withdrawn.

17            There was a second phase; correct?

18     A      Yes.

19     Q      That was in March of 2010?

20     A      Yes.

21     Q      Was this open to all applicants who completed

22  the 2009 training?

23     A      It was open for everyone.  Anyone who desired

24  to want to be in the program, they can apply.

25     Q      Okay, but you had to first go through this

1    2009 training; correct?

2        A    You had to first had to be interviewed first.

3        Q    And is that the training we were talking

4    about?

5        A    Yes.  You have to be interviewed first in

6    order to be qualified to be in this program.

7        Q    All right, and then you were required to

8    attend the three-day mandatory training session; isn't

9    that correct?

10       A    Yes, and I believe, as a matter of fact, I

11   believe that's the one, that's the one day that I didn't

12   complete because there was a two-week.  It was mandatory

13   for two weeks, but then, again, we had to come back

14   three days, and so, to the best of my knowledge, I know

15   there's that one day I got sick, and that's when I went

16   to -- I mean, what's his name, Lou Annanoni, and he's

17   the one, that sponsor of that program, the team leader

18   program, along with the union, and I had to go to him

19   and tell him, and he know I was sick.

20            So, I told him.  I said, "I have to go because

21   I'm very sick," and he seen me and stuff.

22            He said, "Okay, Curtis, no problem."

23            And I told him.  I didn't just leave and just

24   that was it.  It wasn't like that at all.

25       Q    I'm not suggesting that it was.  What I'm

1    trying to figure out is the timing of these events.

2    Okay.  So, there was a two-week training that you

3    participated in, in June of 2009 or July of 2009?

4         A    July 27, and I believe it was all the way up

5    until August 2.

6         Q    And then you were asked to, in fact, come back

7    in March; correct?

8         A    Yes, right, and they wanted to find out --

9    they wanted to find out how did we like the program,

10   what suggestions that we could add to the -- I mean, to

11   the team leader program, and so, everybody had -- you

12   know, they put us into different groups, and so, we came

13   up with different solutions as to how we can be

14   successful leaders as a team leader.

15        Q    This was a mandatory training session, a

16   mandatory three-day training session?

17        A    Yes.

18        Q    You testified earlier you missed the last day;

19   that's not true, is it?  You actually only went to one

20   day?

21        A    I missed one day.

22        Q    Are you sure about that?

23        A    I'm 100 percent.

24        Q    100-percent sure?

25        A    I'm 100-percent sure that the last day I

1   missed.

2        Q    Okay.  So, that's what you're -- let me just

3   explain something.  I want to make sure you're sure

4   about your testimony today.  It's your testimony and the

5   testimony you're going to tell the jury is you only

6   missed the last day and not the last two days?

7        A    Well, like I said, to the best of my

8   knowledge, that was one day that I missed, and Lou

9   Annanoni would tell you because he was the one that I

10  went to.

11       Q    Well, Mr. Reddick, I'm not really concerned

12  about what other people are going to tell me.

13  Mr. Reddick, I want to know --

14       A    I had to report to him on that day.

15       Q    I got you.  I want to know what you're going

16  to tell me, what you're going to tell the jury under

17  oath today, and what you're going to tell the jury under

18  oath at the time of trial, and it's your testimony today

19  under oath that you only missed the last day and not the

20  last two days.  I just want to make sure that that's the

21  testimony you're going to give to the jury under oath.

22       A    Well, the testimony that I'm going to give to

23  the jury is the best I can recall.  If it's one or two

24  days that I missed, I'm not really possibly 100-percent

25  sure, but as the day that I got sick, that was that day,

1    that one day.  So, that's how -- that's how I'm going to

2    say if I come before a jury.  You know, because like I

3    said, that was that one day that I missed.  That's how I

4    see it because it was on a Friday.  I believe it was on

5    a Friday.  It was on a Friday.

6         Q    Okay.  So, if someone testified that you left

7    early on the first day and didn't report for the next

8    two days, you would take issue with that?

9         A    Well, I don't know what to say because like I

10   said, that was that one day I was sick because we was on

11   the last week, the last -- the last day, I mean, the

12   last -- basically, the last week of that day.  Like I

13   said, I only can give you what I can remember, the best

14   of my knowledge, yeah.  I can't -- I don't want to lie

15   and say oh, this and that because that's not me.  That's

16   not me.

17        Q    Okay.  I'm not asking you to lie.

18        A    I can only tell you what I can remember.

19        Q    That's all I'm asking.

20        A    So, if I can't remember something, it doesn't

21   mean that I'm not truthful.

22        Q    Okay, and a few moments ago, you said it was

23   100 percent.  You were 100-percent sure that you just

24   missed the last day.  It sounds like you're telling me

25   now, the best of your recollection, it was just the last

1    day?

2        A    Right, because I'm not perfect with words.

3    Nobody is perfect.

4        Q    But would you agree with me that someone who

5    doesn't finish the program wouldn't be eligible for the

6    new position or consideration into the new position?

7        A    No.  It should be a consideration if you have

8    a condition.  In fact, if it's because I was sick, I

9    shouldn't be disqualified for it.  If I wasn't sick, I

10   would have completed the class.

11       Q    Okay, and do you know how you performed in the

12   interview process?

13       A    Yes.  I was successful in the interview

14   process.

15       Q    Have you ever seen any reports on the

16   interview process that scored you or graded you?

17       A    No, I haven't seen it, but I did receive -- I

18   don't have it, but I did receive a letter that I was

19   successful in the interview, and they also -- they also

20   called those references that I had, and they said due to

21   -- "Due to your qualifications, you are eligible for the

22   team leader program," and that's when I was scheduled to

23   go.

24       Q    All right.  Did you ever learn that you

25   presented poorly in the interview?

1  something?

2      A    No.  As soon as I came in and stuff, he would

3  tell me where I had to go, so I had to report to him.

4      Q    Well, you reported to him before?  I mean, he

5  was always your supervisor?

6      A    Yeah, but I mean, it's every day.  It wasn't

7  never nothing scheduled for me.  It was just whatever he

8  wanted me to do, I had to do.

9      Q    Who was doing those tasks before?

10     A    Which tasks?

11     Q    The tasks that you were now doing at the

12  request of Gray Mitchell?

13     A    I don't know because these were made up by

14  him.  There was no -- there was no specific job.  It was

15  whatever he wanted me to do.  If it was down in the

16  basement, the dorm area, the gutters, the sewers, all

17  that stuff, that's what I had to do.

18     Q    I assume that, before you were doing those

19  tasks, there was someone at Yale doing those tasks, or

20  do you not know the answer to that?

21     A    I don't know.  I don't know the answer to

22  that.

23     Q    So, we can agree that you were not fired?

24     A    No, I wasn't.

25     Q    And we can agree that you weren't demoted;

169

```
1    correct?

2         A    No.  I wasn't demoted.

3         Q    And we can agree your salary did not change?

4         A    That's correct.

5         Q    Okay.  Did you have a recent meeting with a

6    Valerie Stanley?

7         A    Yes.  Well, actually, with Valerie Stanley --

8         Q    And Sheila Dawson?

9         A    Yes, that was --

10        Q    April 30?

11        A    Of this year.

12        Q    What was the purpose of that meeting?

13        A    Because I asked for accommodation.  Before she

14   came, there was Charlie.  Charlie was the supervisor,

15   and he's no longer the supervisor, and I had

16   accommodation, and the accommodation I had was that I

17   have to take medicine at a certain time, okay, the

18   medicine that I take, and I asked for the accommodation

19   so that I can come in without disrupting the workplace,

20   to start on time, from 4:00, from 4:00 to 12:00, and so,

21   I had got the accommodation, and when she came in, she

22   took the accommodation from me.

23        Q    Who?

24        A    Sheila Dawson, so I filed a grievance on

25   Sheila.
```

```
 1                        I N D E X

 2                                                    PAGE

 3   DIRECT EXAMINATION BY MR. DUBIN                    04

 4

 5

 6

 7

 8                    E X H I B I T S

 9   DEFENDANT'S EXHIBITS NO.1, NO.2, NO.3,
           NO.4, NO.5                                   47
10   DEFENDANT'S EXHIBITS NO.6, NO.7, NO.8              48
     DEFENDANT'S EXHIBITS NO.9, NO.10, NO.11, NO.12     48
11   DEFENDANT'S EXHIBIT NO.13                          59

12

13       (Original exhibits retained by Attorney Dubin.)

14

15

16

17

18

19

20

21

22

23

24

25
```

1          C E R T I F I C A T E

2          I hereby certify that I am a Notary Public, in and

3     for the State of Connecticut, duly commissioned and

4     qualified to administer oaths.

5          I further certify that the deponent named in the

6     foregoing deposition was by me duly sworn, and thereupon

7     testified as appears in the foregoing deposition; that

8     said deposition was taken by me stenographically in the

9     presence of counsel and reduced to typewriting under my

10    direction, and the foregoing is a true and accurate

11    transcript of the testimony.

12         I further certify that I am neither of counsel nor

13    attorney to either of the parties to said suit, nor of

14    either counsel in said suit, nor am I interested in the

15    outcome of said cause.

16         Witness my hand and seal as Notary Public this 7th

17    day of July, 2014.

18

19                                        _____

20                                        Jennifer Tramontano

21                                        Notary Public

22    My Commission Expires:

23    May 31, 2015            License Number 00239

24

25

COPY

1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
2

3     CURTIS REDDICK,

4          PLAINTIFF,

5     VS.                         CIVIL ACTION NO:
                                  3:13-CV-01140 RNC
6     YALE UNIVERSITY, ET AL.,

7          DEFENDANTS.

8

9          Deposition of CURTIS REDDICK, VOLUME II, taken

10    pursuant to Section 13-26 of the Practice Book, at

11    Donahue, Durham & Noonan, P.C., 741 Boston Post Road,

12    Guilford, Connecticut, by Sabina Lohr, Licensed

13    Shorthand Reporter and Notary Public in and for the

14    State of Connecticut, on September 11, 2014,

15    at 10:22 a.m.

16

17

18

19                           SABINA LOHR
                             LSR #0000131
20

21         DEL VECCHIO REPORTING SERVICES, L.L.C.
              PROFESSIONAL SHORTHAND REPORTERS
22                    117 RANDI DRIVE
                    MADISON, CT 06443
23      (203) 245-9583          (800) 839-6867
                   FAX (203) 245-2760
24
      HARTFORD              NEW HAVEN            STAMFORD
25

```
 1    APPEARANCES:

 2       ON BEHALF OF THE PLAINTIFF:

 3       MICHELLE GRAMLICH, ESQUIRE
         EMPLOYEE RIGHTS, L.L.C.
 4       57 STATE STREET
         NORTH HAVEN, CONNECTICUT 06473
 5
         ON BEHALF OF THE DEFENDANT YALE UNIVERSITY:
 6
         BROCK T. DUBIN, ESQUIRE
 7       DONAHUE, DURHAM & NOONAN, P.C.
         741 BOSTON POST ROAD
 8       GUILFORD, CONNECTICUT 06437

 9       ON BEHALF OF THE DEFENDANT:

10       GREGG D. ADLER, ESQUIRE
         LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY, P.C.
11       557 PROSPECT AVENUE
         HARTFORD, CONNECTICUT 06105
12
      Also Present:
13    Ms. Mica Notz, Paralegal, Employee Rights, L.L.C.
      Ms. Meg Riccio, Defendant
14

15

16

17

18

19

20

21

22

23

24

25
```

1                          J U R A T

2

3       I have read the foregoing 27 pages and hereby

4   acknowledge the same to be a true and correct record of

5   the testimony.

6

7

8

9                      _____

10                          CURTIS REDDICK

11

12  Subscribed and sworn to _____.

13  Before me this ___ day of _____, 2014.

14

15

16

17

18

19

20

21

22

23  _____

24  Notary Public

25  My Commission Expires:

```
 1                    C E R T I F I C A T E

 2          I hereby certify that I am a Notary Public in,

 3    and for the State of Connecticut, duly commissioned and

 4    qualified to administer oaths.

 5          I further certify that the deponent named in

 6    the foregoing deposition was by me duly sworn and

 7    thereupon testified as appears in the foregoing

 8    deposition; that said deposition was taken by me

 9    stenographically in the presence of counsel and reduced

10    to typewriting by me, and the foregoing is a true and

11    accurate transcript of the testimony.

12          I further certify that I am neither of counsel

13    nor attorney to either of the parties to said suit, nor

14    am I an employee of either party to said suit, nor of

15    either counsel in said suit, nor am I interested in the

16    outcome of said cause.

17          Witness my hand as Notary Public this 15th day

18    of September, 2014.

19

20

21

22                              Sabina Lohr
                                Notary Public
23    License #0000131
      My License Expires December 31, 2016
24    My Notary Certification Expires July 31, 2017

25
```

Del Vecchio Reporting Services

1                              INDEX

2    EXAMINATIONS                              PAGE

3    DIRECT                                     220

4

5    DEFENDANT'S EXHIBITS

6    EXHIBIT NO. 14 - UNIDENTIFIED DOCUMENT      219

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COPY

246

1           UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT
2
3   CURTIS REDDICK,

4      PLAINTIFF,

5   VS.                          CIVIL ACTION NO:
                                 3:13-CV-01140 RNC
6   YALE UNIVERSITY, ET AL.,

7      DEFENDANTS.

8

9      Deposition of CURTIS REDDICK, VOLUME III, taken

10   pursuant to Section 13-26 of the Practice Book, at

11   Donahue, Durham & Noonan, P.C., 741 Boston Post Road,

12   Guilford, Connecticut, by Sabina Lohr, Licensed

13   Shorthand Reporter and Notary Public in and for the

14   State of Connecticut, on September 30, 2014,

15   at 10:08 a.m.

16

17

18

19               SABINA LOHR
                 LSR #0000131
20

21      DEL VECCHIO REPORTING SERVICES, L.L.C.
           PROFESSIONAL SHORTHAND REPORTERS
22                117 RANDI DRIVE
               MADISON, CT 06443
23      (203) 245-9583          (800) 839-6867
             FAX (203) 245-2760
24
   HARTFORD              NEW HAVEN           STAMFORD
25

247

```
1    APPEARANCES:

2        ON BEHALF OF THE PLAINTIFF:

3        MICHELLE GRAMLICH, ESQUIRE
         EMPLOYEE RIGHTS, L.L.C.
4        57 STATE STREET
         NORTH HAVEN, CONNECTICUT 06473
5
         ON BEHALF OF THE DEFENDANT YALE UNIVERSITY:
6
         BROCK T. DUBIN, ESQUIRE
7        DONAHUE, DURHAM & NOONAN, P.C.
         741 BOSTON POST ROAD
8        GUILFORD, CONNECTICUT 06437

9        ON BEHALF OF THE DEFENDANT:

10       GREGG D. ADLER, ESQUIRE
         LIVINGSTON, ADLER, PULDA, MEIKLEJOHN & KELLY, P.C.
11       557 PROSPECT AVENUE
         HARTFORD, CONNECTICUT 06105
12
     Also Present:
13   Ms. Mica Notz, Paralegal, Employee Rights, L.L.C.
     Ms. Meg Riccio, Defendant
14

15

16

17

18

19

20

21

22

23

24

25
```

273

```
 1            MR. ADLER:  Okay.  Thanks.
 2            I have a grievance that I'm going to
 3   mark as Exhibit 18.
 4            (A discussion was held off the record.)
 5            (Defendant's Exhibit 18 was marked for
 6            identification.)
 7       Q.   Mr. Reddick, I'm showing you a grievance,
 8   written grievance form dated 11/13/09.  Actually signed
 9   by your shop steward, filed by your shop steward, Andy
10   Mastriano, on behalf of you.
11            Do you see that?
12       A.   Yes, I see it.  Yep.
13       Q.   And it says, I feel that I was discriminated
14   for my disabil -- for disabled that I have, I think; is
15   that right?
16       A.   Yes.
17       Q.   Did you write that?
18       A.   Yes.
19       Q.   Okay.  And this would -- this grievance was
20   filed just -- and that's your signature on it; right,
21   11/19/09?
22       A.   Yes.
23       Q.   And this was filed just a couple weeks before
24   Mr. Axelrod wrote his letter to Yale; correct?  If you
25   look at the letter.  The letter was December.
```

— Del Vecchio Reporting Services —

274

1      A.     Yeah.   This was before that letter, yes.

2      Q.     Yes.   By a couple of weeks; correct?

3      A.     Yes.

4      Q.     Okay.   And so this -- this grievance form on

5   the right, it says WWP and Curtis Reddick.

6             Do you see that?

7      A.     Yes.

8      Q.     What does that mean?

9      A.     I didn't know what it mean at the -- at the

10  time because when we had a discussion it was me and

11  Marquis and Andy was there.   When we first filed this

12  grievance here.

13            But when me and Marquis was talking they

14  were saying that this was -- well, actually, WWP was

15  to -- to my best knowledge to remember that, was that at

16  the time I wasn't aware of what it represent now.   But

17  at the time I thought it was to -- with -- with --

18  with --

19     Q.     Withdraw?

20     A.     No, not withdraw.   With -- resume.   Resume back

21  at another particular date.   That's what was my

22  understanding of it.   And like I said, when I became a

23  steward I didn't have all -- I didn't know about that

24  until later, way later, that it meant withdrawal.

25     Q.     Right.   It means --

─────────────── Del Vecchio Reporting Services ───────────────

275

1       A.      But I didn't know that.

2       Q.      At the time --

3       A.      To be honest, I did not know.

4       Q.      When did you -- when did you become a steward?

5       A.      I don't know exactly what date or what --

6       Q.      Would any document help refresh your

7   recollection as to when you became --

8       A.      Yes.

9       Q.      -- a steward?

10      A.      If I can see it in front of me.

11      Q.      What document would help you refresh your

12  recollection?

13      A.      I don't know if -- if -- if the union has when

14  I first became a steward.

15      Q.      Okay.  So it would it be the union's records?

16      A.      Yes.

17      Q.      Is it your testimony that you were not a

18  steward in 2009?

19      A.      That's what I'm saying.  I don't know.  I don't

20  know when -- what -- what -- what date it was.  That's

21  what I say.  If they have that, if they had a document,

22  then I can be able to say yes, but I --

23      Q.      So the term WWP means withdrawn with prejudice;

24  correct?

25      A.      Right, yes, that I know now.  But I didn't know

— Del Vecchio Reporting Services —

1    at the present time.

2         Q.    You didn't know that in November 2009?

3         A.    Right.  I did not know what that represented,

4    no.

5         Q.    Now you understand that it means, that the

6    grievance was withdrawn; correct?

7         A.    Now I understand what this means, yes.

8         Q.    Yes.  And is that your signature next to it?

9         A.    Yes.

10        Q.    And your testimony is you thought that meant

11   that it would just be resumed at another time?

12        A.    Yes.

13        Q.    Okay.  And I think you testified the first day

14   you had filed a lot of grievances since then; correct?

15        A.    Yes.

16        Q.    Both on your behalf and on behalf of other

17   members; correct?

18        A.    Yes.

19        Q.    And you're also aware that a member -- any

20   member can file a grievance on their own behalf;

21   correct?

22        A.    Yes, they can.

23        Q.    And you don't have to be a steward to file a

24   grievance; correct?

25        A.    From my understanding, you don't have to be a

1    steward.

2         Q.    Right.   But as a steward, once you became a

3    steward, you obviously know how to file a grievance;

4    correct?

5         A.    Yes.

6         Q.    And some of the grievances that you filed have

7    been resolved; correct?

8         A.    Well, a few of them have been resolved, yes.

9         Q.    And at the time you filed this grievance, what

10   we've marked as Exhibit 18 for identification, you had

11   already been fired by Southern; correct?

12        A.    Yes.

13        Q.    And, in fact, you had already filed a complaint

14   in October 2009 with the CHRO over the Southern

15   termination; correct?

16        A.    Yes.

17        Q.    Go back and look at the -- withdraw that.

18              I believe we marked the Complaint.

19              MR. DUBIN:   I'm not certain whether we did

20   or not.

21              MR. ADLER:   I'm pretty sure we did.   Well,

22   I'm pretty sure we have.

23              So I'm going to mark a copy of the complaint

24   in this lawsuit as Exhibit 19?

25              THE COURT REPORTER:   Yes.

1     A.     Yes.

2       Q.     So it's fair to say at least -- at least as of

3    or before September 27, 2010, you knew that you were not

4    being selected for the team leader position; correct?

5       A.     No.  The reason why I say no is because I asked

6    for another interview because I talked to Bob Young and

7    Brian Wingate.  And I asked them, you know, why wasn't I

8    was able to be able to do those class over?  Because I

9    was sick.  And I said, why should I have to be penalized

10   for it because I have a disability?  And he said, not to

11   worry.

12             Bob Young, he said, we going to set you up

13   for another interview.  And so during that time period I

14   was -- they said, we going to have another interview and

15   you come there and you explain to them what happened.

16             And I did.  And I asked them, can I do the

17   program -- can I do that day or two over?  And they

18   said.  Well, we can't -- you can't -- you have to do the

19   whole -- you have to do the whole thing over.

20             I said, well, can I -- all right, then can

21   I?  And they says, well, Mr. Reddick I tell you what.

22   He says, we'll get back to you.  We'll get back to you

23   on that.

24       Q.     Who is -- go ahead.  Finish your answer.

25       A.     He said, we'll get back to you on that.  Bob

```
 1   Young was -- Bob Young, it was Meg there, and it was
 2   these people here, Steve and -- who else?  Brian
 3   Wingate.
 4        Q.    So the people you had the interview with were
 5   the people who signed this letter; correct?
 6        A.    Yes.
 7        Q.    And didn't that happen before you got this
 8   letter, this discussion that you --
 9        A.    Yes, yes.  It happened before I received this
10   letter, because I asked, can I be able to do the
11   training, what to do those days over, if it was one or
12   two days.  But I can recall that I was sick on that day.
13   But I did not return to that because of my condition.
14        Q.    And so the conver -- the first conversation you
15   had with Brian and Bob Young was earlier than this;
16   correct?
17        A.    Yes.
18        Q.    Okay.  So let's just put the time frame.  You
19   had the conversation with Brian and -- and Bob Young,
20   and they said, we'll try to work this out, basically.
21   And then when you went to the actual interview with
22   Young, Wingate, Riccio and Percival, at that point they
23   told you no, you couldn't just do that one day over,
24   you'd have to do the whole program; correct?
25        A.    Yes.
```

285

1    Q.    Okay.  And then after you had that interview

2    you got this letter, what we've marked as Exhibit 20;

3    correct?

4    A.    Yes.

5    Q.    So as of that point you knew that you weren't

6    going to be selected for the team leader position;

7    correct?

8    A.    Yes, according to this letter.

9    Q.    So -- and you understood that because they also

10   had told that you that they weren't going to like just

11   give you -- let you just do that one day over; correct?

12   A.    Well, the reason why that I -- I asked for --

13   requested for accommodation is because I felt that I

14   should -- I should have -- be able do that also because

15   of my condition.

16   Q.    I totally understand that.  I -- I understand

17   why you asked.  But I just want to like make sure we're

18   clear that as of September 27th, 2010, you were aware

19   that they weren't going to let you do that.  They

20   weren't going to grant your accommodation; correct?

21   A.    Well, I -- like I say, I don't know until I

22   received this letter.

23   Q.    Okay.

24   A.    That's the best way I can answer.

25   Q.    So by the time you received this letter, you

1   were aware that Yale and -- was not going to grant this

2   accommodation request; correct?

3     A.   No, I wasn't aware of that.

4     Q.   Well, when did you become aware of that?

5     A.   I didn't become aware of that until after I

6   said I received this letter.

7     Q.   So when you received this letter you became

8   aware of that?

9     A.   I became aware that they said that I was not

10   selected --

11     Q.   Right.

12     A.   -- for that because they selected other people,

13   even though I already was -- I was already -- was in the

14   program, I completed that program.  But the three

15   days -- the two weeks I completed it.

16     Q.   Right.

17     A.   The three days that they call us back, that's

18   the -- that's the one right there that I got sick.

19     Q.   Right.  And that happened earlier in 2010;

20   correct?

21     A.   Yes.

22     Q.   And that's what you asked for the accommodation

23   for, to just let you do that one day over, and they said

24   no; correct?

25     A.   They didn't say no.  They didn't say no at all.

1   Bob Young specifically said, Curtis, not to worry.  He

2   said we have set you up for another interview.

3       Q.     Right.

4       A.     And that's when I received the --

5       Q.     You went to the --

6       A.     Interview, yes.

7       Q.     You went to the interview --

8       A.     Yes.

9       Q.     -- and Bob Young and the other people at the

10  interview told you at the interview that the only way

11  you could do it was do the whole thing over again?

12      A.     Right.  And I have no problem.  I said, I have

13  no problem with doing it over.  But they didn't

14  accommodate me.  They just say, okay, we'll get back to

15  you.

16      Q.     And then you got the letter saying --

17      A.     Then I got the letter saying that --

18      Q.     -- you're done, basically?

19      A.     -- that -- that they selected other people

20  other than accommodating me for --

21      Q.     Right.

22      A.     -- that, yes.

23      Q.     And you understood that this letter came from

24  like a joint labor management committee.  There were

25  representatives of the union and representatives of Yale

288

1    on this committee?

2        A.    Yes.

3        Q.    And that was just -- that's particular to how

4    this team leader position was structured; correct?

5        A.    Well, it was structured from the -- from Yale

6    and the union.

7        Q.    Right.   Okay.   And you understood that -- and

8    Meg Riccio was one of the people on this committee;

9    correct?

10       A.    Yes.

11       Q.    So I guess before I forget, you understand

12   that --

13       A.    Can I --

14       Q.    Sure.

15       A.    Well, in the beginning I didn't see Meg on

16   this.   But when I went to the interview, she was present

17   there.

18       Q.    Right.

19       A.    But I didn't see it.   It was Brian -- doing the

20   training it was Brian Wingate for the union.

21       Q.    Right.   Earlier?

22       A.    Earlier.

23       Q.    But when you went to the interview, Meg was

24   part of the interview process?

25       A.    Yes, she was.

294

1            So you asked her to file a grievance, Meg

2    said she would not file a grievance.

3            And my question is:  Did she tell you why

4    she was not willing to file a grievance?

5        A.    Well, she felt that it was inappropriate and it

6    wasn't no violation.  That's what she said.

7        Q.    And do you remember anything further about the

8    conversation?  You asked her to file a grievance.  She

9    said no, because there was no violation.  What -- do you

10   remember any other things that were said during this

11   conversation which occurred within the first two weeks

12   of October 2010?

13       A.    I can't recall.

14       Q.    But that's the timing of it, first two weeks of

15   October 2010?

16       A.    Yes.

17       Q.    And so did you file a grievance about that on

18   your own at that time?

19       A.    I believe I filed a grievance or it could have

20   been that I -- I think it could have been Donald Spencer

21   filed that grievance for me.

22       Q.    But you knew from your own experience --

23       A.    Yes.

24       Q.    -- because by 2000 -- by September 2010 you

25   were a steward; correct?

—— Del Vecchio Reporting Services ——

295

1    A.    Yes.

2    Q.    Okay.  And so you knew you could file a

3  grievance on your own if you chose to; correct?

4    A.    Yes.

5    Q.    And as you sit here today, do you know if you

6  filed a grievance, when you got this letter saying that

7  you didn't get the team leader position?

8    A.    I filed several grievances, but I just don't

9  know.  To be honest with you, I just don't know.  But I

10  did file several grievances.

11    Q.    Okay.  And you understood that -- that both Meg

12  and Brian had signed off on this letter, Exhibit 20,

13  when you were denied the position; correct?

14    A.    Yes.

15    Q.    So you were in effect asking Meg to file a

16  grievance against herself; correct?

17    A.    No.  I wasn't asking her to file a grievance.

18  I was asking her to file a grievance on my behalf

19  because --

20    Q.    Yale?

21    A.    -- against me being denied to take the -- to

22  take the -- the -- the class over because of my

23  condition.

24    Q.    Okay.

25    A.    I felt that I shouldn't have to be penalized

312

1    have severe ones and I would have to be treated to the
2    hospital for.  But I have spasms every day, yes.
3        Q.    And finally, Mr. Reddick, you indicated at the
4    first deposition that you have treated with a
5    psychiatrist or a psychologist?
6        A.    Yes.  His name is Solomon.
7            MR. DUBIN:  Do you know if you got those
8    records?
9            MR. ADLER:  I don't know.
10           MR. DUBIN:  Did you get the records?
11           MS. GRAMLICH:  Which ones?
12           MR. DUBIN:  From the psychiatrist or
13   psychologist.
14           MS. GRAMLICH:  No.
15           MR. DUBIN:  You did not get them?
16           MR. ADLER:  I think you asked for them at
17   the deposition.
18           MS. GRAMLICH:  Was it Solomon?
19           THE WITNESS:  Yes, Solomon.
20       Q.    When was the last time you treated with him,
21   Mr. Reddick?
22       A.    I have no -- I don't know.  I don't remember.
23   It wasn't this -- I don't -- it wasn't this year, 2014.
24       Q.    My understanding from your first deposition was
25   that your medical doctor referred you to a psychiatrist

───── Del Vecchio Reporting Services ─────

313

1   or a psychologist because he thought some of your

2   condition could have -- could be psychological in

3   nature; is that correct?

4       A.    Yes, he said it could have affected my -- my

5   condition, yes.

6       Q.    Okay.  Have you treated with anyone, a

7   psychiatrist, a psychologist or a social worker, to

8   discuss the harassment that you feel you're enduring at

9   Yale?

10      A.    Yes.

11      Q.    Who is that?

12      A.    Solomon.

13      Q.    And --

14      A.    Who I -- the one that I just gave you his name.

15      Q.    And you haven't treated with him this calendar

16  year, 2014?

17      A.    No.

18      Q.    Did you treat with him in the calendar year

19  2013?

20      A.    Like I said, I don't remember what year,

21  basically, but I was treated by him.  And also by

22  another -- another -- I don't know his name offhand, but

23  he treated me with -- gave me medicine for it.

24      Q.    Okay.  And is he the same one --

25      A.    I'm sorry.  Go ahead.

321

```
 1                    (Defendant's Exhibit 23 was marked for

 2                    identification.)

 3                    MR. ADLER:  And then the next grievance,

 4     which we haven't discussed yet, is 2293.  And then the

 5     next one is 9260.  And we'll call these -- we'll denote

 6     these as 24 and 25.

 7                    (A discussion was held off the record.)

 8                    (Defendant's Exhibits 24 and 25 were

 9                    marked for identification.)

10                    MR. ADLER:  As long as we're marking

11     documents, why don't you mark this one as Exhibit --

12                    THE COURT REPORTER:  26.

13                    MR. ADLER:  26.  Yeah.  Thanks.

14                    (Defendant's Exhibit 26 was marked for

15                    identification.)

16                    (A discussion was held off the record.)

17        Q.    Just so I understand this, these other two

18     grievances that we marked 24 and 25, I know you just --

19     you handed -- you gave them to us because they were in

20     the --

21                    MS. GRAMLICH:  Time frame.

22                    MR. ADLER:  -- same time frame?

23                    So Exhibit 24, just it's -- Grievance 2293,

24     can you just kind of take a look at it and tell us what

25     that grievance was about, as best -- in your own words.
```

322

1     A.    Yes.   This one was when I came back and I

2    was -- we had a meeting, Gray had a meeting with the

3    whole staff.   And he said that he was relieving me from

4    my duties and that he was giving my job to someone else.

5    And I asked him, Why, why, why are you doing that?

6              And he said that he can do that because his

7    boss, Bob Young, said that Roger Goode -- I mean, Bob

8    Young boss, Roger Goode, said that he could do that.   He

9    can take my job and give it to someone else.   And so

10   that's what happened.

11             And then that's when I said, I think it's

12   unfair for you to do that and I feel that I was being

13   retaliated against because I filed a charge, a charge of

14   discrimination.   And I felt that that was the reason.

15    Q.    And when you say taking away your duties and

16   giving them to someone else, you still had duties within

17   the custodial job description; correct?

18    A.    Yes, but my job was taken away when I

19   specifically did --

20    Q.    You said --

21    A.    I'm sorry.  Go ahead.

22    Q.    When you said your job, you mean your

23   particular assignment was given to somebody else?

24    A.    My job -- my job duties were specifically given

25   to different -- two individuals, yes.

323

1       Q.      And what were those job duties?

2       A.      Those job duties was basically that I was --

3   was doing the classrooms, I was doing a few bathrooms.

4   Also setups, which that's the things that I was -- I was

5   assigned to do.  Those things was taken away from me.

6   And I didn't have no assigned assignment at all.

7               He would -- I was just -- he was having me

8   random from here, there, basements, cleaning gutters and

9   other things that was not related to my job at all.  So

10  I had no assigned doing my job.

11      Q.      You were still doing the job of a custodian and

12  getting paid full time; correct?

13      A.      I was still a custodian, yes.

14      Q.      And you were being assigned duties that were

15  within the custodian job description; correct?

16      A.      No.

17      Q.      They were not even custodian jobs?

18      A.      No.  This was something that he created.  He

19  made up himself.  This has nothing to do with the job

20  that I bidded on.  The job that I bidded on is what he

21  took away from me.

22              In this life, for example, when you bid on a

23  job, they show you a job, which area or what your duties

24  is.  And if you accept that job, that's your -- that's

25  the job you do and that's the area that you're

─────── Del Vecchio Reporting Services ───────

324

1    responsible for.

2       Q.   And how long did you -- how long did you have

3    these undesignated duties?

4       A.   I don't know.  But -- I don't know how long it

5    was that I was continuing to have now a specific

6    assignment.  It was basically whatever he -- he wanted.

7       Q.   Well, do you have a specific assignment now?

8       A.   I have a specific assignment.  Now I do, yes.

9       Q.   And when -- how long have you had -- this is in

10   2011, in September.  So how long did you go without

11   having a specific assignment?

12      A.   Like I said, I don't know.

13      Q.   Was it more than a week?

14      A.   Yeah, it was more than a week, I believe.

15      Q.   More than a month?

16      A.   I don't know.

17      Q.   But you had no loss of pay; correct?

18      A.   I had no loss of pay, no.

19      Q.   And then Exhibit 25 is Grievance 9260, which is

20   also August 23rd, 2011.  Again, these are grievances

21   that you filed on your own behalf.  And this seems to

22   refer back to the overtime issue; is that correct?

23      A.   Yes, that's correct.  And he has not honored

24   that.

25      Q.   Well, Yale claims there's no contract

─────────── Del Vecchio Reporting Services ───────────

325

1    violation; right?  That's what the -- that's what --

2    A.    Well, that's what he put down.  He say --

3    Q.    Who's he?

4    A.    Gray Mitchell.  That's his signature.  He put

5    down there -- he said no contract violation.  That's

6    what he put.  That's Gray Mitchell, yes.

7    Q.    And that's again -- this is about allocation of

8    overtime; correct?

9    A.    Yes.

10    Q.    So I'm going to show you -- we have another

11    document that is marked -- now marked Exhibit 26 that

12    your lawyers handed to us.  And this one seems to be a

13    follow up to Exhibit 21 because it's dated 11 April.

14    It's another return to work slip.

15    And again, says no work above shoulder level

16    with right hand, arm, no -- looks like lift carrying

17    over five pounds with right hand, arm.  Duration of

18    daily work depends on level of symptoms.  May vary from

19    four to eight hours as appropriate.

20    And it says, these limits are essentially

21    unchanged from prior note and extend at least until

22    further testing and referral has been completed.

23    And this is -- do you recall submitting that

24    slip?

25    A.    Yes.

326

1    Q.    And that's -- who's the doctor who signed that?

2    A.    I don't know.  I can't see his name.  I don't

3    know how --

4    Q.    Who's your primary care physician?

5    A.    Dr. Minonovich (phonetic).  But this is not --

6    this was another doctor I had seen.

7    Q.    And that's the same doctor who signed the

8    Exhibit 21; correct?

9    A.    Let me see.  That's the same doctor.

10   Q.    And you -- were you permitted to return to work

11   with these restrictions?

12   A.    Yes.

13   Q.    How did it happen that you were permitted to

14   return to work?  Like what were you told?

15   A.    My -- they told me that I can work.

16   Q.    Who told you?

17   A.    The doctor.

18   Q.    Right.  But did you allege in your complaint

19   that Yale kept you out of work from March 2nd, 2011

20   until approximately April 7th, 2011, and this document

21   is dated April 11th and has essentially the same

22   restrictions?

23         And is it your -- and your testimony is that

24   Yale allowed you to return to work with the restrictions

25   in Exhibit 26; is that right?

—— Del Vecchio Reporting Services ——

327

```
1              MR. DUBIN:  He says he worked.  He says he
2   returned on the 2nd and was able to work until the 7th.
3              MR. ADLER:  Okay.  I'm confused.
4      Q.   I just want to make sure I get this right.  So
5   take a look at the complaint.
6      A.   What you want?  This one?
7      Q.   The long complaint, the Court complaint.
8      A.   What page?  Page 8?
9      Q.   So paragraph 46 indicates that you returned to
10  work on -- in or about early March and worked until
11  April 7th.  And then you were informed by Gray Mitchell
12  that you couldn't -- that Yale wouldn't let you work
13  because you had to be able to work without restrictions.
14     A.   That's correct.
15     Q.   Okay.  So the first Exhibit 21 is dated March
16  23rd.  Do you know -- did you hand this to Mr. Mitchell?
17     A.   Well, one of them I believe -- well, actually
18  he received -- he received the -- the note, yes, the
19  doctor's note.
20     Q.   Did you give it to him?
21     A.   Yes.
22              MR. ADLER:  Okay.
23              MR. DUBIN:  Can we go off the record for one
24  second.
25              (A discussion was held off the record.)
```

```
 1              (A recess was held.)
 2       Q.    We'll get back to the complaint.  I think I
 3  misstated the time sequence.  I want to make sure we
 4  have it accurate.  So you came back to work, if you look
 5  at paragraph 44, on or around March 2nd, 2011; right?
 6       A.    Yes.
 7       Q.    And then on -- if you go to paragraph 46, you
 8  worked until about April 7th and then you were informed
 9  by Gray Mitchell that you would be removed from the
10  workplace until you could come back without
11  restrictions; correct?
12       A.    Yes.  But I also -- I think I was also without
13  the -- I believe here, it shows here that I was out on
14  the 23rd.
15       Q.    Right.  So I'm looking at Exhibit 21.  It says
16  that you were absent on March 23rd and that -- so you
17  were seen by your physician and that you would be out
18  until March 28th; right?
19       A.    Yes.
20       Q.    And then on March 28th, you could return, but
21  with this restriction of no sustained heavy lifting or
22  carrying, no work above shoulder level; right?
23       A.    Yes.  Uh-huh.
24       Q.    Yes?
25       A.    Yes.
```

Del Vecchio Reporting Services

1    Q.    And then when you tried to go back to work --

2    withdraw that.

3              Did you go back to work on the 28th?

4    A.    On the 28th I tried to go back to work and they

5    sent me home.

6    Q.    With this note -- because of this --

7    A.    Yes.

8              MR. DUBIN:    28th of March?

9              THE WITNESS:    Yes.    Right here.    Well,

10   that's when I was -- may return to work, yes.

11   Q.    Right.    So you believe you went back to work --

12   tried to go back to work on the 28th, brought the note

13   and they said this is -- you can't work --

14   A.    Right.

15   Q.    -- with these restrictions.    Let me finish.

16             That you can't work with these restrictions.

17   A.    That's correct.

18   Q.    And then how -- then you have this Exhibit 26.

19   It looks like you were seen on April 11 by your

20   physician.    And it says you can return to work on April

21   12th with this whole set of restriction that we already

22   read into the record; correct?

23   A.    Yes.    I just want to elaborate on that.

24   Q.    Okay.

25   A.    Because when they sent me home, then when I had

330

```
 1    another appointment with him, with my physician, he -- I

 2    told him about -- about I was not required to come to

 3    work because of my restrictions.  And so he says, Well,

 4    you know, I -- you can work.  And then he said -- then

 5    he put down what you see here.

 6         Q.    Which is very specific.

 7         A.    Specific, yeah.

 8         Q.    More specific restrictions?

 9         A.    Yes.

10         Q.    And he says essentially the same, but he's

11    being more specific?

12         A.    Specific, Yes.

13         Q.    And did you try to go back to work with this

14    note?

15         A.    This note I gave as well.  But like I said, I

16    was not -- I was still wasn't required to come back into

17    the -- into the restrictions.  Restrictions --

18         Q.    And who --

19         A.    Gray Mitchell.

20         Q.    You gave this note to Gray Mitchell?

21         A.    He has both.

22         Q.    Okay.  And he still said you still can't come

23    back to work with these restrictions?

24         A.    Yes.

25         Q.    And -- and then getting back to the complaint,
```

331

1   it says -- you claim there was about five weeks before

2   you were able to come back to work; correct?

3       A.    I believe -- I don't know how many -- I'm not

4   100 percent sure.

5       Q.    Did you look at paragraph 48?

6       A.    48?

7       Q.    Yeah, on the top of the next page.  All right.

8   It says five weeks.

9       A.    Yeah, I see that.  Yes.

10      Q.    Is that -- as best of your recollection, it was

11  about five weeks that you were out because of these

12  restrictions?

13      A.    I was out because of the restrictions, but like

14  I said, to the best of my knowledge, I believe it was

15  probably close to five weeks.

16      Q.    Okay.

17      A.    About five weeks.

18      Q.    Okay.  And then when you came back did you --

19  did you have a return to work note that said no

20  restrictions?

21      A.    Yes, I did.  But I don't have it -- I don't

22  have it.  I gave it to Gray Mitchell.  Because that's

23  the only way I would be able to return to work without

24  the restrictions.

25              MR. ADLER:  So let's just try to close the

332

1    loop here.   Let's mark this as Exhibit 27.

2                   (Defendant's Exhibit 27 was marked for

3                   identification.)

4    Q.     So we're going to mark as Exhibit 27 another

5    return to work note from your doctors dated May 2nd,

6    2011.   And this one indicates that you can return to

7    work on May 2nd without any restrictions.

8                   You see that?

9    A.     Yes, I see that.

10   Q.     So -- and did you bring that to Mr. Mitchell?

11   A.     Yes, he has received that.

12   Q.     And then you were permitted to work -- return

13   to work on or about May 2nd; correct?

14   A.     Yes.

15   Q.     So the only period of time -- tell me when

16   you're ready.

17   A.     I'm sorry.  I gave him that, yes.

18   Q.     Yes?  So the period of time that you're

19   complaining about in the lawsuit is the period of time

20   during which you had the restrictions listed in Exhibit

21   21 and 26.  And it's during that time that Yale did not

22   permit you to work; correct?

23   A.     Well, it was more than one time.

24   Q.     I'm talking about what's alleged in

25   paragraphs -- at least the paragraphs of the lawsuit

───────────── Del Vecchio Reporting Services ─────────────

1    regular time or nothing like that --

2        Q.    Okay.

3        A.    -- if it wasn't related to --

4        Q.    Fair enough.  So can we agree, that at least on

5    one date subsequent to the time you allege you were told

6    by Yale not to return to work, at least on one day, a

7    doctor told you, excused you from work because of an

8    illness?

9        A.    Yes.  Right here this.  This one right here.

10   Which one did you want?

11       Q.    I'm talking about Exhibit 26.  You just had

12   your hand on it.

13       A.    Yeah, it's like it says.  I was out on the 11th

14   of April and I may return on the 12th.

15       Q.    And can you just identify for me, Mr. Reddick,

16   exactly the restrictions imposed on you?

17       A.    Well, it mentions here no work above shoulders.

18   That was with right hand, arm.  I can't because they cut

19   it off here.  It says carrying over five pounds with

20   right hand, arm.  Durations of daily work depends on

21   levels of systems.

22              MS. GRAMLICH:  Symptoms.

23              THE WITNESS:  Symptoms.  May vary from four

24   to eight hours as appropriate.  This limits our

25   essential --

1    Q.    Essentially unchanged?

2    A.    Unchanged from prior note and extends at least

3    until testing and referral has been complete.

4    Q.    Okay.  So as I understand the restrictions,

5    there was no work above the shoulder level with your

6    right hand and arm, and there was no carrying over five

7    pounds with your right hand and arm; is that correct?

8    A.    Yes.

9              (A discussion was held off the record.)

10   Q.    Mr. Reddick, when is the last time you saw or

11   spoke with Mr. Nixon?

12   A.    I don't know.  Maybe a couple of months ago.

13   Q.    Why did you see him a couple of months ago?

14   A.    Because I had some landscaping and he does

15   landscaping.  And I asked him would he come by to -- to

16   do some work for the landscaping and he came by.

17   Q.    What did he do for you?

18   A.    Well, he did some -- he trimmed my shrubs, he

19   trimmed my shrubs and stuff, trees.

20   Q.    Anything else?

21   A.    Anything else?  Yeah.  Oh, he took a -- he took

22   some -- he took -- he took some things.  I had some -- I

23   have a whole lot of stuff that I have that I wanted to

24   get rid of and give to people.  So I asked him did he

25   know anybody who's in need of -- of things.  And I had a

356

1   notification on September the 27th that you were not

2   qualified to be selected for the training program?

3              MR. ADLER:  Objection.

4       Q.   Is that correct?

5       A.   I was not qualified -- I was not -- they said I

6   was not selected because I wasn't chosen.  I was

7   selected among their pool.  Pool of people.

8       Q.   Okay.

9       A.   Yes.

10      Q.   And what is your understanding of why you

11  weren't selected at that time?

12      A.   My understanding why I wasn't selected at that

13  time is because they did not give me accommodation,

14  which I asked for.  And during that time period they

15  will not allow me to do the classes over.

16             And I says, well, can I re-do the classes

17  that I missed?  And they said, No, you have to do the

18  whole -- you will have to do the whole class over.  And

19  then I said, Okay, I'll do the class over -- I could do

20  the class over.  But they said, Listen, I'll get back to

21  you.  And that's when I received that letter.

22      Q.   After September 27 of 2012 were you ever

23  invited back for any other training?

24      A.   No.

25      Q.   During the three-day training session you had

357

1    indicated that you had fallen ill; is that correct?

2        A.    Yes.

3        Q.    And do you recall whether it was the first,

4    second or third day?

5        A.    Like I said, it was that day.  It was that day

6    that I got sick.

7        Q.    And you don't recall if it was the first,

8    second or third?

9        A.    Well, as I mentioned in my early testimony,

10   that I felt that it was a day that -- the day that I had

11   missed.  So I'm not 100 percent sure, but I said that I

12   had mentioned in my early testimony that that was that

13   day that I got sick.  But from that time on, I did not

14   return.  But I did mention one day that when I was sick,

15   yes.

16       Q.    Okay.  And do you recall earlier Attorney Adler

17   had asked you whether or not you had provided medical

18   documentation to Ms. Riccio --

19       A.    Yes.

20       Q.    -- regarding this?

21       A.    Yes.  I'm sorry.  Say that again, please.

22       Q.    I just said, do you recall being asked whether

23   or not you provided documents -- or medical documents

24   directly to Ms. Riccio?

25       A.    Yes, I recall that.

363

```
 1    this at all.
 2                (A discussion was held off the record.)
 3        Q.    You testified earlier that you have spasms
 4    every day?
 5        A.    Yes.
 6        Q.    Is that correct?
 7        A.    Yes.
 8        Q.    And are they -- do they -- do your spasms on a
 9    daily basis limit your ability to perform your job
10    duties?
11        A.    I'm sorry?
12        Q.    Do your -- does your condition limit your
13    ability to do your job duties?
14        A.    I can do my job duties, yes, but I do have --
15    when I have severe spasm it does limit me to perform my
16    job duties, yes.
17        Q.    Can you -- can you clarify for me what would
18    constitute, you know, because you had indicated that
19    when they're severe, when your spasms are severe, then
20    they interfered with your job duties.  What was that
21    threshold?
22                MR. DUBIN:  Objection.
23        Q.    You can answer.
24        A.    Well, when I have severe spasms it caused me to
25    have problems breathing, severe stretches of inside by
```

364

1   my pancreas and my chest and also my -- in my legs.  And
2   in the middle of my stomach.
3       Q.    And how often do your symptoms rise to the
4   level of severe?
5       A.    Well, I always -- it's every -- every other
6   month or -- yeah, every other month but sometimes I
7   don't always be every other month.  Sometimes it can
8   come unexpectedly.  That I have a severe -- a severe
9   spasm that limits me to not be able to perform my job
10  and have to be hospitalized.
11           MS. GRAMLICH:  Okay, Curtis, I don't have
12  any other questions.
13               FURTHER RECROSS EXAMINATION
14  BY MR. ADLER:
15      Q.    I just have a followup.
16           On this Exhibit B, Grievance 7203, there's
17  no disposition by management.  Do you remember, was this
18  grievance ever -- was there ever a disposition?
19      A.    Well, I believe that Gray refused to sign
20  because he had received a copy as well.  But he never
21  signed it.  Gray Mitchell.
22      Q.    And were you represented by counsel at the time
23  you filed this grievance?
24      A.    Yes, I was represented by counsel.  Yes.
25      Q.    And do you remember telling Meg that the

1    grievance was in the hands of your lawyer?

2        A.    I spoke to her on one occasion about I have an

3    attorney, yes.

4        Q.    And that your attorney is handling your

5    discrimination issues for you?

6        A.    I told her I had an attorney.

7        Q.    And do you remember, was it around this period

8    of time?

9        A.    I don't recall what time that was.  But I did

10   have -- I had spoke with her concerning the problems

11   that I was facing with this discrimination.

12       Q.    And I hate to do this, but getting back to the

13   CTL process, I know you testified that you thought there

14   was an opening, but it's -- am I correct, that there has

15   been no additional employees qualified -- withdraw that.

16            It's true, isn't it, that at no time since

17   September of 2010 has any other employee been certified

18   or qualified to become a CTL; correct?

19       A.    All the custodians -- senior custodians are

20   qualified, every last one of them.

21       Q.    Let me ask it this way:  Nobody has become a

22   CTL after the time you got that letter; correct?

23       A.    I don't know.

24       Q.    Do you know of anyone who has become a CTL

25   after that?

366

1    A.    Well, like I said, there was a pool of people
2    called in.  There were -- I'm sorry.
3    Q.    This pool of people, they were the same pool of
4    people that you were considered with and --
5    A.    No, not with.  I wasn't with them.  This is the
6    second pool.
7    Q.    Right.  Right.
8    A.    I wasn't with that pool.  I was with the first
9    pool.
10    Q.    Right.  But you also got a letter saying you
11    weren't going to get through the next round with the
12    second pool; correct?
13    A.    I was not selected.
14    Q.    Correct.  So there's no -- there's been no
15    further posting for applications for people to become
16    CTLs since September 2010; correct?
17    A.    I don't -- I didn't look at the sheet.
18    Q.    You're not aware of any, are you?
19    A.    I'm only aware of the opening desk.  It's
20    present now.
21    Q.    Mr. Reddick --
22    A.    I'm trying to answer your question.
23    Q.    I know.  But when the -- when the group of
24    people were selected to be CTLs, there was an open
25    process where anybody who was a senior custodian could

— Del Vecchio Reporting Services—

1  apply; correct?

2    A.    Well --

3    Q.    There was an application process that you

4  participated in; correct?

5    A.    I was -- yes, that was an application process.

6    Q.    Okay.   And there has not been any new

7  application process open since September 2010; correct?

8    A.    I'm not sure because I never bidded on that

9  ever since then.

10    Q.    Let me just ask you -- let me ask it this way:

11  you're not aware of any application process for the CTL

12  position that's been opened since September of 2010;

13  correct?

14    A.    I'm not aware of that.

15          MR. ADLER:  Correct.   Thank you.

16          Nothing further.

17                FURTHER REDIRECT EXAMINATION

18  BY MR. DUBIN:

19    Q.    Mr. Reddick, would you agree with me that when

20  your spasms -- withdrawn.

21          Would you agree that you have spasms every

22  day?

23    A.    Yes.

24    Q.    Would you agree that when your spasms are

25  severe, you cannot do the essential functions of your

368

1  job?

2      A.     When they are very severe, that's when I be --

3  have to be rushed to the hospital and that's when I'm

4  talking about then.   When I have a very severe bad one,

5  I'm incapacitated.   I can't -- I can't do the functions.

6  I can't do anything.   So --

7      Q.     So you would agree with me, that when you have

8  very severe spasms you cannot perform the essential

9  functions of your job; is that correct?

10     A.     Yes.

11     Q.     Thank you.   Do you believe it is reasonable for

12  Yale to send someone home who cannot perform the

13  essential functions of their job?

14             I'm not necessarily talking about the time

15  that -- where you claim you could have done the job

16  despite restrictions.   I'm asking you if you think, as a

17  general proposition, it is reasonable for an employer to

18  send home an employee who cannot perform the essential

19  functions of the job?

20     A.     If that person has a medical condition, and if

21  he has -- Yale knows that if a person has a medical

22  condition that they can accommodate him.   Now, if he

23  can't -- if they accommodate him and they still --

24  during that period of time if he can't do the function

25  of the job, then they -- they -- then they can say,

— Del Vecchio Reporting Services —

1   Okay, listen, we try to accommodate you, but we couldn't

2   get -- you know, we work with you, but we couldn't get

3   you to be able to do the function of your job.  So they

4   can say well, okay.

5       Q.    So you will agree that it's reasonable if,

6   after an accommodation, an employee cannot do the

7   essential functions of their job, to require that

8   employee to go home until they can come back and perform

9   the essential functions of their job?

10      A.    Well, as I mentioned before, is that they have

11  to offer you an accommodation.

12      Q.    Understood.  And my point -- my question is:

13  Despite an accommodation, if an employee cannot perform

14  the essential functions of their job, do you believe

15  it's reasonable to require that employee to go home?

16      A.    I say no.

17      Q.    Okay.  So it's your position that if an

18  employee has a disability, and even despite an

19  accommodation they cannot perform the essential

20  functions of their job, they should be permitted to stay

21  at work and collect a paycheck?

22      A.    Well, Yale is --

23      Q.    Is that your position?

24      A.    Yale -- I just -- I'm trying to -- if you give

25  me a chance to answer your question.

1          Yale is an equal opportunity employer.  And

2   they do not discriminate against a person who has

3   disabilities.  That's why they hire persons with

4   disabilities, because they don't discriminate.  But if

5   that's the case, they would never hire a person who has

6   a disability.  And that's -- that's their policy.

7          So that means that if a person has a

8   disability, then that means that that's discriminatory

9   because now you're saying that, Okay, Yale, you know,

10  this person has a disability.  If Yale hires that person

11  with a disability, then you think -- would you think it

12  would be reasonable for them to be able to allow that

13  person to work if they hired him with a disability?

14          They have things such as things that they do

15  so that they can be able to help a person who has a

16  disability.  For example, if a person can't climb a

17  certain stair, they may use a -- they may create a

18  railing, so that a person can climb the stairs.  So Yale

19  basically hired people with disabilities.  And I don't

20  agree that a person should be able to be sent home

21  because he has a disability.

22      Q.    Okay.  So as I understand your testimony you

23  agree that Yale hires people with disabilities?

24      A.    Yes, they do.

25      Q.    And Yale accommodates people with disabilities?

1    A.    Yes, they do.

2    Q.    Okay.  And it's your position that if, despite

3   an accommodation, an employee cannot perform the

4   essential functions of their job, Yale should

5   nevertheless allow the employee to continue to work and

6   pay that employee a check, despite the fact they cannot

7   perform their job?  That's your position?

8    A.    No.  That's not my position.  As I mentioned

9   before, Yale is an equal opportunity.  They hire people

10   with disabilities.  So if that's the case, if that's --

11   if that's the way that it would be, then Yale would not

12   hire people who had disabilities.

13    Q.    Mr. Reddick, I know this is the third day of

14   your deposition.  You have an allegation in your

15   complaint that Yale continues to harass and retaliate

16   against you.

17         My question for you is:  Have we covered all

18   that in the three days of your depositions?  Is there

19   anything you want to add?

20    A.    Other than what I said about everything,

21   there's nothing else for me to add.

22    Q.    Okay.  That's fine.  I just want to make sure

23   that you're comfortable that we've covered everything

24   and then when we get to trial I don't hear about new

25   things.

376

```
1                      J U R A T

2

3     I have read the foregoing 130 pages and hereby

4   acknowledge the same to be a true and correct record of

5   the testimony.

6

7

8

9                      _____

10                           CURTIS REDDICK

11

12  Subscribed and sworn to _____.

13  Before me this ___ day of _____, 2014.

14

15

16

17

18

19

20

21

22

23  _____

24  Notary Public

25  My Commission Expires:
```

— Del Vecchio Reporting Services —

377

```
 1              C E R T I F I C A T E

 2         I hereby certify that I am a Notary Public in,

 3    and for the State of Connecticut, duly commissioned and

 4    qualified to administer oaths.

 5         I further certify that the deponent named in

 6    the foregoing deposition was by me duly sworn and

 7    thereupon testified as appears in the foregoing

 8    deposition; that said deposition was taken by me

 9    stenographically in the presence of counsel and reduced

10    to typewriting under my direction, and the foregoing is

11    a true and accurate transcript of the testimony.

12         I further certify that I am neither of counsel

13    nor attorney to either of the parties to said suit, nor

14    am I an employee of either party to said suit, nor of

15    either counsel in said suit, nor am I interested in the

16    outcome of said cause.

17         Witness my hand as Notary Public this 14th day

18    of October, 2014.

19

20

21

22                        Sabina Lohr
                          Notary Public
23    License #0000131
      My License Expires December 31, 2016
24    My Notary Certification Expires July 31, 2017

25
```

— Del Vecchio Reporting Services —

378

```
 1                          INDEX

 2    EXAMINATIONS                          PAGE

 3    CROSS (BY MR. ADLER)                   248

 4    REDIRECT (BY MR. DUBIN)                308

 5    RECROSS (BY MR. ADLER)                 315

 6    FURTHER REDIRECT (BY MR. DUBIN)        334

 7    CROSS (BY MS. GRAMLICH)                348

 8    FURTHER RECROSS (BY MR. ADLER)         364

 9    FURTHER REDIRECT (BY MR. DUBIN)        367

10

11    PLAINTIFF'S EXHIBITS

12    EXHIBIT A - 2009 MEMORANDUM OF AGREEMENT

13    FOR CTL                                353

14    EXHIBIT B - 4/14/2011 GRIEVANCE        362

15

16    DEFENDANT'S EXHIBITS

17    EXHIBIT NO. 15 - CIVIL COVER SHEET AND

18    COMPLAINT ENTITLED CURTIS REDDICK AGAINST

19    SOUTHERN CONNECTICUT STATE UNIVERSITY   255

20    EXHIBIT NO. 16 - COMPLAINT FILED WITH THE

21    COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

22    AGAINST LOCAL 35                        263

23    EXHIBIT NO. 17 - LETTER DATED DECEMBER 2ND,

24    2009, TO YALE FROM EUGENE AXELROD       265

25    EXHIBIT NO. 18 - 11/13/09 GRIEVANCE     273
```

```
 1   DEFENDANT'S EXHIBITS                          PAGE

 2   EXHIBIT NO. 19 - COMPLAINT                     278

 3   EXHIBIT NO. 20 - LETTER DATED SEPTEMBER 27TH,

 4   2010, ADDRESSED TO CURTIS REDDICK FROM BOB

 5   YOUNG, BRIAN WINGATE, MEG RICCIO AND STEVE

 6   PERCIVAL                                       282

 7   EXHIBIT NO. 21 - FIVE PAGES PRODUCED BY

 8   ATTORNEY GRAMLICH                              315

 9   EXHIBIT NO. 22 - GRIEVANCE 7203                320

10   EXHIBIT NO. 23 - GRIEVANCE 2294                321

11   EXHIBIT NO. 24 - GRIEVANCE 2293                321

12   EXHIBIT NO. 25 - GRIEVANCE 9260                321

13   EXHIBIT NO. 26 - 11 APRIL RETURN TO WORK SLIP  321

14   EXHIBIT NO. 27 - 5/2/11 RETURN TO WORK SLIP    332

15

16

17

18

19

20

21

22

23

24

25
```