

# Employee Rights, LLC

57 State Street • North Haven, CT 06473

November 3, 2011

---

**VIA FAX: 203-805-6559**

Ms. Pekah Wallace
Regional Manager
Commission on Human Rights and Opportunities
Rowland State Government Center
55 West Main St., Suite 210
Waterbury, CT 06702-2004

Re: **Curtis Reddick v. Yale University**
    **CHRO#: 1230051**

Dear Ms. Wallace:

    Pursuant to the rules and regulations adopted by the Connecticut Commission on Human Rights and Opportunities, Complainant Curtis Reddick respectfully submits this letter in response to the Answer of Respondent Yale University (hereinafter referred to as the "Respondent"). The following will demonstrate that Mr. Reddick was subject to Disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.* (the "ADA") and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.* (the "CFEPA"). Specifically, the Complainant will show that the reasons provided for the Respondent's adverse employment acts are pretextual, inconsistent, and incorrect. Accordingly, the following will show that a Positive Merit Assessment Review and subsequent fact finding session is warranted in order to further establish discrimination on the basis of disability against Complainant Mr. Reddick.

## I. Factual Background

    The Complainant is a 48 year old African American male who was hired by Yale University (hereinafter "Respondent") on or about Twenty-One (21) years ago consistently performing his position in an above average and satisfactory manner. The Complainant is a disabled individual that suffers from a chronic unknown condition that causes him to have severe spasms that shuts off his blood flow. The Complainant further suffers from the disability of chronic sleep apnea. Beginning in 2008 the Complainant's medical condition caused him to suffer episodic flare-ups and necessitated that he apply for and was granted intermittent family medical leave time. The Complainant has consistently, since 2008, applied for, and continues to be covered under, intermittent family medical leave until present date. Respondent at all times was fully knowledgeable and aware of the Complainant's chronic health conditions.

Following the onset of Complainant's medical conditions, Complainant began to be subject to severe harassment and discrimination by the Respondent. The Complainant's union intervened and notified Associate Dean, Mark Templeton of the hostile environment that Complainant was being subjected to and requested a resolution. The Complainant continued to face harassment and discrimination due to his disabilities and his need to utilize family medical leave time when his medical condition would flare-up. In October of 2009, the Complainant was falsely accused by his supervisor, McGuire of not having performed his job stating that the Complainant had inadequately cleaned the bathrooms located within Complainant's assigned area. The Complainant however, was not the individual responsible for those unperformed tasks as they were a direct assignment to be performed by the night shift. The Complainant reported the harassment and discrimination to the Dean of the Yale University Law School.

When management became aware that the Complainant had made a report with the Dean, the Complainant was further harassed and retaliated against wherein he was reprimanded by McGuire for "not following the chain of command." The Complainant was further advised that there would be "consequences to pay" for his actions. The harassment, discrimination and retaliation against the Complainant thereafter intensified. McGraw began to reprimand and counsel the Complainant in regard to his attendance even though the Complainant was covered under approved family medical leave. During a meeting with McGraw he openly discussed Complainant's private and confidential health information in front of other employees. Complainant was provided with written warnings for his attendance, even though McGraw was well aware that the Complainant's absences were excused and covered under family medical leave. The Complainant was then contacted by Respondent's Human Resource Department and falsely notified that he no longer had any family medical leave time available for use.

On November 24, 2009, Complainant submitted a formal complaint letter to the Respondent outlining the harassment, discrimination and retaliation he was being subjected to. During the last week of October, due to the continued discrimination, harassment, retaliation and resulting stress on the job, Complainant suffered another disability related flare-up and had to be taken from the job by ambulance to the emergency room. Upon the Complainant's return, the Complainant was advised by the Respondent that they wanted to relocate Complainant to another job that entailed only washing windows.

On December 10, 2009 the Respondent received a legal letter from counsel notifying Respondent that their actions were in violation of the Family Medical Leave Act and the American's with Disability Act. For a few months following that letter the Complainant was pretty much left alone. During this same time period, Complainant was notified that he had been selected to partake in the Respondent's Team Leader Training Program and upon completion he would be placed into a Team Leader position. This opportunity would move the Complainant from a Level 6 to a Level 10 resulting in almost a $10k per year increase in Complainant's salary. All individuals selected for the program had to attend a two week long class. The Complainant completed the entire first week of the program and was then called back with his peers to provide feedback on how we he liked the program. During that last day of the program, the Complainant began to have problems breathing and sought medical attention. The Complainant was out of the workplace for three days due to his medical complications. When the Complainant returned back to the workplace, his peers who had attended the Team Leader

Program were in the process of being placed into their promotional positions. When the Complainant inquired if he was going to be placed into a promotional position, Complainant was advised me that he could not be promoted because he had missed the last day of the program. The Complainant notified Respondent that he did not feel it was fair to penalize him due to his disability. The Complainant was then told that he would be set up for the final interview and not to worry, it would be straightened out.

On September 27, 2010, Complainant received a written notification that he had not been selected for promotion. The Complainant was the only employee who had attended the Team Leader Program who was not promoted. The September 27, 2010, letter included the names of Bob Young, Director of Facility Services, Brian Wingate, Yale University Best Practices, Meg Riccio, Local 35, Yale University Best Practices and Steve Percival, Director, YSM Facility Services. The Complainant immediately contacted Meg Riccio who was his Union Representative and questioned her on how she could sign off on such a letter when she was fully aware that the only reason he had not been promoted was due to his disability. The Complainant made a formal request that Meg Riccio follow through with a grievance on his behalf. Because Complainant is also a Union Steward, he knew that it would take several months for his grievance to be processed and began to wait until he was called to be heard. Since that time period, the Respondent continues to perform Team Leader Programs resulting in promotions for Complainant's peers, but the Complainant is the only individual excluded from the opportunity due to his disability.

On or about the third week of February 2011, due to complications with Complainant's disability, the Complainant suffered from retention of fluids in his right arm. As a result, Complainant was out of the work place. Complainant returned to work on or about March 2, 2011. On March 28, 2011, Complainant's doctor placed him on a lifting restriction and Complainant notified his employer and provided them with the necessary medical forms. Complainant continued to perform his position without incident, with the lifting restriction and was able to perform the essential functions of his position. A week later on April 7, 2011, Complainant was approached by supervisor Gray Mitchell and notified that Supervisor Bob Young said Complainant must leave the job immediately until he no longer had work restrictions. Complainant questioned Gray why he was able to work for the last two years with medical restrictions and now it has changed. Complainant was not provided with an answer and only told to leave the job. The Respondent forced Complainant out of the workplace for five (5) weeks with no pay and resulting in Complainant losing all of his PTO time during this time period. The Respondent did not face any hardship in allowing Complainant to continue to perform his position with a one arm lifting restriction. Complainant performed various duties throughout the work day that included cleaning offices, rearranging chairs and tables, washing windows, emptying small trash containers, all of which did not require that he be able to lift with both arms. Complainant was further assigned to perform his duties with another co-worker – such as a buddy system, so Complainant was never in a position where he was forced or required to lift heavy items without assistance.

While being forced out of his job during the month of May, 2011, Complainant went down to the Union Hall to file a new grievance and to check on the status of his previous grievance. Complainant was notified at that time that Meg Riccio had refused and failed to file

3

Complainant's grievance of discrimination in September of 2010. Meg Riccio was well aware that Complainant had been declined the opportunity for promotion due to his disability and as a Union Representative Meg Riccio should have filed a timely grievance on behalf of Complainant with or without his request to do so. Complainant was thereafter advised by another Union Representative that Meg Riccio has further refused to pursue Complainant's grievance of April 2011, wherein Complainant was sent home due to his disability and lifting restriction. Complainant believes that Meg Riccio is aiding and abetting in Respondent's discriminatory actions being taken against him due to my disabilities.

Complainant's CHRO Affidavit was received by the Commission on Human Rights and Opportunities on August 12, 2011. On September 1, 2011, Complainant arrived to work and attended a workplace meeting. At that meeting, Complainant was notified by Greg Mitchell that he was relieved of his current job duties effective immediately. Greg Mitchell further advised Complainant that his job duties and responsibilities would be reassigned to other employees. When Complainant expressed opposition to these retaliatory actions, Greg Mitchell threatened Complainant with reassignment of his working hours. Complainant currently does not have a set working schedule, job description or assignment and he is advised by Greg Mitchell that his future assignments will be assigned to him on an as needed basis, by Mitchell personally. Respondent's actions are in direct retaliation for Complainant's filing of his CHRO complaint on August 12, 2011.

## II. Tolling

The Respondent begins its Answer to this Commission with the Affirmative Defense that this Commission lacks jurisdiction over the majority of the complainant's complaint on the basis that they occurred more than 180 days prior to the Complainant's filing with this Commission. While generally, a claim of adverse action must occur during the time limitation, the continuing-violation doctrine provides an exception to the usual strict application of such time period. In Connecticut Light & Power Co. v. Secretary of United States Dep't of Labor, 85 F.3d 89 (2d Cir. 1996), the Second Circuit held:

> Under the continuing violation standard, a timely charge with respect to any incident of discrimination in furtherance of a policy of discrimination renders claims against other discriminatory actions taken pursuant to that policy timely, even if they would be untimely if standing alone. A continuing violation exists where there is a relationship between a series of discriminatory actions and an invalid, underlying policy. Thus, in cases where the plaintiff proves i) underlying discriminatory policy or practice, and ii) an action taken pursuant to that policy during the statutory period preceding the filing of the complaint, the continuing violation rule shelters claims for all other actions taken pursuant to the same policy from the limitations period. Essentially, under this doctrine, "a single non time-barred act can save other acts that are time-barred, but the mere fact that retaliation or discrimination continued over a long period does not mean one can simply ignore the statutes of limitations altogether."

In order to invoke the continuing violation doctrine exception, a complainant must show that ongoing violations, and not just the effects of previous violations, extended into the statutory period. See English v. Whitfield, 858 F.2d 957, 962-63 (4th Cir. 1988); Bruno v. Western Elec.

4

Co., 829 F.2d 957, 960 (10th Cir. 1987). An Administrative Law Judge must then ask whether or not there is an allegation of a course of related discriminatory conduct, and whether or not the charge is filed within the requisite time period after the last alleged discriminatory act. Bachmeier v. Tombstone Pizza, 96- STA-33 (ALJ Nov. 25, 1996).

A compelling case is made for the presence of a continuing violation in the present matter as will be discussed in greater detail below, wherein the Complainant has consistently and routinely been discriminated against, harassed and retaliated against and although these issues were addressed directly with the Respondent by means of legal notification over a year ago, the Respondent permitted the discrimination, harassment and retaliation to continue unremedied to present day. Further, evidence will demonstrate that the Complainant has systematically and continually been excluded from employment opportunities and/or removed from employment opportunities due to his disability and Respondent and Union, although aware that its leadmen promotional policy is discriminatory, has continued to allow the policy and discriminate against the disabled Complainant. *See* Tyson v. Sun Refining & Marketing Co., 599 F. Supp. 136, 138-140 (E.D. Pa. 1984); *see also* Thomas v. Arizona Public Serv. Co., 89-ERA-19 (Sec'y Sept. 17, 1993) (applying the continuing violations theory applied where the complainant was systematically and continually excluded from employment opportunities).

### III. Respondent Discriminated Against the Complainant in violation of the ADA.

The ADA prohibits discrimination on the basis of disability if the employee is "qualified" and can perform the "essential functions" of his position with or without accommodation. A claimant who alleges discrimination in violation of the ADA must create a prima facie case by demonstrating that (1) he/she is a disabled person under the ADA; (2) he/she is otherwise qualified to perform the job (with or without accommodation); and (3) he/she suffered adverse employment action because of his/her disability. Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 149-50 (2d Cir.1998), White v. York Int'l Corp., 45 F.3d 357, 360-61 (10th Cir.1995). Under the burden-shifting scheme set forth in McDonnell Douglas v. Green, 411 U.S. 792 (1973), if the complainant succeeds in making a prima facie showing, the burden then switches to the employer to show that there was a non-discriminatory reason for the disputed employment practice. The burden then returns to the complainant to show that the employer's reason is not valid. Id.

In instances where the complainant does have direct evidence of an employer's discriminatory motive, often called the "direct evidence theory", a different prima facie case is required, and complainant merely needs to show: (1) that he or she is a member of a protected class, and (2) "an impermissible factor played a 'motivating' or 'substantial' role in the employment decision." Levy v. Commission on Human Rights and Opportunities, 236 Conn. 96, 106, 671 A.2d 349 (1996).

### A. Complainant meets a prima facie case of discrimination under the ADA

1. <u>Complainant is disabled under the ADA.</u>

Complaint meets the requirements to set forth a prima facie case of discrimination under the ADA. First, Complainant is a disabled individual under the ADA.

Under the ADA, an individual is considered disabled if they have "a physical or mental impairment that substantially limits one or more of the major life activities of the individual . . ." *See* 42 U.S.C. §12101.

To be "substantially limited" one must be:

> (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

In the present case, the Complainant suffers from two substantially limiting disabilities. The first, although without a name, is a disability that causes Complainant to have severe spasms that shuts off his blood flow. Complainant is unable to eliminate this condition with medications and the condition increases when Complainant is under severe stress. The Complainant further suffers from the disability of chronic sleep apnea and more recently in September of 2011 was diagnosed with anxiety, emotional distress and hyperventilation. The Complainant further suffered from other disabling health conditions that included severe fluid build-up and retention in his right arm which required that Complainant take medication and caused a working restriction. All of these conditions have substantially limited the Complainant in a variety of major life activities which include walking, sleeping, lifting, concentrating and memory.

2. <u>Complainant was qualified to perform his position, with or without an accommodation.</u>

The ADA defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). This definition "includes individuals who could perform the essential functions of a reassignment position, with or without reasonable accommodation, even if they cannot perform the essential functions of the current position." <u>Barnett v. U.S. Air, Inc.</u>, 228 F.3d 1105, 1111 (9th Cir. 2000). A "qualified individual with a disability," under the law, is a person who, by reason of skill, experience, education or other requirements is able to perform the "essential" functions of a job even though they have a medical condition (disability) that may prevent them from performing those duties in the same manner as they are typically performed.

6

In regards to the present matter, there is no suggestion or evidence during the eight-teen (18) years previous to Complainant disclosing his medical condition in 2008, that the Complainant was unable or unwilling to perform his position in an adequate and acceptable manner. Not a single document, performance evaluation, warning or reprimand exists in the Complainant's personnel records and all previous evaluations of the Complainant never indicated or noted any work deficiencies. The Complainant was in fact able, capable and willing to perform the essential functions of his job with or without an accommodation and continues to be able to do so.

### A.  Respondent's Leave Policy Is Discriminatory

On March 2, 2011, the Complainant following a leave related to his disability was returned to the workplace. On March 28, 2011, Complainant's doctor placed the Complainant on lifting restrictions and the Complainant notified the Respondent and provided Respondent with the appropriate medical documentation. (See **Exhibit # 7**) The Complainant returned back to the workplace without incident and was able to perform the essential functions of his job at all times. A week later on April 7, 2011, the Complainant was advised by Greg Mitchell that supervisor Bob Young stated that the Complainant must leave the job immediately and not return until the Complainant no longer had any work restrictions, discussed in greater detail below. It appears that the Respondent is asserting some form of an internal policy that restricts individuals with disabilities from performing their positions unless they are 100% disabled free. Asserting such an internal policy is highly discriminatory and a direct violation of the ADA. The Respondent cannot even begin to assert that the Complainant was incapable of performing his essential duties when in fact the Respondent never even discussed or assessed the Complainant's limitation. The Respondent further completely refused and/or ignored the possibility of additional accommodations such as light duty or other assignments. Instead, the Respondent created, relied on or asserted a policy that mandated that the disabled Complainant be removed from his position until he was no longer disability restricted. In the alternative, if reliance on any formal policy is not asserted by the Respondent, it is clearly suggestive that McGraw and Mitchell were acting pursuant to their own personal discriminatory animus towards the Complainant. Nevertheless, even if this is the case, Respondent still remains liable for their acts because these individuals were acting within the scope of their authority in furtherance of Respondent's business.

### 3.  Complainant suffered adverse employment action as a result of the Respondent's Discrimination.

#### A. Reprimands Due to Disability and Need For FMLA

Within its opening paragraph, Respondent requests a dismissal of the present matter indicating that the Complainant was counseled appropriately for attendance issues that arose when Complainant was not on approved leave and that all decisions in regards to the Complainant were based on his performance. Respondent further denies that the Complainant has continuously been on medical leave since 2008 and specifically denies that the Complainant

7

was approved for FMLA leave time in the fall of 2009 until November of 2009. A review of **Exhibit #1** however will clearly illustrate that the Complainant was on an approved FMLA leave beginning on June of 2009 until the end of December 2009. A review of **Exhibit #2** will demonstrate that in fact, the Complainant was reprimanded by the Respondent for utilizing his approved FMLA leave time. The Respondent counters that the Complainant was not discriminated against due to his disability and need for FMLA leave, but alleges said discipline was due to Complainant's performance issues on job. However, Respondent does not provide a single document to support this assertion. The reason is simple, none exist. Not a single disciplinary action or poor performance evaluation exists for said time period, in fact, the Complainant's work history has consistently been satisfactory or above throughout his employment with the Respondent.

### B. Respondent's Pattern and Practice of Continued Disability Discrimination and Retaliation

The Respondent denies that the Complainant was being subject to a pattern and practice of discrimination, harassment and retaliation. It denies that the Complainant was falsely accused of not performing his job and reprimanded for not cleaning bathrooms. Respondent fails to note that a grievance was filed substantiating Complainant's complaint and requesting union intervention. Respondent, although admitting that the Complainant reported acts of discrimination and harassment to the Dean of the Yale University Law School, denies that the Complainant was thereafter retaliated against. The Complainant was reprimanded for not following the chain of command and advised that there was going to be "consequences to pay" for his actions. A week later, the Complainant was falsely written up in regards to his attendance even though Complainant was covered under approved family medical leave (discussed in further detail above). (See **Exhibit #1** and **#2**). McGraw further openly and publicly admonished Complainant and discussed Complainant's medical condition and medications in front of other personnel. Complainant filed grievances based on the above discriminatory actions. (See **Exhibit #3**).

On November 24, 2009, the Complainant filed a written formal complaint with the Respondent's Office for Equal Opportunity Programs. This document is in the exclusive possession and control of the Respondents. And, despite Complainant's efforts to obtain a copy of this document, he was advised by Valerie Stanley that this document would not be disclosed to him on November 2, 2011. Therefore, we request that this Commission request this document in production. Although Respondent alleges that an investigation occurred and found no harassment or discrimination, it does not submit any such findings, reports or documents to substantiate its claim. During this same time period, due to the stress on the job, the Complainant had to be taken by ambulance from the worksite to the emergency room. (See **Exhibit #4**) Upon the Complainant's return to the workplace, Complainant was advised by McGraw that he was going to be reassigned and given the responsibility of only washing windows. Respondent claims that this assignment was on a voluntary basis, however, Complainant was never asked if he wanted to voluntarily participate in washing windows, the Complainant was only advised that he was going to be reassigned. These actions prompted the Complainant at that time to seek out legal assistance. Respondent received a detailed letter from counsel indicating Respondent's discriminatory actions and violations of the ADA. (See **Exhibit**

8

#5). Exhibit 5 clearly notified the Respondent in detail of the Complainant's complaints and allegations of disability discrimination.

### C. Respondent's Team Leader Program/Discrimination/Failure to Promote

On or about late June, 2009, Respondent began to select senior custodial individuals to partake in the Respondent's Team Leader Training Program and upon completion those selected would be placed into a Team Leader position. This opportunity would have increased the Complainant's pay Level from Level 6 to a Level 10, resulting in an approximate 10K increase in the Complainant's salary. Respondent admits that this process began in June of 2009. Although the Respondent indicates that not all individuals who participated in the program would be placed into a Team Leader position, it fails to note that the Complainant was the only individual who had completed the training and who was not placed into a Team Leader position. Based on Respondent's Exhibit B, however, Respondent's Answer is inaccurate and misleading. First, the Complainant was an individual chosen during the Respondent's "pilot program" which entitled the Complainant "upon successful completion to be assigned to a team." The next process is called the "Phase In" process which states that the selected initial candidates would then be chosen for and scheduled for "training" and "upon completion of the required training candidates will be placed in the positions identified on a trial period or probationary basis." Respondent's Exhibit B further indicates that "training will be offered on an ongoing basis to both lead candidates as well as custodial or other Local 35 staff interested in professional development." Respondent indicates that the Complainant in June of 2009 did in fact successfully complete the above process.

Respondent then suggests that the Complainant did not receive a position because only 6 positions were available and Complainant was not one of the top 6 candidates. Complainant is unaware of how many positions were available and leaves Respondent to its proof. It is however, the actions that occurred during the second phase of the process that Complainant claims was discriminatory towards his person, on the basis of his disability. The Complainant is not in agreement with Respondent's claims that the Complainant had missed half of the first day and was absent on the second and third day of the Phase II training process. The Complainant attended the first and second day of training in its entirety. It was on the third day that the Complainant departed early due to an episodic flare up of his medical condition due to this disability. Upon Complainant's return to the workplace, the Complainant became aware that his peers were being placed into lead positions. The Complainant spoke with Bob Young and Brian Wingate and inquired if he was going to also be placed into a lead position. The Complainant was told at that time he was not going to be placed into a position because he had failed to complete the training. The Complainant informed Young and Wingate that he had missed part of the last class due to his disability and requested the accommodation of being able to complete the last class. The Complainant's request was outright denied. The Complainant advised Young and Wingate that he felt it was unfair and discriminating to deny him the ability to complete the last day of the program due to his disability. Young and Wingate advised the Complainant not to worry about it, they would fix it, but was later refused any such opportunity.

The Complainant was denied a reasonable accommodation to complete the training and was discriminatorily excluded from completing the training. Not only was the Complainant

9

denied the accommodation to complete the training program, but another non-disabled Caucasian peer, Gary Henderson also missed training days, yet he became and was eligible for the team leader position. The disabled, African American, Complainant however, was singled out and treated with disparity and discrimination.

The Respondent thereafter claims that in the last phase of recruitment for lead positions, the Complainant merely interviewed poorly and lacked in references and therefore he was not selected. The Respondent would have this Commission believe that the same individual who had been selected two times prior based on his interviews and references, was suddenly disqualified on those same credentials. Most compelling however is the fact that the Complainant was disqualified based on interviewing poorly (**Exhibit #6**), yet the Complainant was completely excluded from any opportunity to even be interviewed – so how then, could the Complainant have been disqualified based on a poor interview, when the Complainant was not even provided with the opportunity to be interviewed?

### i. Respondent's Custodial Team Leadership Program is Discriminatory As Applied

The Respondent asserts that it acted in accordance with its Custodial Team Leadership Program and that Complainant is statutorily barred from asserting any such claim as it was not filed within the 180-day filing period. However, Respondent fails to address that fact that its Leadership Program as applied negatively impacts disabled individuals, Complainant in particular. As previously discussed, the Complainant suffered from complications due to his disability and was incapable of completing the three day mandatory training session. Given that Respondent fails to admit or deny that it held full knowledge that on the last day of the training program Complainant had breathing problems and sought medical attention, it can only be assumed that Respondent was knowledgeable for the reason why Complainant missed the last day of training. Respondent again, does not admit or deny that Young or Wingate were notified by Complainant that he [Complainant] advised them of the reason for having missed the last day of the training class and had notified them that he [Complainant] did not feel it was right to be penalized due to his disability. Therefore, it must be considered as factual that Respondent was well aware of Respondent's disability, the reason for having missed the last day of the training and that Complainant had requested the accommodation of being given the opportunity to complete the training. Not only was the Complainant denied the opportunity to complete the training, but was even denied the opportunity to interview.

Respondent now comes forth to this Commission asserting a statute of limitation. As discussed above, when a Respondent policy discriminatorily impacts a class of protected individuals and continues to do so, the claims are not time-barred if the effects of that policy continue to exist. In the present matter, Respondent's Team Leadership Program continues to impact the disabled Complainant. This is quite simple given that Respondent's own policy clearly indicates that future promotions into Team Leader positions (Steady State) will be given to only those individuals who have completed the training. Since Complainant was denied the accommodation and the right to complete the required training, Respondent's policy to present date, directly negatively impacts and discriminates against the Complainant.

### D. Failure to Accommodate

As discussed in greater detail above, the Complainant notified Respondent that the reason he had missed the last day of the training program was due to his disability. Upon Complainant's return back to the workplace, Complainant requested the accommodation of being able to complete the last part of the training class to be eligible for promotion. The Complainant's request for accommodation was outright denied. Not only was the Complainant denied the ability to complete the training, but Respondent's own policy indicates that training opportunities would be available to candidates on a continual basis.

On March 2, 2011, the Complainant, following a procedure related to his disability, was returned to the workplace. On March 28, 2011, Complainant's doctor placed the Complainant on lifting restrictions and the Complainant notified the Respondent and provided Respondent with the appropriate medical documentation. (See **Exhibit #7**) The Complainant returned back to the workplace without incident and was able to perform the essential functions of his job at all times. A week later on April 7, 2011, the Complainant was advised by Greg Mitchell that supervisor Bob Young stated that the Complainant must leave the job immediately and not return until the Complainant no longer had any work restrictions. (See **Exhibit #7, Grievance**) These actions were performed during a staff meeting with several custodial staff in attendance. Complainant was advised that his job duties were being reassigned to other individuals. Not only was the Complainant advised that his job duties were being assigned to others (in violation of not only the ADA, but the Respondent's Collective Bargaining Agreement) as discussed above, but Mitchell further threatened the Complainant with reassignment of his working hours. Complainant filed a grievance with the Union.(**Exhibit #8**)

The Complainant had been on a variety of work restrictions under FMLA for two years prior to this incident and questioned Mitchell on why all of a sudden the Complainant had to leave the workplace. The Complainant was not provided with a response from Mitchell. Complainant however, had been performing the essential functions of his duties for several weeks without incident. Contrary to Respondent's position that the Complainant was not capable of performing the essential functions of his job, relying strictly on its Exhibit D – Complainant's Job Description - a review of said job description indicates no disqualifying function that the Complainant was incapable of performing with limited use of one of his arms. Washing windows, dusting, sweeping, picking up trash, emptying garbage, mopping floors are all functions that can be completed with the limited use of one arm. Further, the Complainant did not perform his position alone. Complainant was always partnered with another employee at all times in the performance of his job functions. The Respondent fails to admit or deny the fact that it was not under any undue hardship in allowing Complainant to continue to perform his position with a one arm lifting restriction and fails to provide a single valid business reason for disqualifying the Complainant from his current position. Respondent fails provide a single affirmative defense on why it failed to provide the Complainant with any form of an accommodation or an alternative position for the short duration of Complainant's limitations. Instead, as admitted by the Respondent, it did nothing more than out right discriminate against the Complainant and forced the Complainant out of the workplace for five (5) weeks without pay. The Respondent did not engage in any form of an interactive process with the Complainant; it made not a single attempt to provide the Complainant with any form of an accommodation whatsoever; and did not seek out alternative positions for the Complainant during this time

11

period. Lastly, the Respondent provides not a single iota of evidence to indicate that from March 2, 2011, the date that Complainant returned back to the workplace following his surgery, until April 7, 2011, the date Respondent banished Complainant from his position that the Complainant failed to perform a single essential job function.

### III. Retaliation:

To state a claim for retaliation under Title VII, it is stated one must demonstrate that (1) he/she engaged in a protected activity (i.e., opposed discrimination or participated in a discriminatory proceeding); (2) the alleged retaliator knew of the protected activity; (3) he/she was subjected to an adverse employment action; and (4) a causal connection existed between the protected activity and the disadvantageous employment action.

First, it should be noted that the Respondent to date, has failed to provide an Answer to Complainant's Amended Affidavit, received by the Commission on September 2, 2011. That Amended Complaint addressed additional acts of retaliation that took place against the Complainant following the filing of his CHRO Complaint with this Commission. Despite Respondent's failure to Answer, the Complainant provides the following synopsis of the various retaliatory actions he has been routinely subjected to by the Respondent.

Respondent, as detailed throughout this Response, retaliated against Complainant for the protected activity he engaged in on his own behalf that included direct complaints of disability discrimination, harassment and retaliation. Not only did the Complainant face the above retaliatory actions, but more recently, on August 4, 2011, Complainant was forced to file a grievance when he was being intentionally bypassed for his scheduled over-time, once again notifying Respondent that the felt that these actions were based on discrimination and retaliation. (**Exhibit #9**). On September 1, 2011, Complainant was forced to file a grievance after Mitchell once again informed the Complainant that his job was going to be assigned to someone else. On September 9, 2011, Greg Mitchell and Team Leader Carlton Phillips began intimidating the Complainant and attempting to force Complainant to perform the tasks assigned to other employees. These two individuals began to follow, threaten and intimidate the Complainant around the facility resulting in the Complainant having an anxiety attack and being rushed to the emergency room. (**Exhibit #10**) On September 23, 2011, Complainant was forced to once again file a grievance for being bypassed for his assigned over-time. (**Exhibit #11**).

### IV. Conclusion

It is evident that the Complainant has been routinely subjected to disparity and discrimination that has resulted in adverse employment actions against the Complainant based on his disability. The Respondent does not substantiate an affirmative defense that in fact the Complainant was not treated without prejudice or discriminated against as a direct result of his disability. The Respondent has not submitted any documentation or has made any assertion of an affirmative defense. The Complaint has shown that he meets a prima facie case of discrimination and that the reasons provided for the Respondent's actions are questionable. Accordingly, the Complainant requests that the CHRO grant him a positive Merit Assessment Review so that he may provide further evidence and witness testimony wherein Complainant can substantiate his

12

claims of disability discrimination. Complainant seeks to be provided with fair and equal access to promotional opportunities and fair and equal assignments with or without an accommodation, as well as to be able to work in a work environment free of discrimination, harassment and retaliation.

Respectfully submitted,

*Michelle Gramlich*

Michelle Gramlich, Esq.
Employee Rights, LLC
57 State Street
North Haven, CT 06473
203-936-9111
Fax: 203-239-9111

### *Certification*

This is certify that a copy of the foregoing has been sent to Respondent's counsel on this 3rd day of November, 2011.

Caroline G. Hendel
Associate General Counsel
Yale University, Office of VP & General Counsel
Whitney Grove Square
2 Whitney Avenue, 6th Fl.
P. O. Box 208255
New Haven, CT 06520
Fax: 203-432-7960