ⓘ Cited
As of: March 16, 2015 7:21 PM EDT

# Amoroso v. United Techs. Corp.

United States District Court for the District of Connecticut

November 6, 2000, Decided

3:00CV00432(AVC)

### Reporter

2000 U.S. Dist. LEXIS 18169; 2000 WL 1731340

ROBERT AMOROSO, Plaintiff, v. UNITED TECHNOLOGIES CORPORATION, PRATT & WHITNEY DIVISION, Defendant.

**Disposition:** [*1] UTC/Pratt's motion to dismiss (document no. 6) GRANTED with prejudice.

## Core Terms

days, equitable tolling, discriminatory, depression, motion to dismiss, doctrine of equitable tolling, continuing violation, pro se, time-barred, deadlines, commence, Rights, layoff

## Case Summary

### Procedural Posture

Defendant employer moved to dismiss plaintiff employee's claims for damages and injunctive relief pursuant to the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., the Age Discrimination in Employment Act, 29 U.S.C.S. § 621 et seq., plaintiff also made a claim under the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-58, 46a-60(a)(1).

### Overview

Plaintiff was terminated from long-term employment with defendant. He filed a pro se complaint asserting he was wrongfully discharged and not recalled when new hiring began because of his disability and age in violation of the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 621 et seq., plaintiff also made a claim under the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-58, 46a-60(a)(1). Defendant moved to dismiss for lack of subject matter jurisdiction; and failure to state a cause of action upon which relief can be granted. It was clear the last discriminatory act occurred in December 1997. Plaintiff did not file his charge of discrimination with the Connecticut Commission on Human Rights and Opportunities until February 1999, or outside the 300 day window provided by the ADA and the ADEA, and the more limited 180 day period mandated by the CFEPA. in the interest of judicial economy, it has chosen to retain jurisdiction over his pendent state law action. The motion to dismiss was granted based on the statutes of limitations.

### Outcome

Defendant's motion to dismiss was granted with prejudice because all of plaintiff's claims were time-barred, and he had not alleged facts sufficient to constitute a continuing violation or justify the application of the equitable tolling doctrine.

## LexisNexis® Headnotes

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Parties > Pro Se Litigants > General Overview

Civil Procedure > Parties > Pro Se Litigants > Pleading Standards

*HN1* When ruling on a motion to dismiss brought pursuant to Fed. R. Civ. P. 12(b)(6), a court must presume that the facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. A court may dismiss such a complaint only where it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim. This requirement compels even more vigilance with respect to civil rights violations where the plaintiff is pro se.

Civil Procedure > Parties > Pro Se Litigants > General Overview

**HN2** Where a plaintiff proceeds pro se, a court must liberally construe his supporting papers and interpret them to raise the strongest arguments that they suggest.

> Business & Corporate Compliance > ... > Discrimination > Age Discrimination > ADEA Enforcement
>
> Labor & Employment Law > Discrimination > Age Discrimination > Exhaustion of Remedies
>
> Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > ADA Enforcement
>
> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN3** A plaintiff may not bring an action under the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., or the Age Discrimination in Employment Act (ADEA), 29 U.S.C.S. § 621 et. seq., in federal court unless the claim was properly raised with the Equal Employment Opportunity Commission (EEOC). Under the ADEA and the ADA, an aggrieved party must file a claim with the EEOC within 300 days of the discriminatory action or 180 days of the discriminatory action if the state involved has no agency authorized to investigate age discrimination. 29 U.S.C.S. § 626(d)(2); 29 U.S.C.S. § 633(b); 42 U.S.C.S. § 12117(a).

> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN4** Connecticut has an agency authorized to investigate charges of discrimination. Conn. Gen. Stat. § 46a-54.

> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN5** See Conn. Gen. Stat. 46a-82(e).

> Governments > Legislation > Statute of Limitations > General Overview
>
> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN6** When a plaintiff experiences a continuous practice and policy of discrimination the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.

> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN7** The principles of equitable tolling do not extend to what is at best a garden variety claim of excusable neglect. A plaintiff has the burden of showing that equitable tolling is appropriate.

> Governments > Legislation > Statute of Limitations > General Overview
>
> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN8** Equitable tolling of the statute of limitations for a discrimination claim may apply where a plaintiff has actively pursued his judicial remedies by filing a defective pleading during the statutory period, where plaintiff has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass, where the court has led the plaintiff to believe that the plaintiff had done all that was required of him, where affirmative misconduct on the part of the defendant may have lulled the plaintiff into inaction, where the plaintiff has received inadequate notice, and where a motion for the appointment of counsel was pending.

> Governments > Legislation > Statute of Limitations > General Overview
>
> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

**HN9** Equitable tolling of a statute of limitations for a discrimination claim is not available when a plaintiff fails to diligently pursue his rights. Likewise, a plaintiff's allegation that he was incapable of complying with the requirements due to emotional distress or deep depression is similarly insufficient.

**Counsel:** ROBERT M. AMOROSO, plaintiff, Pro se, E. Hartford, CT.

For ROBERT M. AMOROSO, plaintiff: Igor I. Sikorsky, Jr., Unionville, CT.

For UNITED TECHNOLOGIES CORP, PRATT & WHITNEY DIVISION, defendant: Albert Zakarian, Day, Berry & Howard, Hartford, CT.

**Judges:** Alfred V. Covello, Chief United States District Judge.

**Opinion by:** Alfred V. Covello

# Opinion

### RULING ON THE DEFENDANT'S MOTION TO DISMISS

The plaintiff, Robert Amoroso, brings this action for damages and injunctive relief against the defendant, United

Technologies Corporation, Pratt & Whitney Division (UTC /Pratt), pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq.; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et. seq.; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-58 and 46a-60(a)(1). He has alleged that UTC/Pratt wrongfully discharged him and failed to recall him because of his age and disability. UTC/Pratt brings the within motion to dismiss the complaint in its entirety based on: 1) lack of subject matter [*2] jurisdiction; and 2) Amoroso's failure to state a cause of action upon which relief can be granted.

The issues presented are whether: 1) Amoroso's actions under state and federal discrimination laws are time-barred due to his failure to file a charge of discrimination within 300 days of the last discriminatory act he experienced, and 2) UTC/Pratt's actions give rise to a continuing violation or the doctrine of equitable tolling, thereby relieving Amoroso from the applicable statute of limitations. The court concludes that: 1) all of Amoroso's actions are time-barred, and 2) he has not alleged facts sufficient to constitute a continuing violation or justify the application of the equitable tolling doctrine. For the following reasons, UTC/Pratt's motion to dismiss is GRANTED.

## FACTS

Examination of Amoroso's complaint and supporting papers discloses the following relevant facts:

On or about June 5, 1968, UTC/Pratt hired Amoroso upon his graduation from college.

Beginning in August 1996 until some unspecified time following his layoff, Amoroso was under a doctor's care for severe depression "due to an impending divorce . . . and then [his] layoff."

In October 1996, Amoroso [*3] began taking anti-depressant medication for his depression. During this time, Amoroso's supervisor at UTC/Pratt was on notice that he was taking this medication.

On or about February 12, 1997, UTC/Pratt notified Amoroso, who was then 52 years old, that it was laying him off as part of its effort to cut operating costs. At the time UTC/Pratt notified him of its "reduction in workforce," Amoroso held the position of senior project engineer in the company's repair development division.

Following his discharge in February 1997, Amoroso "was so emotionally tramatized [sic] and depressed from the layoff . . . and his previous divorce . . . that he was unable to commence civil action until almost two years" had passed.

"Throughout 1997, jobs [that] the plaintiff was qualified for were posted and filled without his recall."

On February 1, 1999, Amoroso filed a charge of discrimination with the Connecticut Commission on Human Rights and Opportunities (CCHRO).

On April 10, 1999, the CCHRO dismissed his case for "lack of jurisdiction" because he had not filed his charge within the required 180 day period.

On March 12, 1999, the plaintiff appealed the CCHRO's decision; the CCHRO "accepted [*4] the appeal, and forwarded the case to the [Equal Opportunity Employment Office ("EEOC")] Boston area office for review."

On December 11, 1999, the plaintiff received "from the EEOC a Notice of Suit Rights enabling the plaintiff to file suit in civil court." That notice, attached to Amoroso's complaint, provided that the EEOC "[could not] investigate [Amoroso's] charge because it was not filed with in the time limit required by law."

On March 7, 2000, Amoroso filed the complaint in this matter.

## STANDARD

*HN1* When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the court must presume that the facts alleged in the complaint are true and draw all reasonable inferences from those facts in favor of the plaintiff. See Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). A court may dismiss such a complaint only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim." Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974). This requirement "compels even more vigilance with respect to civil rights violations where the plaintiff is pro se." Easton v. Sundram, 947 F.2d 1011, 1015, [*5] (2d Cir. 1991). Thus, the court may consider statements contained in the plaintiff's opposition to the motion to dismiss. [1] See Lucas v. New York City, 842 F. Supp. 101, 104 (S.D.N.Y. 1994).

---

[1]  *HN2* Where a plaintiff proceeds pro se, a court must liberally construe his supporting papers and "interpret [them] to raise the strongest arguments that they suggest." Soto v. Walker, 44 F.3d 169, 173 (2d Cir. 1995).

## DISCUSSION

### I. Violations of State and Federal Discrimination Statutes

UTC/Pratt has moved to dismiss Amoroso's ADA, ADEA, and CFEPA actions, arguing that each is time-barred. Specifically, it contends that the "plaintiff did not file a charge of discrimination with the CCHRO within 180 days of the alleged discriminatory conduct, and did not file a charge of discrimination with the EEOC within 300 days of [that same] conduct." Amoroso responds that he received a right-to-sue letter from the EEOC's Boston area office on December 11, 1999, which, he maintains, "allowed [*6] [him] to file a lawsuit within 90 days of receipt[.]"

*HN3* A plaintiff may not bring an ADA or ADEA action in federal court "unless the claim was properly raised with the EEOC." Miller v. International Tel. & Tel. Corp., 755 F.2d 20, 23 (2d Cir. 1985). "Under the ADEA, an aggrieved party must file a claim with the EEOC within 300 days of the discriminatory action or 180 days of the discriminatory action if the state involved has no agency authorized to investigate age discrimination." Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 59 (2d Cir. 1986). See 29 U.S.C. § 626(d)(2); 29 U.S.C. § 633(b). These same filing deadlines also apply to actions brought pursuant the ADA. See 42 U.S.C. § 12117(a). Under both federal statutes, the applicable time-frame in the present case is 300 days because *HN4* Connecticut has an agency authorized to investigate charges of discrimination. See Conn. Gen. Stat. § 46a-54 (outlining powers of CCHRO). *HN5* The time frame is more limited, however, under the CFEPA, pursuant to which a plaintiff must file a charge of discrimination with the CCHRO "within [*7] one hundred and eighty days after the alleged act of discrimination . . . ." Conn. Gen. Stat. 46a-82(e); State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 472, 559 A.2d 1120 (1989).

Amoroso has failed to comply with the deadlines contained in either the federal or state statutes. The most recent discriminatory act Amoroso has alleged is UTC/Pratt's failure, "throughout 1997," to recall him for posted jobs for which he was qualified. Drawing all reasonable inferences in favor of Amoroso, then, UTC/Pratt's last discriminatory act occurred in December of 1997. According to his complaint, however, Amoroso did not file his charge of discrimination with the CCHRO until February 1, 1999, which is well outside the 300 day window provided by the ADA and the ADEA, as well as the more limited 180 day period mandated by the CFEPA.

Amoroso has argued that the right-to-sue letter he received from the EEOC entitles him to maintain the present action despite his failure to comply with the statutory deadlines. The court finds this argument misplaced. In its December 9, 1999 letter to Amoroso, the EEOC checked a box which stated that it was refusing to investigate [*8] his charge "because it was not filed within the time limit required by law." While the letter represents that he could "file a lawsuit against [UTC/Pratt]," it does not ensure that any such lawsuit will be successful. Accordingly, Amoroso's ADA, ADEA, and CFEPA [2] counts are time-barred absent facts supporting a continuing violation or the application of the doctrine of equitable tolling. [3] As discussed below, his complaint contains no such facts.

### [*9] II. Equitable Tolling

In order to excuse his failure to comply with the statutory deadlines of the CFEPA, the ADEA, and the CFEPA, Amoroso submits that: 1) he was "so emotionally tramatized [sic] and depressed from the layoff . . . and his previous divorce . . . that he was unable to commence civil action until two years" after UTC/Pratt's alleged discriminatory conduct; and 2) he understood that "the time frame within which he needed commence action" was two years. UTC/Pratt, like this court, has interpreted Amoroso's opposition as an argument for the equitable tolling of the statute of limitations.

"*HN7* The principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect." Irwin v. Department of Veterans Affairs, 498 U.S.

---

[2] The Connecticut Supreme Court recently granted certification to determine whether the 180 day period for filing a discrimination complaint with the CCHRO was jurisdictional, and therefore not susceptible to waiver or equitable tolling. See Williams v. Commission on Human Rights and Opportunities, 252 Conn. 930, 746 A.2d 794 (1999). Because this court concludes that Amoroso has not alleged facts sufficient to trigger the equitable tolling doctrine, it does not reach the jurisdictional issue presented in Williams.

[3] Amoroso's complaint alleges that UTC/Pratt laid him off as part of "a pattern and practice of discrimination against older employees[,]" words which ring of the standard for a continuing violation. See Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). "*HN6* When a plaintiff experiences a continuous *practice and policy of discrimination* . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Id. (emphasis added). Because Amoroso's complaint has failed to allege any act "in furtherance" of such a policy or practice that occurred within 300 days of his filing, he cannot show a continuing violation.

89, 96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990). A plaintiff has the burden of showing that equitable tolling is appropriate. See Hedgepeth v. Runyon, 1997 U.S. Dist. LEXIS 19508, 1997 WL 759438, at *4 (S.D.N.Y. Dec. 10, 1997). Courts have applied this doctrine "only sparingly" and, in particular, in the following circumstances:

> HN8 where the [plaintiff] has actively pursued his judicial remedies by filing a defective pleading [*10] during the statutory period, . . . where the [plaintiff] has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass[,] . . . where the court has led the plaintiff to believe that [the plaintiff] had done all that was required of [him], where affirmative misconduct on the part of the defendant may have lulled the plaintiff into inaction, where the [plaintiff] has received inadequate notice, and where a motion for the appointment of counsel [was] pending.

South v. Saab Cars USA, Inc., 28 F.3d 9, 11 (2d Cir. 1994) (internal quotation marks and citations omitted). HN9 Equitable tolling is not available, however, when a plaintiff fails to diligently pursue his rights. See id. at 12. Likewise, a plaintiff's allegation that he was incapable of complying with the requirements due to emotional distress or "deep depression" is similarly insufficient. See Boos v. Runyon, 201 F.3d 178, 185 (2d Cir. 2000) (holding that "paranoia, panic attacks, and depression" insufficient to justify further inquiry into tolling); Lloret v. Lockwood Greene Eng'rs, Inc., 1998 U.S. Dist. LEXIS 3999, No. 97 CIV 5750, 1998 WL 142326, [*11] at *3 (holding pro se plaintiff's "deep depression" did not toll time limitations of ADA and ADEA).

Here, Amoroso has not alleged any facts to support an equitable tolling argument. As noted above, he maintains that the emotional trauma and depression he experienced due to his layoff and simultaneous divorce rendered him unable to commence this action in a timely fashion. In the alternative, he asserts that his understanding was that he had two years to file a complaint with the CCHRO. Under Boos and Saab, neither of these reasons justify the application of the equitable tolling doctrine. Amoroso's pro se status does nothing to change this result. Cf. Blaizin v. Caldor Store # 38, 1999 U.S. Dist. LEXIS 1861, No. 97 CIV. 1604(DAB), 1999 WL 97899, at *2 (S.D.N.Y. Feb. 23, 1999) (holding equitable tolling not appropriate despite plaintiff's pro se status and limited English skills). Accordingly, the court concludes that Amoroso's ADA, ADEA, and CFEPA [4] actions are time-barred.

[*12] **CONCLUSION**

Based on the foregoing reasons, UTC/Pratt's motion to dismiss (document no. 6) is GRANTED with prejudice. The clerk of the court is ordered to enter judgment for the defendant.

It is so ordered this __day of November, 2000 at Hartford, Connecticut.

Alfred V. Covello

Chief United States District Judge

---

4   While the court has dismissed Amoroso's federal law causes of action, in the interest of judicial economy, it has chosen to retain jurisdiction over his pendent state law action. See 28 U.S.C. § 1367(c); Itar-Tass Russian News Agency v. Russian Kurier, 140 F.3d 442, 446-47 (2d Cir. 1998).

Ⓐ Neutral

As of: March 16, 2015 7:28 PM EDT

# Cavuoto v. Oxford Health Plans, Inc.

United States District Court for the District of Connecticut

June 22, 2000, Decided ; June 22, 2000, Filed

3:99-CV-00446 (EBB)

**Reporter**

2000 U.S. Dist. LEXIS 9112; 2000 WL 888263

BARBARA CAVUOTO, Plaintiff v. OXFORD HEALTH PLANS, INC., BRENDAN SHANAHAN, SCOTT THIBEAULT, and NICK DAUKAS, Defendants

**Disposition:** [*1] Defendants' Motion to Dismiss Counts 1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, and 19 [Doc. No. 16] GRANTED and DENIED as to Count 5.

## Core Terms

alleges, terminated, motion to dismiss, set forth, discriminatory, disability, payroll, implied contract, promissory estoppel, responsibilities, promises, negligent infliction of emotional distress, hostile work environment, statute of limitations, individual defendant, cause of action, misrepresentations, complaints, distress, severe

## Case Summary

### Procedural Posture

Defendant former employer filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) plaintiff former employee's action alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the Americans with Disabilities Act of 1990, 42 U.S.C.S. § 12101 et seq., the Equal Pay Act, the Connecticut Fair Employment Practices Act, and various state law claims.

### Overview

Plaintiff former employee brought an action against defendant former employer alleging violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. § 12101 et seq., the Equal Pay Act, the Connecticut Fair Employment Practices Act (FEPA), and various state law claims, regarding her employment with defendant and her subsequent termination. Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and

12(b)(6). The court granted defendant's motion in part, holding that plaintiff failed to state claims under Title VII, the Equal Pay Act, FEPA, or for her state law claims, because defendant's actions were simply run-of-the-mill complaints about her particular job and were not sufficiently severe to make her working environment abusive. The court denied defendant's motion in part, holding that plaintiff set forth a prima facie case under the ADA because she was regarded by her supervisor as having a disability within the meaning of the ADA.

### Outcome

Motion granted in part because plaintiff former employee failed to state claims under Title VII of the Civil Rights Act of 1964, the Equal Pay Act, the Connecticut Fair Employment Practices Act, or for her state law claims. Motion denied in part because plaintiff set forth a prima facie case under the Americans with Disabilities Act of 1990 (ADA), because she was regarded by her supervisor as having a disability within the meaning of the ADA.

## LexisNexis® Headnotes

Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Constitutional Law > The Judiciary > Jurisdiction > General Overview

Constitutional Law > The Judiciary > Jurisdiction > Diversity Jurisdiction

*HN1* A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the court's statutory or constitutional power to adjudicate the case and typically alleges that the federal court lacks either federal question or diversity jurisdiction over the action.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

*HN2* In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1), the court construes the complaint broadly and liberally in conformity with the principle set out in Fed. R. Civ. P. 8(f). In ruling on such a motion, the court is to consider allegations of the complaint as true.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > General Overview

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN3* A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be granted only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. The function of a motion to dismiss is merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

*HN4* Pursuant to a Fed. R. Civ. P. 12(b)(6) analysis, the court takes all well-pleaded allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. However, the Federal Rules do not allow the substitution of conclusory statements "for minimally sufficient factual allegations.

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

*HN5* Pursuant to 42 U.S.C.S. § 2000e-5(e), a charge of discrimination must be filed with the Equal Employment Opportunity Commission (EEOC) within 180 days of the alleged unlawful employment practice or, if the claimant has already filed the charge with a state or local equal employment agency, the time is expanded to 300 days. This requirement functions as a statute of limitations, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon plaintiff's suit in a district court.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

*HN6* For purposes of the Equal Employment Opportunity Commission's filing requirements, the period of limitations begins to run on the date the plaintiff is given notice of the alleged discriminatory act, even if the acts or its effects do not occur until later.

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > Regulators > US Equal Employment Opportunity Commission > General Overview

*HN7* A Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., plaintiff may not bring claims in a lawsuit which were not included in her Equal Employment Opportunity Commission (or CHRO) charges.

Civil Rights Law > Protection of Rights > Procedural Matters > Continuing Violations

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > ... > Statute of Limitations > Begins to Run > Continuing Violations

*HN8* Under the continuing-violation exception to the statute of limitations under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the limitations period is extended for all claims of discriminatory conduct committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations. However, multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.

Governments > Legislation > Statute of Limitations > Extensions & Revivals

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Statute of Limitations

Labor & Employment Law > ... > Statute of Limitations > Begins to Run > Continuing Violations

*HN9* Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., is not to be used as a general civility code but is actionable only for conduct sufficiently extreme to amount to a change in the terms and conditions of employment.

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

*HN10* The U.S. Supreme Court has interpreted Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., to bar requiring people to work in a discriminatorily hostile or abusive work environment. This form of harassment is actionable when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and to create an abusive working environment.

Civil Rights Law > Protection of Rights > Procedural Matters > Statute of Limitations

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

*HN11* The Connecticut Fair Employment Practices Act (FEPA) was amended by the legislature to make the statute coextensive with Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq. FEPA, therefore, through the CHRO, has a statute of limitations of 180 days.

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > Regulators > US Equal Employment Opportunity Commission > General Overview

*HN12* A failure to comply with the administrative requirements prescribed by the legislature for a discrimination claim bars the statutory authority to pursue that claim in court.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN13* The Americans with Disabilities Act of 1990, 42 U.S.C.S. § 12101 et seq., prohibits an employer from discriminating against a qualified individual with a disability because of the disability in regard to the terms, conditions and privileges of employment. 42 U.S.C.S. § 12112(a).

Business & Corporate Compliance > ... > Labor & Employment Law > Discrimination > Accommodation

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN14* In order to state a viable Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. § 12101 et seq., claim, the plaintiff must plead and prove that: (a) her employer is subject to the ADA; (b) she suffers from a disability within the meaning of the ADA; (c) she could perform the essential functions of her job with or without reasonable accommodation; and (d) she was discriminated against because of her disability.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > General Overview

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Major Life Activities

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Regarded With Impairments

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

*HN15* The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C.S. § 12101 et seq., defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. 42. U.S.C.S. § 12102(2). Disability is not a unitary concept under the ADA. Instead, the ADA sets forth three subsets of disability, any one of which is sufficient to trigger its protections.

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

*HN16* A federal court must look to the highest level of decision-making in the state.

Business & Corporate Compliance > ... > Discrimination > Labor & Employment Law > Discrimination

Labor & Employment Law > Wrongful Termination > Public Policy

*HN17* An employee who contests his or her discharge as a violation of the safe workplace public policy must prove that the condition or situation in which a plaintiff was directed to work posed an objectively, substantial risk of death, disease, or serious bodily harm.

Labor & Employment Law > Wrongful Termination > Breach of Contract > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > For Cause Standard

Labor & Employment Law > Wrongful Termination > Breach of Contract > Implied Contracts

*HN18* Under Connecticut law, a plaintiff must prove by a fair preponderance of the evidence that her employer agreed, either by words or actions, to undertake some form of actual contract commitment to a plaintiff, under which she could not be terminated without just cause.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > Duration of Employment

Labor & Employment Law > ... > At Will Employment > Exceptions > Implied Contracts

Labor & Employment Law > ... > Employment Contracts > Conditions & Terms > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > For Cause Standard

Labor & Employment Law > Wrongful Termination > Breach of Contract > Implied Contracts

*HN19* Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities and the like.

Contracts Law > Formation of Contracts > Consideration > General Overview

Contracts Law > ... > Consideration > Enforcement of Promises > General Overview

Contracts Law > Formation of Contracts > Consideration > Promissory Estoppel

Labor & Employment Law > Employment Relationships > Employment Contracts > Breaches

Labor & Employment Law > ... > Employment Contracts > Conditions & Terms > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > General Overview

Labor & Employment Law > Wrongful Termination > Breach of Contract > Implied Contracts

*HN20* In Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel, where injustice to a promisee who has acted in reliance can be avoided only by enforcement of a clear and definite promise which a promisor could reasonably be expected to induce reliance. To prevail on such a claim, a plaintiff must prove by a fair preponderance of the evidence that her employer agreed with her, by words or actions, that she could not be terminated without cause.

Contracts Law > Types of Contracts > Covenants

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > Business Torts > Bad Faith Breach of Contract > General Overview

Torts > Business Torts > Fraud & Misrepresentation > General Overview

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > General Overview

Torts > ... > Fraud & Misrepresentation > Negligent Misrepresentation > Defenses

*HN21* Negligent misrepresentation claims, fraud claims and breach of the implied covenant of good faith and fair dealing claims all must be brought within three years from the date of the act or omission of which Plaintiff complains. Conn. Gen. Stat. § 52-577.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

Torts > Negligence

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > General Overview

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > Elements

*HN22* In order to establish a cause of action for negligent infliction of emotional distress, the plaintiff must prove that the defendants: (1) should have realized that their conduct involved an unreasonable risk of causing distress to the plaintiff; and (2) should have realized that the distress, if caused, might result in illness or bodily harm.

Labor & Employment Law > Wrongful Termination

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

Torts > Negligence

Torts > ... > Types of Negligence Actions > Negligent Infliction of Emotional Distress > General Overview

**HN23** Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > Elements

**HN24** In order to assert a claim for intentional infliction of emotional distress, the plaintiff must establish four elements: (1) that the actor intended to inflict emotional distress or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe.

Torts > Intentional Torts > Intentional Infliction of Emotional Distress > General Overview

**HN25** Whether the defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the court. Only where reasonable minds would differ, does it become a question for the jury. The general rule is that there is liability for conduct exceeding all bounds usually tolerated by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.

**Counsel:** For BARBARA CAVUOTO, plaintiff: Eugene N. Axelrod, Employment Law Group, Woodbridge, CT.

For OXFORD HEALTH PLANS, INC, BRENDAN SHANAHAN, SCOTT THIBEAULT, NICK DAUKAS, defendants: John Higgins Kane, Robinson & Cole, Hartford, CT.

For BRENDAN SHANAHAN, SCOTT THIBEAULT, NICK DAUKAS, defendants: David J. Burke, Robinson & Cole, Stamford, CT.

**Judges:** ELLEN BREE BURNS, SENIOR UNITED STATES DISTRICT JUDGE.

**Opinion by:** ELLEN BREE BURNS

# Opinion

## RULING ON MOTION TO DISMISS

Plaintiff Barbara Cavuoto ("Plaintiff") brings this nineteen-count Complaint against her former employer, Oxford Health Plans, Inc., and three employees of Oxford (collectively "Defendants"). She claims, *inter alios*, violations of Title VII based on hostile work environment, gender discrimination and retaliation, the Americans with Disabilities Act ("ADA"), the Equal Pay Act, the Connecticut Fair Employment Practices Act ("FEPA"), and state law claims based on breach of contract, promissory estoppel, implied duty of good faith and fair dealing, negligent infliction [*2] of emotional distress and intentional infliction of emotional distress. Defendants now move to dismiss all claims, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, with the exception of those brought under Title VII for gender discrimination and the Equal Pay Act.

## STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, the Motion. Inasmuch as, under each of these grounds for dismissal, the factual allegations of the Complaint are deemed true, the Court distills the Statement of Facts from said Complaint.

Plaintiff is a resident of Connecticut and was employed by Oxford as the Payroll Manager from June 26, 1995 to on or about March 9, 1998. She does not allege that she was working under a contract with Oxford, whose principal place of business is also in Connecticut.

Brendan Shanahan ("Shanahan") was Oxford's Vice President and Comptroller and Plaintiff's immediate supervisor. Scott Thibeault ("Thibeault") was the Director of Compensation and Benefits, while Nick Daukus ("Daukus") was the Human Resources Generalist.

Plaintiff alleges that, in her interview [*3] for the job,

Shanahan orally promised and represented to her that the payroll system was suitable for Oxford, that Oxford was sensitive to family responsibilities, and that she would not have to work an excessive amount of hours each week. These alleged promises took place prior to her employment with Oxford.

Plaintiff alleges that, as soon as she commenced employment, she discovered that the payroll system was inadequate, that the Payroll Department lacked the necessary physical space and staff, and that she was required to work sixty-five hours per week.

Plaintiff also alleges that she inherited compliance issues, that she complained to Shanahan in 1995, and that she submitted a similar complaint through the Vice President of Human Resources. Despite these discoveries, Plaintiff continued her employment with Oxford. She further alleges that, despite the fact that she continually requested assistance from Shanahan concerning the affairs of the Payroll Department, he failed to act "in accord with his managerial responsibilities."

Plaintiff further alleges that Shanahan "continually" used vulgarities while in her presence (although they are not alleged to be directed to Plaintiff) [*4] and that he excluded her from senior management meetings because she was an "hysterical female" who was "incapable of attending" such meetings. She says that this occurred due to her severe PMS, of which Shanahan was aware.

Plaintiff also alleges that a "Corrective Action Letter" was issued to her on or about August 12, 1997, containing false accusations and blaming her for "low morale" in her department, when actually the low morale had been confirmed to be "company wide" by surveys done by Oxford.

Plaintiff further states that Thibeault "repeatedly" used profanity around her, although this, too, was not directed to her. She also alleges that both Thibeault and Daukas tried to circumvent her authority by having her subordinates bring complaints to them directly.

As to her Equal Pay claim, Plaintiff contends that Oxford compensated females "significantly less than male managers who had similar jobs and responsibilities."

Finally, she claims that when she was terminated, the process followed by Oxford was unreasonable and extreme, and caused her to suffer emotional distress.

**LEGAL ANALYSIS**

**I. The Standards of Review**

**A. Federal Rule of Civil Procedure** [*5] **12(b)(1)**

*HN1* A Motion to Dismiss under Rule 12(b)(1) "challenges the court's statutory or constitutional power to adjudicate the case . . . and "typically . . . alleges that the federal court lacks either federal question or diversity jurisdiction over the action." 2A James W. Moore *et al.*, Moore's Federal Practice, P12.07, at 12-49 (2d ed. 1994) *quoted in* Bleiler v. Cristwood Contracting Co., Inc., 868 F. Supp. 461, 464 (D.Conn. 1994), *affirmed in part, reversed in part on other grounds*, 72 F.3d 13 (2d Cir. 1995).

*HN2* In considering a motion to dismiss under Rule 12(b)(1), the court construes the complaint broadly and liberally in conformity with the principle set out in Federal Rule of Civil Procedure 8(f). *See* 5A Charles A. Wright *et al.*, Federal Practice and Procedure § 1350, at 218-19 (1960 & Supp. 1991). In ruling on such a motion, the court is to consider allegations of the complaint as true. Zellars v. Liberty Nat. Life Ins. Co., 907 F. Supp. 355 (M.D.Ala. 1995); Hart v. Mazur, 903 F. Supp. 277 (D.R.I. 1995).

**B. Federal Rule of Civil Procedure 12(b)(6)**

*HN3* A motion to dismiss [*6] pursuant to Fed. R. Civ. P. 12(b)(6) should be granted only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1984). The function of a motion to dismiss is "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984) *quoting* Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980).

*HN4* Pursuant to a Rule 12(b)(6) analysis, the Court takes all well-pleaded allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996). *See also* Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)(Federal Rules reject approach that pleading is a game of skill in which one misstep by counsel may be decisive of case). However, the Federal Rules do not allow the substitution of conclusory [*7] statements "for minimally sufficient factual allegations." Furlong v. Long Island College Hosp., 710 F.2d 922, 927 (2d Cir. 1983).

**II. The Standards As Applied**

**a. Plaintiff's Title VII Claims and ADA Claim: Counts 1,3,4**

Defendant Oxford moves to dismiss these Title VII claims, [1] firstly, for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). Oxford asserts that, inasmuch as Plaintiff failed to meet the time limits of such a claim, she is now time-barred from bringing it before this Court. Secondly, Defendant alleges that Plaintiff was not subjected to a severely hostile working environment within the meaning of Title VII or the ADA.

*HN5* Pursuant to 42 U.S.C. Section 2000e-5(e), a charge of discrimination must be filed with the EEOC within 180 days of the alleged unlawful employment practice or, if the claimant has already [*8] filed the charge with a state or local equal employment agency, the time is expanded to 300 days. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998). This requirement functions as a statute of limitations, in that discriminatory incidents not timely charged before the EEOC will be time-barred upon Plaintiff's suit in a district court. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 712 (2d Cir. 1996); *see also* Butts v. City of New York, 990 F.2d 1397, 1401 (2d Cir. 1993).

In Delaware v. Ricks, 449 U.S. 250, 258, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980), the Supreme Court held that, *HN6* for purposes of the EEOC's filing requirements, the period of limitations begins to run on the date the Plaintiff is given notice of the alleged discriminatory act, even if the acts or its effects do not occur until later. [2] In the present case, Plaintiff claimed discriminatory incidents beginning in June of 1995 and continuing through the end of August, 1997. *See, e.g.*, Complaint at PP 15, 22, 23, 27, 28 and 29. However, she did not file her CHRO Complaint until June 26, 1998, which is almost two years after [*9] the initial conduct of which she complained as discriminatory conduct amounting to a hostile work environment. [3]

[*10] Nor can Plaintiff take advantage of the continuing-violation exception to the statute of limitations under Title VII. *HN8* Under this exception, the limitations period is extended for all claims of discriminatory conduct committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations. Annis v. County of Westchester, 136 F.3d 239, 246 (2d Cir. 1998). However, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993), *cert. denied*, 511 U.S. 1052, 128 L. Ed. 2d 339, 114 S. Ct. 1612 (1994). Plaintiff may not use this exception simply because the conduct which she sets forth in the complaint is not discriminatory conduct within the meaning of Title VII, in the first place.

Plaintiff alleges that her job responsibilities were misrepresented to her during her job interview and that, shortly following her employment, she found that these misrepresentations were significant. She further alleges that, having discovered [*11] the above misrepresentations, in August, 1995, she submitted a complaint through Shanahan and the Human Resources Department. She also inquired of Shanahan why he had misrepresented the state of the payroll department to her.

Plaintiff further alleges that she was issued a Corrective Action letter on August 12, 1997, which contained erroneous, untrue and exaggerated statements concerning complaints from employees in Plaintiff's department. A revised Corrective Action Letter was issued at the end of August, 1997.

Finally, she asserts that male co-workers frequently used profanity in front of her, though it was not directed to her, which she found personally objectionable. However, the lack of gentility of these particular men still does not: (a) bring her within any continuing violation exception: or (b) set forth a claim for hostile work environment or sexual discrimination within the meaning of Title VII. "*HN9* Title VII is not to be used as a 'general civility code' but is actionable only for conduct sufficiently 'extreme to amount to a change in the terms and conditions of employment.'" Osier v. Broome County, 47 F. Supp. 2d 311, 323, 1999 WL 304683 (N.D.N.Y. 1999), *quoting* Faragher v. City of Boca Raton, 524 U.S. 775, 783, 141 L. Ed. 2d 662, 118 S. Ct.

---

[1]   The only Title VII claim which Defendants have not moved to dismiss is Count Two, which Count pleads gender discrimination.

[2]   For purposes of examining the time requirements under both the EEOC and CHRO charges, the state courts have looked to the federal courts in deciding issues regarding discriminatory practices. *See* Department of Health Servs. v. Commission on Human Rights & Opportunities, 198 Conn. 479, 489, 503 A.2d 1151 (1986).

[3]   Plaintiff alleges in her Complaint that she was retaliated against for making complaints about her working environment. However, she never set forth a retaliation count in either of her EEOC or CHRO complaints. This is fatal to her retaliation claims, in that *HN7* a Title VII plaintiff may not bring claims in a lawsuit which were not included in her EEOC (or CHRO) charges. Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974). "Allowing a complaint to encompass allegations outside of the ambit of the predicate EEOC charge would frustrate the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge." Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 499 (7th Cir. 1994).

2275 (1998). [*12]

**HN10** The Supreme Court has interpreted Title VII to bar "requiring people to work in a discriminatorily hostile or abusive work environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). This form of harassment is actionable "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and to create an abusive working environment." Id. In her Complaint, Plaintiff alleges a hostile work environment within the meaning of Title VII and the ADA which was caused by the use of profanity in her presence, that her supervisors encouraged her subordinates to report to them, rather than to her, that, on two occasions, a coworker reduced her to tears and, when she filed an action under Oxford's anti-harassment policy, her case was not investigated by Oxford. Construing these allegations in the light most favorable to Plaintiff, the Court finds that such actions are simply run-of-the-mill complaints about her particular job and were not sufficiently severe to make her working environment "abusive" within the meaning of Title VII or the ADA.

This cannot [*13] be the basis for a hostile work environment claim because there is no implication of all-encompassing discriminatory behavior.

Accordingly, Counts 1 and 3, brought under Title VII, are dismissed, both procedurally and substantively, pursuant to subsections (1) and (6) of Federal Rule of Civil Procedure 12. [4] Count 4, brought under the ADA, and incorporating the identical conduct, also must be dismissed because such did not create a hostile work environment under the standards set forth above.

Counts 3, 7 and 8 are also dismissed as to the individual Defendants, as Plaintiff did not [*14] name them in her CHRO charge and never served them notice of same. **HN12** A failure to comply with the administrative requirements prescribed by the legislature for a discrimination claim bars the statutory authority to pursue that claim in Court. See Sullivan v. Board of Police Commissioners, 196 Conn. 208, 216, 491 A.2d 1096 (1985); accord Carter v. City of Hartford, 1998 U.S. Dist. LEXIS 21011, 1998 WL 823044 (D.Conn. 1998)(dismissing individuals not named in EEOC petition pursuant to Fed.R.Civ.P. 12(b)(1)).

**b. Count Five: The ADA Claim**

**HN13** The ADA prohibits an employer from discriminating against a "qualified individual with a disability because of the disability . . . in regard to [the] terms, conditions and privileges of employment." 42 U.S.C. Section 12112(a).

**HN14** In order to state a viable ADA claim, the Plaintiff must plead and prove that: (a) her employer is subject to the ADA; (b) she suffers from a disability within the meaning of the ADA; (c) she could perform the essential functions of her job with or without reasonable accommodation; and (d) she was discriminated against because of her disability. Reeves v. Johnson Controls World Servs., 140 F.3d 144, 149-50 (2d Cir. 1998); [*15] Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998).

In the present case, Plaintiff succeeds in setting forth her *prima facie* case in that she is regarded by her supervisor as having a disability within the meaning of the ADA. **HN15** The ADA defines "disability" as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual; (2) a record of such impairment; or (3) being regarded as having such an impairment. See 42. U.S.C. § 12102(2). "Disability is not a unitary concept under the ADA." Abbott v. Bragdon, 107 F.3d 934, 938 (1st Cir. 1997). Instead, the statute sets forth three subsets of disability, any one of which is sufficient to trigger the Act's protections. Id. The subset which Plaintiff meets is three, as her pleading that she was not permitted to attend certain meetings because she was an "hysterical woman" due to her PMS, must be interpreted as being "regarded as having a disability" by her supervisor. Accordingly, she states a claim upon which relief may be granted in Count 5.

**c. Count 10: Conn. Gen. Stat. § 31-49 Claim**

**HN16** A federal court must look to [*16] the highest level of decision-making in the state, here the Supreme Court for Connecticut. The Supreme Court, in Parsons v. United Technologies Corp., Sikorsky Aircraft Division, 243 Conn. 66, 700 A.2d 655 (1997), held that an at-will employee could plead a cause of action for wrongful discharge for refusing to travel to the area of the Persian Gulf war, as such was a reasonably unsafe working condition, which threatened his **physical** welfare or could result in the **risk of death, disease or serious bodily harm** to the employee. Id. at 80,

---

[4] **HN11** The FEPA was amended by the legislature to make the statute coextensive with Title VII. FEPA, therefore, through the CHRO, has a statute of limitations of 180 days. Accordingly, as with the Title VII claim, the FEPA claims brought in Counts 6-9 are dismissed as time-barred. In any event, such claims are dismissed for the identical substantive reasons the Court has set forth in this Ruling regarding Plaintiff's Title VII claims.

82. **HN17** An employee "who contests his or her discharge as a violation of the safe workplace public policy [must] prove that the condition or situation in which a plaintiff was directed to work posed an objectively, substantial risk of death, disease, or serious bodily harm." *Id.* at 86.

Plaintiff's pleadings herein are woefully insufficient to plead a cause of action based on an unsafe working condition. Based on the objective standard set forth in <u>Parsons</u> in defining an unsafe working condition, Plaintiff's claims do not, in whole or in part, set forth facts from which one could make [*17] the leap that the behavior complained of is violative of Section 31-49. *See also* <u>Perille v. Raybestos-Manhattan Europe, Inc.</u>, 196 Conn. 529, 494 A.2d 555 (no cause of action under Section 31-49, even where interactions among co-workers resulted in assault).

Plaintiff fails to set forth a cause of action under Section 31-49. Hence, Count 10 is also dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### c. Counts 11-12: Breach of Implied Contract Count 14: Promissory Estoppel

Counts 11 through 13 allege that Oxford made certain promises to Plaintiff and breached those promises. Counts 11 and 12 are both entitled "Breach of Contract As to All Defendants".

The Counts must be dismissed as to the individual Defendants, as it is clear from the language, and damages sought, that they relate only to Oxford itself. No allegations against the three individual Defendants are pleaded. Accordingly, pursuant to Fed.R.Civ.P. 12(b)(6), the individual Defendants are dismissed from these Counts.

As to Oxford, these claims must also be dismissed. **HN18** Under Connecticut law, a plaintiff must prove by a fair preponderance of the evidence that her employer [*18] "'agreed, either by words or actions, to undertake [some] form of actual contract commitment'" to [Plaintiff], under which [she] could not be terminated without just cause." <u>Manning v. Cigna Corp.</u>, 807 F. Supp. 889, 895 (D.Conn. 1991), *quoting* <u>Coehlo v. Posi-Seal Int'l., Inc.</u>, 208 Conn. 106, 112, 544 A.2d 170 (1988)(citations omitted). Plaintiff alleges that an implied contract arose when Defendant advised her that the payroll department was in good shape, that she would not have to work long hours, and that the payroll system was capable of handling the size of the growing company. There are no written documents upon which Plaintiff relies to bolster her claim of implied contract.

Plaintiff alleges that after commencing employment with Oxford, she found these statements, upon which she relied, to be untrue. This, however, does not legally change her position to an employee who could not be terminated without just cause, as Plaintiff seems to allege. "**HN19** Typically, an implied contract of employment does not limit the terminability of an employee's employment but merely includes terms specifying wages, working hours, job responsibilities and [*19] the like." <u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 234 Conn. 1, 14, 662 A.2d 89 (1995). Although the alleged promises of Oxford included Plaintiff's working hours and job responsibilities, Oxford did not change Plaintiff's at-will status and Plaintiff did not plead that Oxford breached its implied contract with her by terminating her without cause. Rather, her claim for breach of an implied contract is the fact that the oral promises made to her were allegedly false. The Court is at a loss as to damages Plaintiff suffered as a result of this and, with no remedy, there can be no breach of implied contract.

Nor is Plaintiff's claim for promissory estoppel (Count 14) a viable cause of action under Connecticut law, based on the facts of this case. Count 14 is a duplicate of the breach of implied contract Counts 11 and 12, except the term "induced reliance" is added to each sentence. **HN20** In Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel, where injustice to a promisee who has acted in reliance can be avoided only by enforcement of "a clear and definite promise which a promisor could reasonably be expected to induce [*20] reliance." <u>Manning</u>, 807 F. Supp. at 895 (citations omitted). To prevail on such a claim, a plaintiff again must prove by a fair preponderance of the evidence that her employer agreed with her, by words or actions, that she could not be terminated without cause. Although Plaintiff pleads that she "relied to her detriment" on the alleged statements set forth above, she does not say why, or how, she was damaged thereby. Nowhere does she plead that she could not have been terminated without cause, which is the *sina qua non* of claims of breach of implied contract and promissory estoppel.

Even viewing these allegations in the light most favorable to Plaintiff, and drawing all inferences in her favor, the Court cannot find that she sets forth a claim under Count 11, 12 or 14 and they are, accordingly, dismissed.

### e. Counts 13, 15 and 16: The Statute of Limitations

**HN21** Negligent misrepresentation claims, fraud claims and breach of the implied covenant of good faith and fair dealing claims all must be brought within three years from the date of the act or omission of which Plaintiff complains. Conn. Gen. Stat. § 52-577. *Accord* <u>West Haven v.</u>

Commercial Union Ins. Co. 894 F.2d 540 (2d Cir. 1996); [*21]   In re Colonial Ltd. Partnership Litigation, 854 F. Supp. 64, 90 (D.Conn. 1994).

Plaintiff asserts that Defendants made certain misrepresentations and fraudulent statements to her prior to her commencing employment with Oxford. She further alleges that "immediately after commencing employment", she discovered that these statements and representations were false. It is these allegations which form the basis for Plaintiff's claim for implied covenant of good faith, promissory estoppel, negligent misrepresentation and fraud/deceit.

Plaintiff was hired on or about June 26, 1995. In her Complaint she alleges that these statements were made "on or about June of 1995, prior to accepting her position as payroll manager . . . . " She further asserts that she "discovered" that the representations were false "immediately upon commencing employment." Therefore, in order for these claims to be timely brought, Plaintiff must have filed these claims by June 26, 1998.

Inasmuch as her Complaint containing these claims was not brought until February 18, 1999, Count 13 through and including Count 16 are time-barred and will be dismissed, as Plaintiff fails to set forth claims upon which [*22] relief may be granted. Fed.R.Civ.P. 12(b)(6). Accord, Fed.R.Civ.P. 12(b)(1). [5]

### f. Count 18: Negligent Infliction of Emotional Distress [6]

*HN22* In order to establish a cause of action for negligent infliction of emotional distress, [*23] the Plaintiff must prove that the Defendants: (1) should have realized that their conduct involved an unreasonable risk of causing distress to the Plaintiff; and (2) should have realized that the distress, if caused, might result in illness or bodily harm. Barrett v. Danbury Hospital, 232 Conn. 242, 259, 260-61, 654 A.2d 748 (1995).

There are, however, specific rules when the alleged infliction occurs in the workplace. "*HN23* Negligent infliction of emotional distress in the employment context arises only where it is 'based upon unreasonable conduct of the defendant in the termination process.' The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress. 'The mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior.'". Parsons 243 Conn. at 88-89, citing Morris v. Hartford Courant Co., 200 Conn. 676, 682, 513 A.2d 66 (1986) and Madani v. Kendall Ford, Inc., 312 Ore. 198, 204, 818 P.2d 930 (1991).

In the present case, the Court finds that there was nothing unreasonable [*24]  or socially intolerable behavior in the termination of Plaintiff. The fact that she was not allowed to retrieve her personal belongings without a corporate employee at hand is usual behavior for corporations for their own protection. See Parsons, 243 Conn. at 89 (removing an employee from building under security escort after termination insufficient to support claim for negligent infliction of emotional distress). The cancellation of her voice mail is also not intolerable behavior, transgressing bounds of decency.

Accordingly, Count 18 is dismissed for failure to state a claim upon relief may be granted. Fed.R.Civ.P. 12(b)(6).

### g. Count 19: Intentional Infliction of Emotional Distress

*HN24* In order to assert a claim for intentional infliction of emotional distress, the Plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that the emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the distress suffered by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986). [*25]

*HN25* Whether the Defendant's conduct is sufficient to satisfy the element of extreme and outrageous conduct is a question, in the first instance, for the Court. Johnson v. Chesebrough-Pond's USA Co., 918 F. Supp. 543, 552 (D.Conn.) aff'd 104 2d. 355 (2d Cir. 1996). Only where reasonable minds would differ, does it become a question for the jury. Id., citing Reed v. Signode Corp., 652 F. Supp. 129, 137 (D.Conn. 1986). See also 1 Restatement (Second) of Torts § 46, comment (h). The general rule "is that there is liability for conduct exceeding all bounds usually tolerated

---

[5]   Plaintiff attempts to set forth additional arguments in her memorandum of law, not set forth in her complaint, regarding these causes of action. These after-the-fact allegations cannot supersede allegations of the Complaint, nor be considered by this Court in ruling on this Motion to Dismiss. See, e.g. Davis v. Cole, 999 F. Supp. 809, 813 (E.D.Va. 1998).

[6]   This Count is dismissed against the individual Defendants Thibeault and Daukus because there are no specific, wrongful allegations brought against these two men in this Count. In fact, neither was involved in the termination of Plaintiff.

by a decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." <u>Johnson</u>, 918 F. Supp. at 552 *quoting* <u>Mellaly v. Eastman Kodak Co.</u>, 42 Conn. Supp. 17, 19-20, 597 A.2d 846 (Conn. Super. 1991). *See also* 1 Restatement (Second) at comment (d)("Conduct must be so outrageous and extreme . . . as to go beyond all possible grounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society".).

Applying these stringent standards to the present case, [*26] while viewing them in the light most favorable to Plaintiff, the Court finds that Defendants' conduct as alleged in the Complaint was not "so outrageous and extreme . . . [as] to be regarded as atrocious and utterly intolerable in a civilized society."

Hence, Count 19 is also dismissed for failure to state a claim under which relief may be granted. Fed.R.Civ.P. 12(b)(6).

## CONCLUSION

For all of the foregoing reasons, Defendants' Motion to Dismiss Counts 1, 3, 4, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, and 19 [Doc. No. 16] is GRANTED. It is DENIED as to Count 5.

If the parties believe that a settlement conference would be of assistance, they shall so notify the Court.

SO ORDERRED

ELLEN BREE BURNS

SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this 22nd day of June, 2000.

 Neutral

As of: March 16, 2015 7:19 PM EDT

# Goins v. Bridgeport Hosp.

United States District Court for the District of Connecticut

March 25, 2013, Decided; March 25, 2013, Filed

No. 3:11cv560 (SRU)

**Reporter**

2013 U.S. Dist. LEXIS 41160; 2013 WL 1193227

AMEY GOINS, Plaintiff, v. BRIDGEPORT HOSPITAL, MARYLYN COSCIA, Defendants.

**Prior History:** Goins v. Bridgeport Hosp., 2011 U.S. Dist. LEXIS 118774 (D. Conn., Oct. 14, 2011)

## Core Terms

termination, adverse employment action, hostile work environment, summary judgment, hostile, discriminatory, disciplined, nurses, prima facie case, alleges, warning, disciplinary, retaliation, workplace, genuine, shifts, material fact, patient, oxygen, severe, summary judgment motion, disparate treatment, work environment, nonmoving party, written warning, co-worker's, incidents, bitch, fails

**Counsel:** [*1] For Amey Goins, Plaintiff: W. Martyn Philpot, Jr., LEAD ATTORNEY, Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT.

For Bridgeport Hospital, Defendant: Adam S. Mocciolo, Michael N. Lavelle, LEAD ATTORNEYS, Pullman & Comley - Bpt, Bridgeport, CT.

For Marylyn Coscia, in her official and individual capacity, Defendant: Gordon D. Quinn, LEAD ATTORNEY, Sullivan & Hayes, Springfield, MA; Meghan B Sullivan, LEAD ATTORNEY, Sullivan, Hayes & Quinn, LLC, Springfield, MA.

**Judges:** Stefan R. Underhill, United States District Judge.

**Opinion by:** Stefan R. Underhill

## Opinion

### MEMORANDUM OF DECISION

Plaintiff Amey Goins alleges that her former employer, Defendant Bridgeport Hospital (the "Hospital"), created a hostile work environment, treated her disparately, wrongfully terminated her, and unlawfully retaliated against her in violation of Title VII, 42 U.S.C. § 2000e et seq. She further alleges that her former supervisor, Defendant Marylyn Coscia, created a hostile work environment and discriminated against her in violation of 42 U.S.C. § 1981.

Currently pending are two motions for summary judgment: one brought by Bridgeport Hospital [doc. # 74] and the other brought by Marylyn Coscia [doc. # 75]. For the reasons that follow, [*2] the motions for summary judgment are granted.

### I. Background[1]

Amey Goins, an African-American registered nurse began working at the Hospital in 2005. Her supervisor from 2005 until 2009 was Marylyn Coscia and from 2009 until Goins' termination in March 2010 was Candace Maffei. Both Coscia and Maffei are Caucasian. Goins alleges that the Hospital created a hostile work environment, treated her disparately, wrongfully terminated her employment and unlawfully retaliated against her in violation of Title VII, 42 U.S.C. § 2000e et seq. She further alleges that two of her supervisors, Coscia and Maffei, created a hostile work environment and treated her disparately in violation of 42 U.S.C. § 1981, and that all three defendants intentionally inflicted emotional distress upon her in violation of Connecticut state law. In October 2011, District Judge Mark R. Kravtiz dismissed the suit against Maffei and dismissed the count of intentional infliction [*3] of emotional distress against all Defendants. See Ruling and Order [doc. # 49].

Goins claims that during her employment she was subjected to a variety of hostile and discriminatory behavior by Coscia and others. Goins claims that during her tenure at the

---

[1] Unless otherwise noted, the facts are taken from Defendants' Local Rule 56(a)(1) Statements [docs. # 74-10, 75-6], Defendants' Mots. for Summ. J. [docs. # 74, 75], Goins' Local Rule 56(a)(2) Statement [doc. # 82-2] and Goins' Opp'n to Summ. J. [doc. # 82].

Hospital, Coscia refused to post positive notes about Goins on the bulletin board by the nurses' lounge, but posted positive comments about other nurses on the same bulletin board. In July 2005, Coscia grabbed her hand stiffly and said that she was "sick and tired of [the Hospital's Chairman of Psychiatry] telling her that Goins was a good nurse." Pl.'s Local Rule 56(a)(2) Statement [doc. # 82-2] at 8-9. Beginning in 2006, Goins was consistently denied shift change requests. Although Goins signed a work/payroll schedule agreement with the Hospital, which established an evenings/night shift schedule, Goins asked to be assigned to day shifts. Coscia repeatedly denied Goins' shift-change requests while allowing white nurses to switch, despite the fact that Goins had more seniority. Ultimately, Coscia's denials were reversed by Anna Aquillo, Director of the Unit.

In January 2009, Peter Kokkoros, a white nurse, told Goins that a patient had [*4] an order from a physician for oxygen. Kokkoros had failed to enter the order into the computer system before the end of his shift. Goins did not check the computer system to verify the oxygen order before administering the oxygen. Goins was issued a disciplinary warning that remained in her personnel file for a period of time. Kokkoros was not issued a written warning. After Goins found out that Kokkoros did not receive a written warning, Goins filed a complaint with the Commission on Human Rights and Opportunities ("CHRO"). Based on statements from Coscia, the Hospital answered the complaint by stating that Goins and Kokkoros had received equivalent warnings. After the Hospital conducted a more thorough investigation, it discovered that Coscia had backdated a written warning to Kokkoros. Coscia was asked to retire. The Hospital downgraded Goins' discipline from a written warning to a verbal warning. The Hospital, however, considers Goins' omission to be more serious than Kokkoros' because she had administered the treatment without either a direct physician order or confirmation of the order.

Also in January 2009, while Goins was sitting at a conference table giving a report, an African-American [*5] co-worker, Pat Allen, pushed her way behind Goins. Goins believes that Allen's actions constituted physical aggressiveness and violence. Although Goins' supervisor witnessed the event and other supervisors were apprised of the event, they did not reprimand Allen. Allen continued to berate Goins during her employment, suggesting that she should quit her job and questioning her sexual orientation.

In March 2009, Goins was disciplined for forgetting to check off that she had given a patient medication. She claims that white nurses were not disciplined for the same infraction.

In September 2009, one of Goins' patients fell on the floor. Maffei, who replaced Coscia, questioned Goins twice and issued her a disciplinary warning for not knowing the protocol to follow when a patient falls. Goins claims that white nurses were not repeatedly questioned and then disciplined in similar cases. After this incident, Goins filed a second CHRO complaint.

Also in September 2009, someone anonymously wrote "Fake Bitch" with an arrow pointing to Goins' name on the float log posted in the nurses' lounge. Goins made a copy of the float log and gave it to Maffei. Maffei asked her supervisor if she recognized [*6] the handwriting. Her supervisor did not. Nothing more was done. The float log remained posted in the nurses' lounge.

Back in February 2009, Coscia failed to give Goins her performance review. Goins claims that the delay caused her to forgo a wage increase because in March 2009 the Hospital instituted a wage freeze. However, the Hospital states that the delay in the performance evaluation did not deprive Goins of a pay raise because any raise would apply retroactively. Goins was not the only employee who did not receive a timely review from Coscia. Goins had still not received her review from Coscia when Coscia retired in September 2009. Finally in November 2009, Goins' performance evaluation for the period from February 2008 to February 2009 was completed by Maffei and Matthew McDonough, the department director. Goins received her review from Maffei, which indicated that she was lacking in overall competence, leadership and critical-thinking skills. Goins was placed on a 90-day performance improvement plan and was ineligible for a wage increase. This review was in contrast to her prior positive reviews.

A performance evaluation for the period of November 17, 2009 to February 15, 2010 [*7] was prepared by Maffei and given to Goins on March 19, 2010, the date of her termination. Although Goins' second CHRO complaint was dismissed in February 2010, the CHRO subsequently reinstated the complaint after Goins was terminated, and allowed her to file an amended complaint. Goins filed an amended complaint in October 2010. This complaint was also dismissed. A release of jurisdiction letter was issued by the CHRO in March 2011. Goins then commenced this action.

## II. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson,* 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970);  [*8] *see also Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d. 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of his pleadings, but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249-50.

The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  [*9] As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 247-48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex,* 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue  [*10] of material fact, summary judgment may enter. *Celotex,* 477 U.S. at 323.

### III. Discussion

Goins brings hostile work environment (Count I), disparate treatment (Count I), wrongful termination (Count III) and retaliation (Count IV) claims against Bridgeport Hospital. Goins also brings hostile work environment and disparate treatment claims (Count II) against Marylyn Coscia, her former supervisor.

*A. Hostile Work Environment Claims*

To succeed on a hostile work environment claim under either § 1981 or Title VII, "the plaintiff must establish that his workplace was permeated with instances of racially discriminatory conduct such as 'discriminatory intimidation, ridicule, and insult,' such that 'the environment would reasonably be perceived, and is perceived, as hostile or abusive.' Whether the environment may be considered sufficiently hostile or abusive to support such claim is to be measured by the totality of circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Williams v. Cnty. of Westchester,* 171 F.3d 98, 100 (2d Cir. 1999)  [*11] (per curium) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (citations omitted). "As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. . . . Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." *Alfano v. Costello,* 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citations omitted). Nevertheless, "a single act can meet the threshold, if by itself, it can and does work a transformation of the plaintiff's workplace." *Id.* "In short, a plaintiff alleging a hostile work environment must demonstrate either a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* (internal quotation marks omitted). In addition, the plaintiff must

show that such harassment occurred because of her race. *See Brennan v. Metro. Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir. 1999) ("A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class."). But, race-based hostility need [*12] not and does not always announce itself as such, and routine workplace actions, when continuously handled in a racially discriminatory way, can combine to create a hostile work environment. *See Jemmott v. Coughlin,* 85 F.3d 61 (2d Cir. 1996) (hostile work environment claim involving shift changes, job assignments, and disciplinary procedures in the workplace).

Construing Goins' allegations liberally and viewing the totality of circumstances in the light most favorable to her, no reasonable jury could find that her work environment was hostile. Nothing in the record supports the conclusion that the workplace was "severely permeated" with discriminatory intimidation, ridicule or insult. Although Goins may well have felt ridiculed or intimidated, there is insufficient evidence to support a reasonable conclusion that the occurrences were pervasive and the product of discriminatory intent. The incidents were sparse, often separated by months. And no single act was extraordinarily severe, including the anonymous racially-neutral "fake bitch" written on the nurses' log. *See Stepheny v. Brooklyn Hebrew School for Special Children,* 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (co-worker's use of [*13] the phrase "white bitch" five times over five months did not create a racially hostile work environment); *Augustin v. Yale Club of New York City,* 2006 U.S. Dist. LEXIS 67462, 2007 WL 2690289, at *21-22 (S.D.N.Y. 2006) (co-worker's use of "black bitch" insufficient to create a hostile work environment given the infrequent and sporadic nature of the remark); *Beale v. Mount Vernon Police Dept.,* 895 F. Supp. 2d 576, 2012 U.S. Dist. LEXIS 141215, 2012 WL 4473282, at *9 ("courts have regularly concluded that the occasional use of [bitch] is not severe enough to create a hostile work environment").

"Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude." *Alfano,* 294 F.3d at 377. Coscia and others may have been harsh, unjust and rude to Goins, but that alone does not constitute a hostile workplace environment. Goins' warranted disciplinary actions for workplace violations do not create a hostile work environment. Neither do her disagreements with supervisors. And, other than conjecture, Goins fails to produce evidence to support a claim that the harassment occurred because of her race. *See Parker v. Sony Pictures Entm't,* 260 F.3d 100, 111 (2d Cir. 2001) ("A defendant need not prove a negative [*14] when

it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only to point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))). Therefore, Goins' hostile work environment claim fails as a matter of law.

*B. Disparate Treatment*

When evaluating a claim of employment discrimination under 42 U.S.C. § 1981 and Title VII, we apply the *McDonnell-Douglas* burden-shifting framework. Goins first has an obligation to present evidence sufficient to establish a prima facie case of discrimination. "In the context of alleged discriminatory treatment, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination." *Ruiz v. County of Rockland,* 609 F.3d 486, 491-92 (2d Cir. 2010). If plaintiff can establish a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory [*15] reason" for the employment action. *McDonnell Douglas,* 411 U.S. at 802. If the defendant articulates such a nondiscriminatory reason, the burden shifts back to the plaintiff "to show that [defendant's] stated reason for [the adverse employment action] was in fact pretext." *Id.* at 804. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Goins cannot survive summary judgment on her disparate treatment claim against Coscia and the Hospital. Although Goins satisfies the first and second prongs of the *McDonnell-Douglas* framework, Goins fails to establish the third prong (adverse employment action) against Coscia, and the fourth prong (discriminatory intent) against Coscia and the Hospital.

First, Goins did not establish a prima facie case for her section 1981 disparate treatment claim against Coscia. Goins did not suffer an adverse employment action while Coscia was an employee at Bridgeport Hospital. An adverse employment action "must be [*16] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir. 2004) (citation omitted). Employment actions that have been deemed sufficiently adverse include "a termination of employment, a demotion evidenced by a decrease in wage

or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities." *Id.* (quoting *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000)). Goins alleges she suffered an adverse employment action when she was not assigned her requested shift changes, reprimanded for failing to check off a patient's name after giving medication, reprimanded for not knowing the protocol policy when a patient fell, not given her yearly evaluation in a timely manner and disciplined for the "oxygen incident." But these incidents cannot be considered adverse employment actions. The disciplinary action was not an adverse employment action because the impact of the discipline was not sufficiently adverse. In fact, the written disciplinary warning Goins received for the "oxygen incident" was eventually reduced to a verbal warning **[*17]** by the Hospital. Goins also did not suffer an adverse employment action when Coscia and others denied her the day shifts she requested. Goins was not hired for day shifts; therefore, denial of her requests did not constitute a change in her employment.

Second, even if I assume Goins has demonstrated a prima facie case, defendants have put forth evidence supporting legitimate nondiscriminatory reasons for Goins' disciplinary warnings, poor review and eventual termination: Goins failed to follow hospital protocol on the occasions she was disciplined; Goins had difficulty communicating with co-workers; Goins needs to improve her critical-thinking skills. The burden then shifts back to Goins to show that the "real reason" for her termination was her race. But there is no direct or indirect evidence in the record that Goins was treated differently because of her race. For many of the incidents Goins describes, Goins alleges that similarly situated white nurses were treated differently. But Goins does not provide much more than a few conclusory statements to support that allegation. And for the one example where she provides sufficient detail, the "oxygen incident," the Hospital, after it **[*18]** investigated the incident, downgraded her discipline from written warning to verbal warning—the same discipline that the white nurse received.

*C. Wrongful Termination*

Goins' wrongful termination claim fails for the same reason that her employment discrimination claim against the Hospital fails. Wrongful termination claims are also decided using the *McDonnell-Douglas* framework. Even assuming proof of a prima facie case, a reasonable jury would not find that the real reason she was terminated was because of her race.

*D. Retaliation*

In order to establish a prima facie case of retaliation, Goins must show "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a material adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action, i.e., that a retaliatory motive played a part in the adverse employment action. *Cifra v. G.E. Co.,* 252 F.3d 205, 216 (2d Cir. 2001). If Goins submits evidence sufficient to demonstrate a prima facie case, then the "burden of production shifts to the defendant to proffer a legitimate **[*19]** non-retaliatory reason for the adverse employment action. . . . If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 552-53 (citation and quotation omitted).

Goins has failed to produce evidence from which a reasonable jury could find that Goins' termination was caused by retaliatory animus. Goins argues that a temporal inference can be made given the timing of her second CHRO complaint and her poor review and subsequent termination. Goins filed her complaints in June 2009 and October 2009. She received a negative review in November 2009 and was terminated in March 2010. Although there is a temporal connection, Goins has provided no additional evidence that any of the individuals responsible for her termination harbored any animus towards Goins because she filed the CHRO complaints. Goins has not even put forth evidence that her supervisors knew Goins filed the second complaint.

Even if Goins did meet each element of her prima facie case, **[*20]** the Hospital has produced evidence of a legitimate, non-retaliatory reason for terminating her. The Hospital has shown that she had poor working relationships with her coworkers, that she did not always follow hospital protocol, and that she was given 90 days to improve her performance but failed to do so. Goins has no evidence that the Hospital's decisions are pretextual. Accordingly, Goins' retaliation claim fails as a matter of law.

**IV. Conclusion**

For the foregoing reasons, the Hospital's Motion for Summary Judgment [doc. # 74] and Coscia's Motion for Summary Judgment [doc. # 75] are GRANTED. The clerk shall enter judgment and close the file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 25th day of March 2013.

/s/ Stefan R. Underhill

Stefan R. Underhill

United States District Judge

✚ Positive

As of: March 16, 2015 7:29 PM EDT

# Morris v. Town of Islip

United States District Court for the Eastern District of New York

September 22, 2014, Decided; September 22, 2014, Filed

No 12-CV-2984 (JFB)(SIL)

**Reporter**

2014 U.S. Dist. LEXIS 133168; 2014 WL 4700227

## Core Terms

disability, impairment, helper, major life activity, retaliation, assigned, accommodate, summary judgment, emergency, substantial limitation, requests, lifting, reasonable accommodation, discrimination claim, adverse employment action, no evidence, allegations, overhead, retaliation claim, prima facie case, functions, cause of action, return to work, light duty, essential function, termination, notice, days, limitations, concludes

## Case Summary

### Overview

HOLDINGS: [1]-In this ADA action, the employee failed to submit evidence that raised a genuine issue of fact to whether he suffered from a disability, prior to July 23, 2009 where the employee was able to perform his alleged major life activities, including his own pre-surgery job requirements, with little to no restriction and there was no medical evidence to the contrary; [2]-No rational jury could find that the employee, between his return to work and departure in late July 2009, had a record of impairment, particularly where the employee's own treating physician refused to provide the employee with a letter indicating that he was limited or restricted in any way; [3]-The employee's retaliation claims were without merit where there was no evidence that the employer actually took negative employment actions against the employee.

### Outcome

Employer's motion granted.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

*HN1* Where the opposing party fails to controvert a fact so set forth in the S.D.N.Y. & E.D.N.Y. Civ. R. 56.1 statement, that fact will be deemed admitted.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

*HN2* Pursuant to Fed. R. Civ. P. 56(a), a court may grant a motion for summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1). The court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

*HN3* On a motion for summary judgment, once the moving party has met its burden, the opposing party must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Indeed, the mere existence of some alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth concrete particulars showing that a trial is needed. Accordingly, it is insufficient for a party opposing summary judgment merely to assert a conclusion without supplying supporting arguments or facts.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

*HN4* The Americans with Disabilities Act of 1990 (ADA) provides that no covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C.S. § 12112(a). The plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. To make out a prima facie case, a plaintiff must show that (1) the employer is subject to the ADA; (2) the plaintiff was a person with a disability within the meaning of the ADA; (3) the plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered adverse employment action because of her disability.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > General Overview

*HN5* A threshold question is whether the plaintiff has a disability within the meaning of the Americans with Disabilities Act of 1990 (ADA). The ADA Amendment Act of 2008 defines "disability" as: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C.S. § 12102(1).

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Regarded With Impairments

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN6* No failure to accommodate claim can be made, as a matter of law, for an individual who was "regarded as" disabled, rather than who was actually disabled. In other words, the "regarded as" theory of disability is no longer actionable in the context of a failure to accommodate claim.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > General Overview

*HN7* For a plaintiff to establish that she has a disability under 42 U.S.C.S. § 12102(1), she must (1) show that she suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that her impairment substantially limits the major life activity previously identified. Pursuant to the Americans with Disabilities Act Amendment Act of 2008 (ADAAA), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. 42 U.S.C.S. § 12102(2). Major life activities also may include the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C.S. § 12102(2). Notably, post-ADAAA, major life activities no longer need to be of central importance. 42 U.S.C.S. § 12102(2)(A).

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN8* The Americans with Disabilities Act of 1990 (ADA) does not define what constitutes a substantial limitation. However, it is clear that the standard is not meant to be demanding, 29 C.F.R. § 1630.2(j)(1)(i), and should not demand extensive analysis, 29 C.F.R. § 1630.2(j)(1)(iii). Thus, an impairment will be considered a disability under the ADA if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. The revised Equal Employment Opportunity Commission regulations provide that an impairment is a disability if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population; that is, while an

impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting, the substantially limits analysis is comparative.

Labor & Employment Law > ... > Disabilities Under ADA > Mental & Physical Impairments > Substantial Limitations

*HN9* To show substantial limitation with respect to work under the Americans with Disabilities Act of 1990 a plaintiff must prove that he is significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. However, an impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Records of Impairments

*HN10* Even if a plaintiff cannot show a substantial limitation of a major life activity, she still may be able to establish an Americans with Disabilities Act of 1990-qualifying disability if she can show "a record" of such an impairment. 42 U.S.C.S. § 12102(1)(B). According to the Equal Employment Opportunity Commission, this part of the definition is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. In other words, a record reflecting a plaintiff's classification as disabled for other purposes or other standards is not enough.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

*HN11* District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the Americans with Disabilities Act of 1990.

Labor & Employment Law > ... > Scope & Definitions > Disabilities Under ADA > Records of Impairments

*HN12* Records of hospitalization or other medical treatment do not per se establish a record of an Americans with Disabilities Act of 1990-qualifying disability; rather, the

evidence must establish a physical impairment that substantially impaired a major life activity.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN13* "Essential functions" are defined under Equal Employment Opportunity Commission regulations to mean the fundamental duties to be performed in the position in question, but not functions that are merely marginal.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Governments > State & Territorial Governments > Employees & Officials

*HN14* N.Y. Civ. Serv. Law § 71 permits a civil service employer to terminate an employee who has been separated from service for more than one year by reason of disability resulting from occupational injury. This provision is a legitimate, non-discriminatory basis for termination.

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > General Overview

*HN15* To bring a Title VII of the Civil Rights Act of 1964 discrimination claim in federal court, a plaintiff must first exhaust administrative remedies by filing an administrative charge alleging discrimination within 300 days of the alleged discriminatory conduct. This statutory filing period is analogous to statutes of limitations, and, as such, a failure to timely file a charge acts as a bar to a plaintiff's action.

Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > General Overview

*HN16* Claims that were not asserted before the Equal Employment Opportunity Commission (EEOC) or an appropriate State or local agency may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency. Reasonably related conduct is that which would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made. In determining whether a claim is "reasonably related" to the EEOC charge, the focus should be on the factual allegations made in the EEOC charge itself and on whether those allegations gave the EEOC adequate notice to investigate the claims asserted in court.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

Labor & Employment Law > ... > Retaliation > Elements > General Overview

Labor & Employment Law > ... > Retaliation > Statutory Application > Americans With Disabilities Act

*HN17* Retaliation claims brought under the Americans with Disabilities Act of 1990 (ADA) are examined under the McDonnell Douglas burden-shifting framework. To establish a prima facie case of retaliation under the ADA, the plaintiff must show the following elements: (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity.

Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof

*HN18* If the plaintiff establishes a prima facie case of unlawful discrimination, the burden then shifts to the defendant to set forth some legitimate, nondiscriminatory reason for the complained-of conduct. Where the defendant articulates such a reason, then the presumption of discrimination is rebutted, and it simply drops out of the picture. The burden then shifts back to the plaintiff to show, without the benefit of any presumption, that a reasonable jury could conclude by a preponderance of the evidence that the employer's explanation is merely a pretext for impermissible retaliation. To meet this burden, the plaintiff may rely on evidence presented to establish the prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. It is insufficient, however, for a plaintiff merely to show that she satisfies McDonnell Douglas's minimal requirements of a prima facie case and to put forward evidence from which a factfinder could find that the employer's explanation was false. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, i.e., whether the record contains sufficient evidence to support an inference of discrimination.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

Labor & Employment Law > ... > Retaliation > Statutory Application > Americans With Disabilities Act

Labor & Employment Law > ... > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

*HN19* The U.S. Supreme Court has defined an "adverse employment action" in the Title VII of the Civil Rights Act of 1964 retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is materially adverse and that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. The same definition applies to retaliation claims under the Americans with Disabilities Act of 1990.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN20* Requesting accommodation inevitably carries the possibility that the employer will not honor the request. If the prospect that an employer might not honor the request would deter a reasonable employee from even making the request, reasonable employees would not request accommodation. For this reason, a failure to accommodate cannot constitute retaliation for an employee's request for accommodation.

Labor & Employment Law > ... > Retaliation > Elements > Adverse Employment Actions

Labor & Employment Law > ... > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

*HN21* "Minor annoyances" do not rise to the level of actionable retaliation under Title VII of the Civil Rights Act of 1964.

**Counsel:** [*1] For Plaintiff: Damon Andrew Hagan, Mayer, Ross & Hagan, Patchogue, NY.

For Defendant: Ernest Stolzer, Jessica Moller, Lauren Darienzo, and Richard Finkel, Bond Schoeneck & King, PLLC, Garden City, NY.

**Judges:** JOSEPH F. BIANCO, United States District Judge.

**Opinion by:** JOSEPH F. BIANCO

# Opinion

### MEMORANDUM AND ORDER

Joseph F. Bianco, District Judge:

Plaintiff Andrew Morris ("Morris" or "plaintiff") brings this action against defendant Town of Islip ("defendant" or "the Town"), alleging employment discrimination in violation of

the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* (″ADA″).[1] Specifically, plaintiff alleges that defendant (1) discriminated against plaintiff on account of his disability by failing to accommodate plaintiff's requests for reasonable accommodation, assigning him elevated or overhead work, denying his request for an emergency personal day, and directing him to come to work to be evaluated for light duty and discharging him without proper notice after a second injury in July 2009; and (2) retaliated against plaintiff through similar conduct for filing a disability discrimination complaint with the New York State Division of Human Rights (″NYSDHR″) in April 2009.

The Town moves for summary judgment pursuant to Federal Rule of Civil Procedure 56, arguing: (1) the discrimination claims must be dismissed because plaintiff cannot establish an ADA-qualifying disability for certain claims, or that he was an otherwise ″qualified individual″ for purposes of the ADA, (2) the discrimination claims fail on their merits because the uncontroverted evidence demonstrates that the Town provided reasonable accommodations, plaintiff did not suffer adverse employment actions, and the Town lawfully terminated plaintiff's employment pursuant to New York Civil Service Law § 71; and (3) plaintiff cannot establish a retaliation claim because he cannot set forth a prima facie case of retaliation or show that any decisions were pretextual. For the following reasons, the Court grants the motion for summary judgment in its entirety.

The first six causes of action—which relate to the period from early June 2009 to July 23, 2009—cannot survive summary judgment for several reasons. First, it is uncontroverted that Morris, upon returning to work in June 2009, provided documentation from his treating orthopedist that indicated that plaintiff could return to work on June 8, 2009. The documentation did not [*3] list any physical restrictions or limitations. Moreover, prior to July 23, 2009, plaintiff never provided any medical documentation to indicate he was restricted in his ability to perform his job functions. In fact, plaintiff testified that he tried to get such documentation from his doctor, and his doctor refused to provide it. Thus, given these uncontroverted facts, no rational jury could conclude that plaintiff suffered from a disability under the ADA during this period. Second, even assuming *arguendo* that a disability could be established, there is uncontroverted evidence that overhead work is an essential function of plaintiff's job and, thus, the employer was not required to eliminate that function to accommodate an individual with a disability. Third, even assuming *arguendo* that the Town had to provide a reasonable

accommodation, there is uncontroverted evidence that it did—namely, plaintiff acknowledged that his supervisors provided him with a helper unless there was a ″freak thing″ where one was unavailable. It is uncontroverted that plaintiff had a helper on twenty of the twenty-nine days he worked, including the date of his injury (*i.e.*, July 23, 2009). Finally, to the extent [*4] plaintiff asserts a claim based upon a temporary denial of a personal day (which was later restored to plaintiff), no rational jury could conclude that such an act is an adverse employment action either under the standard for a disability discrimination claim, or under the more liberal standard for adverse action under a retaliation claim. In short, plaintiff has failed to submit any evidence that raises a genuine issue of disputed fact as to any of these claims for disability discrimination or retaliation.

With respect to the seventh cause of action, an ADA discrimination and retaliation claim relating to the period after July 23, 2009, the Court concludes that this cause of action also cannot survive summary judgment. First, there can be no disability discrimination claim for that period because it is uncontroverted that, as a result of the July 23, 2009 injury, plaintiff was totally disabled and, thus, not otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation. Second, it is undisputed that plaintiff was separated from service for more than one year by reason of disability resulting from occupational therapy, and plaintiff provides [*5] no evidence or legal argument to raise a genuine issue of fact as to defendant's decision to terminate plaintiff under Section 71 of the New York Civil Service Law. In fact, plaintiff's counsel did not even argue in his opposition papers that plaintiff's termination was unlawful or discriminatory. Finally, to the extent plaintiff asserts that the constant light duty evaluation requests were discriminatory or retaliatory, the Town has submitted uncontroverted evidence that such evaluations were requested pursuant to a provision in the collective bargaining agreement with plaintiff's union. Moreover, plaintiff has submitted no evidence of any negative consequence that resulted. In short, plaintiff has submitted no evidence that would allow a rational juror to find that such requests for evaluations under that provision were discriminatory or retaliatory.

I. Background

A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and defendant's Rule 56.1

---

[1]   The Court previously dismissed plaintiff's state law [*2] claims. (*See* Order, Docket No. 18.)

Statement of Facts.[2] Contrary to Local Rule 56.1(b), plaintiff did not file a Rule 56.1 Statement of Facts in response to defendant's submission. In fact, plaintiff submitted no evidence in connection with his opposition, only a memorandum of law. Accordingly, the Court [*6] could deem every fact in defendant's submission admitted for purposes of this motion. L.R. 56.1(c); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (**HN1** Where "the opposing party [] fails to controvert a fact so set forth in the [] Rule 56.1 statement, that fact will be deemed admitted."); *Litchhult v. USTRIVE2, Inc*., No. 10-CV-3311 (JFB)(ARL), 2013 U.S. Dist. LEXIS 98619, 2013 WL 3491076, at *2 n.1 (E.D.N.Y. July 10, 2013) (detailing standard). However, in an abundance of caution, the Court has examined the record carefully and concludes that the facts in defendant's Rule 56.1 Statement are supported by admissible evidence, and plaintiff has not pointed to any evidence in the record to controvert such facts. In addition, the Court's own independent review of the record has not uncovered any evidence to controvert the facts contained in defendant's Rule 56.1 Statement. The Court construes the facts in the light most favorable to plaintiff, the nonmoving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

### 1. Plaintiff's Employment

Plaintiff began working for the Town in May 1995, starting as a Custodial Worker I based at Islip MacArthur Airport. (Def. 56.1 ¶¶ 1-2.) In March 1997, he became a Maintenance Mechanic I ("MMI"). (*Id*. ¶ 3.) As part of [*7] his job responsibilities, plaintiff carried heavy light fixtures, which sometimes weighed as much as one to two hundred pounds. (*Id*. ¶ 5.) He also had to drive, carry ladders, and perform overhead and elevated work. (*Id*. ¶ 6.) Other responsibilities included replacing broken lights, changing light fixtures, repairing electrical outlets, and working on ceiling and exhaust fans. (*Id*. ¶ 7.) In July 1998, Morris transferred from MacArthur Airport to the Town's Department of Public Works Maintenance Bureau ("the Bureau"). (*Id*. ¶ 8.) After his transfer, Morris continued to perform the heavy lifting, driving, and overhead work required of the MMI position. (*Id*. ¶ 9.)

Roughly fifteen maintenance mechanics were assigned to the Bureau, spread fairly evenly across three job classifications-I, II, and III. (*Id*. ¶10.) Approximately four held the MMI title. (*Id*. ¶ 11.) MMIs generally serve as helpers for the MMIIs and MMIIIs; they are assigned according to the magnitude of the work to be undertaken, and might not be assigned to mechanics that are performing work of a less intensive nature. (*Id*. ¶¶ 12-13.)

In August 2001, plaintiff was promoted to MMIII, a title that requires that the employee be in [*8] a "physical condition commensurate with the demands of the position." (*Id*. ¶¶ 14-15.) The work Morris performed as an MMI, *i.e.*, heavy lifting, overhead work, and elevated work, also was required of the MMIII title. (*Id*. ¶¶ 16-17.) According to Morris, "sometimes" the MMIII was provided with a helper. (*Id*. ¶ 18.) As of January 2, 2007, plaintiff performed whatever "electrical work within the Town of Islip [that] needed to be done." (*Id*. ¶ 19.) His electrical responsibilities included overhead work, elevated work, and lifting of heavy objects weighing between one-hundred and two-hundred pounds. (*Id*. ¶ 20.) Plaintiff also performed "a lot more ballast and overhead lighting" work after his promotion. (*Id*. ¶ 21.)

### 2. Plaintiff's Alleged Disability and Return to Work

On January 2, 2007, plaintiff injured his shoulder slipping off a truck and was out of work until January 22, 2007. (*Id*. ¶¶ 22-23.) Two years later, on January 30, 2009, plaintiff had surgery on the injured shoulder. (*Id*. ¶ 24.) For a time after his surgery, plaintiff was "one hundred percent disabled." (*Id*. ¶ 25.) He was unable to perform the "normal" and "everyday" functions of his job title, with or without a reasonable accommodation. [*9]  (*Id*. ¶ 26.)

In April 2009, while out work because of the surgery and on workers' compensation, plaintiff filed a complaint with the NYSDHR. (*Id*. ¶ 27; *see* NYSDHR Complaint, Finkel Aff. Ex. E.) Morris alleged that the Town's requests for him to come in for a light duty evaluation, and its decision to subject plaintiff to additional scrutiny, were discriminatory. (Def. 56.1 ¶ 28.) NYSDHR conducted an investigation and found that the Town's attempt to monitor and evaluate plaintiff's physical condition and capacity to perform light duty work was in accordance with the "policy and procedure set forth in the Collective Bargaining Agreement and rules governing Worker's Compensation," which was a "legitimate, non-discriminatory reason" for the Town's actions. (*Id*. ¶ 29; *see* NYSDHR Finding, Finkel Aff. Ex. F.) Accordingly, NYSDHR found no probable cause and dismissed the complaint. (Def. 56.1 ¶ 30.)

Plaintiff returned to work on or about June 9, 2009. (*Id*. ¶ 31.) Upon his return, he provided the Town with medical

---

[2]    Although the Rule 56.1 Statement of Fact contains specific citations to the record, the Court cites to the statements rather than to the underlying citations.

documentation from his treating orthopedist, Dr. Joshua Dines. (*Id*. ¶ 32.) Dr. Dines stated that plaintiff "may return to work on 6-8-09." (*Id*. ¶ 33; *see* Dines Letter, Abbate Affidavit [*10] Ex. I.) Dr. Dines did not list any physical restrictions or limitations. (*See generally* Dines Letter.) Between his return in June 2009 and subsequent injury on July 23, 2009, plaintiff never provided the Town with any medical documentation to indicate that he was restricted or limited in his ability to perform his job functions. (Def. 56.1 ¶ 35.) According to Morris, he tried to get a letter from Dr. Dines to indicate what plaintiff's restrictions were before July 23, 2009, but Dr. Dines "would not give it to me saying anything else." (*Id*. ¶ 36; Morris Dep. at 136:14-22, Finkel Aff. Ex. C.)

After he returned to work, Morris claims that he was "for the most part" able to perform the essential functions of his job title. (Def. 56.1 ¶ 37.) He described "lifting and reaching" as his "biggest problem," but he performed overhead work to the best of his ability.[3] (*Id*. ¶¶ 38-39.) According to plaintiff, he spoke with his supervisors and asked them to let him have "at least one or two helpers" if there was a "big" job coming up. (*Id*. ¶ 40.) By plaintiff's own account, until his injury in July 2009, he was provided with helpers "[f]or the most part," though "[n]ot every day."[4] (Morris Dep. at 145:4-10.) [*11] His supervisors provided a requested helper if it was "feasible"—unless "there were some freak thing where a lot of people were out or something like that, but for the most part it wasn't a problem getting me a helper." (*Id*. at 145:13.) A helper was assigned to Morris twenty of the twenty-nine days that he worked before his injury on July 23, 2009. (Def. 56.1 ¶ 44.) During this time, Bobby Powers was the only other MMIII who performed electrical work. (*Id*. ¶ 45.) Powers handled the "bigger jobs" and was only assigned helpers on nine of the thirty-one days that he worked during the same time period. (*Id*. ¶¶ 45-47.)

3. Emergency Personal Leave Day

On or about April 29, 2009, the Acting Commissioner of Public Works issued a memorandum to employees advising them that, in accordance with the Collective Bargaining Agreement, "Emergency Absences (PV or Personal Leave Day) with less than three (3) days notice will require an explanation and/or documentation," and the failure to provide an explanation "may result in the denial of the paid leave." (*Id*. ¶ 50; Emergency Absences Notice, Abbate Aff. Ex. M.) During 2009, the Commissioner requested explanations from other employees twenty-nine times, twelve of those coming before July 9, 2009. (Def. 56.1 ¶ 53.) Employees provided various reasons for their requests (which were approved), including child care issues, car trouble, or home maintenance concerns. (*Id*. ¶ 54; *see* Leave Requests, Abbate Aff. Ex. N.)

On July 9, 2009, plaintiff took a day off, requesting that it be considered a paid emergency personal day. (Def. 56.1 ¶ 51.) The Town asked plaintiff to explain his request. (*Id*. ¶ 52.) He stated, [*13] "I took an emergency personal day." (*Id*. ¶ 55; Morris Leave Request, Abbate Aff. Ex. O.) The Town then denied plaintiff's request for leave. (Def. 56. 1 ¶ 56.) On July 21, 2009, plaintiff filed a grievance relating to that denial. (*Id*. ¶ 57.) He wrote, "I feel I am being singled out due to my shop steward duties and past grievance. I would like the 8 hours I was docked [pay] returned." (*Id*. ¶ 58; Leave Request Grievance, Abbate Aff. Ex. P.) The grievance did not allege disability discrimination. The Town held a hearing on the grievance in late 2009 or early 2010. (*See* Def. 56.1 ¶ 60.) At the hearing, Morris explained why he used the paid emergency personal day. (*Id*. ¶ 61.) The Town then rescinded the denial, granted plaintiff's request, and restored the eight hours of pay that had been docked for using the day without explanation.[5] (*Id*. ¶ 62.)

4. July 2009 Injury and Discharge

On July 23, 2009, Morris suffered another shoulder injury while working at the marina. (*Id*. ¶ 63.) He had been assigned a helper on that day. (*Id*. ¶ 64.) Since then, by his own account, Morris has been "totally disabled" and not been physically capable of performing the job duties of an

---

[3]   It is uncontroverted that the Town assigned Morris the same type of work upon his return to surgery as he had been assigned prior to his surgery, including the following tasks: installation of a fan and electrical switch, installation of electrical switches for lighting replacement of ceiling tiles, rewiring a fuse and changing a bulb at the marina, removing piping from a roof, repairing an exit light, fixing flood lights, examining breakers and dryers, and installing ceiling fans and new lights. (Def. 56.1 ¶¶ 48-49.)

[4]   Helpers also were provided before the injury. (*See* Morris [*12] Dep. at 143:9-14 (Q: Well, didn't the helpers work with you before you were injured? A: Yes. Q: So nothing changed after your injury. A: No. They still helped me.").)

[5]   According to a letter from Robert Finnegan, the Director of the Office of Labor Relations and Personnel, during the hearing, Morris did not raise anti-union issues, refer to any past grievance, or argue that the policy was a change in practice or contract. (Finnegan Letter, Abbate Aff. Ex. Q.) Instead, Morris said he took the day off because of [*14] the emergency hospitalization of an immediate family member. (*Id*.) Finnegan, therefore, found that Morris had satisfied the disclosure requirements. (*Id*.)

MMIII, even with a helper. (*Id*. ¶ 65.) Plaintiff's orthopedist corroborated this physical condition. (*Id*. ¶ 66; *see* Physician's Notes, Abbate Aff. Exs. S, T, U, V, W, X, Y, Z, AA (stating that plaintiff is totally disabled and may not return to work).) In November 2009, plaintiff applied to New York State for a permanent disability retirement pension. (Def. 56.1 ¶ 67.) At that time, plaintiff had no intention of ever returning to work. (*Id*. ¶ 68.) He represented to the State's examining physician that he was unable to perform his job duties. (*Id*. ¶ 69.)

As of August 24, 2010, plaintiff had not returned to work. (*Id*. ¶ 71.) By then, he had been absent from work for more than one continuous year. (*Id*. ¶ 72.) As a result [*15] of that continued absence, the Town separated plaintiff from his employment, sending him a letter stating, "In accordance with the agreement between the Town of Islip and International Brotherhood of Teamsters, Local #237, and pursuant to Section 71 of the Civil Service Law, you will be removed from the payroll as of August 31, 2010." (*Id*. ¶ 73; *see* Separation Notice, Abbate Aff. Ex. BB.) New York granted plaintiff's permanent disability retirement pension in May 2011, finding him "permanently incapacitated from the performance of his duties." (Def. 56.1 ¶ 70; *see* Disability Services Letter, Abbate Aff. Ex. CC.)

B. Procedural Background

Plaintiff filed the complaint on June 14, 2012. Defendant moved to dismiss the New York State Human Rights Law claims on September 19, 2012. The Court granted the motion during a telephone conference on November 26, 2012. Defendant filed its answer on January 7, 2013. Defendant moved for summary judgment on February 4, 2014. Plaintiff opposed on March 19, 2014. Defendant replied on April 2, 2014. The Court held oral argument on May 7, 2014. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

*HN2* Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion [*16] for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for [*17] the nonmoving party").

*HN3* Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

Plaintiff's first, third, fifth, and seventh causes of action allege disability discrimination: (1) Claim 1: upon his return from a work-related injury [*18] in June 2009, the Town

refused to assign plaintiff a helper as a reasonable accommodation; (2) Claim 3: upon his return from a work-related injury in June 2009, the Town "regularly" assigned plaintiff "elevated or overhead work"; (3) Claim 5: upon his return from a work-related injury in June 2009, the Town denied plaintiff's request for an emergency personal day; and (4) Claim 7: after his second injury in July 2009, the Town repeatedly directed plaintiff to be evaluated for light duty at a time when he was "totally disabled and unable to work," and then discharged him without proper notice. (Complaint ¶¶ 37, 41, 50, 62.) Plaintiff's second, fourth, sixth, and seventh causes of action allege retaliation: (1) Claim 2: plaintiff was denied helpers in retaliation for filing a disability discrimination complaint against the Town in April 2009; (2) Claim 4: plaintiff was assigned overhead and elevated work in retaliation for the filing; (3) Claim 6: the Town denied plaintiff's paid emergency personal day request in retaliation for the filing; and (4) Claim 7: after his second injury in July 2009, the Town retaliated against plaintiff by harassing him to come in for evaluation for light [*19] duty assignments and by discharging him without proper notice. (*Id.* ¶¶ 30, 39, 44, 52, 63.) The Court addresses each claim in turn.

A. ADA Discrimination Claims

The first, third, and fifth causes of action center on events alleged to have occurred between June 9, 2009, and July 23, 2009. The seventh cause of action arises from events alleged to have taken place after July 23, 2009. Defendant argues that the first three causes of action must be dismissed because (1) plaintiff did not have an ADA-qualifying disability; (2) the failure to accommodate claim fails as a matter of law because not only was the Town not obligated to provide reasonable accommodations for his essential job functions, but plaintiff also cannot show that, even if reasonable accommodations were needed in order for him to complete the essential job functions, defendant did not provide him with such; (3) defendant did not have to eliminate essential job functions; and (4) the temporary denial of the paid emergency personal day is not actionable as a matter of law. Defendant argues that the seventh cause of action must be dismissed because (1) after the July 2009 injury, plaintiff was not otherwise qualified to perform [*20] the essential functions of his job, with or without a reasonable accommodation; (2) the Town requested that plaintiff report for evaluation and also discharged him pursuant to the Collective Bargaining Agreement and N.Y. Civ. Serv. Law § 71; and (3) plaintiff otherwise failed to exhaust his available administrative remedies. For the

reasons set forth below, the Court agrees with defendant.

1. Claims 1, 3, and 5

a. Whether Plaintiff Had an ADA-Qualifying Disability

*HN4* The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The plaintiff "bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Heyman v. Queen Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999); *see also Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 383 (2d Cir. 1996) ("A plaintiff who raises a disability discrimination claim bears the initial burden of establishing a prima facie case."). To make out a prima facie case, a plaintiff must show that (1) the employer is subject to the ADA;[6] (2) the plaintiff is a person with a disability within the meaning of the ADA; (3) the plaintiff [*21] was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) the plaintiff suffered adverse employment action because of her disability. *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003) (citing *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869-70 (2d Cir. 1998)).

*HN5* A threshold question is whether the plaintiff has a disability within the meaning of the ADA. *Graham v. Three Vill. Cent. Sch. Dist.*, No. 11-CV-5182, 2013 U.S. Dist. LEXIS 143264, 2013 WL 5445736, at *10 (E.D.N.Y. Sept. 30, 2013). The ADA Amendment Act of 2008 ("ADAAA") defines "disability" as:

> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(1).

As relevant in this case, *HN6* "no failure to accommodate claim can be made, as a matter of law, for an individual who was 'regarded as' disabled, rather than who was actually

---

[6]   This is undisputed in this case.

2014 U.S. Dist. LEXIS 133168, *21

disabled. In other words, the 'regarded as' theory of disability is no longer actionable in the context of a failure to accommodate claim." *Graham*, 2013 U.S. Dist. LEXIS 143264, 2013 WL 5445736, at *11 (citing 42 U.S.C. § 12201(h)); *see also Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'" (quoting 42 U.S.C. § 12201(h))). Further, with respect to the other pre-July 23, 2009 discrimination claims, there is no evidence from which a reasonable jury could conclude [*22] that that plaintiff was regarded by the Town as having an ADA-qualifying disability from June 9 to July 23, 2009, as required. *See Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999) (for purposes of the "regarded as" prong, requiring the covered entity to "believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting").[7] Dr. Dines cleared plaintiff to return to work and did not list any limitations, and there is no evidence that the Town knew or thought that plaintiff had any restrictions from work. (*See* Def. 56.1 ¶¶ 31-40.) Plaintiff was assigned and performed the identical work as before his surgery, and nothing indicates that the Town changed its expectations of his performance, either. (*See id.* ¶¶ 48-49.) In fact, plaintiff did not specifically raise a "regarded as" theory of liability in his opposition. Thus, for purposes of the first three discrimination claims, this Court only addresses in more detail below whether there is evidence from which a rational jury could find that plaintiff was disabled or had a record of disability.

i. Whether Plaintiff [*23] Had a Physical Impairment that Affects a Major Life Activity

*HN7* For a plaintiff to establish that she has a disability under the statute's first subsection, she must "(1) show that [she] suffers from a physical or mental impairment, (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity, and (3) show that [her] impairment substantially limits the major life activity previously identified." *Green v. DGG Props. Co.*, No. 11-CV-1989 (VLB), 2013 U.S. Dist. LEXIS 13138, 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013) (quoting *Kravtsov v. Town of Greenburgh*, No. 10-CV-3142(CS), 2012 U.S. Dist. LEXIS 94819, 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012)) (internal quotation marks omitted). Pursuant to the ADAAA, major life activities include, but

are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Major life activities also may include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* Notably, post-ADAAA, "major life activities no longer need to be of 'central importance.'" *D'Entremont v. Atlas Health Care Linen Servs., Co.*, No. 12-CV-0060 (LEK/RFT), 2013 U.S. Dist. LEXIS 34474, 2013 WL 3880040, at *6 (N.D.N.Y. Mar. 13, 2013) (quoting *Sam-Sekur v. Whitmore Grp., Ltd.*, No. 11-CV-4938, 2012 U.S. Dist. LEXIS 83586, 2012 WL 2244325, at *6 (E.D.N.Y. June 15, 2012)); *see also* 42 U.S.C. § 12102(2)(A).

*HN8* The ADA does not define what [*24] constitutes a substantial limitation. *See Kravtsov*, 2012 U.S. Dist. LEXIS 94819, 2012 WL 2719663, at *10 (stating that "[t]he ADA does not define the term 'substantially limited,' but post-ADAAA regulations" clarify the term). However, it is clear that the standard "is not meant to be [] demanding," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," *id.* 1630.2(j)(1)(iii). Thus, an impairment will be considered a disability under the ADA "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." *Risco v. McHugh*, 868 F. Supp. 2d 75, 108 n.47 (S.D.N.Y. 2012) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (internal quotation marks omitted). An impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." *Kravtsov*, 2012 U.S. Dist. LEXIS 94819, 2012 WL 2719663, at *10 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)) (internal quotation marks omitted); *see also Brandon v. O'Mara*, No. 10-CV-5174(RJH), 2011 U.S. Dist. LEXIS 112314, 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) ("[T]he revised EEOC regulations provide that [a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[; t]hat is, while [a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially [*25] limiting, . . . the substantially limits analysis is comparative." (second and fourth alterations in original) (citation and internal quotation marks omitted)).

---

[7] *Sutton* was superseded by statute on other grounds. *See, e.g., Young v. Precision Metal Prods., Inc.*, 599 F. Supp. 2d 216, 223 (D. Conn. 2009).

Plaintiff claims that the injury to his shoulder rendered him "unable to lift his right arm over his head" and prompted his doctor to "restrict[] him from lifting more than 15 pounds." (Complaint ¶ 32.) Defendant argues that there is no evidence that this alleged impairment substantially limited a major life activity. The Court agrees with the Town.

In the instant case, plaintiff's selfserving, conclusory allegation of disability is belied by "the record evidence that plaintiff was cleared by his doctor," and, thus, standing alone, it "cannot support a finding by a rational fact finder that plaintiff was substantially limited" in a major life activity. *McDonald v. City of New York*, 786 F. Supp. 2d 588, 608 (E.D.N.Y. 2011) ("These vague and ambiguous descriptions by plaintiff of his limitations, coupled with the record evidence that plaintiff was cleared by his doctor to walk up to three miles per day cannot support a finding by a rational factfinder that plaintiff was substantially limited in the major life activities of walking or standing."). In addition, with respect to the claimed lifting limitation, [*26] numerous courts have held, "as a matter of law, that the weight limitation similar to that claimed by plaintiff is insufficient to establish a substantial limitation on one's ability to lift, work, or perform any other major life activity." *Id.* at 609 (discussing claimed limitation of inability to lift weighs exceeding twenty pounds); *see also Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 644 (2d Cir. 1998) (finding two plaintiffs' inability to lift "very heavy objects" or "anything heavy," respectively, insufficient to establish substantial limitation on ability to lift as compared to average person); *Snow v. Ridgeview Med. Ctr.*, 128 F.3d 1201, 1207 (8th Cir. 1997) (explaining that a "general lifting restriction imposed by a physician, without more, is insufficient to constitute a disability within the meaning of

the ADA"); *Williams v. Channel Master Satellite Sys., Inc.*, 101 F.3d 346, 349 (4th Cir. 1996) (same, for twenty-five pound lifting limitation); *Aucutt v. Six Flags, Over Mid—Am., Inc.*, 85 F.3d 1311, 1319 (8th Cir. 1996) (same, for twenty-five pound lifting restriction); *Gittens v. Garlocks Sealing Techs.*, 19 F. Supp. 2d 104, 111 (W.D.N.Y. 1998) (same, for thirty pound lifting restriction).[8]

Moreover, to the extent plaintiff may claim a limitation with respect to work,

> **HN9** to show substantial limitation in this activity under the ADA a plaintiff must prove that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."

*McDonald*, 786 F. Supp. 2d at 609 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). However, "[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one." *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999) (internal quotation marks and citation omitted). Here, Morris has not shown that his alleged impairment significantly restricted his ability to perform a class of jobs, or a broad range of jobs in various classes, during the relevant time period. He has presented no evidence to suggest that he was disqualified from performing even the essential functions of his own job. By his own account, when he returned to work in June 2009, he was "for the most part" able to perform [*29] the essential functions

---

8   Plaintiff's reliance on the NYSDHR's finding of "probable cause," as to his second complaint in 2010, is unavailing. As a threshold matter, plaintiff has not shown that the finding of probable cause would have preclusive effect in New York State courts or in this Court, particularly because there was no final administrative [*27] determination, and no state court reviewed the NYSDHR's findings. *See Macer v. Bertucci's Corp*., No. 13-CV-2994 (JFB)(ARL), 2013 U.S. Dist. LEXIS 170367, 2013 WL 6235607, at *4-6 (E.D.N.Y. Dec. 3, 2013) (detailing claim preclusion standard). Moreover, plaintiff did not submit the entire NYSDHR report and, thus, the Court does not know what information the NYSDHR had before it in reaching that initial determination. Thus, the NYSDHR's finding itself has no probative value, especially in light of the uncontroverted evidence that defendant has submitted to this Court regarding the disability and retaliation claims. As the Second Circuit has noted, under such circumstances, that initial finding is not enough to preclude summary judgment:

> Plaintiffs assert that the mere existence of the initial CCHR "probable cause" determination, later reversed, is enough to preclude summary judgment, but an initial finding which does no more than simply repeat facts alleged elsewhere and conclusorily states that the facts reflect discrimination does not create a genuine issue of material fact. This is particularly so where, as here, factual determinations are entirely absent from the initial determination.

*Hines v. City of New York*, 159 F.3d 1346, 1998 WL 514323, at *2 (2d Cir. 1998) (summary order) (citing *Goldberg v. B. Green & Co*., 836 F.2d 845, 848 (4th Cir. 1988) (holding Commission's probable cause finding not sufficiently [*28] probative to create a genuine issue of fact on age discrimination claim)).

of his job title. (Def. 56.1 ¶ 37.) He described "lifting and reaching" as his "biggest problem," but he performed overhead work to the best of his ability. (*Id.* ¶¶ 38-39.) This uncontroverted evidence record precludes any rational finding that plaintiff's alleged impairment significantly limited his ability to perform a class of jobs or a broad range of jobs in various classes. *See, e.g., Young*, 599 F. Supp. 2d at 225-26 (finding that plaintiff's ability to maintain a fulltime job that is apparently similar to his previous job undermines the argument that plaintiff is significantly restricted in working); *see also Ongsiako v. City of New York*, 199 F. Supp. 2d 180, 185-86 (S.D.N.Y. 2002) (finding absence of evidence "from which a rational juror could infer that [plaintiff's] impairment precluded him from performing a broad class of jobs," where evidence "leads to only one rational inference: plaintiff's back impairment . . . prevented him only from working as a City construction laborer or in other jobs for which heavy lifting was an essential function"); *Gittens*, 19 F. Supp. 2d at 111 (granting summary judgment and finding that plaintiff has "failed to plead that he has a disability within the meaning of the ADA" where "plaintiff has not been limited from employment in general, and in fact [*30] has remained employed by defendant").

In sum, the Court concludes that plaintiff has failed to submit evidence that raises a genuine issue of fact to whether he suffered from a disability, prior to July 23, 2009, within the meaning of the ADAAA. Plaintiff was able to perform his alleged major life activities, including his own pre-surgery job requirements, with little to no restriction. There is no medical evidence to the contrary. For these reasons, the Court concludes that plaintiff has failed to produce evidence from which a rational jury could conclude that his alleged impairment with respect to a major life activity was substantially limiting. Accordingly, even construing the evidence most favorably to plaintiff, he cannot demonstrate a disability under subsection one of the ADAAA for the time period before July 23, 2009. *See Graham*, 2013 U.S. Dist. LEXIS 143264, 2013 WL 5445736, at *14-15 (finding that plaintiff did not suffer from disability under ADAAA definition based upon own testimony and lack of any medical evidence to support contrary finding).

ii. The "Record" of a Disability Prong

*HN10* Even if a plaintiff cannot show a substantial limitation of a major life activity, she still may be able to establish an ADA-qualifying disability if she [*31] can show "a record" of such an impairment. *See* 42 U.S.C. § 12102(1)(B). According to the Equal Employment Opportunity Commission ("EEOC"), this "part of the definition is satisfied if a record relied on by an employer indicates that

the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Colwell*, 158 F.3d at 645 (quoting 29 C.F.R. pt. 1630 App., § 1630.2(k)) (emphasis added). In other words, "a record reflecting a plaintiff's classification as disabled for other purposes or other standards is not enough." *Id.*

Morris claims that "[t]here are numerous medical records establishing [his] disability, and the Town of Islip were fully aware of [his] injuries and limitations." (Opposition, at 9.) This is insufficient, because plaintiff points to no supporting documentation in the record for the time period at issue. *See Jeffries v. Verizon*, No. 10-CV-2686(JFB)(AKT), 2012 U.S. Dist. LEXIS 135543, 2012 WL 4344197, at *10 (E.D.N.Y Aug. 31, 2012) (*HN11* "District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA." [*32] (quoting *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 301 (S.D.N.Y. 2003)) (internal quotation marks omitted); *Cody v. Cnty. of Nassau*, 577 F. Supp. 2d 623, 642 (E.D.N.Y. 2008) (concluding that plaintiff's "record of impairment" claim fails, in part, because plaintiff "offers no evidence to support a finding that she has a record of an impairment that substantially limits a major life activity," and that "the only statement offered by plaintiff that even addresses this argument is contained in the affidavit of her counsel"). Moreover, even if plaintiff had provided such materials, *HN12* records of hospitalization or other medical treatment do not per se establish a record of an ADA-qualifying disability; rather, the evidence must establish a physical impairment that substantially impaired a major life activity. *See, e.g., Colwell*, 158 F.3d at 645 (record of previous hospital stay did not, by itself, constitute a record of impairment); *Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 615 (5th Cir. 2001) (health screening form, which indicated that new employee was under care of physician and had undergone surgery, did not show that plaintiff's impairment substantially limited any major life activity, and therefore, was insufficient as record of disability); *Hilburn v. Murata Elecs. N. Am., Inc.*, 181 F.3d 1220, 1229-30 (11th Cir. 1999) (employer record that employee missed work following heart attack and in following years did not establish that employee had record of disability); *Dicara v. Conn. Rivers Council*, 663 F. Supp. 2d 85, 93 (D. Conn. 2009) (noting [*33] that fact that employee underwent surgery and was hospitalized was insufficient to create record of substantially limiting impairment). Finally, as noted *supra*, Dr. Dines authorized

plaintiff's return to work, without indicating that plaintiff had any disability or limitations or restrictions. Dr. Dines also refused to provide plaintiff with a letter indicating that he was limited or restricted in any way. (Def. 56.1 ¶ 29.)

Accordingly, even construing the record in plaintiff's favor, the first, third, and fifth causes of action cannot survive summary judgment, because no rational jury could find that plaintiff, between his return to work and departure in late July 2009, had a physical impairment that substantially affected a major life activity, or that plaintiff had a record of impairment, particularly where plaintiff's own treating physician refused to provide such evidence.

b. Alternative Grounds

The Court's analysis of the first three discrimination claims may properly end here, because plaintiff has failed the first requirement of such claims. *See Cody*, 577 F. Supp. 2d at 643 (concluding that because plaintiff had failed to show she had an ADA-qualifying disability under her disability discrimination claim, [*34] her reasonable accommodation claim could not prevail). The Court, however, in an abundance of caution, will address the other grounds raised by the defendant. As detailed below, the Court concludes that, even assuming *arguendo* that there was sufficient evidence from which plaintiff could establish that he had a disability within the meaning of the ADAAA, plaintiff's pre-July 23, 2009 claims also fail on several other grounds: (1) no rational jury find that defendant failed to provide plaintiff with a reasonable accommodation; (2) no rational jury could find that plaintiff's essential job functions did not include overhead work; and (3) no rational jury could find that the temporary denial of a paid leave day was an adverse employment action (or retaliatory).

i. Failure to Accommodate Claim

With respect to a claim under the ADA for failure to accommodate, an employer may be liable if it "fails to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is . . . an employee.'" *Cody*, 577 F. Supp. 2d at 643 (quoting *Sussle*, 269 F. Supp. 2d at 312). "A plaintiff can state a claim for discrimination based upon an employer's failure to accommodate her disability by alleging [*35] facts showing: (1) that she has a disability within the meaning of the [ADA]; (2) that the defendants, who are covered by the ADA, had notice of her disability; (3) that with reasonable accommodations she could perform the essential functions of the position sought; and (4) that defendant refused to make such accommodations." *Feeley v.*

*N.Y.C. Police Dep't*, No. 97-CV-02891-RJD, 2001 U.S. Dist. LEXIS 25431, 2001 WL 34835239, at *9 (E.D.N.Y. Sept. 4, 2001). Once a plaintiff has set forth a prima facie case, "the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship." *Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012). For the following reasons, and assuming that plaintiff had a disability and the Town had notice of the disability, the accommodation claim cannot survive summary judgment because plaintiff does not show that, "even if reasonable accommodations were needed in order for [him] to complete [his] essential job functions (which, based on plaintiff's own testimony, seems clear was not, in fact, the case), defendant did not provide [him] with such." *Graham*, 2013 U.S. Dist. LEXIS 143264, 2013 WL 5445736, at *19 (footnote omitted).

During his deposition, plaintiff admitted that he was able to perform the core functions of an MMIII upon his return, that he was able to perform overhead work, and that he only [*36] requested helpers if there was a "big" job for him to do. (Def. 56.1 ¶¶ 30, 32, 33.) He also admitted that when he did request a helper, the Town provided one unless "there was some freak thing where a lot of other people were out or something like that." (*Id.* ¶ 34.) The Town's records confirm that plaintiff had a helper on twenty of the twenty-nine days he worked after his return in June 2009. The only other individual sharing plaintiff's title and responsibilities had helpers on nine of thirty-one days. The Court also notes that there is no evidence that plaintiff specifically requested help because of an impairment, rather than because there was a "big" job for him to do, which also weighs against a finding of failure to accommodate. *See Taylor v. Phoenixville Sch. Dist.*, 174 F.3d 142, 162 (3d Cir. 1999) (describing possible actions that might reflect interactive process between employer and employee as "meet[ing] with the employee who requests an accommodation request, request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome"). Thus, no reasonable factfinder could conclude [*37] that the Town did not honor, where feasible, plaintiff's requests for accommodation (if

any).[9] Accordingly, based on the uncontroverted evidence, including plaintiff's own testimony, the Court grants summary judgment to defendant on the failure to accommodate claim on this ground, as well.

ii. Assignment of Essential Job Function

Plaintiff claims that he suffered an adverse employment action because he was assigned a greater percentage of overhead work after his injury. (Opposition, at 13.) This does not establish an adverse employment action sufficient to support the third cause of action. "Adverse employment actions [*38] include discharge, refusal to higher, refusal to promote, demotion, reduction in pay, and reprimand." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012); *see also Graham*, 2013 U.S. Dist. LEXIS 143264, 2013 WL 5445736, at *22 (explaining that, for purposes of retaliation claim, adverse employment actions include termination of employment, demotion, less distinguished title, material loss of benefits, or significantly diminished material responsibilities). "Courts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632-33 (6th Cir. 1999) (citing *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 913 (7th Cir. 1996)).

Therefore, no reasonable factfinder could conclude that plaintiff's essential job functions did not include these duties and that the Town impermissibly assigned plaintiff such work. Moreover, there is no evidence that would allow the factfinder to compare the distribution of plaintiff's work before and after his injury to ascertain the merits of the above allegation. Accordingly, the Court grants summary judgment to defendant on plaintiff's third cause of action on this ground, as well.

iii. Emergency Personal Day

Finally, the Court concludes that the temporary denial of the paid leave day, [*39] which the Town later rescinded, does not constitute an adverse employment action sufficient to sustain a discrimination claim as a matter of law. *See, e.g., Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir. 1988) (stating that where defendants have denied plaintiff pay for

compensatory and vacation time, "to survive a motion for summary judgment, plaintiff must present evidence demonstrating that she was entitled to and denied a benefit, and that the reason for that denial was [unlawful discrimination]"); *Kalp v. Kalmon Dolgin Affiliates of Long Island Inc.*, No. 11-CV-4000 (JG), 2013 U.S. Dist. LEXIS 43548, 2013 WL 1232308, at *6 (E.D.N.Y. Mar. 27, 2013) ("The denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action. . . . Kalp has not demonstrated that the denial of her vacation request was a complete bar to her taking vacation. In fact, she took March 7, 2011 as a vacation day." (internal quotation marks and citation omitted)). The uncontroverted evidence in the record is that, in initially denying one day of paid leave, defendant was applying a written policy that was part of the Collective Bargaining Agreement, which required an explanation for a request for a paid emergency personal day. Specifically, it is undisputed that plaintiff initially provided [*40] no explanation other than to state, "I took an emergency personal day," and his request for one day paid leave was denied. After filing a grievance and providing an explanation at the hearing for his request to use an emergency personal day, the denial was rescinded, and the eight hours of pay that had been docked for using the day without an explanation were restored to him. Under these circumstances, no rational jury could find that plaintiff suffered an adverse employment action, either under a disability discrimination claim, or under the more liberal standard for adverse action under a retaliation claim. Moreover, plaintiff points to nothing to indicate that defendant's legitimate, non-discriminatory reason for the temporary denial was a pretext for discrimination or for retaliation. Accordingly, the Court also grants summary judgment to defendant on the fifth cause of action on these independent grounds.

2. Claim 7

The seventh cause of action alleges that the Town discriminated against plaintiff by directing him to come in to be evaluated for light duty assignments "when it knew or should have known" that he "was totally disabled and unable to work," and for discharging him without [*41]

---

[9] Plaintiff argues that "[p]rior to the injury, he had a helper nearly every day, especially when he was doing any sort of sizeable job. After he returned subsequent to the first injury, he was sometimes denied helpers under the guise of helpers being needed elsewhere, only to find out later that said helpers were assigned where they were not needed to prevent Mr. Morris from getting the help he needed." (Opposition, at 13.) Plaintiff, however, points to no admissible evidence to support this conclusory allegation. Any temporal proximity, standing alone, cannot overcome defendant's showing and plaintiff's own testimony.

proper notice. (Complaint ¶ 62.)[10] The claim covers events subsequent to July 23, 2009.

As a threshold matter, the claim fails because it is undisputed that, as a result of the July 23, 2009, injury, plaintiff was not otherwise qualified to perform the essential functions of his job, with or without a reasonable accommodation. *See Shannon*, 332 F.3d at 99. **HN13** "Essential functions" are defined under EEOC regulations to mean the "'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" *Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)). Plaintiff testified that since July 23, 2009, he has been incapable of performing his duties, even with a helper (Def. 56.1 ¶ 54), and medical evidence supports the conclusion that plaintiff is totally disabled (*id.* ¶¶ 55, 56). Plaintiff also told the State's examining physician that he is unable to perform his job functions. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, 119 S. Ct. 1597, 143 L. Ed. 2d 966 (1999) ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element [*42] of her ADA case—at least if she does not offer a sufficient explanation."). Thus, because plaintiff was not "otherwise qualified" subsequent to July 23, and he does not proffer a sufficient explanation, plaintiff cannot establish a prima facie case of disability discrimination under the ADA.

In addition, according to the Town, the predicate for its requests to evaluate plaintiff for light duty assignments was a provision in the Collective Bargaining Agreement between the Town and its workforce. Even assuming *arguendo* that plaintiff otherwise was qualified to perform the essential functions of his job, the enforcement of such a provision cannot support a claim of discrimination based on disability. *See Cioce v. Cnty. of Westchester*, 128 F. App'x 181, 184 (2d Cir. 2005) ("Even assuming arguendo that his allegations support his claim that he is disabled as that term is defined under the ADA, Cioce's allegations and submitted evidence indicate that his receipt of benefits for his injuries—pursuant to the collective-bargaining agreement ("CBA") between Westchester County and the Correction Officers Benevolent Association—was terminated because of his failure to submit to independent medical examinations as required by the CBA, and not because of his disability. [*43] The fact that Cioce disagreed as to whether he was required to submit to these examinations does not support his claim of discrimination based on his disability."); *Honey v. Cnty. of*

*Rockland*, 200 F. Supp. 2d 311, 321 (S.D.N.Y. 2002) (finding that requests for medical evaluations to ascertain fitness to work all three shifts as required by job was not adverse employment action under ADA because requests did not materially change plaintiff's working conditions).

Similarly, defendant claims that plaintiff was separated from his employment pursuant to **HN14** N.Y. Civil Service Law § 71, which "permits a civil service employer to terminate an employee who has been separated from service for more than one year by reason of disability resulting from occupational injury." *O'Leary v. Town of Huntington*, No. 11-CV-3754 (JFB)(GRB), 2012 U.S. Dist. LEXIS 126086, 2012 WL 3842567, at *12 (E.D.N.Y. Sept. 5, 2012) (quoting *Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 195 (S.D.N.Y. 2006)). This provision is a legitimate, non-discriminatory basis for the termination. *Hatter v. Fulton*, No. 92 CIV. 6065(WK), 1997 U.S. Dist. LEXIS 10429, 1997 WL 411623, at *7 (S.D.N.Y. 1997) (stating that upon defendant's assertion of right to terminate under Civil Service Law § 71, burden shifts to plaintiff to show that proffered reason was pretextual), *aff'd sub. nom. Hatter v. N.Y.C. Housing Auth.*, 165 F.3d 14 (2d Cir. 1998). "No presumption of discrimination arises when an employer makes a decision explicitly provided for by the Civil Service Law. *Bresloff-Hernandez v. Horn*, No. 05 Civ. 0384(JGK), 2007 U.S. Dist. LEXIS 71257, 2007 WL 2789500, at *6 (S.D.N.Y. Sept. 25, 2007) (citing *Syken v. New York*, 02 Civ. 4673, 2006 U.S. Dist. LEXIS 92264, 2006 WL 3771095, at *9 (S.D.N.Y. Dec. 21, 2006)). Plaintiff has not presented any evidence [*44] that defendant's proffered reason was pretextual.

Lastly, the discharge-related claim also fails because plaintiff has not exhausted his administrative remedies by raising a termination claim before the NYSDHR or EEOC. **HN15** To bring a Title VII discrimination claim in federal court, a plaintiff must first exhaust administrative remedies by filing an administrative charge alleging discrimination within 300 days of the alleged discriminatory conduct. *O'Grady v. Middle Country Sch. Dist.* No. 11, 556 F. Supp. 2d 196, 199 (E.D.N.Y. 2008) (citing *Ruhling v. Tribune Co.*, No. 04 Civ. 2430(ARL), 2007 U.S. Dist. LEXIS 116, 2007 WL 28283, at *8 (E.D.N.Y. Jan. 3, 2007)). This statutory filing period is "analogous to [ ] statute[s] of limitations," *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 712 (2d Cir. 1996), and, as such, "a failure to timely file a charge acts as a bar to a plaintiff's action." *Butts v. N.Y.C. Dep't of Hous. Pres. & Dev.*, No. 00 Civ. 6307(KMK), 2007 U.S. Dist. LEXIS

---

[10]    In his opposition, plaintiff only addresses the light duty requests, not his discharge. (*See* Opposition, at 19-21.) Plaintiff also does not address most of defendant's arguments for summary judgment.

6534, 2007 WL 259937, at *6 (S.D.N.Y. Jan. 29, 2007); *see also McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 214 (2d Cir. 2006).

Nevertheless, **HN16** "'claims that were not asserted before the EEOC [or an appropriate State or local agency] may be pursued in a subsequent federal court action if they are reasonably related to those that were filed with the agency.'" *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 177 (2d Cir. 2005) (quoting *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam)). "Reasonably related conduct is that 'which would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 358 (2d Cir. 2001)); *see also Mathirampuzha v. Potter*, 548 F.3d 70, 77 (2d Cir. 2008) (stating that claim is reasonably related where "administrative complaint can be fairly read to encompass the claims [*45] ultimately pleaded in a civil action or to have placed the employer on notice that such claims might be raised"). In determining whether a claim is "reasonably related" to the EEOC charge, "'the focus should be on the factual allegations made in the [EEOC] charge itself'" and on whether those allegations "gave the [EEOC] 'adequate notice to investigate'" the claims asserted in court. *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Deravin v. Kerik*, 335 F.3d 195, 201-02 (2d Cir. 2003)).

Plaintiff's termination allegations arose subsequent to the filing of his NYSDHR complaint. There is no evidence that plaintiff ever brought a termination allegation to the NYSDHR and EEOC, and the Court concludes that such an allegation is not "reasonably related" to the other discrimination allegations in the April 2009 NYSDHR complaint. As a matter of law, then, plaintiff's claim expands the scope of the charge to encompass "new unlawful employment practices or bases for discrimination," rather than "additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 83 (2d Cir. 2001) (citations omitted); *see Lyles v. District of Columbia*, 777 F. Supp. 2d 128, 136 (D.D.C. 2011) ("Plaintiff's EEO charges outline three allegedly retaliatory acts of discrimination. The first is

denial of promotions, the second [*46] is a threat to place plaintiff on leave, and the third is plaintiff's reassignment to the Day Treatment Program. As neither complaint raises the elimination of plaintiff's position in any way, the current claim has not been exhausted."). Accordingly, the Court grants summary judgment to defendant on plaintiff's discharge-related discrimination claim on this ground, as well.

B. Retaliation Claims

1. Legal Standard

*HN17* Retaliation claims brought under the ADA are examined under the same *McDonnell Douglas* burden-shifting framework. *See, e.g., Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show the following elements: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.* **HN18** If the plaintiff establishes a prima facie case of unlawful discrimination, the burden then shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the complained-of conduct. *McDonnell Douglas*, 411 U.S. at 802; *see also Fincher*, 604 F.3d at 720 (stating that where the plaintiff succeeds in establishing a prima facie [*47] case, "then a presumption of retaliation arises and the employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff alleges was retaliatory"). Where the defendant articulates such a reason, then the presumption of discrimination is rebutted, and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (citation omitted). The burden then shifts back to the plaintiff to show, without the benefit of any presumption, that a reasonable jury could conclude by a preponderance of the evidence that the employer's explanation is merely a pretext for impermissible retaliation. *Treglia*, 313 F.3d at 721.[11] To meet this burden, the plaintiff may rely on evidence presented to establish the *prima facie* case as well as additional evidence. Such additional evidence may include

---

[11]   Following the Supreme Court's decisions in *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 186 L. Ed. 2d 503 (2013), and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009), it is an open question in this Circuit whether an ADA plaintiff must now show that disability discrimination (or the plaintiff's protected activity, in a retaliation claim) was a but-for cause of the adverse employment action. *See Castro v. City of New York*, __F. Supp. 2d __, 24 F. Supp. 3d 250, 2014 U.S. Dist. LEXIS 79040, 2014 WL 2582830, at *14 n.34 (E.D.N.Y. 2014) ("[T]he question of whether the heightened, 'but-for' standard of causation for Title VII retaliation claims . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit."); *see also Tse v. New York Univ.*, No. 10-CV-7207 (DAB), 2013 U.S. Dist. LEXIS 134223, 2013 WL

direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). It is insufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in [*48] favor of plaintiff on the ultimate issue, *i.e.*, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207-08 (S.D.N.Y. 2000).

*HN19* The Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable [*49] worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006) (internal citations omitted). The same definition applies to retaliation claims under the ADA. *Platt v. Inc. Vill. of Southampton*, 391 F. App'x 62, 64 (2d Cir. 2010); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 90 (2d Cir. 2010).

### 2. Application

In his opposition, plaintiff only addresses the denied emergency personal day and the request that he report for a light duty evaluation. (Opposition, at 18.) Although it appears that plaintiff has abandoned his other claims, *see Marache v. Akzo Nobel Coatings, Inc.*, No. 08. Civ. 11049, 2010 U.S. Dist. LEXIS 23273, 2010 WL 908467, at *15 (S.D.N.Y. Mar. 12, 2010) (finding a claim abandoned by virtue of plaintiff's failure to address it in opposition to motion for summary judgment), out of an abundance of caution, the Court addresses all the retaliation allegations. For the following reasons, the Court concludes that plaintiff's retaliation claims are without merit.

### a. Alleged Failure to Provide a Helper

As discussed *supra*, plaintiff's testimony and the Town's uncontroverted records show that plaintiff was provided

with a helper unless none were available. Thus, there is no evidence that defendant actually took negative employment actions against plaintiff, or that there was any change in his working conditions, when he did not have a helper. Moreover, defendant's "alleged failure to accommodate [plaintiff's] [*50] disability subsequent to an ADA . . . protected request cannot be bootstrapped into a viable disability retaliation claim." *Missick v. City of New York*, 707 F. Supp. 2d 336, 356-57 (E.D.N.Y. 2010) (citing *Gomez v. Laidlaw Transit, Inc.*, 455 F. Supp. 2d 81, 90 (D. Conn. 2006)); *Gomez*, 455 F. Supp. 2d at 90 ("To the extent plaintiff claims that defendant's ongoing failure to accommodate her constituted retaliation, this claim is also insufficient as a matter of law. *HN20* Requesting accommodation inevitably carries the possibility that the employer will not honor the request. If the prospect that an employer might not honor the request would deter a reasonable employee from even making the request, reasonable employees would not request accommodation. For this reason, a failure to accommodate cannot constitute retaliation for an employee's request for accommodation."). The Court also notes that, even assuming plaintiff established a prima facie case of retaliation based on temporal proximity, he fails to proffer any evidence that defendant's legitimate non-discriminatory reason—no helper was provided on days when no MMI was available—is a pretext for retaliation.

### b. Overhead Work

Similarly, there simply is no evidence that plaintiff's NYSDHR complaint in April 2009 motivated defendant to assign plaintiff overhead and elevated work after he returned from surgery. [*51] For instance, there is no evidence whatsoever that the Town disproportionately assigned plaintiff such projects after he complained to the NYSDHR, much less any statements or evidence that would allow a reasonable jury to conclude that the existence of such projects was a pretext for retaliation.

### c. Emergency Personal Day

As discussed *supra*, after plaintiff was denied the paid leave day, he filed a grievance, was afforded a hearing, and had the denial reversed, with ultimately no loss to him. Plaintiff does not dispute the existence of the Town's policy with respect to emergency days. In his opposition, plaintiff states that other employees were allowed to take emergency leave

---

5288848, at *18 n.18 (S.D.N.Y. Sept. 19, 2013); *Najjar v. Mirecki*, No. 11-CV-5138 (KBF), 2013 U.S. Dist. LEXIS 94011, 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013). This Court need not resolve that issue in this case because, as discussed *infra*, plaintiff has not produced sufficient evidence from which a rational jury could find that he was retaliated against, even under the "motivating factor" standard.

without offering any details. (Opposition, at 19.) Plaintiff, however, does not show that those employees requested the leave fewer than three days before taking it, and he ignores the documentary evidence that supports defendant's claim that they neutrally applied the policy to all employees. Therefore, the Court concludes that plaintiff fails to establish a prima facie case of retaliation with respect to the emergency personal day. *See Chin-McKenzie v. Continuum Health Partners*, 876 F. Supp. 2d 270, 286 (S.D.N.Y. 2012) ("It is, simply, not a material adverse change in a term or condition of employment to require [*52] an employee to go to the EHS or ED after having an on-the-job allergy attack, to notify a supervisor before leaving duty, or to undergo a fitness examination. Nor did Chin—McKenzie incur a materially adverse change in work conditions when she received an "average" performance rating, was compelled to document the reason for a bereavement leave, or was denied requested days off. These are the sort of **HN21** 'minor annoyances' that do not rise to the level of actionable retaliation under Title VII." (internal citation and footnote omitted)); *see also Pierre v. Napolitano*, 958 F. Supp. 2d 461, 480 (S.D.N.Y. 2013) (concluding that temporary denial of Law Enforcement Availability Pay benefits, which was rescinded as soon as supervisor realized error in interpretation of preconditions for benefits, "were more disruptive than a mere inconvenience" and did not "demonstrate that [the plaintiff] suffered an adverse employment action" (citations and internal quotation marks omitted)). Moreover, even if plaintiff had established prima facie case, he proffers no proof to suggest that his NYSDHR filing motivated defendant to initially deny the request.

d. "Light Duty" Evaluation Requests

Plaintiff proffers no evidence or authority that the requests for him to discuss [*53] the potential of light duty from August 2009 through January 2010 constituted "an employment action disadvantaging the plaintiff." *Terry*, 336

F.3d at 141 (2d Cir. 2003). As a threshold matter, it is not even clear from the record that plaintiff complied with these requests by coming to the office to be evaluated. It appears from his deposition that he simply submitted a note from his doctor saying he was unable to come to work. (Morris Dep. at 228.) Given the lack of any consequences to plaintiff, no rational jury could find that these requests would reasonably dissuade an employee from making a charge of discrimination. Moreover, it is uncontroverted that NYSDHR found that the Town's attempt to monitor and evaluate plaintiff's physical condition and capacity to perform light duty work was in accordance with the procedures in the Collective Bargaining Agreement. (Def. 56.1 ¶ 29.) Plaintiff proffers no admissible evidence to show this was a pretext for retaliation.[12]

Therefore, even viewing the facts in the light most favorable to plaintiff, the Court concludes that no reasonable jury could find that defendant retaliated against plaintiff in response to his NYSDHR complaint in April 2009.[13] Accordingly, the Court grants summary judgment to defendant on plaintiff's retaliation claims.

IV. Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment in its entirety. Plaintiff's complaint is dismissed in its entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: September 22, 2014

Central Islip, NY

---

[12]   Plaintiff claims that his union representative told plaintiff that he would be left alone if he dropped his claims with NYSDHR. (Opposition, at 21.) This testimony is hearsay, and plaintiff's argument that the representative was speaking on behalf of a member of the Town is wholly speculative [*54] and cannot establish a genuine dispute of material fact.

[13]   In his opposition papers and at oral argument, plaintiff alleged that defendants' investigators conducted surveillance of his activities in March and April 2009, while he was on workers' compensation because of surgery. As a threshold matter, although these allegations are contained in the background section of the complaint, they are not mentioned in connection with any of the specific causes of action. Moreover, to the extent plaintiff has attempted to assert a cause of action based upon this alleged conduct, defendant correctly argues that those same allegations were raised before the NYSDHR in plaintiff's first complaint and, subsequent to its dismissal based upon a finding of no probable cause, plaintiff did not bring a timely action based upon those allegations. Thus, any such claim would be time-barred. In [*55] any event, those allegations could not be the basis for a plausible retaliation claim. Plaintiff alleges that the surveillance, including the March 24, 2009 incident at the school, began *prior* to his April 2009 filing with the NYSDHR. Thus, on the issue of causation, no rational jury could find that surveillance that began prior to the filing was retaliation for that filing.

No *Shepard's* Signal™
As of: March 16, 2015 7:24 PM EDT

# Perrelli v. Prudential Ins. Co.

United States District Court for the District of Connecticut

September 19, 2008, Decided

CIVIL ACTION NO. 3:07-cv-01797 (VLB)

**Reporter**
2008 U.S. Dist. LEXIS 70800

STEVE PERRELLI, Plaintiff, v. PRUDENTIAL INSURANCE COMPANY, INC., Defendant.

## Core Terms

benefits, termination, motion to dismiss, disability, alleges, argues, infliction of emotional distress

**Counsel:** [*1] For Steve Perrelli, Plaintiff: W. Martyn Philpot, Jr., LEAD ATTORNEY, Law Offices of W. Martyn Philpot, Jr., LLC, New Haven, CT.

For Prudential Ins Co Inc, Defendant: Debra S. Morway, LEAD ATTORNEY, Morgan, Lewis & Bockius, New York, NY; Jeremy P. Blumenfeld, Sarah E. Pontoski, LEAD ATTORNEYS, PRO HAC VICE, Morgan, Lewis & Bockius LLP-PA, Philadelphia, PA; Rene M. Johnson, LEAD ATTORNEY, PRO HAC VICE, Morgan Lewis & Bockius LLP - NJ, Princeton, NJ.

**Judges:** Vanessa L. Bryant, United States District Judge.

**Opinion by:** Vanessa L. Bryant

## Opinion

*MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION TO DISMISS [Doc. # 16]*

The defendant, Prudential Insurance Company, Inc. ("Prudential"), moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss this action filed by the plaintiff, Steve Perrelli. Prudential argues that all of Perrelli's causes of action are preempted by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* Because Perrelli has not stated an ERISA claim, Prudential argues that his case must be dismissed. In the alternative, Prudential argues that even if ERISA does not preempt Perrelli's claims, they are time barred and do not allege sufficient facts. For the reasons given below, [*2] Prudential's motion

to dismiss is GRANTED.

Perrelli sued Prudential in Connecticut Superior Court, asserting violations of the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-51 *et seq.*, and claims of intentional infliction of emotional distress and negligent infliction of emotional distress. Prudential removed the case to this Court on the basis of federal question jurisdiction pursuant to 28 U.S.C. § 1331, claiming that Perrelli's state law causes of action are preempted by ERISA. Prudential asserted in the alternative that this Court has jurisdiction on the basis of diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1) because Perrelli is a citizen of Connecticut, Prudential is incorporated and maintains its principal place of business in New Jersey, and the amount in controversy exceeds $ 75,000.

Perrelli alleges in his complaint that he began working for Prudential in 1980. From February to August 2005, he took a short term disability leave of absence because of his stress and depression. He received short term disability benefits during that leave. In August 2005, Perrelli began receiving long term disability benefits. Perrelli's eligibility for [*3] long term benefits was to be reviewed after one year. Perrelli alleges that he "was classified as a 'retiree' for purposes of his medical benefits," suggesting that he maintained his status as an employee while he received long term disability benefits. [Doc. # 1, Ex. A, Complaint p. 1] He alleges that he "has not worked for Prudential since August 2006 . . . ." [Doc. # 1, Ex. A, Complaint p. 2] It is unclear from Perrelli's complaint whether "not work[ing]" for Prudential is equivalent to termination, resignation, retirement, or taking a leave of absence. According to Perrelli's complaint, Prudential informed him that he was not eligible for further disability benefits on February 13, 2007.

Perrelli filed a charge with the Connecticut Commission on Human Rights and Opportunities (CHRO) on April 27, 2007. The CHRO issued a release of jurisdiction letter on October 5, 2007, and Perrelli then filed the present case. In

his present complaint, Perrelli claims that Prudential's termination of his benefits violated the CFEPA and constituted both intentional infliction of emotional distress and negligent infliction of emotional distress. According to Perrelli, Prudential terminated his benefits [*4] because of his age, which was 51, and his disability of depression. Perrelli also alleges that he was harassed, that he endured an "openly hostile work environment," that he was "unfairly discharged from his position," and that Prudential "permitt[ed] [Perrelli] to be subjected to unchecked, rampant discrimination in the workplace, and then fir[ed] him when he complained about it . . . ." [Doc. # 1, Ex. A, Complaint pp. 2, 4, 5] Perrelli does not allege any other facts regarding the manner in which he was harassed, discriminated against, and terminated.

Prudential removed the case to this Court on December 6, 2007, and filed a motion to dismiss on January 11, 2008. Prudential argues that Perrelli's complaint alleges only one adverse action by Prudential, namely, the termination of Perrelli's benefits. Because those benefits were paid pursuant to the Prudential Welfare Benefits Plan, which expressly states that it is governed by ERISA, Prudential argues that Perrelli's state law causes of action are preempted by ERISA. Perrelli filed his memorandum in opposition to Prudential's motion to dismiss on March 3, 2008. Perrelli argues that the termination of his benefits "is but one of the [*5] litany of violations ascribed to" Prudential in the complaint. [Doc. # 22, p. 4] Prudential filed a reply on March 20, 2008.

"The Federal Rules of Civil Procedure require that a pleading contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Fed. R. Civ. P. 8(a)(2). Under this simplified standard for pleading, a court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. . . . [The court] therefore must construe the complaint liberally . . . ." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir. 2007). The court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party. . . . In general, [the court's] review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Id.* "To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face." *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir. 2008).

Perrelli [*6] acknowledges in his memorandum in opposition

to Prudential's motion to dismiss that he does have a claim for improper termination of benefits. Because those benefits were paid under a plan governed by ERISA, Perrelli may not bring state law causes of action with respect to his benefits. Pursuant to 29 U.S.C. § 1144(a), ERISA supersedes all state laws relating to ERISA-governed plans. Perrelli has not amended his complaint to state an ERISA claim despite being on notice of Prudential's preemption argument.

The remaining issue is whether Perrelli may assert state law claims regarding harassment, an "openly hostile work environment," unfair discharge, and being fired for complaining about "unchecked, rampant discrimination." [Doc. # 1, Ex. A, Complaint pp. 2, 4, 5] It is unclear from Perrelli's complaint whether those allegations relate solely to the termination of his benefits, in which case ERISA provides the exclusive means of relief, or whether they relate to other conduct by Prudential, in which case Perrelli's state law claims could be cognizable. Construing the complaint liberally, Perrelli appears to claim that regardless of the termination of his benefits, his employment was terminated [*7] because of his age and disability.

However, Prudential argues that those possible claims of age and disability discrimination are time barred because the CFEPA requires Perrelli to file his CHRO charge within 180 days of the discriminatory act. See Conn. Gen. Stat. § 46a-82(f). Perrelli filed his CHRO charge on April 27, 2007, and 180 days prior to that date was October 29, 2006. If the discriminatory act occurred before October 29, 2006, Perrelli's CFEPA claims are time barred. The complaint does not state the date of Perrelli's termination or Prudential's other discriminatory acts.

In an effort to address the 180 day requirement, Perrelli submitted an affidavit with his memorandum in opposition to Prudential's motion to dismiss. Thereafter, Prudential attached to its reply brief a letter sent to Perrelli by Prudential's benefit appeals specialist. Neither the affidavit nor the letter is mentioned in the complaint or attached to it. Accordingly, the Court cannot consider those documents in ruling on the motion to dismiss. The Court must limit its consideration to the facts alleged in the complaint and documents that are attached to the complaint or to which the complaint refers.

Although [*8] the complaint does not state the date on which any discriminatory acts occurred, the complaint alleges that Perrelli "has not worked for Prudential since August 2006 . . . ." [Doc. # 1, Ex. A, Complaint p. 2] A reasonable inference to draw from that allegation is that Perrelli was terminated in August 2006, more than 180 days

before he filed his CHRO charge. Therefore, Perrelli's CFEPA claims are time barred. Furthermore, even if Perrelli was terminated within 180 days before filing his CHRO charge, he has failed to allege enough facts to make his CFEPA claims facially plausible. It is insufficient for Perrelli to allege that he was harassed, subjected to a hostile work environment, and unfairly discharged for complaining about unspecified discrimination unless Perrelli bolsters those assertions with concrete facts that are unrelated to the termination of his benefits. Because Perrelli has failed to do that, his CFEPA claims must be dismissed. Perrelli's claims of intentional infliction of emotional distress and negligent infliction of emotional distress appear to concern the same insufficiently alleged conduct as the CFEPA claims, and,

therefore, they are also dismissed.

Prudential's [*9] motion to dismiss [Doc. # 16] is GRANTED. The Clerk is directed to CLOSE this case.

IT IS SO ORDERED.

/s/

Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: September 19, 2008.

✤ Positive

As of: March 16, 2015 7:21 PM EDT

# Peters v. Sikorsky Aircraft Corp.

United States District Court for the District of Connecticut

August 10, 2006, Decided ; August 10, 2006, Filed

Case No. 3:04cv1066 (PCD)

**Reporter**

2006 U.S. Dist. LEXIS 55626; 180 L.R.R.M. 2414; 18 Am. Disabilities Cas. (BNA) 671

Edward PETERS, Plaintiff, v. SIKORSKY AIRCRAFT CORP., Defendant.

## Core Terms

jitney, preempted, duties, Lift, Fork, rights, collective bargaining agreement, summary judgment, restrictions, essential function, open position, fork truck, layoff, accommodate, state law, six-month, plaintiff's claim, Grade, statute of limitations, employees, recalls, hybrid, physical disability, disability, seniority, alleges, terms, discrimination claim, prima facie case, court held

## Case Summary

### Procedural Posture

Plaintiff former employee sued defendant former employer alleging that a layoff and two failed recalls constituted discrimination based upon a physical disability in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, and breach of contract based on a collective bargaining agreement with a union. The employer moved for summary judgment dismissing both claims. The employee contested the motion.

### Overview

Due to restrictions from a wrist operation, the employee worked as a fork lift operator. He suffered another wrist injury and was unable to operate a jitney vehicle used in this job. After a reduction in force, the employee was notified of an available job in 2002, but the employer determined that he was not qualified as the job required use of the jitney. The employer assumed that the employee was not interested in another position in 2003 as he failed to obtain a required medical examination or respond to five letters. The court granted the employer's motion. The discriminatory employment practices claims were not preempted by § 301 of the Labor Management Relations Act (LMRA). However,

the employee failed to exhaust his state administrative remedies as to the layoff. As to the first recall, the employee did not show that he was qualified for the job as he was unable to operate the jitney, which was an essential job function. As to the second recall, the employee failed to submit to the required medical examination to determine if he was qualified. The breach of contract claims, which were preempted by § 301 of the LMRA, were not filed within the six month limitations period.

### Outcome

The court granted the employer's motion for summary judgment.

## LexisNexis® Headnotes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN1* Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN2* The mere existence of an alleged factual dispute is not, by itself, sufficient to defeat a motion for summary judgment. An adverse party must provide sufficient evidence to demonstrate that there is a genuine issue of material fact.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

*HN3* Only disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment.

> Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

*HN4* On summary judgment a court must view the facts in the light most favorable to the adverse party and draw all inferences in its favor.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

*HN5* An adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.

> Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > ADA Enforcement

> Labor & Employment Law > ... > Civil Actions > Exhaustion of Remedies > Filing of Charges

> Labor & Employment Law > ... > Civil Actions > Time Limitations > General Overview

*HN6* A plaintiff bringing a civil action for employment discrimination under the Connecticut Fair Employment Practices Act (CFEPA) must first file a "timely complaint" with the Connecticut Commission on Human Rights and Opportunities (CHRO) and then obtain a release from the commission. Conn. Gen. Stat. §§ 46a-100, 46a-101. The CFEPA states that an administrative complaint must be filed within 180 days with the CHRO in order to be timely. Conn. Gen. Stat. §§ 46a-82 .

> Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption

*HN7* Although § 301 of the Labor Management Relations Act (LMRA) is facially a grant of jurisdiction to the federal district courts, it has been construed to be a source of substantive law as well, giving federal courts the authority to fashion a uniform federal common law to resolve disputes over collective bargaining agreements. The United States Supreme Court has analyzed the preemptive effect of § 301 and stressed that uniform interpretation of collective bargaining agreements according to a federal body of common law would allow parties to negotiate and administer these agreements with certainty and efficiency. Accordingly,

the Supreme Court has held that this federal interest in uniform interpretation of collective bargaining agreements may preempt certain state-law tort actions. If resolution of a state law claim depends upon analysis of the terms of a collective bargaining agreement, then § 301 pre-empts the claim. However, when a state law claim can be resolved without interpreting the collective bargaining agreement, the claim is independent of it and not preempted by § 301.

> Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > General Overview

> Business & Corporate Compliance > ... > Discrimination > Disability Discrimination > Federal & State Interrelationships

*HN8* Under the Connecticut Fair Employment Practices Act (CFEPA), it is a discriminatory employment practice to refuse to hire or employ or to bar or to discharge from employment any individual because of the individual's physical disability. Conn. Gen. Stat. § 46a-60(a)(1). Courts construe disability discrimination claims brought under the CFEPA similarly to those brought under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., and Connecticut courts review federal precedent concerning employment discrimination for guidance in enforcing the CFEPA.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

> Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

*HN9* Courts employ the burden shifting framework of McDonnell Douglas Corp. v. Green in a disability discrimination suit. A plaintiff must first demonstrate a prima facie case of discrimination, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext. The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the prima facie stage is de minimis.

> Labor & Employment Law > ... > Disability Discrimination > Evidence > General Overview

*HN10* Under Connecticut law, as under the Americans with Disabilities Act, 42 U.S.C.S. § 12101 et seq., to establish a prima facie case of discrimination, a plaintiff must show that (1) he was a member of a protected group; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN11* In order to make out his prima facie disability discrimination case, a plaintiff must demonstrate that he is qualified for the positions at issue. In determining if a plaintiff is "qualified," courts look to whether or not the employee can perform the essential functions of the job. Although the term "essential functions" is not defined in the Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., itself, the Equal Employment Opportunity Commission defines the term in its ADA regulations to mean the fundamental duties of the position in question, but not functions that are merely marginal. The regulations illustrate possible reasons a given function may be considered "essential." 29 C.F.R. § 1630.2(n). A function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed. 29 C.F.R. § 1630.2(n)(2)(ii). Also, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN12* A function may be essential if a limited number of employees are available to perform that function, and if the employer actually requires employees in the position to perform the function it claims is essential. 29 C.F.R. § 1630.2(n).

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

*HN13* Employers formulate jobs to fit the needs of their enterprises and the essential character of a particular job qualification is therefore a matter of judgment and opinion.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN14* The Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60, has been interpreted to require an employer to reasonably accommodate disabled employees. However, it is well established that a reasonable accommodation can never involve the elimination of an essential function of a job.

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN15* A plaintiff must show an accommodation is available that allows the plaintiff to perform the essential functions of the job by introducing evidence that such an accommodation exists and would permit the employee to perform the job at the same level as a non-disabled employee.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

Labor & Employment Law > ... > Disability Discrimination > Scope & Definitions > Qualified Individuals With Disabilities

Labor & Employment Law > ... > Evidence > Burdens of Proof > Employee Burdens of Proof

Labor & Employment Law > ... > Disability Discrimination > Reasonable Accommodations > General Overview

*HN16* To withstand a motion for summary judgment, a plaintiff must identify a reasonable accommodation which, if implemented, would permit him to perform the essential functions of the job.

Business & Corporate Compliance > ... > Disability Discrimination > Reasonable Accommodations > Interactive Process

*HN17* The Americans with Disabilities Act (ADA), 42 U.S.C.S. § 12101 et seq., envisions an "interactive process," whereby employers and employees work together to evaluate whether an employee's disability can be reasonably accommodated. Courts construing ADA claims recognize that medical inquiries may be necessary where an employer has genuine reason to doubt whether that employee can perform job-related functions.

Labor & Employment Law > Collective Bargaining & Labor Relations > Federal Preemption

*HN18* When a court must construe and interpret the terms and provisions of a collective bargaining agreement to decide a plaintiff's breach of contract claim, it is well settled that federal labor law preempts the state law claim. Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

*HN19* A six-month statute of limitations applies to hybrid claims brought under § 301 of the Labor Management Relations Act. A hybrid claim is one in which an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both. Because there is no federal statute of limitations that expressly applies to such hybrid claims, the appropriate statute of limitations is the six-month time period provided under § 10(b) of the National Labor Relations Act, 29 U.S.C.S. § 160(b).

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

*HN20* The United States Court of Appeals for the Second Circuit has concluded that a hybrid claim is presented if a plaintiff, in addition to suing the employer, can also bring a cause of action against a union for breach of the duty of fair representation (regardless of whether or not the plaintiff actually does bring the union action). A plaintiff cannot circumvent the six-month limitations period for hybrid actions by choosing to sue only his employer. What makes a case a "hybrid" action against both union and employer is the nature of the claim, not the identity of the parties. A six-month statute of limitations applies to an action for breach of contract brought against the employer only.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

*HN21* The United States Court of Appeals for the Second Circuit has held that the mere presence of an arbitration clause in a collective bargaining agreement is enough to make an employee's claim a hybrid one and subject it to the six-month statute of limitations.

Governments > Legislation > Statute of Limitations > Time Limitations

Labor & Employment Law > Collective Bargaining & Labor Relations > Enforcement of Bargaining Agreements

*HN22* The six-month limitations period begins to run when a plaintiff discovers, or should have discovered, those acts that constitute an alleged violation of the collective bargaining agreement.

**Counsel:** [*1]  For Edward Peters, Plaintiff: Alexander H.

Schwartz, Southport, CT; Peter Harvey, Orange, CT.

For Sikorsky Aircraft Corp, Defendant: Albert Zakarian, Day, Berry & Howard, Hartford, CT; Douglas W. Bartinik, Robert C. McNamee, Day, Berry & Howard-Htfd-CT, Hartford, CT.

**Judges:** Peter C. Dorsey, United States District Judge.

**Opinion by:** Peter C. Dorsey

# Opinion

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** Plaintiff Edward Peters ("Peters") brings this action alleging discrimination based upon a physical disability (Count I) and breach of contract (Count II). Defendant Sikorsky Aircraft Corp. ("Sikorsky") moves for summary judgment on both counts of Plaintiff's Amended Complaint [Doc. No. 35]. For the reasons set forth herein, Defendant's Motion for Summary Judgment [Doc. No. 37-1] is **granted**.

## I. BACKGROUND

Defendant Sikorsky designs, manufactures and overhauls helicopters. Its main manufacturing plant is located in Stratford, Connecticut and it also maintains smaller Connecticut facilities in Bridgeport and Shelton. Sikorsky employed Plaintiff from 1988 until his layoff on January 12, 2001. Plaintiff primarily worked in the larger Stratford facility, but he also [*2] worked for short periods of time at its smaller Bridgeport and Shelton locations. Plaintiff was a member of the Teamsters Union, Local 1150 (the "Union") while he was employed at Sikorsky. A collective bargaining agreement ("CBA") between Sikorsky and the Union set forth, among other things, the rules that Sikorsky must follow when laying off and recalling employees. Employees are laid off and recalled by their non-interchangeable occupational groups in accordance with seniority. This process, and the definitions and parameters of these terms, are contained in the CBA, Article VIII, Sections 8.1-8.24 and Appendix A.

Plaintiff began his employment at Sikorsky in 1988 as a Riveter/ Assembler. After Plaintiff underwent surgery to his right wrist in 1991, his doctor gave him permanent medical restrictions that prohibited him from riveting and lock bolting. Sikorsky attempted to find Plaintiff another position that would accommodate his restrictions and eventually, Sikorsky found Plaintiff a Labor Grade 9 Fork Lift Operator

position on the first shift in its Bridgeport facility. Later, he received a promotion to a Labor Grade 8 Fork Lift Operator position in the main Stratford plant. As [*3] a Labor Grade 8 Fork Lift Operator, Plaintiff was responsible for moving material using two machines: a jitney vehicle (also called a "power ox") and a fork truck (also called a "fork lift"). [1] A Grade 8 Fork Lift Operator would also have to load and unload the wagon pulled by the jitney vehicle and could be assigned other duties. In the Grade 8 position, Plaintiff estimated that he used the jitney vehicle 30% of the time, and the fork truck 70% of the time, until a second injury in 1996.

In 1996, Plaintiff's second injury [*4] to his right wrist meant that he could no longer partially drive the jitney vehicle. Plaintiff's physician, Dr. Zaretsky, assessed a permanent disability rating for his right wrist of 27% and ordered that Plaintiff stop driving the jitney vehicle. Sikorsky's Medical Department concurred with Dr. Zaretsky's order and Plaintiff never drove the jitney vehicle after 1996. In 1997, Sikorsky issued Plaintiff a revised Medical Placement Report ("1997 MPL") at Dr. Zaretsky's request detailing his restrictions. [2] Plaintiff testified that these medical restrictions have not changed since 1997.

After 1996, Plaintiff sought and was given a significant amount of family leave. Plaintiff also took time off from work because of wrist pain. Plaintiff used [*5] only a fork truck, and not a jitney vehicle, from 1996 until 1998 to perform his duties as a Fork Lift Operator. The large Stratford facility had six other Fork Lift Operators on the first shift at this time.

In 1998, Plaintiff asked for a shift change to the smaller second shift to reduce his absences for family reasons. Sikorsky tried to grant Plaintiff's requests by offering a number of temporary light duty jobs on the second shift that satisfied his medical restrictions. Plaintiff performed various duties in all three of Defendant's Connecticut facilities during 1998, 1999 and 2000, including: placing nuts and bolts in UR bins, performing some crib attendant duties and kitting assembler jobs in both Stratford and Shelton, panel

board maintenance duties, and fork lift work. Some of these duties are light duty. During these temporary assignments, Sikorsky maintained Plaintiff's title, hourly pay and labor grade of Fork Lift Operator.

On January 12, 2001, Sikorsky conducted a reduction in force that affected the Plaintiff's occupational group. As a result, Plaintiff and four other employees in transportation were laid off. The CBA provided employees laid off for lack of work with [*6] certain recall rights based upon their seniority. When a position becomes available for recall, the Sikorsky human resources department contacts the most senior employee laid off in that occupational group. If the laid off employee is interested in the position, he or she must complete pre-employment processing (including a medical exam, drug test and background check). Sikorsky had an opening in one of the two Fork Lift Operator positions in its smaller

Bridgeport facility in early 2002. The other Fork Lift Operator position was held by a work leader that had more seniority and was two labor grades more advanced than Plaintiff. On February 14, 2002, the Human Resources Department notified Plaintiff of this open position.

On February 26, 2002, Plaintiff attended his pre-employment processing at Sikorsky. He continued to have the same restrictions set out in the 1997 MPR (including an inability to drive jitney vehicles). Plaintiff assumed that the duties of the Bridgeport position were the same as the duties of the Fork Lift position Sikorsky had been able to modify to accommodate his restrictions four years earlier in Stratford. However, after learning about Plaintiff's continued [*7] inability to use a jitney vehicle, Sikorsky notified him that he would not be called back because the position required someone to operate both the jitney vehicle and the fork truck. [3] Sikorsky then filled the position with the next most senior person on layoff status.

As a result of the failed recall in 2002, Plaintiff filed a claim with the Connecticut Commission on Human Rights and

---

[1]   During the time that Plaintiff worked as a Labor Grade 9 Fork Lift Operator in the Bridgeport facility, he used only the jitney vehicle. The jitney vehicle pulls a wagon and delivers small parts and packages. It is operated by manipulating handgrips that must be pressed to start, steer and stop the vehicle. The fork truck is primarily used to move material on wooden pallets. In contrast to a jitney vehicle, the fork truck has a wheel for steering and levers to raise and lower the boom.

[2]   The restrictions in the 1997 MPL are as follows: (i) minimal use of right hand with minimum grasping, (ii) no lifting over 10 pounds, (iii) no riveting or lock bolting, (iv) no repetitive gripping or grasping, and (v) no duties driving jitney vehicles (power oxs).

[3]   Plaintiff's "denial" in his 56(a)(2) at P 53 is not credited, because it does not deny Defendant's assertion that these were the reasons given for refusing to assign Peters to the 2002 open position. (See Am. Compl. at P 7.) To the extent that Plaintiff denies Defendant's assertion that jitney vehicle duties were essential for the open position, see discussion infra Part III.A.2.ii.

Opportunities ("CHRO") on September 3, 2002, claiming discrimination on the basis of disability.

In May 2003, another open Fork Lift Operator position became available in Sikorsky's Shelton facility on the second shift. The position [*8] included operating a fork truck some of the time, going out into the yard to get parts, operating a scrubber, using hand tools, and other odd jobs. The scrubber had hand controls like a jitney that required an operator to use his or her wrists to operate it. Supervision for this open Shelton position was concerned that the restrictions in Plaintiff's 1997 MPR would prevent him from performing the job duties of the position. [4]

Nevertheless, Sikorsky contacted Plaintiff about this open position and he came in for a pre-employment medical screening on May 23, 2003. Dr. Mongillo, one of Defendant's parttime physicians, examined him. At the examination, Plaintiff wore a splint on his right hand and complained of pain, including parethesias (numbness), tingling, and pain in the arm. Dr. Mongillo was concerned that a doctor had [*9] not seen Plaintiff since 2001. Thus, he recommended that Plaintiff see Dr. Watson, a hand specialist, to get an objective diagnosis of Plaintiff's condition, comment on therapy, and give an opinion as to what Plaintiff's medical restrictions should be. Dr. Mongillo told Plaintiff that Sikorsky would pay for the examination and that he must see a hand specialist for an evaluation. While he recommended Dr. Watson, he later told the Plaintiff that he could see another doctor for the evaluation, provided the doctor was a hand specialist. In addition to Plaintiff's conversation with Dr. Mongillo, the Sikorsky Medical Department and the Sikorsky Human Resources Department sent, and Plaintiff received, five letters trying to schedule an appointment for a hand specialist. [5] Plaintiff did not answer the letters and he did not see a hand specialist. [6] As a result, Sikorsky did not make a further determination as to Plaintiff's restrictions or his ability to perform the job at the Shelton plant. Pursuant to the last letter (dated November 20, 2003), Plaintiff's lack of response by December 4, 2003 led Sikorsky to presume that he had chosen not to pursue any further employment with Sikorsky. [*10] On December 4, 2003, Plaintiff amended his complaint at the CHRO to include allegations that Sikorsky discriminated against him

on the basis of disability by not placing him in the Shelton position in 2003.

Plaintiff filed his Amended Complaint ("Am. Compl.") with this Court on June 16, 2005. Peters alleges that the layoff and two failed recalls constitute discriminatory employment practices based upon a physical disability in violation of Conn. Gen. Statute § 46a-60 (Count I). He also alleges that these events constitute [*11] a breach of the CBA between Sikorsky and his Union (Count II).

## II. STANDARD OF REVIEW

*HN1* Rule 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *HN2* The mere existence of an alleged factual dispute is not, by itself, sufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The adverse party must provide sufficient evidence to demonstrate that there is a genuine issue of material fact. See id. at 248-49. *HN3* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. *HN4* The court must view the facts in the light most favorable to the adverse party and draw all inferences in its favor. See Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992). [*12] However,*HN5* "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). A party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986).

## III. DISCUSSION

Defendant argues in its briefs that both Counts I and II are preempted by the Labor Management Relations Act

---

[4]   Plaintiff's response to Defendant's factual assertions in its 56(a)(1) Statement at 60 is not responsive to the facts asserted therein. See discussion infra Part III.A.2.ii.

[5]   The letters were dated May 30, 2003, July 23, 2003, August 13, 2003, August 28, 2003 and November 20, 2003.

[6]   Plaintiff's denial of Defendant's factual assertion in its 56(a)(1) Statement at P 75 is not responsive to the facts asserted therein, because P 75 simply quotes Peters' deposition testimony. However, the Court credits additional facts that Plaintiff alleges in his 56(a)(2) Statement at P 75, adequately supported by citations to the record.

("LMRA") because they require analysis of, and are dependent on, a collective bargaining agreement. As explained below, Count I for discriminatory employment practices is not preempted by the LMRA, but summary judgment is granted to Defendants on other grounds. Count II for breach of the CBA is preempted by the LMRA, subject to a six-month statute of limitations, and since the action was not filed within six months, summary judgment is granted to Defendants as to Count II.

**A. Count I: Discriminatory Employment Practices**  In Plaintiff's Am. Compl.  [*13]  , he identifies three separate incidents of alleged discrimination based on his physical disability: the January 2001 layoff, the February 2002 failed recall ("2002 Recall"), and the May 2003 failed recall ("2003 Recall"). Each of these events will be treated separately.

**1. The January 2001 Layoff**

In Count I, Plaintiff alleges that his layoff in January 2001 "was prompted by the physical disability of the plaintiff" and this layoff constitutes a discriminatory employment practice in violation of Conn. Statute § 46a-60. It is unnecessary for the court to consider Defendant's LMRA preemption argument with respect to Count I and the 2001 layoff, because the Plaintiff failed to exhaust his state administrative remedies under the Connecticut Fair Employment Practices Act ("CFEPA").

*HN6*  A plaintiff bringing a civil action for employment discrimination under the CFEPA must first file a "timely complaint" with the CHRO and then obtain a release from the commission. Conn. Gen. Stat. § 46a-100, 46a-101. The CFEPA states that an administrative complaint must be filed within 180 days with the CHRO in order to be timely. Conn. Gen. Stat. §§ 46a-82 [*14]  .

However, Plaintiff was laid off on January 12, 2001 and did not file a claim with the CHRO until September 3, 2002, almost twenty months later. The administrative complaint is certainly not "timely" under the requirements of the CFEPA, and therefore, the Plaintiff did not exhaust his state administrative remedies, as set by the legislature, with

respect to the January 2001 layoff. [7]  See Sullivan v. Board of Police Comm'rs, 196 Conn. 208, 215-16, 491 A.2d 1096 (1985) (holding that plaintiff's failure to follow administrative route set in the Connecticut statute gives plaintiff no authority to pursue his claim in civil court). Consequently, Plaintiff's claim under Conn. Gen. Stat. § 46a-60 regarding his January 2001 layoff is dismissed and summary judgment is granted to the Defendants as to this claim.

[*15]  **2. The 2002 and 2003 Recalls**

**i. LMRA Pre-emption**

Defendant argues that Plaintiff's state law disability discrimination claim based upon the two recalls is preempted by § 301 of the LMRA. Defendant maintains that the claims are founded upon recall rights created by the CBA, and the Court will have to interpret the terms of the CBA to resolve these claims. The Court disagrees.

*HN7*  Although § 301 of the LMRA is facially a grant of jurisdiction to the federal district courts, it has been construed to be a source of substantive law as well, giving federal courts the authority to fashion a uniform federal common law to resolve disputes over collective bargaining agreements. See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957); Teamsters v. Lucas Flour Co., 369 U.S. 95, 103-104, 82 S. Ct. 571, 7 L. Ed. 2d 593 (1962). In Lucas Flour, the Supreme Court analyzed the preemptive effect of § 301 and stressed that uniform interpretation of collective bargaining agreements according to a federal body of common law would allow parties to negotiate and administer these agreements with certainty [*16]  and efficiency. Id.

Accordingly, the Supreme Court has held that this federal interest in uniform interpretation of collective bargaining agreements may preempt certain state-law tort actions. Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 210-11, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985) ("Any other result would elevate form over substance and allow parties to evade the requirements of § 301 by relabeling their contract claims as claims for tortious breach of contract."). If resolution of a state law claim depends upon analysis of the

---

[7]   Plaintiff appears to misconstrue Defendant's arguments regarding the exhaustion of state administrative remedies. Plaintiff writes that "since the plaintiff admits that his second count is governed exclusively by the LMRA, defendant's contention that plaintiff has failed to exhaust his state administrative remedies becomes irrelevant, as such state administrative procedures are only a prerequisite to a suit under the CFEPA." (Pl.'s Opp., Section II.B.) However, Defendant actually argues that Plaintiff's failure to exhaust his administrative remedies is applicable to Count I, the state law discrimination claim. (Def.'s Memo, Section II.C.) The exhaustion of state administrative remedies is clearly relevant for the purposes of the state law claim of employment discrimination (Count I). Therefore, Plaintiff implicitly concedes that the 180 day administrative requirement is a prerequisite to filing a CFEPA suit in civil court here.

terms of a collective bargaining agreement, then § 301 pre-empts the claim. Id. at 220. [8] However, when a state law claim can be resolved without interpreting the collective bargaining agreement, the claim is independent of it and not preempted by § 301. See Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 409-410, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988).

 [*17]  Defendant maintains that the right to recall is created by, and completely dependent upon the CBA. Defendant argues that any claim based upon the recall is therefore preempted. In support of this assertion, Defendant cites a number of cases where claims were preempted because the right or duty a plaintiff sought to be enforced was derived from a collective bargaining agreement. For example, in Allis-Chalmers Corp., a state tort suit for bad faith failure to pay benefits was preempted because the implied covenant of good faith and fair dealing, contained in all contracts, established the duties and rights at issue. 471 U.S. at 216-17. Likewise, in United Steelworkers of America v. Rawson, a state tort claim that a union negligently failed to inspect a mine pursuant to a collective bargaining agreement provision was also held to be preempted, because the union's duty to inspect did not exist independently of the agreement. 495 U.S. 362, 371, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990). This Court held that a claim for negligent infliction of emotional distress is preempted where the collective bargaining agreement set the duty owed to plaintiff. Almonte v. Coca-Cola Bottling Co., 959 F. Supp. 569, 576-77 (D. Conn. 1997). [*18]  In the context of recall rights contained in collective bargaining agreements, Defendant cites Zimmer v. AT&T, 947 F. Supp. 302 (E.D. Mich. 1994), aff'd mem., 78 F.3d 585 (6th Cir. 1996) (holding that tort claims alleging breach of a duty of care concerning the processing of an employee's recall interest form were preempted). Defendant also cites a decision where this Court held that an employee's claims for violations of his recall and seniority rights under a collective bargaining agreement were preempted, because the prohibition of the defendant's actions was governed by the agreement. Petrucelli v. Cytec Indus., No. 3:95-cv-1055 (AHN), 1996 U.S. Dist. LEXIS 22498 at *15 (D. Conn. 1996).

As the caselaw cited above demonstrates, a claim alleging a failure to recall pursuant to a CBA may be preempted where

the underlying duty to recall arises from the CBA. However, the Court believes that Plaintiff's discrimination claim concerns rights and duties that exist independently of the CBA. In this regard, Plaintiff's argument is more persuasive. Sikorsky has indeed "attempted to conflate the issue of whether the Plaintiff was entitled [*19]  to be recalled[,] which may implicate the [CBA]," with the question of whether the Plaintiff has a right not to be denied a position based upon a physical disability, which may constitute discrimination as it and does not implicate, but arises apart from, the CBA. (Pl.'s Opp., Section II.B.)

The caselaw Defendant cites concerns mostly state law tort claims that are essentially a claim for contract breach, and where the defendants would have no duty to refrain from their allegedly wrongful conduct absent the CBA. Although Zimmer seems to suggest that all claims based upon recall rights in a CBA are preempted, the Sixth Circuit's holding is inapposite here. The claims in Zimmer alleged a breach of a duty of care concerning the processing of the employee's recall interest form, and certainly, no such independent duty of care exists aside from the CBA. 947 F. Supp. at 306-307. However, duties and obligations regarding alleged discrimination do exist independently from the CBA, and these are based on state law. In Petrucelli, this Court held preemption was appropriate for a claim of intentional infliction of emotional distress, noting that "plaintiff has not  [*20]  alleged any specific actions whose prohibition [have] an independent basis in state law." 1996 U.S. Dist. LEXIS 22498 at *15. Peters, on the other hand, alleges actions that are prohibited by the state law of Connecticut and this claim, although related to the right to recall found in the CBA, is sufficiently independent of the CBA to avoid preemption.

Additionally, Defendant argues that resolution of Plaintiff's discrimination claims will not simply require reference to the CBA, but its analysis and interpretation does and therefore, this claim should be preempted. Defendant cites a First Circuit case, Fant v. New Eng. Power Serv. Co., 239 F.3d 8, 15-16 (1st Cir. 2001), where a state law claim for discrimination was preempted because the conduct at issue constituted a breach of duty under the CBA and resolution of the dispute hinged upon interpretation of the CBA. Similarly, this Court held that claims of fraud and intentional

---

[8]   As this Court has noted, the Supreme Court has articulated multiple standards to decide if a state law claim is preempted by § 301. Preemption is necessary for "claims that are 'founded directly on the rights created by collective bargaining agreements,' claims that 'require[] the interpretation of a collective bargaining agreement,' claims that are 'substantially dependent on analysis of a collective bargaining agreement,' claims that are 'inextricably intertwined with consideration of the terms of the labor contract,' and claims that assert rights 'derived from the contract.'" Williams v. Comcast Cablevision of New Haven, Inc., 322 F. Supp. 2d 177, 182 (D. Conn. 2004) (internal citations omitted).

infliction of emotional distress were preempted because resolution of the claims required interpretation of a collective bargaining agreement's terms regarding negotiations and modifications to that agreement. Dittman v. GMC-Delco Chassis Div., 941 F. Supp. 284, 289 (D. Conn. 1996), [*21] aff'd mem., 116 F.3d 465 (2d Cir. 1997).

However, as demonstrated infra in Section III.A.2.ii, resolution of Plaintiff's physical disability discrimination claim does not require analysis and interpretation of the CBA. While Defendant is correct in pointing out that the CBA contains various provisions regarding layoffs, recalls and seniority, the Court is unaware of any specific terms or provisions that govern the actual recall procedure after the initial notification of an open position. [9] Instead, our inquiry is a fact-bound analysis and will not require interpretation of the CBA.

[*22]  In Count I, the Plaintiff is not arguing that Defendant interfered with rights stemming from the CBA. Instead, Plaintiff claims Defendant violated an independent right under the CFEPA to be free from employment discrimination. The Court is not aware of instructive caselaw in this jurisdiction where, as here, a Plaintiff alleges employment discrimination in the context of a recall. The difficulty is that, without the right to recall in the CBA, Plaintiff's state law rights against employment discrimination could not be exercised at all. Additionally, "the boundary between claims requiring 'interpretation' of a CBA and ones that merely require such an agreement to be 'consulted' is elusive." Wynn v. AC Rochester, 273 F.3d 153, 158 (2d Cir. 2001). This line is even more elusive where the rights to recall are found in the CBA, but a plaintiff's claims are based upon state anti-discrimination statutes.

The Court concludes that Plaintiff's state law discrimination claim is sufficiently independent of the CBA to avoid preemption. The cases cited in Plaintiff's Opposition, mostly from the Sixth Circuit, are instructive. Plaintiff relies upon Lingle, which held that [*23] since plaintiff's retaliatory discharge claim did not require interpretation of the CBA,

preemption was inappropriate. 486 U.S. at 414. In Smolarek v. Chrysler Corp., 879 F.2d 1326, 1335 (6th Cir. 1989), the court held that because resolution of claims for retaliatory discharge and handicap discrimination would not necessitate interpretation of a collective bargaining agreement, these claims were not preempted. Although these cases do not involve rights to recall specifically, they do apply to claims that an employer discriminated on the basis of a disability. Thus, they are persuasive where a claim is founded upon independent state rights which do not require interpretation of a CBA. [10] A similar conclusion can be found in the Second Circuit's Wynn decision. In that case, a plaintiff's misrepresentation claim was not preempted by § 301, even when it was based upon rights to employee benefits and recall found in the collective bargaining agreement. Wynn, 273 F.3d at 159. The court noted that "reference to the CBA may be needed, but . . . state law -- not the CBA -- is the source of the rights asserted by plaintiffs: the right to [*24] be free of economic harm caused by misrepresentation." Id.

[*25]  Furthermore, application of state law to Count I will not implicate the policy interests of the Supreme Court in promulgating a uniform federal labor law. In Allis-Chalmers Corp., although the Court held that the tort claims were preempted by § 301, it also noted that "in extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." 471 U.S. at 212. Where a plaintiff's age discrimination claims arose under New York state laws, one court held that "it cannot be said that such a claim is, in reality, one under § 301 of the LMRA." Intern'l Assoc. of Machinists & Aerospace Workers v. Gen. Elec. Co., 713 F. Supp. 547, 554 (N.D.N.Y. 1989). The court's ruling was consistent with the federal interest in a uniform labor law policy, because it did not involve the breach of a duty stemming from a CBA, and "the heart of the plaintiff's claims against [GE] arise under the laws of the State of New York and are not generally of the sort which may be

---

[9]   It would be a different situation if the CBA set forth the process whereby an employee notified of an open recall position could be denied, or if it outlined the decision-making process to be followed when making job reassignments. Cf. Zimmer, 947 F. Supp. 302 at 306-307 (noting that the CBA contained terms that required the employer to present the employee with a "complete termination packet" including a recall interest form, and tort claims based upon a failure to follow this process were preempted).

[10]   Additionally, the Sixth Circuit applied a Lingle analysis to state handicap discrimination claims and followed Smolarek in O'Shea v. The Detroit News, 887 F.2d 683, 687 (6th Cir. 1989) (holding that despite an employer's possible defenses (based on a CBA) about its right to make a certain employment decision, "the point is that Michigan employees have the right not to be discriminated against on the basis of age or handicap without regard to the collective bargaining agreement's language about an employee's rights"); see also Welch v. General Motors Corp., 922 F.2d 287, 290 (6th Cir. 1990) (affirming the district court's ruling that even where a CBA provides a remedy for discrimination, independent state statutory rights could be asserted because "the right to be free from handicapped discrimination was created by the [Michigan Handicapper's Civil Rights Act] and not solely by the collective bargaining agreement").

negotiated [*26] away at a bargaining table." Id. at 554-55. Plaintiff's claim of physical disability discrimination is similarly an assertion of state law rights, which arise independent of the CBA and will not implicate federal labor law policy.

With regard to the two failed recalls, Plaintiff's Count I claim that Sikorsky's employment practices constituted discrimination is not preempted by § 301 of the LMRA.

### ii. Discriminatory Employment Practices Claim

*HN8* Under the CFEPA, it is a discriminatory employment practice "to refuse to hire or employ or to bar or to discharge from employment any individual . . . because of the individual's . . . physical disability." Conn. Gen. Stat. § 46a-60(a)(1). Courts construe disability discrimination claims brought under the CFEPA similarly to those brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Connecticut courts review federal precedent concerning employment discrimination for guidance in enforcing the CFEPA. Worster v. Carlson Wagon Lit Travel, Inc. 353 F. Supp. 2d 257, 267 (D. Conn. 2005); Levy v. Commission on Human Rights & Opportunities, 236 Conn. 96, 671 A.2d 349, 355 (Conn. 1996). [*27] *HN9* Courts employ the burden shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See Hill v. Pfizer, Inc., 266 F. Supp. 2d 352, 359 (D. Conn. 2003) (explaining that a plaintiff must first demonstrate a *prima facie* case of discrimination, the defendant must then offer a legitimate reason for its decision, and if it does so, the burden shifts back to plaintiff who must demonstrate pretext); see also Levy, 671 A.2d at 357-58 (same). "The burden of proof that must be met to permit an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minimus*." Hill, 266 F. Supp. 2d at 359. *HN10* Under Connecticut law, as under the ADA, to establish a *prima facie* case of discrimination, Plaintiff must show that (1) he was a member of a protected group; (2) he was qualified for the job; (3) he suffered an adverse employment action; and (4) the adverse employment decision occurred under circumstances giving rise to a reasonable inference of discrimination. Shaw v. Greenwich Anesthesiology Assocs. P.C., 137 F. Supp. 2d 48, 64-65 (D. Conn. 2001); [*28] Curry v. Goodman, CV020817767S, 2004 Conn. Super. LEXIS 3481 at *14-15 (Conn. Super. Ct. 2004).

The Court finds that Defendant's evidence is sufficient to defeat Plaintiff's *prima facie* case with regard to both failed recalls. The Plaintiff has not met his burden of demonstrating evidence sufficient to create a genuine issue of material fact to survive summary judgment on Count I. Specifically, Plaintiff cannot prove the second element of his *prima facie* case, that he was qualified for the open recall positions, with or without reasonable accommodations.

### 1. 2002 Recall

*HN11* In order to make out his *prima facie* discrimination case, Plaintiff must demonstrate that he is qualified for the positions at issue. E.g., Shaw, 137 F. Supp. 2d at 64-65. In determining if a plaintiff is "qualified," courts look to whether or not the employee can perform the essential functions of the job. Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99-100 (2d Cir. 2003); Mitchell v. Washingtonville Cent. Sch. Dist., 190 F.3d 1, 6 (2d Cir. 1999). Although the term "essential functions" is not defined in the ADA itself, [*29] the Equal Employment Opportunity Commission ("EEOC") defines the term in its ADA regulations to mean "the fundamental duties of the position in question, but not functions that are merely marginal." Mitchell, 190 F.3d at 8 (internal citation omitted); see also Shannon, 332 F.3d at 100. The regulations illustrate possible reasons a given function may be considered "essential." 29 C.F.R. § 1630.2(n). Specifically applicable to Defendant's proffered evidence, "the function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed." Id. § 1630.2(n)(2)(ii). Also, a court must give "considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." Shannon, 332 F.3d at 100 (internal quotations and citations omitted); see also Cheatwood v. Roanoke Indus., 891 F. Supp. 1528, 1537 (N.D. Ala. 1995).

With respect to the 2002 Recall, Defendant offers evidence to show that operating the jitney vehicle was an essential function of the open position in the Bridgeport [*30] facility. Plaintiff admitted in his deposition that, as a Labor Grade 9 Forklift Operator, he and others used only the jitney vehicle. Once he was promoted to Labor Grade 8, he began using the fork truck also. He also admitted that until his 1996 injury, he used the jitney vehicle 30% of the time, and the fork truck 70% of the time. Furthermore, Scott Katchmar, a supervisor in the transportation department in 2002, states in his affidavit that an individual filling the open position in Bridgeport in 2002 had to operate both the jitney vehicle and the fork truck. This is because the Bridgeport facility had only one other Fork Lift Operator besides the position to be filled. The existing Operator was a working leader with more seniority than Peters, and he was in a better labor grade. Plaintiff worked as a Fork Lift Operator and only

used a fork truck in the Stratford plant between 1996 and 1998, but there were six other Operators on Plaintiff's shift in the larger facility. Defendant claims that this allowed the Plaintiff to temporarily operate only the forktruck (and not the jitney vehicle), because other Operators could use the jitney vehicles when necessary. Plaintiff, however, maintains [*31] that operating the jitney vehicle was not essential to the position, and his medical restrictions therefore did not prevent him from performing the duties of the open position. Though unable to use a jitney vehicle, Plaintiff nevertheless argues that he was qualified for the 2002 Bridgeport position since he was able to perform the work required of him using only a fork truck between 1996 and 1998, before his layoff.

To the extent this argument is made to rebut Defendant's assertion that using a jitney vehicle was an essential function for the Bridgeport position, it fails to create a genuine issue of material fact. Plaintiff states that he "was able to perform all work necessary to his position of forklift operator between 1996 and 1998 without accommodation of any kind, except such accommodation as he made for himself." (56(a)(2) Statement at P 44.) However, this conclusory statement does not effectively deny the fact that the 2002 open position in Bridgeport required the use of both a jitney vehicle and fork truck. Plaintiff does not point to any evidence in the record that this open position would not require an operator to use a jitney vehicle.

Uncontested evidence shows [*32] that Plaintiff himself used a jitney vehicle 30% of the time prior to his injury in 1996, the open position was available in a different and smaller facility, and there was only one other Fork Lift Operator there. As the EEOC ADA regulations instruct, **HN12** a function may be essential if a limited number of employees are available to perform that function, and if the employer actually requires employees in the position to perform the function it claims is essential. 29 C.F.R. § 1630.2(n). The fact that Plaintiff was able to perform all of the required work by utilizing only a fork truck in the larger Shelton facility four years earlier is not sufficient to create

an issue of fact as to whether using a jitney vehicle was an essential function for this position. [11]

[*33] It is undisputed that Plaintiff could not perform tasks that required using a jitney vehicle. After his 1996 injury, Plaintiff's doctor ordered him to stop operating jitney vehicles, and he could not and did not drive one after 1996. His 1997 MPR stated that he had minimal use of his right hand with minimal grasping, and could perform no duties driving jitney vehicles. These restrictions remain unchanged.

Consequently, Plaintiff does not offer sufficient evidence to show he was qualified for the 2002 position because he does not refute the fact that using a jitney vehicle was an essential function for the 2002 Bridgeport position, and it is undisputed that the Plaintiff is unable to use a jitney vehicle. [12] [*35] **HN13** "Employers formulate jobs to fit the needs of their enterprises . . . [and] the essential character of a particular job qualification is therefore a matter of judgment and opinion." Shannon, 332 F.3d at 102-03. It is clear that Plaintiff did not drive a jitney vehicle due to his medical restrictions between the 1996 injury and the 2001 layoff, and this modification was a departure from the normal duties performed by other Fork Lift Operators. Plaintiff does [*34] not point to any facts that suggest a Fork Lift Operator could perform his job exclusively with a fork truck, without passing jitney vehicle duties on to other Operators. And as the record indicates, Fork Lift Operator duties could vary depending on the facility, shift, and time period. Nothing in the record states that an open recall position should only include duties identical to those performed by the employee in that position prior to a layoff. [13] The limited personnel in the Bridgeport facility, along with the fact that the time and place in which Plaintiff worked from 1996 to 1998 allowed certain modifications to be made to the position, is sufficient to show that driving a jitney vehicle was an essential function.

Plaintiff also claims that Defendant's failure to recall him for the 2002 Bridgeport position is discriminatory because Defendant did not make any attempt to reasonably

---

[11]   Additionally, Plaintiff admits that he did not know the details of the open Bridgeport position, did not ask, and assumed the duties would be the same as they were four years earlier in Stratford. (56(a)(2) Statement PP 51-52.)

[12]   Plaintiff's assertion that he was cleared by the Sikorsky medical department in 2002 to return to work as a Forklift Operator is based upon a MPR Work Sheet, dated February 26, 2002 and attached to Plaintiff's Brief as Exhibit 8. However, the worksheet is not signed by a doctor and states on its face that "THIS IS NOT A PERMANENT RECORD." Plaintiff does not offer any reason why the Court should credit the worksheet as evidence that Plaintiff was qualified for the open position. The MPR Work Sheet is simply a worksheet. Though it appears Plaintiff was initially cleared for work with restrictions on this handwritten form, it was subsequently amended by hand to read "Placement NOT Accepted." The document is not a finalized MPR that returns an employee to work.

[13]   The Court notes that engaging in an analysis of duties and essential functions that a recalled employee can be expected to perform requires interpretation of the terms of the CBA, and would therefore be preempted by § 301 of the LMRA.

accommodate the Plaintiff's restrictions. *HN14* "The CFEPA has also been interpreted to require an employer to reasonably accommodate disabled employees." Hill, 266 F. Supp. 2d at 364. However, it is well established that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon, 332 F.3d at 100 (citation omitted).

Plaintiff suggests that Sikorsky could make a reasonable accommodation by eliminating jitney vehicle responsibilities or requiring the more senior Fork Lift Operator in Bridgeport in 2002 to use the jitney vehicle when necessary. However, the law clearly does not require Defendant to accommodate [*36] Plaintiff's physical disability by eliminating essential functions from the job, and Plaintiff does not cite any authority that suggests otherwise. See Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 140 (2d Cir. 1995) ("Individuals whose physical condition precludes them from engaging in heavy lifting, and who seek jobs for which such lifting is shown to be an essential function, need not be accommodated by shifting responsibility for the lifting to other individuals.") (citation omitted); Gilbert v. Frank, 949 F.2d 637, 643-44 (2d Cir. 1991) (holding that employee's suggestion that other workers could lift mailbags that were too heavy for him was not a reasonable accommodation because it eliminated an essential function of the job); Drew v. Sears, Roebuck & Co., No. 3:95cv1746 (PCD), 1997 U.S. Dist. LEXIS 23843 (D. Conn. 1997) (holding that employee must be able to perform the required functions of a position with the accommodation suggested, and employer is not required to modify the actual duties of the job for employee). As the Second Circuit stressed in Borkowski, *HN15* a plaintiff must show an accommodation is available that [*37] allows the plaintiff to perform the essential functions of the job by introducing evidence that such an accommodation exists and would permit the employee to perform the job at the same level as a non-disabled employee. 63 F.3d at 141. [14]

Aside from the accommodations referenced above which eliminate an essential function of the job, Plaintiff has not identified other effective and reasonable accommodations that potentially render him otherwise qualified for the position. *HN16* To withstand a motion for summary judgment, the Plaintiff must identify a reasonable [*38] accommodation which, if implemented, would permit him to perform the essential functions of the job. See Kennedy

v. Dresser Rand Co., 193 F.3d 120, 122 (2d Cir. 1999), cert. denied, 528 U.S. 1190, 120 S. Ct. 1244, 146 L. Ed. 2d 103 (2000). Because Plaintiff has failed to meet this burden and establish a genuine issue of material fact as to his qualifications for the 2002 Bridgeport recall position, summary judgment is granted to Defendants on Count I and the 2002 Recall.

## 2. 2003 Recall

With regard to the 2003 recall in Shelton, Plaintiff's Opposition is devoid of any arguments that contradict Defendant's assertions. From the Facts section of Plaintiff's Opposition, however, it appears as though Plaintiff claims Defendant's request that he see a hand specialist was unreasonable, because Sikorsky had not requested such an opinion before. The Plaintiff does not cite any authority to suggest that it was unreasonable for Dr. Mongillo and Sikorsky to make this request, however. Plaintiff admits that Dr. Mongillo would allow him to see another doctor for the evaluation, as long as it was a hand specialist. Additionally, the undisputed evidence [*39] indicates that it was Plaintiff's failure to answer five separate letters requesting medical records and his refusal to see a hand specialist that led to Sikorsky's assumption that Plaintiff no longer sought employment at Sikorsky in December 2003. Peters has not come forth with any explanation that would provide legal justification for his own failure to participate in the process.

Therefore, Plaintiff has not offered sufficient evidence regarding the 2003 Recall to meet the burden of a *prima facie* case of discrimination. Statements found in the Facts Section of his Opposition seem to attempt to create a genuine issue of material fact that he was qualified for the 2003 Shelton position. Plaintiff claims that although Sikorsky expressed reservations about his ability to perform the job in 2003, these concerns were not genuine because they were not expressed at the time the Plaintiff returned to work after his injury in 1996. (56(a)(2) Statement P 60.) Plaintiff does not, however, offer any support for his assertion that a request for a specialized medical examination seven years later is unreasonable. Comparing the situation in 1996 to that in 2003, with respect to a position [*40] with different though analogous duties, does not create an issue of fact sufficient to survive summary judgment.

Furthermore, Plaintiff does not contradict the legal authorities Defendant cites which state that *HN17* the ADA envisions

---

[14]   To the extent that Plaintiff suggests that Sikorsky should have measured his qualifications against the modified position he held in the Stratford facility, the Seventh Circuit has held that an employee's qualifications must be measured against the duties of his original position and not a temporary or modified position assigned as a result of injury. Malabarba v. Chicago Tribune Co., 149 F.3d 690, 696 (7th Cir. 1998).

an "interactive process," whereby employers and employees work together to evaluate whether an employee's disability can be reasonably accommodated. Jackan v. N.Y. State DOL, 205 F.3d 562, 566 (2d Cir. 2000). [15] Courts construing ADA claims recognize that medical inquiries may be necessary where an employer has genuine reason to doubt whether that employee can perform job-related functions. Donofrio v. N.Y. Times, 99 Civ. 1576 (RCC)(JCF), 2001 U.S. Dist. LEXIS 13788 at *20-21 (S.D.N.Y. 2001), magistrate's decision adopted by, 2002 U.S. Dist. LEXIS 2399 (S.D.N.Y. 2002). Since Plaintiff failed to submit to the independent examination requested by Defendant to determine what positions Plaintiff could qualify for, he cannot prove his *prima facie* case of discrimination. See 2001 U.S. Dist. LEXIS 13788, [WL] at *22; Thompson v. City of N.Y., 98 Civ. 4725 (GBD), 2002 U.S. Dist. LEXIS 23675 at *26 (S.D.N.Y. 2002).

[*41] Accordingly, this Court finds that the plaintiff has not met his burden of establishing a *prima facie* case of discrimination under the CFEPA with regard to either the 2002 Recall or the 2003 Recall. Summary judgment is appropriate in favor of Defendant on Count I entirely.

## B. Count II: Breach of Contract

Count II of the Amended Complaint for breach of the CBA is completely preempted by § 301 of the LMRA, and this is not disputed. *HN18* The Court must construe and interpret the terms and provisions of the CBA to decide Plaintiff's breach of contract claim and therefore, it is well settled that federal labor law preempts the state law claim. See, e.g., Allis-Chalmers Corp., 471 U.S. at 211 ("Questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law."); Caterpillar, Inc. v. Williams, 482 U.S. 386, 394, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987); Williams, 322 F. Supp. 2d at 183-84.

However, Defendant argues that Plaintiff's claims preempted

by § 301 of the LMRA are also barred [*42] by a six-month statute of limitations. The Court agrees. Plaintiff correctly notes that *HN19* a six-month statute of limitations applies to hybrid claims brought under § 301. A hybrid claim is one in which "an employee has a cause of action against both the employer and the union, where the two claims are inextricably linked, and where the case to be proved is the same against both." McKee v. Transco Products, Inc., 874 F.2d 83, 86 (2d Cir. 1989). The Supreme Court, in Delcostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 171-72, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983), determined that because there is no federal statute of limitations that expressly applies to such hybrid claims, the appropriate statute of limitations is the six-month time period provided under § 10(b) of the National Labor Relations Act (29 U.S.C. § 160(b)).

Nonetheless, Plaintiff argues that his action is not such a hybrid claim because he sues only his employer and therefore, the Connecticut six-year statute of limitations for breach of contracts should apply. *HN20* The Second Circuit, however, has concluded that a hybrid claim is presented if the plaintiff, in addition [*43] to suing the employer, can also bring a cause of action against a union for breach of the duty of fair representation (regardless of whether or not the plaintiff actually does bring the union action). McKee, 874 F.2d at 86-87. Indeed, the Plaintiff "cannot circumvent the six-month limitations period for hybrid actions by choosing to sue only [his] employer." Id. at 86. Instead, "what makes a case a 'hybrid' action against both union and employer is the nature of the *claim*, not the identity of the *parties*." Id. (emphasis in original) (internal citations and quotations omitted); see also Carrion v. Enterprise Ass'n, 227 F.3d 29, 34 (2d Cir. 2000) (following McKee in holding that a six-month statute of limitations applies to an action for breach of contract brought against the employer only); Notice v. Chanler Lewis, Inc., 333 F. Supp. 2d 28, 30-31 (D. Conn. 2004) (same). [16]

[*44] Additionally, *HN21* the Second Circuit has held that

---

[15] The Facts Section claims that an August 28, 2003 letter from Sikorsky requesting a hand specialist examination (the fourth such letter) "made clear to the Plaintiff that regardless of the report of the specialist, he would not be granted the fork lift position in Shelton." (Pl.'s Opp., Facts Section, 2nd to last ); (56(a)(2) Statement, 75.) Presumably, Plaintiff offers this letter to show that Sikorsky would not put him in the open position even if he did participate in the interactive process. However, the letter does not indicate what Plaintiff contends it does. It merely says that the requested evaluation was not tied to a specific position at Sikorsky, but any number of open positions. In fact, such language seems to indicate that Sikorsky actively tried, from May until December of 2003, to ascertain Plaintiff's exact restrictions since the Shelton position (and possible other open positions) required Plaintiff to perform duties similar to those using a jitney vehicle.

[16]

The single case Plaintiff cites to support his contention that Count II is not a hybrid claim is Cabarga Cruz v. Fundacion Eductitiva Ana G. Mendez, 822 F.2d 188 (1st Cir. 1987). However, Cruz is unpersuasive. It was decided before the relevant decisions in this jurisdiction

the mere presence of an arbitration clause in a CBA is enough to make an employee's claim a hybrid one and subject it to the six-month statute of limitations. United Auto, Aerospace and Agric. Implement Workers v. R.E. Dietz Co., 996 F.2d 592, 596 (2d Cir. 1993) ("We hold that the mere presence of an arbitration clause implicates the federal interest in prompt, private dispute resolution in labor cases and requires application of the six-month statute of limitations."); McKee, 874 F.2d at 87-88 (noting the destructive effect upon CBA arbitration provisions if employees were allowed to bring claims of breach of the agreement up to six years after the alleged violation); Ycaza v. CT Transit Stamford Div., 289 F. Supp. 2d 180, 183 (D. Conn. 2003). Section 6.17 of the CBA between the Union and Sikorsky provides for mandatory arbitration in the event a contractual grievance is not settled through the required grievance procedures. This arbitration clause subjects Plaintiff's claim for breach of the CBA to a six-month statute of limitations.

The record demonstrates that Count II for breach [*45] of contract is not timely under the applicable six-month statute of limitations. **HN22** The six-month period begins to run when the plaintiff discovers, or should have discovered, those acts that constitute the alleged violation of the agreement. E.g., Ycaza, 289 F. Supp. 2d at 183; Wilhelm v. Sunrise Ne., 923 F. Supp. 330, 337 (D. Conn. 1995) (internal citations and quotations omitted). In this action, the Plaintiff filed his first complaint with the Court in June 2004. Therefore, the LMRA claim based upon his January

2001 layoff is untimely by about three years. Defendant notified Plaintiff that he would not receive the first recall position in March 2002, and therefore the LMRA claim based upon the 2002 Recall is untimely by more than a year and a half. Likewise, Defendant notified Plaintiff that he would not receive the second recall position on or about June 15, 2003, [17] and therefore the LMRA claim based on the 2003 Recall is untimely by about six months. As a result, Plaintiff's Count II claims under § 301 of the LMRA fail as a matter of law, and Defendant is entitled to summary judgment on Count II entirely.

[*46] **IV. CONCLUSION**

The Court has considered Plaintiff's claims and finds them to be insufficient to survive Defendant's motion for summary judgment. Count I fails because Plaintiff cannot make out a *prima facie* case of discriminatory employment practices. Count II for breach of the CBA is subject to a six-month statute of limitations and since the action was not filed within six months, Plaintiff's claim fails as a matter of law.

For the reasons stated herein, Defendant's Motion for Summary Judgment is **granted**. The clerk shall close the file.

Peter C. Dorsey

United States District Judge

---

regarding hybrid claims and therefore it does not take into account the standards set forth in McKee and Carrion. Additionally, Cruz is factually distinguishable. In that case, the court held that the claim was a pure breach of contract claim against the employer, because the facts demonstrated that plaintiff had no action against the union for breach of its duty of fair representation. Cruz, 822 F.2d at 191. Peters, however, stated in his deposition that the Union did not take his claim to arbitration or pursue the grievance procedures provided in the CBA. (Peters Dep. at 79-80.) Peters, unlike the plaintiff in Cruz, does have a possible claim against the Union for its failure to pursue his grievance, pursuant to the CBA. See Allocco v. Dow Jones & Co., No. 02 Civ. 1029 (LMM), 2002 U.S. Dist. LEXIS 11690 at *21-22 (S.D.N.Y. June 27, 2002) ("Even though Allocco chose not to bring suit against the Union, it is clear from his allegations regarding the Union's failure to pursue his grievance that he has a fair representation claim against the Union."), citing McKee, 874 F.2d at 86-87.

[17]   Am. Compl. P 11.