UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| CURTIS REDDICK | : | CIVIL ACTION |
| | : | NO. 3:13-CV-01140 WWE |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY, ET AL | : | |
| | : | |
| DEFENDANTS | : | JULY 30, 2015 |

## AFFIDAVIT OF BROCK T. DUBIN

I, Brock T. Dubin, upon my oath, depose and state as follows:

1.     I am over the age of eighteen years and believe in the obligation of an oath.

2.     I am a member of the Bar of this Court and a partner with the law firm of Donahue, Durham & Noonan, P.C., attorneys for the defendant, Yale University.

3.     Annexed hereto as Exhibit 1 are true and accurate copies of relevant portions of the August 20, 2014 deposition of Charles Nixon.

4.     Annexed hereto as Exhibit 2 are true and accurate copies of relevant portions of the June 13, 2014 deposition of Curtis Reddick.

5.     Annexed hereto as Exhibit 3 are true and accurate copies of relevant portions of the September 30, 2014 deposition of Curtis Reddick.

Dated: Guilford, Connecticut
      July 30, 2015

                                 Brock T. Dubin


STATE OF CONNECTICUT     )
                               ) ss. Guilford

COUNTY OF NEW HAVEN    )


Subscribed and sworn to before me this 30th day of July, 2015

                                 Notary Public

                                    MAURA G. BLACK
                                    NOTARY PUBLIC
                          MY COMMISSION EXPIRES 12/31/18

DEFENDANT
YALE UNIVERSITY


By:_____/s/_____
     BROCK T. DUBIN – CT1877
     DONAHUE, DURHAM & NOONAN, P.C.
     Concept Park, Suite 306
     741 Boston Post Road
     Guilford, CT   06437
     Telephone:  (203) 458-9168
     Fax:  (203) 458-4424
     Email:  bdubin@ddnctlaw.com

## CERTIFICATION

I hereby certify that on July 30, 2015 a copy of the foregoing Affidavit of Brock T. Dubin was filed electronically and served by mail on anyone unable to accept electronic mail. Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated in the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
BROCK T. DUBIN

# EXHIBIT 1

1

1        UNITED STATES DISTRICT COURT

2          DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * * * * *

4    CURTIS REDDICK,                    *

5              Plaintiff              *

6          vs                          *

7    YALE UNIVERSITY, THE FEDERATION   * Civil Action No.:

8    OF UNIVERSITY EMPLOYEES,          * 3:13-CV-0114(RNC)

9    LOCAL 35, UNITE HERE, AFL-CIO,    *

10   AND MEG RICCIO,                   *

11             Defendants             *

12   * * * * * * * * * * * * * * * *

13

14         DEPOSITION OF CHARLES NIXON

15

16   Taken pursuant to the Federal Rules of Civil Procedure,

17   held at the LAW OFFICES OF DONAHUE, DURHAM & NOONAN,

18   741 Boston Post Road, Guilford, Connecticut, before

19   Cynthia Trotta, License #SHR.0050, a Registered

20   Professional Reporter and a Notary Public in and for the

21   State of Connecticut, on WEDNESDAY, AUGUST 20, 2014,

22   commencing at 10:11 a.m.

23

24

25

87

1  for work, and I had to instruct him not to report for

2  work due -- from Joe Realejo, by my manager, my

3  immediate manager.

4       Q      Do you know how long he was suspended for?

5       A      I believe it might have been for the rest of

6  the month or -- either the rest of the month or the

7  rest -- the rest of the week or the rest of the month.

8  It was a period of time.  I don't recall exactly how

9  long.

10      Q      And you don't recall any other time while

11 you were employed at Yale that you were asked to

12 suspend Mr. Reddick?

13      A      It may have been.  I don't recall which

14 time, but it may have been.

15      Q      And why is it you were asked to suspend Mr.

16 Reddick on or about September 19th?

17      A      "Continued disregard of the department's

18 policy of not allowing persons with restrictions to

19 return to work cannot continue."  So --

20      Q      Were you ever aware that there was a policy

21 in place at Yale prohibiting people with restrictions

22 from working?

23      A      I've never seen one, actually, policy.

24      Q      Has that -- was that ever discussed with you

25 as pertained to employees other than Mr. Reddick?

89

1    regarding their restriction.

2        Q      Did you participate in a discussion

3    regarding reasonable accommodations for employees who

4    presented to work with restrictions?

5        A      E-mails, phone conversations, that's what --

6    I can't -- that's what I -- I'm not sure what you're

7    referring to with "discussions."  Were they formal

8    meeting discussions, or did I have a conversation with

9    somebody on the phone?  Yes.  I spoke to Ruth DeAngelo

10   or Valerie Stanley, yes.

11       Q      Okay.  And that pertained to other

12   employees, not just Mr. Reddick?

13       A      Not just Mr. Reddick, that's right.

14       Q      So, if I understand correctly, an employee

15   comes to work with some type of imposed restriction by

16   a medical provider, yes?

17       A      Right, yes.

18       Q      At that point a discussion ensues within

19   Yale as to whether that employee can be reasonably

20   accommodated, correct?

21       A      That's correct.

22       Q      And is it -- is it correct that if they

23   could not be reasonably accommodated, they would be

24   told not to work?

25       A      That's correct.

90

1     Q     And if they could be reasonably

2 accommodated, they would be allowed to work?

3     A     That's correct.

4     Q     And if they were told they could not work,

5 they were sent home, correct?

6     A     Yes.

7     Q     But that would not be counted as some type

8 of absenteeism from work, correct?

9     A     Yes, it is.  If you're not at work, you're

10 absent, and that goes against you.

11     Q     I see.  And do you believe that Mr.

12 Reddick's -- withdrawn.

13          Do you know how many times Mr. Reddick was

14 absent from work while you were employed by Yale?

15     A     Not exactly, no.

16     Q     Was it more than one day?

17     A     Yes.

18     Q     Was it more than ten days?

19     A     There may have been times, yeah, with his,

20 you know -- with his episodes.

21     Q     You were his supervisor, correct?

22     A     Yes.

23     Q     And it's fair to say Mr. Reddick was absent

24 from work quite a bit?

25     A     Yeah -- yes.

# EXHIBIT 2

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X

CURTIS REDDICK,                              :

                 PLAINTIFF,       :

           VS.                      :CIVIL ACTION NO.:

YALE UNIVERSITY, ET AL,              3:13 CV 01140 RNC

            DEFENDANTS.        :

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ X


DEPOSITION OF CURTIS REDDICK, taken at the law

offices of Williams, Walsh & O'Connor, 37 Broadway,

North Haven, Connecticut, before Jennifer Tramontano, a

Licensed Shorthand Reporter and Notary Public, in and

for the State of Connecticut, on Friday, June 13, 2014,

at 9:09 a.m.


DEL VECCHIO REPORTING SERVICES, L.L.C.
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CONNECTICUT 06443
(203) 245-9583    (800) 839-6867
FAX (203) 245-2760


HARTFORD          NEW HAVEN          STAMFORD

1    restrictions were lifted?

2        A    Immediately, yes.

3        Q    Okay.   Until the restrictions were lifted;

4    correct?

5        A    Yes.

6        Q    Okay, and you went to your doctor?

7        A    I went to my doctor.

8        Q    Okay, and the restrictions were lifted?

9        A    The restrictions were lifted, yes.

10       Q    And then you went back to work?

11       A    Yeah.   I went back to work after that, yes.

12       Q    Okay.   Now, you said that that constitutes

13   discrimination?

14       A    Yes, because I had a medical condition.   That

15   wouldn't happen, and I feel that it was -- that I lost

16   wages because of that very reason, and I also -- I also

17   felt that when I had restrictions before, I was

18   accommodated, and I never was -- it wasn't a problem

19   then, and why is it a problem now?

20       Q    Let me ask you this:   Did you, during this

21   April 7, 2011 meeting with Gray Mitchell, say "I need an

22   accommodation"?

23       A    Yes, I asked for accommodation.

24       Q    What accommodation did you ask for?

25       A    I asked for accommodation for me doing the job

1    because of me not being able to use my arm, because it

2    was in my arm that I had fluid in my arm.

3        Q     So, this is the fluid in the arm episode

4    you're claiming that occurred on April 11 -- in April of

5    2011?

6        A     Yeah, yes.

7        Q     Was the fluid in your arm, does that in any

8    way relate to the spasms that you have, or is that a

9    different medical condition?

10       A     No, it's to the same thing that I have, the

11   spasms.  I get -- like I said, it affects my system.

12       Q     What is the accommodation that you asked for?

13   I didn't understand the accommodation that you asked

14   for.

15       A     Well, the accommodation I asked for was to be

16   able to do things that -- which I had in the past, like

17   light stuff, like, you know, doing, like I said, setting

18   up different functions.  Those are light things I could

19   do, also assist -- getting the assistance which I asked,

20   which Lavene is on the job and stuff, so I asked for a

21   helper, a buddy, which is a buddy system where you can

22   get assistance for if you have any type of problem,

23   medical problem or something, or if you need some

24   assistance and helping, helping in the area.

25             So, it's not that I couldn't do the essential

1    part of my job.  It's just that I needed some help

2    because I can only use that arm, the one arm.  The other

3    arm had fluid in it, so I asked for accommodation.

4         Q    So, you could not use the arm with fluid in

5    it; is that correct?

6         A    The arm that I had with fluid in it, I

7    couldn't lift more than ten pounds in that arm, but as

8    far as using it, I could use it, but as far as using it

9    to the fullest, no.

10        Q    When did this fluid develop?

11        A    When I had the -- when I had the episode.

12        Q    When was that?

13        A    That was -- let's see --

14        Q    The Complaint shows the third week of

15   February 2011; is that about right?  I'm looking at

16   Paragraph 44.

17        A    Yeah, February 11, yeah, okay.

18        Q    It doesn't say February 11.  It says the third

19   week of February 2011; is that correct?

20        A    The third week of February you said?

21             MS. GRAMLICH:  That's what it says here.

22        This is what he's reading.

23             THE WITNESS:  Let me see this.  Okay,

24        around the third week of February '11, yes.

25   BY MR. DUBIN

1      Q    Okay.  So, it was around the third week of

2  February 2011?

3      A    Yes.

4      Q    And you had an episode; correct?

5      A    Yes.

6      Q    And you used your intermittent FMLA; correct?

7      A    Yes.

8      Q    And then you returned to work on March 2;

9  correct?

10      A    Yes.

11      Q    And you had fluid in your arm; is that

12  correct?

13      A    That's true.

14      Q    And you were -- and you then had a minor

15  lifting restriction documented by your treating

16  physician; correct?

17      A    Yes.

18      Q    And you believe that lifting restriction to

19  have been ten pounds; correct?

20      A    Yes.

21      Q    Okay.  The accommodation that you wanted and

22  asked for was to use the buddy system?

23      A    Yes.

24      Q    Okay, and I think what you told me what you

25  wanted to do was, you wanted to do setup; is that what

1    you wanted to do, light duty and setting up functions?

2         A    Yeah.   Those setups basically were light where

3    I can, you know, be able to do those things, but also,

4    there are other tasks, too, that they want you to do all

5    combined together.

6              So, if you were -- if you were to have a

7    buddy, or if you had to do it, you can either -- they

8    can either assign you to do that or not assign you to do

9    that, or they can assign you to a buddy that can help

10   and assist you to take -- to take care of the tasks,

11   and, also, with the buddy system, also, there is also to

12   do things such as wash windows and stuff.

13        Q    What do the setups entail, Mr. Reddick?

14        A    The setups entail setting up the classrooms,

15   like rearranging them.   Like if you ever go to court,

16   you know, you have the different types of setups.   They

17   may want you to set up, set the chairs a certain way

18   diagonal corners and stuff like that.

19             There are other things you got to bring in the

20   room to set up, like some podiums and stuff, things like

21   that.

22        Q    So, did the setups involve moving chairs?

23        A    Yeah, light stuff, like chairs.

24        Q    How about tables?

25        A    Tables, yes, some tables, but you also have

1    someone to assist you.

2         Q    And who did you have to assist you?

3         A    Lavene, Lavene Walker.

4         Q    Is that a male or female?

5         A    Female.

6         Q    And how old is Lavene Walker?

7         A    I don't know how old she is.  I don't know how

8    old she is.

9         Q    Okay.  How tall is she?

10        A    She's about 5'6".

11        Q    Okay.  How much does she weigh, approximately,

12   do you know?

13        A    I don't know her weight.  I don't know, but

14   she been doing that for -- we've been doing that for

15   years, so she's familiar.  She can do the job.

16        Q    The accommodation that you had requested is

17   that Lavene and you, with your one arm, move the tables

18   and chairs?

19        A    Yes.

20        Q    And that accommodation was --

21        A    Yes, but also, washing windows and things like

22   that was also in the buddy system, too.

23        Q    Okay.  You returned to work after that period

24   of time, when?  I'm looking at your Complaint, again,

25   sir.  The Complaint says that it looks like it was a

# EXHIBIT 3

COPY 246

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF CONNECTICUT
 2   ----------------------------------------------

 3   CURTIS REDDICK,

 4      PLAINTIFF,

 5   VS.                        CIVIL ACTION NO:
                                3:13-CV-01140 RNC
 6   YALE UNIVERSITY, ET AL.,

 7       DEFENDANTS.

 8

 9       Deposition of CURTIS REDDICK, VOLUME III, taken

10   pursuant to Section 13-26 of the Practice Book, at

11   Donahue, Durham & Noonan, P.C., 741 Boston Post Road,

12   Guilford, Connecticut, by Sabina Lohr, Licensed

13   Shorthand Reporter and Notary Public in and for the

14   State of Connecticut, on September 30, 2014,

15   at 10:08 a.m.

16

17

18

19              SABINA LOHR
                LSR #0000131
20

21       DEL VECCHIO REPORTING SERVICES, L.L.C.
            PROFESSIONAL SHORTHAND REPORTERS
22              117 RANDI DRIVE
                MADISON, CT 06443
23       (203) 245-9583        (800) 839-6867
                FAX (203) 245-2760
24
     HARTFORD            NEW HAVEN          STAMFORD
25
```

— Del Vecchio Reporting Services —

```
 1      A.     Yes.  This one was when I came back and I
 2   was -- we had a meeting, Gray had a meeting with the
 3   whole staff.  And he said that he was relieving me from
 4   my duties and that he was giving my job to someone else.
 5   And I asked him, Why, why, why are you doing that?
 6              And he said that he can do that because his
 7   boss, Bob Young, said that Roger Goode -- I mean, Bob
 8   Young boss, Roger Goode, said that he could do that.  He
 9   can take my job and give it to someone else.  And so
10   that's what happened.
11              And then that's when I said, I think it's
12   unfair for you to do that and I feel that I was being
13   retaliated against because I filed a charge, a charge of
14   discrimination.  And I felt that that was the reason.
15      Q.     And when you say taking away your duties and
16   giving them to someone else, you still had duties within
17   the custodial job description; correct?
18      A.     Yes, but my job was taken away when I
19   specifically did --
20      Q.     You said --
21      A.     I'm sorry.  Go ahead.
22      Q.     When you said your job, you mean your
23   particular assignment was given to somebody else?
24      A.     My job -- my job duties were specifically given
25   to different -- two individuals, yes.
```

1   that were filed.  So you ultimately filed a procedural

2   complaint in this action in August 2011; is that

3   correct?

4      A.    Yes.

5      Q.    And the fact the grievance that you filed we --

6   that were submitted earlier, Exhibit 24 and 25, 24 was

7   filed on 9/11/2011?

8      A.    Yes.

9      Q.    Do you recall testifying earlier that you

10   believed -- I'm sorry.  Strike that.

11          What was the conduct on this September 1st,

12   2011 grievance?  That was against Gray Mitchell; is that

13   correct?

14      A.    Yes.

15      Q.    And what was the conduct being complained of?

16      A.    It was -- the -- the complaint was that he --

17   he -- he had gave my job -- he assigned me -- he took my

18   job away from me and gave it to two other -- two other

19   individuals, and he said that -- and I asked him why,

20   and he said that he can do that, and that Bob Young, his

21   boss, and Roger Goode said that they can do that.

22      Q.    And it's your belief that he removed you from

23   your job duties because you had made your formal filing

24   with the Commission of Human Rights?

25      A.    Yes.  And I felt that that was a retaliation

1   due to that being filed in that complaint.

2       Q.    Those grievances that we discussed earlier

3   today, have any of them been resolved?

4       A.    Actually with Gray's, no.  Because he no longer

5   works for the university at all.  So none of these were

6   resolved.

7       Q.    Okay.  Do you know whether or not any of them

8   have gone to arbitration?

9       A.    None.

10      Q.    Do you know whether or not the union took any

11  action to address these complaints that were raised in

12  the grievances?

13      A.    Well, we talked about it, but it was never

14  resolved.  And so what it was is with these -- with

15  Gray, because Gray wasn't there, he no longer worked at

16  the university, then there was no -- there was no need

17  for any -- anything because he wasn't working there

18  anymore.

19          MR. ADLER:  Could you be more specific about

20  which grievances?  Because he's pointing to these two

21  grievances.  So what are the exhibit numbers?

22      A.    Yeah, the --

23          MS. GRAMLICH:  25 and 24.

24          MR. ADLER:  Okay.

25      Q.    So from September 2011, when both of these

377

```
 1              C E R T I F I C A T E
 2         I hereby certify that I am a Notary Public in,
 3    and for the State of Connecticut, duly commissioned and
 4    qualified to administer oaths.
 5         I further certify that the deponent named in
 6    the foregoing deposition was by me duly sworn and
 7    thereupon testified as appears in the foregoing
 8    deposition; that said deposition was taken by me
 9    stenographically in the presence of counsel and reduced
10    to typewriting under my direction, and the foregoing is
11    a true and accurate transcript of the testimony.
12         I further certify that I am neither of counsel
13    nor attorney to either of the parties to said suit, nor
14    am I an employee of either party to said suit, nor of
15    either counsel in said suit, nor am I interested in the
16    outcome of said cause.
17         Witness my hand as Notary Public this 14th day
18    of October, 2014.
19
20
21
22                        Sabina Lohr
                          Notary Public
23    License #0000131
      My License Expires December 31, 2016
24    My Notary Certification Expires July 31, 2017
25
```